**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**Case No.: _____**

GOVERNMENT EMPLOYEES INSURANCE CO.,
GEICO INDEMNITY CO., GEICO GENERAL
INSURANCE COMPANY and GEICO CASUALTY CO.,

      Plaintiffs,

vs.

VLADIMIR KORCHAGIN, L.M.T., TOUCH OF
HEALTH MEDICAL CENTER, L.L.C., TOH
MANAGEMENT, L.L.C., ALENA KLOCHKO, M.D.,
DANA DALE HANSON, D.C., COMPLETE INJURY
CARE, L.L.C., CENTRAL FLORIDA CHIROPRACTIC
CARE, INC., ORLANDO CENTRAL CHIROPRACTIC,
L.L.C., FORT MYERS CENTRAL CHIROPRACTIC,
L.L.C., CHARLES PENZA, D.C., KARLA VEGA, D.C.,
ANTHONY ROLDOS, D.C., JONATHAN AROCHO,
D.C., MEGAN PEARCE, D.C., MARK BIONDI, D.C.,
REZA MOHAMMADI, D.C., MARIA
KABUSHINSKAYA, P.A., OLEG KOVALENKO, CFL
MEDICAL SUPPLIES, L.L.C., CFL DIAGNOSTIC,
L.L.C., CFL MD, L.L.C., DANIEL AMPONSAH, M.D.,
KEVIN BALL, P.A., 855LEGAL4U, INC., and
ANASTASIIA ALEKSANDROVA,

      Defendants.

_____/

**Jury Trial Demand**

## COMPLAINT

Plaintiffs, Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. (collectively "GEICO" or "Plaintiffs"), sue Defendants and allege as follows:

1.     This action seeks to recover more than $2,700,000.00 that Defendants wrongfully obtained from GEICO by submitting, and causing to be submitted, thousands of fraudulent and unlawful no-fault ("no-fault", "personal injury protection", or "PIP") insurance charges through Defendants Touch of Health Medical Center, L.L.C. ("Touch of Health"), Central Florida Chiropractic Care, Inc. ("Central Florida Chiro"), Orlando Central Chiropractic, L.L.C. ("Orlando Central Chiro"), Fort Myers Central Chiropractic, L.L.C. ("Fort Myers Chiro"), CFL Medical Supplies, L.L.C. ("CFL Medical Supplies"), CFL Diagnostic, L.L.C. ("CFL Diagnostic"), and CFL MD, L.L.C. ("CFL MD") relating to medically unnecessary, illusory, unlawful, and otherwise non-reimbursable health care services and goods, including initial examinations, follow-up examinations, diagnostic imaging services, electrodiagnostic testing services, physical therapy services,  chiropractic services, and durable home medical equipment ("HME") (collectively, the "Fraudulent Services"), that purportedly were provided to Florida automobile accident victims ("Insureds") who were eligible for coverage under GEICO no-fault insurance policies.

2.     In addition, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than $75,000.00 in pending, fraudulent PIP claims that Defendants have submitted or caused to be submitted through Touch of Health, Central Florida Chiro, Orlando Central Chiro, Fort Myers Chiro, CFL Medical Supplies, CFL Diagnostic, and CFL MD, because:

   (i)     at all relevant times (a) Touch of Health, Central Florida Chiro, Orlando Central Chiro, Fort Myers Chiro, CFL Diagnostic, and CFL MD operated in violation of  the Florida Health Care Clinic Act, Fla. Stat. § 400.990 et seq. (the "Clinic Act"); (b) Touch of Health, Orlando Central, Fort Myers Chiro, CFL Medical Supplies, CFL Diagnostic, and CFL MD operated in violation of Florida's patient brokering act, Fla. Stat § 817.505 (the "Patient Brokering

Act") and Florida law regulating advertising by chiropractors, Fla. Stat. § 460.413, F.A.C. Rule 64B2-15.001 (the "Chiropractor Advertising Laws"); (c) Touch of Health operated in violation of Florida's anti-kickback statute, Fla. Stat. § 456.054 (the "Anti-Kickback Statute"); (d) Orlando Central Chiro and Fort Myers Chiro operated in violation of Florida's Patient Self-Referral Act, Fla. Stat. § 456.053 (the "Self-Referral Act"); and (e) Touch of Health, Central Florida Chiro, Orlando Central Chiro, Fort Myers Chiro, and CFL Medical Supplies operated in violation of Florida law governing home medical equipment provider licensure (the "HME Licensing Laws"), Fla. Stat. §§ 400.93 and 408.806;

(ii)     the underlying Fraudulent Services were not medically necessary, and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(iii)    in many cases, the Fraudulent Services never were provided in the first instance; and

(iv)     the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to fraudulently inflate the charges submitted to GEICO.

3.       Defendants fall into the following categories:

(i)      Defendants Touch of Health, Central Florida Chiro, Orlando Central Chiro, Fort Myers Chiro, CFL Medical Supplies, CFL Diagnostic, and CFL MD – through which the Fraudulent Services purportedly were provided and were billed to insurance companies, including GEICO – operated in pervasive violation of, variously, Florida's Patient Brokering Act, Anti-Kickback Statute, Self-Referral Act, Clinic Act, and Chiropractor Advertising Laws.

(ii)     Defendant Vladimir Korchagin ("Korchagin") is massage therapist licensed to practice massage therapy in Florida who owned Touch of Health, and unlawfully held secret ownership interests in Orlando Central Chiro, Fort Myers Chiro, CFL Medical Supplies, CFL Diagnostic, and CFL MD.

(iii)    Defendant TOH Management, L.L.C. ("TOH Management") is a Florida limited liability company, was owned and controlled by Korchagin and had Korchagin as its sole member, and was used by Korchagin to conceal his unlawful ownership interests in Orlando Central Chiro, Fort Myers Chiro, CFL Medical Supplies, CFL Diagnostic, and CFL MD.

(iv)   Defendant Oleg Kovalenko ("Kovalenko") is not licensed in any health care professions, and falsely purported to be the sole owner and managing member of CFL Medical Supplies and CFL Diagnostic.

(v)   Defendant Daniel Amponsah, M.D. ("Amponsah") is a physician licensed to practice medicine in Florida, who falsely purported to serve as the medical director of CFL Diagnostic, and falsely purported to be the sole owner and managing member of CFL MD.

(vi)   Defendant Dana Dale Hanson, D.C. ("Hanson") is a chiropractor licensed to practice chiropractic in Florida, who purported to be the sole owner and managing member of Central Florida Chiro and Complete Injury Care, L.L.C. ("Complete Injury"), falsely purported to be the sole owner and managing member of Orlando Central Chiro and Fort Myers Chiro, and purported to perform many of the Fraudulent Services.

(vii)   Defendant Complete Injury is a Florida limited liability company that operated what purported to be a legitimate medical referral service, but actually was used to facilitate the Defendants' pervasive violation of Florida's Self-Referral Act, Clinic Act, and Chiropractor Advertising Laws.

(viii)   Defendant 855LEGAL4U, Inc. ("855LEGAL4U") is a Florida corporation that operated what purported to be a legitimate medical and legal referral service, but actually was used to facilitate the Defendants' pervasive violation of Florida's Patient Brokering Act, Anti-Kickback Statute, Self-Referral Act, Clinic Act, and Chiropractor Advertising Laws.

(ix)   Defendant Anastasiia Aleksandrova ("Aleksandrova") purported to own and control 855LEGAL4U.

(x)   Defendant Alena Klochko, M.D. ("Klochko") is a physician licensed to practice medicine in Florida, and falsely purported to serve as the medical director of Touch of Health.

(xi)   Defendants Charles Penza, D.C. ("Penza"), Karla Vega, D.C. ("Vega"), Anthony Roldos, D.C. ("Roldos"), Jonathan Arocho, D.C. ("Arocho"), Megan Pearce, D.C. ("Pearce"), Mark Biondi, D.C. ("Biondi"), and Reza Mohammadi, D.C. ("Mohammadi") are chiropractors licensed to practice chiropractic and purported to perform many of the Fraudulent Services.

(xii)   Defendant Maria Kabushinskaya, P.A. ("Kabushinskaya") is a licensed physician assistant, and purported to perform many of the Fraudulent Services at Touch of Health.

(xiii)   Defendant Kevin Ball, P.A. ("Ball") is a licensed physician assistant, and purported to perform many of the Fraudulent Services at CFL MD.

4.        As set forth below, Defendants have known that:

(i)      at all relevant times (a) Touch of Health, Central Florida Chiro, Orlando Central Chiro, Fort Myers Chiro, CFL Diagnostic, and CFL MD operated in violation of the Clinic Act; (b) Touch of Health, Orlando Central, Fort Myers Chiro, CFL Medical Supplies, CFL Diagnostic, and CFL MD operated in violation of the Patient Brokering Act and the Chiropractor Advertising Laws; (c) Touch of Health operated in violation of the Anti-Kickback Statute; (d) Orlando Central Chiro and Fort Myers Chiro operated in violation of the Self-Referral Act; and (e) Touch of Health, Central Florida Chiro, Orlando Central Chiro, Fort Myers Chiro, and CFL Medical Supplies operated in violation of the HME Licensing Laws;

(ii)     the underlying Fraudulent Services were not medically necessary, and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(iii)    in many cases, the Fraudulent Services never were provided in the first instance; and

(iv)     the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to fraudulently inflate the charges submitted to GEICO.

5.        As such, Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that were billed to GEICO through Touch of Health, Central Florida Chiro, Orlando Central Chiro, Fort Myers Chiro, CFL Medical Supplies, CFL Diagnostic, and CFL MD.

6.        The charts annexed hereto as Exhibits "1" – "7" set forth representative samples of the fraudulent claims that have been identified to date that Defendants have submitted, or caused to be submitted, to GEICO.

7. Defendants' fraudulent scheme began no later than 2014 and has continued uninterrupted since that time. As a result of Defendants' fraudulent scheme, GEICO has incurred damages of more than $2,700,000.00.

8. Defendants' fraudulent scheme is the latest in a long line of insurance fraud scams aimed at Florida consumers and insurers. They are part of an insurance fraud epidemic that – in 2014 – 2015 alone – led to almost 1,200 convictions in Florida. See Florida Department of Financial Services, Division of Insurance Fraud Annual Report for Fiscal Year 2014-2015.

## THE PARTIES

### I. Plaintiffs

9. Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company, and GEICO Casualty Co. (collectively, "GEICO") are Maryland corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in Florida.

### II. Defendants

10. Defendant Korchagin resides in and is a citizen of Florida. Korchagin was licensed to practice massage therapy in Florida in 2011. Korchagin owned and operated Touch of Health, held secret ownership interests in Orlando Central Chiro, Fort Myers Chiro, CFL Medical Supplies, CFL Diagnostic, and CFL MD, and used Touch of Health, Orlando Central Chiro, Fort Myers Chiro, CFL Medical Supplies, CFL Diagnostic, and CFL MD as vehicles to submit fraudulent no-fault billing to GEICO and other insurers.

11.     Defendant Touch of Health is a Florida limited liability company with its principal place of business in Orlando, Florida. At all times, Touch of Health falsely purported to a properly licensed health care clinic that operated in compliance with the licensing and operating requirements set forth in the Clinic Act. Touch of Health was organized in Florida on or about October 20, 2017, had Korchagin as its managing member and owner, and was used to submit fraudulent no-fault insurance billing to GEICO and other insurers.

12.     Defendant TOH Management is a Florida limited liability company with its principal place of business in Orlando, Florida. TOH Management was organized in Florida on or about May 5, 2016, had Korchagin as its managing member and owner, and was used by Korchagin to facilitate his secret ownership interests in Orlando Central Chiro, Fort Myers Chiro, CFL Medical Supplies, CFL Diagnostic, and CFL MD.

13.     Defendant Klochko resides in and is a citizen of Florida. Klochko was licensed to practice medicine in Florida in 2007, and falsely purported to serve as medical director at Touch of Health.

14.     Defendant Hanson resides in and is a citizen of Florida. Hanson was licensed to practice chiropractic in Florida in 2004, owned and operated Central Florida Chiro and Complete Injury, falsely purported to be the sole owner and managing member of Orlando Central Chiro and Fort Myers Chiro, used Central Florida Chiro, Orlando Central Chiro, and Fort Myers Chiro as vehicles to submit fraudulent no-fault billing to GEICO and other insurers, was employed by or associated with Touch of Health, and purported to perform many of the Fraudulent Services.

15. Defendant Complete Injury is a Florida limited liability company with its principal place of business in Florida, which purported to operate as a health care referral service. Complete Injury was incorporated in Florida on or about October 10, 2018, and purported to have Hanson as its sole owner and managing member. Since 2018, Complete Injury was used to facilitate the Defendants' pervasive violation of Florida's Self-Referral Act, Clinic Act, and Chiropractor Advertising Laws.

16. Defendant Central Florida Chiro is a Florida corporation with its principal place of business in Orlando, Florida. At all times, Central Florida Chiro unlawfully operated as an unlicensed health care clinic in Florida. Central Florida Chiro was incorporated in Florida on or about December 30, 2013, was owned by Hanson, and was used as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers.

17. Defendant Orlando Central Chiro is a Florida limited liability company with its principal place of business in Orlando, Florida. At all times, Orlando Central Chiro unlawfully operated as an unlicensed health care clinic in Florida. Orlando Central Chiro was organized on or about September 21, 2016, falsely purported to have Hanson as its managing member and sole owner, and was used as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers.

18. Defendant Fort Myers Chiro is a Florida limited liability company with its principal place of business in Orlando, Florida. At all times, Fort Myers Chiro unlawfully operated as an unlicensed health care clinic in Florida. Fort Myers Chiro was organized in Florida on or about November 21, 2018, falsely purported to have Hanson as its managing

member and sole owner, and was used as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers.

19.     Defendant Penza resides in and is a citizen of Florida. Penza was licensed to practice chiropractic in Florida in 2007, and purported to perform many of the Fraudulent Services at Touch of Health.

20.     Defendant Vega resides in and is a citizen of Florida. Vega was licensed to practice chiropractic in Florida in 2013, and purported to perform many of the Fraudulent Services at Central Florida Chiro and Orlando Central Chiro.

21.     Defendant Roldos resides in and is a citizen of Florida. Roldos was licensed to practice chiropractic in Florida in 2017, and purported to perform many of the Fraudulent Services at Touch of Health.

22.     Defendant Arocho resides in and is a citizen of Florida. Arocho was licensed to practice chiropractic in Florida in 2014, and purported to perform many of the Fraudulent Services at Central Florida Chiro and Orlando Central Chiro.

23.     Defendant Pearce resides in and is a citizen of Florida. Pearce was licensed to practice chiropractic in Florida in 2011, and purported to perform many of the Fraudulent Services at Fort Myers Chiro.

24.     Defendant Biondi resides in and is a citizen of Florida. Biondi was licensed to practice chiropractic in Florida in 2012, and purported to perform many of the Fraudulent Services at Touch of Health.

25.     Defendant Mohammadi resides in and is a citizen of Florida. Mohammadi was licensed practice chiropractic in Florida in 2017, and purported to perform many of the Fraudulent Services at Orlando Central Chiro.

26.     Defendant Kabushinskaya resides in and is a citizen of Florida. Kabushinskaya was licensed as a physician assistant in Florida in 2017, and purported to perform many of the Fraudulent Services at Touch of Health.

27.     Defendant Kovalenko resides in and is a citizen of Massachusetts. Kovalenko is not a physician or other health care professional, and falsely purported to be the owner and managing member of CFL Diagnostic and CFL Medical Supplies.

28.     CFL Medical Supplies is a Florida limited liability company with its principal place of business in Touch of Health and Korchagin's office in Orlando, Florida. At all times, CFL Medical Supplies falsely purported to be in compliance with the HME Licensing Laws. CFL Medical Supplies was organized in Florida on or about February 29, 2016, falsely purported to have Kovalenko as its sole owner and managing member, and was used to submit fraudulent no-fault insurance billing to GEICO and other insurers.

29.     CFL Diagnostic is a Florida limited liability company with its principal place of business in Touch of Health and Korchagin's office in Orlando, Florida. At all times, CFL Diagnostic falsely purported to a properly licensed health care clinic that operated in compliance with the licensing and operating requirements set forth in the Clinic Act. CFL Diagnostic was organized in Florida on or about December 1, 2017, falsely purported to have Kovalenko as its sole owner and managing member, and was used to submit fraudulent no-fault insurance billing to GEICO and other insurers.

30.     Defendant CFL MD is a Florida limited liability company with its principal place of business in Orlando, Florida. At all times, CFL MD unlawfully operated as an unlicensed health care clinic in Florida. CFL MD was organized in Florida on or about April 5, 2019, falsely purported to have Amponsah as its sole owner and managing member, and was used to submit fraudulent no-fault insurance billing to GEICO and other insurers.

31.     Defendant Amponsah resides in and is a citizen of Florida. Amponsah was licensed to practice medicine in Florida in 2007, falsely purported to serve as medical director at CFL Diagnostic, and falsely purported to be the sole owner and managing member of CFL MD.

32.     Defendant Ball resides in and is a citizen of Florida. Ball was licensed as a physician assistant in Florida in 2016, and purported to perform many of the Fraudulent Services at CFL MD.

33.     Defendant Aleksandrova resides in and is a citizen of Florida. Aleksandrova owned and controlled 855LEGAL4U, and used 855LEGAL4U to facilitate the Defendants' pervasive violation of Florida's Patient Brokering Act, Anti-Kickback Statute, and Clinic Act.

34.     Defendant 855LEGAL4U is a Florida corporation with its principal place of business in Orlando, Florida. 855LEGAL4U was incorporated in Florida on or about January 23, 2015, purported to operate a medical and legal referral service, and was owned and controlled by Aleksandrova. Since 2015, 855LEGAL4U was used to facilitate the Defendants' pervasive violation of Florida's Patient Brokering Act, Anti-Kickback Statute, and Clinic Act.

## JURISDICTION AND VENUE

35.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the total matter in controversy, exclusive of interest and costs, exceeds the jurisdictional threshold of $75,000.00, and is between citizens of different states.

36.     This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act).

37.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

38.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Middle District of Florida is the District where one or more of Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS

**I.      An Overview of the Pertinent Law Governing No-Fault Insurance Reimbursement**

**A.      The Florida No-Fault Law**

39.     Florida has a comprehensive statutory system designed to ensure that motor vehicle accident victims are compensated for their injuries.  The statutory system is embodied within the Florida Motor Vehicle No-Fault Law (the "No-Fault Law", Fla. Stat. §§ 627.730-627.7405), which requires automobile insurers to provide Personal Injury Protection benefits ("PIP Benefits") to Insureds.

40.     Under the No Fault Law, an Insured can assign his or her right to PIP Benefits

to health care services providers in exchange for those services. See Fla. Stat. § 627.736. Pursuant to a duly executed assignment, a health care services provider may submit claims directly to an insurance company in order to receive payment for medically necessary services, using the required claim forms, including the Health care Financing Administration insurance claim form (known as the "HCFA-1500 form"). See id.

**B.     No-Fault Reimbursement and Compliance with Florida Law Governing Health care Practice**

41.     In order for a health care service to be eligible for PIP reimbursement, it must be "lawfully" provided. See Fla. Stat. § 627.736.

42.     Pursuant to the No-Fault Law, "lawful" or "lawfully" means "in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of state and federal law related to the provision of medical services or treatment." See Fla. Stat. § 627.732.

43.     Thus, health care services providers, including clinics licensed under the Clinic Act, may not recover PIP Benefits for health care services that were not provided in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of Florida and federal law related to the provision of the underlying services or treatment – including, among other things, the Clinic Act, Self-Referral Act, Patient Brokering Act, HME Licensing Laws, and Chiropractor Advertising Laws.

44.     By extension, insurers such as GEICO are not required to make any payments of PIP Benefits for health care services that were not provided in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of Florida and federal law related to the provision of the underlying services or treatment.

C.      **No-Fault Reimbursement and the Clinic Act**

45.     Subject to certain limited exceptions, a license issued by the Florida Agency for Health Care Administration is required in order to operate a clinic in Florida. See Fla. Stat. § 400.991(1)(a). The Clinic Act defines "clinic" to mean "an entity where health care services are provided to individuals and which tenders charges for reimbursement for such services, including a mobile clinic and a portable equipment provider." See Fla. Stat. § 400.9905.

46.     However, the Clinic Act provides an exemption from the clinic licensing requirements for:

> A sole proprietorship, group practice, partnership, or corporation that provides health care services by licensed health care practitioners . . . that is wholly owned by one or more licensed health care practitioners, or the licensed health care practitioners set forth in this paragraph and the spouse, parent, child, or sibling of a licensed health care practitioner if one of the owners who is a licensed health care practitioner is supervising the business activities and is legally responsible for the entity's compliance with all federal and state laws. However, a health care practitioner may not supervise services beyond the scope of the practitioner's license … .

Fla. Stat. § 400.9905(4)(g)(emphasis added).

47.     In order to qualify for the "wholly owned" exemption under the Clinic Act, the licensed health care practitioner has a continuing obligation to supervise the business activities of the clinic and remain legally responsible for the entity's compliance with all federal and state laws.

48.     What is more, a clinic that does not qualify for the wholly owned exemption, and does not otherwise have a license, operates unlawfully under Florida law.

49.     Unless they are operating pursuant to an exemption from the clinic licensing requirements, clinics operating in Florida must – among other things – "appoint a medical

director or clinic director who shall agree in writing to accept legal responsibility for [certain enumerated] activities on behalf of the clinic." <u>See</u> Fla. Stat. § 400.9935(1).

50.     Among other things, a clinic medical director must "[c]onduct systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful. Upon discovery of an unlawful charge, the medical director or clinic director shall take immediate corrective action." <u>See</u> Fla. Stat. § 400.9935(1).

51.     In addition, a clinic medical director must "[e]nsure that all practitioners providing health care services or supplies to patients maintain a current active and unencumbered Florida license", and "[e]nsure that all health care practitioners at the clinic have active appropriate certification or licensure for the level of care being provided." <u>See</u> Fla. Stat. § 400.9935(1).

52.     Pursuant to the Clinic Act, clinics and their owners must disclose their ownership interests in a clinic as part of the clinic licensing application process, and clinic owners must submit to background screening if they hold more than a 5 percent ownership interest in a clinic. <u>See</u>, <u>e.g.</u>, Fla. Stat. §§ 400.991, 408.806; 59A-33.002, F.A.C.

53.     Pursuant to the Clinic Act, "[a] charge or reimbursement claim made by or on behalf of a clinic that is required to be licensed under this part but that is not so licensed, or that is otherwise operating in violation of this part, regardless of whether a service is rendered or whether the charge or reimbursement claim is paid, is an unlawful charge and is noncompensable and unenforceable. A person who knowingly makes or causes to be made an unlawful charge commits theft within the meaning of, and punishable as provided in, [Fla. Stat. §] 812.014." <u>See</u> Fla. Stat. § 400.9935(3).

54.     Thus, pursuant to both the No-Fault Law and the Clinic Act, clinics that operate in violation of the Clinic Act's medical director, ownership disclosure, or other operating requirements are not entitled to collect PIP Benefits, whether or not the underlying health care services were medically necessary or actually provided.

55.     By extension, insurers such as GEICO are not required to make any payments of PIP Benefits to clinics that operate in violation of the Clinic Act's medical director, ownership disclosure, or other requirements, <u>whether or not the underlying health care services were medically necessary or actually provided.</u>

**D.     No-Fault Reimbursement and the HME Licensing Laws**

56.     Under Florida law, subject to limited exceptions not applicable here, entities providing home use HME must be licensed by the Florida Agency for Health Care Administration. <u>See</u> Fla. Stat. § 400.93(1).

57.     Pursuant to Fla. Stat. §§ 400.93 and 408.806, HME providers and their owners must disclose their ownership interests in a HME provider as part of the licensing process.

58.     Moreover, pursuant to Fla. Stat. § 400.957, "[c]ompliance with state and federal laws regarding prohibited patient referrals and rebates shall be a condition of licensure" for HME providers.

59.     HME providers that operate in violation of Florida licensing requirements, including ownership disclosure, or other operating requirements are not entitled to collect PIP Benefits, whether or not the underlying equipment was medically necessary or actually provided.

60.    By extension, insurers such as GEICO are not required to make any payments of PIP Benefits to HME providers that operate in violation of Florida law's licensure, ownership disclosure, or other requirements, whether or not the underlying health care services were medically necessary or actually provided.

**E.    No-Fault Reimbursement and the Patient Brokering Act and Anti-Kickback Statute**

61.    Florida's Patient Brokering Act, Fla. Stat. § 817.505, broadly prohibits any person from offering, paying soliciting, or receiving any commission, bonus, rebate, kickback, or bribe – directly or indirectly, in cash or in kind – or from engaging in any fee-splitting arrangement of any type whatsoever, to either induce a patient referral or in exchange for a patient referral.

62.    What is more, the Patient Brokering Act makes it unlawful for any person to "aid, abet, advise, or otherwise participate" in such conduct.

63.    Though the Patient Brokering Act contains a limited exception for "a health … information service that provides information upon request and without charge to consumers about providers of health care goods or services to enable consumers to select appropriate providers or facilities", the limited exception does not apply unless – among other things – the health information service:

(i)    does not attempt through its standard questions for solicitation of consumer criteria or through any other means to steer or lead a consumer to select or consider selection of a particular health care provider or health care facility;

(ii)    does not provide or arrange for transportation of a consumer to or from the location of a health care provider or health care facility; and

(iii)    charges and collects fees from a health care provider or health care facility participating in its services that are set in advance, are consistent with the fair

> market value for those information services, and are not based on the potential value of a patient or patients to a health care provider or health care facility or of the goods or services provided by the health care provider or health care facility.

See Fla. Stat. § 817.505(3)(i).

64.     Florida's Anti-Kickback Statute, Fla. Stat. § 456.054, prohibits any health care provider from offering, paying, soliciting, or receiving a kickback, directly or indirectly, overtly or covertly, in cash or in kind, for referring or soliciting patients.

65.     Pursuant to Section 456.054, violations of the Anti-Kickback Statute also constitute violations of the Patient Brokering Act.

66.      Clinics and other health care providers that operate in violation of the Patient Brokering Act or Anti-Kickback Statute are not entitled to collect PIP Benefits, whether or not the underlying health care services were medically necessary or actually provided.

67.     By extension, insurers such as GEICO are not required to make any payments of PIP Benefits to clinics and other health care providers that operate in violation of the Patient Brokering Act or Anti-Kickback Statute, whether or not the underlying health care services were medically necessary or actually provided.

**F.      No-Fault Reimbursement and the Self-Referral Act**

68.     Florida's Patient Self-Referral Act, Fla. Stat. § 456.053, prohibits health care providers from referring patients for certain designated health care services to any entity in which the health care provider is an investor or has an investment interest.

69.     In this context, licensed chiropractors are defined as "health care providers" under the Self-Referral Act, and "designated health services" include physical therapy and diagnostic imaging services.

70.     The Self-Referral Act also provides that:

Any health care provider or other entity that enters into an arrangement or scheme, such as a cross-referral arrangement, which the physician or entity knows or should know has a principal purpose of assuring referrals by the physician to a particular entity which, if the physician directly made referrals to such entity, would be in violation of this section, shall be subject to a civil penalty of not more than $100,000 for each such circumvention arrangement or scheme to be imposed and collected by the appropriate board.

See Fla. Stat. § 456.053(5)(f).

71.     Pursuant to the Self-Referral Act, clinics and other health care providers may not submit any claim for payment to any insurer for services rendered pursuant to an unlawful self-referral. See Fla. Stat. § 456.053(5)(c).

72.     What is more, clinics and other health care providers that collect payments for services rendered pursuant to unlawful self-referrals must "refund such amount on a timely basis". See Fla. Stat. § 456.053(5)(d).

73.     More generally, insurers such as GEICO are not required to make any payments of PIP Benefits to clinics and other health care providers that operate in violation of the Self-Referral Act, whether or not the underlying health care services were medically necessary or actually provided.

**G.     No-Fault Reimbursement and the Chiropractor Advertising Laws**

74.     Florida law regulates advertising by chiropractors, and prohibits chiropractors from – among other things – advertising "under a name other than one's own", engaging in "[f]alse, deceptive, or misleading advertising", and "[s]oliciting patients either personally or through an agent, unless such solicitation falls into a category of solicitations approved by rule of the board [of chiropractic medicine]". See Fla. Stat. § 460.413.

75.     Similarly, the Florida Board of Chiropractic has promulgated various rules regarding chiropractor advertising. Among other things, these rules:

    (i)    prohibit chiropractors from disseminating or causing the dissemination of any advertisement or advertising which is in any way fraudulent, false, deceptive or misleading;

    (ii)    prohibit chiropractors from disseminating or causing the dissemination of any advertisement or advertising which contains a reference to any other degree such as "M.D." or "D.O." unless  the chiropractor has actually received such a degree or certification; and

    (iii)    prohibit chiropractors from disseminating or causing the dissemination of any advertisement or advertising which contains a representation that the chiropractor has received any license or recognition from the State of Florida which is superior to the license and recognition granted to any chiropractor.

See F.A.C. Rule 64B2-15.001.

76.     Chiropractors, clinics, and other health care providers that operate in violation of the Chiropractor Advertising Laws are not entitled to collect PIP Benefits, whether or not the underlying health care services were medically necessary or actually provided.

77.     Likewise, insurers such as GEICO are not required to make any payments of PIP Benefits to clinics and other health care providers that operate in violation of the Chiropractor Advertising Laws, whether or not the underlying health care services were medically necessary or actually provided. See, e.g., Med. Serv. Ctr. of Fla., supra; Silver Star Health & Rehab, Inc., supra.

**H.     No-Fault Reimbursement and Medical Necessity**

78.     Pursuant to the No-Fault Law, insurers such as GEICO are only required to pay PIP Benefits for medically necessary services. See Fla. Stat. § 627.736. Concomitantly, a

health care services provider, including a clinic organized under the Clinic Act, is only eligible to receive PIP Benefits for medically necessary services. Id.

79.     Pursuant to the No-Fault Law, "medically necessary" means:

a medical service or supply that a prudent physician would provide for the purpose of preventing, diagnosing, or treating an illness, injury, disease, or symptom in a manner that is:

(a) In accordance with generally accepted standards of medical practice;

(b) Clinically appropriate in terms of type, frequency, extent, site, and duration; and

(c) Not primarily for the convenience of the patient, physician, or other health care provider.

See Fla. Stat. § 627.732.

**I.      No-Fault Billing and No-Fault Reimbursement**

80.     Pursuant to the No-Fault Law, insurers such as GEICO are not required to pay PIP Benefits:

(i)      for any service or treatment that was not lawful at the time rendered;

(ii)     to any person who knowingly submits a false or misleading statement relating to the claim or charges;

(iii)    for any treatment or service that is upcoded; or

(iv)    with respect to a bill or statement that does not substantially meet the billing requirements set forth in the No-Fault Law.

See Fla. Stat. § 627.736.

81.     The No-Fault Law's billing requirements provide – among other things – that all PIP billing must, to the extent applicable, comply with the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms, as well

as the guidelines promulgated by the American Medical Association ("AMA") in connection with the use of current procedural terminology ("CPT") codes. <u>See</u> Fla. Stat. § 627.736.

**II.     Defendants' Fraudulent Scheme**

82.     Since at least 2014, and continuing through the present day, the Defendants masterminded and implemented a fraudulent scheme in which they billed GEICO millions of dollars, or caused GEICO to be billed millions of dollars, for medically unnecessary, illusory, and otherwise non-reimbursable services.

**A.     The Violations of the Clinic Act**

83.     As part of the Defendants' fraudulent scheme, Touch of Health, Central Florida Chiro, Orlando Central Chiro, Fort Myers Chiro, CFL Diagnostic, and CFL MD operated in pervasive violation of the Clinic Act.

84.     Touch of Health, Central Florida Chiro, Orlando Central Chiro, Fort Myers Chiro, CFL Diagnostic, and CFL MD were "clinics" within the meaning of the Clinic Act, in that they were entities "where health care services are provided to individuals and which tenders charges for reimbursement for such services".

85.     However, at all relevant times, Touch of Health and CFL Diagnostic operated in violation of the Clinic Act in that they never had legitimate medical directors as required by the Clinic Act.

86.     Moreover, Central Florida Chiro, Orlando Central Chiro, Fort Myers Chiro, and CFL MD operated as health care clinics without licenses from the Agency for Health Care Administration and without legitimate exemptions from the licensure requirements of

the Clinic Act and, as a result, operated as unlicensed health care clinics in violation of the Clinic Act.

**1.     The Unlawful Operation of Orlando Central Chiro in Violation of the Clinic Act**

**a.     Korchagin's Secret and Unlawful Ownership Interest in Orlando Central Chiro**

87.     As set forth above, at all relevant times, Hanson – a licensed chiropractor – purported to be the sole owner and managing member of Orlando Central Chiro.

88.     However, at all relevant times, Korchagin held a secret and unlawful ownership interest in Orlando Central Chiro.

89.     In keeping with the fact that Korchagin held a secret and unlawful ownership interest in Orlando Central Chiro, Hanson – who also worked for Korchagin at Touch of Health – ceded total control over Orlando Central Chiro's business operations to Korchagin.

90.     For example, Korchagin and TOH Management – which was owned and controlled by Korchagin – were responsible for generating and submitting virtually all of Orlando Central Chiro's fraudulent PIP billing to GEICO and other insurers.

91.     Moreover, the return address for virtually all of the bills submitted through Orlando Central Chiro to GEICO was Korchagin, TOH Management, and Touch of Health's office located at 1405 W. Colonial Drive, Suite B, Orlando, Florida (the "Colonial Drive Office").

92.     What is more, to the extent that the Insureds receiving purported treatment at Orlando Central Chiro were referred for MRI services between June 2018 and the present, Hanson – at Korchagin's direction – caused virtually every such Insured to be referred to CFL

Diagnostic, which was also secretly owned by Korchagin, and which also operated out of Korchagin's Colonial Drive Office.

93.     Furthermore, to the extent that the Insureds receiving purported treatment at Orlando Central Chiro were referred to a vendor for HME, Hanson – at Korchagin's direction – caused virtually every such Insured to be referred to CFL Medical Supplies, which was also secretly owned by Korchagin, and which also operated out of Korchagin's Colonial Drive Office.

94.     In addition, the pre-determined treatment protocol and billing codes employed by Hanson, Korchagin, Vega, Mohammadi, and Arocho at Orlando Central Chiro was virtually identical to the pre-determined treatment protocol and billing codes employed by Korchagin at Touch of Health.

95.     Because Orlando Central Chiro was never "wholly owned" by a licensed health care practitioner, Orlando Central Chiro never qualified for the exemption from licensure as a "health care clinic" set forth in Section 400.9905(4)(g), and was not otherwise licensed as a health care clinic. As a result, Orlando Central Chiro operated – at all relevant times – in violation of the Clinic Act.

**b.     The Unlawful Operation of Orlando Central Chiro Without Supervision by Hanson**

96.     Even if Orlando Central Chiro had been solely owned by Hanson – and it was not – Hanson never legitimately supervised the business activities of Orlando Central Chiro, inasmuch as Hanson never conducted reviews of the billing or treatment records from Orlando Central Chiro to ensure that the billing was not fraudulent or unlawful, and never

even made an attempt to discover the unlawful charges submitted through Orlando Central Chiro.

97.     Indeed, given the fraudulent treatment and billing protocol described below – which was pervasive across all of the billing submitted to GEICO through Orlando Central Chiro – there is simply no way that Hanson could have legitimately supervised the business activities of Orlando Central Chiro to ensure that the billing was not fraudulent or ensure compliance with all applicable federal and state laws as required by the Clinic Act.

98.     Had Hanson legitimately supervised the business activities of Orlando Central Chiro, Hanson would have noted, among other things, that:

(i)     Orlando Central Chiro was – as set forth herein – operating in pervasive violation of the Clinic Act, the Patient Brokering Act, the Self-Referral Act, the HME Licensing Laws, and the Chiropractor Advertising Laws;

(ii)     the Fraudulent Services purportedly provided by and billed through Orlando Central Chiro were not medically necessary, and were provided – to the extent that they were provided at all –and pursuant to a pre-determined fraudulent protocol;

(iii)     in many cases, the Fraudulent Services purportedly provided by and billed through Orlando Central Chiro never were provided in the first instance; and

(iv)     the billing codes used for the Fraudulent Services purportedly provided by and billed through Orlando Central Chiro misrepresented and exaggerated the level of services that purportedly were provided in order to fraudulently inflate the charges submitted to GEICO.

99.     Accordingly, Orlando Central Chiro never qualified for the exemption from licensure as a "health care clinic" set forth in Section 400.9905(4)(g). Nor did Orlando Central Chiro have a medical director or a clinic license as required for a health care clinic without an exemption. As a result, Orlando Central Chiro operated – at all relevant times – in violation of the Clinic Act.

**2.      The Unlawful Operation of Fort Myers Chiro in Violation of the Clinic Act**

**a.      Korchagin's Secret and Unlawful Ownership Interest in Fort Myers Chiro**

100.    As set forth above, at all relevant times, Hanson – a licensed chiropractor – purported to be the sole owner and managing member of Fort Myers Chiro.

101.    However, at all relevant times, Korchagin held a secret and unlawful ownership interest in Fort Myers Chiro.

102.    In keeping with the fact that Korchagin held a secret and unlawful ownership interest in Fort Myers Chiro, Hanson – who also worked for Korchagin at Touch of Health – ceded total control over Fort Myers Chiro's business operations to Korchagin.

103.    For example, Korchagin and TOH Management – which was owned and controlled by Korchagin – were responsible for generating and submitting virtually all of Fort Myers Chiro's fraudulent PIP billing to GEICO and other insurers.

104.    Moreover, the return address for virtually all of the bills submitted through Fort Myers Chiro to GEICO was Korchagin, TOH Management, and Touch of Health's Colonial Drive Office.

105.    What is more, to the extent that the Insureds receiving purported treatment at Fort Myers Chiro were referred to a vendor for HME, Hanson – at Korchagin's direction – caused virtually every such Insured to be referred to CFL Medical Supplies, which was also secretly owned by Korchagin, and which also operated out of Korchagin's Colonial Drive Office.

106.    Moreover, the pre-determined treatment protocol and billing codes employed by Hanson, Korchagin, and Pearce at Fort Myers Chiro was virtually identical to the pre-determined treatment protocol and billing codes used by Korchagin at Touch of Health.

107.    Because Fort Myers Chiro was never "wholly owned" by a licensed health care practitioner, Fort Myers Chiro never qualified for the exemption from licensure as a "health care clinic" set forth in Section 400.9905(4)(g), and was not otherwise licensed as a health care clinic. As a result, Fort Myers Chiro operated – at all relevant times – in violation of the Clinic Act.

**b.    The Unlawful Operation of Fort Myers Chiro Without Supervision by Hanson**

108.    Even if Fort Myers Chiro had been solely owned by Hanson – and it was not – Hanson never legitimately supervised the business activities of Fort Myers Chiro, inasmuch as Hanson never conducted reviews of the billing or treatment records from Fort Myers Chiro to ensure that the billing was not fraudulent or unlawful, and never even made an attempt to discover the unlawful charges submitted through Fort Myers Chiro.

109.    Indeed, given the fraudulent treatment and billing protocol described below – which was pervasive across all of the billing submitted to GEICO through Fort Myers Chiro – there is simply no way that Hanson could have legitimately supervised the business activities of Fort Myers Chiro to ensure that the billing was not fraudulent or ensure compliance with all applicable federal and state laws as required by the Clinic Act.

110.    Had Hanson legitimately supervised the business activities of Fort Myers Chiro, Hanson would have noted, among other things, that:

    (i)      Fort Myers Chiro was – as set forth herein – operating in pervasive violation of the Clinic Act, the Patient Brokering Act, the Self-Referral Act, the HME Licensing Laws, and the Chiropractor Advertising Laws;

    (ii)     the Fraudulent Services purportedly provided by and billed through Fort Myers Chiro were not medically necessary, and were provided – to the extent that they were provided at all –and pursuant to a pre-determined fraudulent protocol;

    (iii)    in many cases, the Fraudulent Services purportedly provided by and billed through Fort Myers Chiro never were provided in the first instance; and

    (iv)    the billing codes used for the Fraudulent Services purportedly provided by and billed through Fort Myers Chiro misrepresented and exaggerated the level of services that purportedly were provided in order to fraudulently inflate the charges submitted to GEICO.

111.    Accordingly, Fort Myers Chiro never qualified for the exemption from licensure as a "health care clinic" set forth in Section 400.9905(4)(g). Nor did Fort Myers Chiro have a medical director as required for a health care clinic without an exemption. As a result, Fort Myers Chiro operated – at all relevant times – in violation of the Clinic Act.

**3.    The Unlawful Operation of Central Florida Chiro in Violation of the Clinic Act**

112.    As set forth above, at all relevant times, Hanson – a licensed chiropractor – purported to own Central Florida Chiro.

113.    However, Hanson never legitimately supervised the business activities of Central Florida Chiro, inasmuch as Hanson never conducted reviews of the billing or treatment records from Central Florida Chiro to ensure that the billing was not fraudulent or unlawful, and never even made an attempt to discovery the unlawful charges submitted through Central Florida Chiro.

114.    Indeed, given the fraudulent treatment and billing protocol described below – which was pervasive across all of the billing submitted to GEICO through Central Florida

Chiro – there is simply no way that Hanson could have legitimately supervised the business activities of Central Florida Chiro to ensure that the billing was not fraudulent or ensure compliance with all applicable federal and state laws as required by the Clinic Act.

115.    Had Hanson legitimately supervised the business activities of Central Florida Chiro, Hanson would have noted, among other things, that:

(i)     Central Florida Chiro was operating in pervasive violation of the HME Licensing Laws;

(ii)    the Fraudulent Services purportedly provided by and billed through Central Florida Chiro were not medically necessary, and were provided – to the extent that they were provided at all –and pursuant to a pre-determined fraudulent protocol;

(iii)   in many cases, the Fraudulent Services purportedly provided by and billed through Central Florida Chiro never were provided in the first instance; and

(iv)    the billing codes used for the Fraudulent Services purportedly provided by and billed through Central Florida Chiro misrepresented and exaggerated the level of services that purportedly were provided in order to fraudulently inflate the charges submitted to GEICO.

116.    Accordingly, Central Florida Chiro never qualified for the exemption from licensure as a "health care clinic" set forth in Section 400.9905(4)(g). Nor did Central Florida Chiro have a medical director as required for a health care clinic without an exemption. As a result, Central Florida Chiro operated – at all relevant times – in violation of the Clinic Act.

**4.     The Unlawful Operation of CFL Diagnostic in Violation of the Clinic Act**

**a.     Korchagin's Secret and Unlawful Ownership Interest in CFL Diagnostic**

117.    As set forth above, at all relevant times, Kovalenko purported to be the sole owner and managing member of CFL Diagnostic.

118.     In fact, Kovalenko was never the true sole owner or member of CFL Diagnostic.

119.     Rather, at all relevant times, Korchagin held a secret and unlawful ownership interest in CFL Diagnostic.

120.     In keeping with the fact that Korchagin held a secret and unlawful ownership interest in CFL Diagnostic, CFL Diagnostic's purported principal place of business was the Colonial Drive Office, which was also Korchagin, TOH Management, and Touch of Health's office.

121.     Moreover, at all relevant times, Kovalenko resided in and was a citizen of Massachusetts – not Orlando, Florida where CFL Diagnostic purported to operate.

122.     Because Kovalenko, at all relevant times, resided in Massachusetts, he played no role in the day-to-day operations of CFL Diagnostic.

123.     Instead, Korchagin was responsible for the day-to-day operations of CFL Diagnostic.

124.     In keeping with the fact that Korchagin was responsible for the day-to-day operations of CFL Diagnostic, all of the billing submitted to GEICO by CFL Diagnostic was submitted by Korchagin and TOH Management.

125.     Moreover, virtually all of the Insureds to whom CFL Diagnostic provided MRI services were referred to CFL Diagnostic, at Korchagin's direction, from the other entities in which he held an ownership interest, including Touch of Health and Orlando Central Chiro.

126.    Moreover, the MRI services purportedly provided through CFL Diagnostic were actually advertised as if they were provided by Touch of Health, rather than CFL Diagnostic.

127.    For example, Touch of Health's website, www.touchofhealthmedical.com, indicated that it was Touch of Health – not CFL Diagnostic – that offered MRI services at the Colonial Drive Office, despite the fact that no MRI services were billed through Touch of Health.

128.    As set forth above, clinics that operate in violation of the Clinic Act's licensing or operating requirements, including the Clinic Act's ownership disclosure requirements, are not entitled to collect PIP Benefits.

129.    In the claims identified in Exhibit "5", Korchagin, Kovalenko, Amponsah, and CFL Diagnostic falsely represented that CFL Diagnostic was in compliance with the Clinic Act's licensing and operating requirements, and therefore was entitled to collect PIP Benefits, when in fact CFL Diagnostic was not in compliance with the Clinic Act's licensing and operating requirements, and was not entitled to collect PIP Benefits, because Korchagin, Kovalenko, Amponsah, and CFL Diagnostic unlawfully failed to disclose the direct and indirect ownership interests in CFL Diagnostic.

**b.    The Unlawful Operation of CFL Diagnostic Without a Legitimate Medical Director**

130.    Kovalenko was never a licensed health care professional.

131.    Moreover, though Korchagin was a licensed massage therapist, he never held a license as a physician or chiropractor.

132.    Therefore, pursuant to the Clinic Act, neither Kovalenko nor Korchagin could operate CFL Diagnostic, or use CFL Diagnostic as a vehicle to submit PIP billing to GEICO and other insurers, unless they recruited a licensed physician to serve as CFL Diagnostic's medical director. See Fla. Stat. §§ 400.9905, 440.9935.

133.    However, if Kovalenko and Korchagin recruited a legitimate physician to serve as a legitimate medical director at CFL Diagnostic, the physician actually would be obligated to fulfill the statutory requirements applicable to a clinic medical director. See, e.g., Fla. Stat. § 400.9935(1).  By extension, any such legitimate medical director would impede Kovalenko and Korchagin's ability to use CFL Diagnostic as a vehicle to submit a large amount of fraudulent billing to GEICO and other Florida automobile insurers.

134.    Accordingly, Kovalenko and Korchagin required a pliable physician willing to falsely pose as the "medical director" at CFL Diagnostic, but who – in actuality – would not even attempt to fulfill the statutory requirements applicable to a clinic medical director, and thereby would permit Kovalenko and Korchagin to use CFL Diagnostic as a vehicle to submit a large amount of fraudulent PIP billing to GEICO and other insurers.

135.    Therefore, in or about April 2018, Kovalenko and Korchagin recruited Amponsah, a licensed physician who was willing to falsely pose as the legitimate medical director of CFL Diagnostic.

136.    In order to circumvent Florida law and induce the Florida Agency for Health Care Administration to maintain CFL Diagnostic's licensure and to permit CFL Diagnostic to operate as a clinic, Kovalenko and Korchagin entered into a secret scheme with Amponsah. In exchange for a designated salary from Kovalenko, Korchagin, and CFL Diagnostic,

Amponsah agreed to falsely represent, to the Florida Agency for Health Care Administration, to the Insureds who sought treatment at CFL Diagnostic, and to the insurers including GEICO that received PIP claims from CFL Diagnostic, that he was the true medical director at CFL Diagnostic, and that he truly fulfilled the statutory requirements applicable to clinic medical directors at CFL Diagnostic.

137.    However, Amponsah never genuinely served as medical director at CFL Diagnostic. Instead, from the beginning of his association with CFL Diagnostic as its phony "medical director", Amponsah ceded all day-to-day decision-making and oversight regarding health care services at CFL Diagnostic, and the resulting billing, to Korchagin and Kovalenko.

138.    Amponsah never legitimately served as medical director at CFL Diagnostic, inasmuch as he never conducted systematic reviews of CFL Diagnostic's billings to ensure that the billings were not fraudulent or unlawful, and never even made any attempt to discover the unlawful charges submitted through CFL Diagnostic, much less take any immediate corrective action. See Fla. Stat. § 400.9935(1).

139.    Had Amponsah legitimately served as CFL Diagnostic's medical director, Amponsah would have noted, among other things, that CFL Diagnostic was operating in pervasive violation of the Clinic Act and the Patient Brokering Act.

140.    In fact, true authority over the provision of health care services through CFL Diagnostic, and the resulting billing – including the authority that would, at a legitimate clinic, be vested in the medical director – was held at all times by Korchagin and Kovalenko.

141.    Amponsah unlawfully permitted Korchagin and Kovalenko to dictate every aspect of the manner in which Insureds would be treated at CFL Diagnostic, and to dictate every aspect of the manner in which health care services at CFL Diagnostic would be billed to GEICO and other insurers.

142.    Kovalenko and Korchagin used the façade of Amponsah's phony "appointment" as CFL Diagnostic's ersatz "medical director" to do indirectly what he was forbidden from doing directly – namely: (i) to operate a clinic without a legitimate medical director; (ii) to engage in unlicensed medical decision-making with respect to the Insureds who sought treatment at CFL Diagnostic; and (iii) to use CFL Diagnostic as a vehicle to submit a massive amount of fraudulent PIP billing to GEICO and other insurers.

**5.    The Unlawful Operation of CFL MD in Violation of the Clinic Act**

**a.    Korchagin's Secret and Unlawful Ownership Interest in CFL MD**

143.    At all relevant times, Amponsah purported to be the sole owner and managing member of CFL MD.

144.    However, at all relevant times, Korchagin held a secret and unlawful ownership interest in CFL MD.

145.    In keeping with the fact that, at all relevant times, Amponsah was not the true sole owner or managing member of CFL MD, Amponsah never performed or directly supervised any of the putative services billed to GEICO through CFL MD.

146.    In keeping with the fact that Korchagin held a secret and unlawful ownership interest in CFL MD, CFL MD's putative principal place of business was the Colonial Drive Office, which was also Korchagin, TOH Management, and Touch of Health's office.

34

147.    What is more, all of the billing submitted to GEICO by CFL MD was submitted by Korchagin and TOH Management.

148.    Moreover, the return address for all of the bills submitted through CFL MD to GEICO was the Colonial Drive Office, which was also Korchagin, TOH Management, and Touch of Health's office.

149.    In further keeping with the fact that, at all relevant times, Korchagin held a secret and unlawful ownership interest in CFL MD, virtually all of the patients purportedly treated at CFL MD were referred to CFL MD, at Korchagin's direction, from Touch of Health, Orlando Central Chiro, and Fort Myers Chiro, which Korchagin also controlled.

150.    Accordingly, because CFL MD was never "wholly owned" by a licensed health care practitioner, CFL MD never qualified for the exemption from licensure as a "health care clinic" set forth in Section 400.9905(4)(g), and was not otherwise licensed as a health care clinic. As a result, CFL MD operated – at all relevant times – in violation of the Clinic Act.

**b.      The Unlawful Operation of CFL MD Without Supervision by Amponsah**

151.    Furthermore, Amponsah never legitimately supervised the business activities of CFL MD, inasmuch as Amponsah never conducted reviews of the billing or treatment records from CFL MD to ensure that the billing was not fraudulent or unlawful, and never even made an attempt to discover the unlawful charges submitted through CFL MD.

152.    Indeed, given the fraudulent treatment and billing protocol described below, there is simply no way that Amponsah could have legitimately supervised the business

activities of CFL MD to ensure that the billing was not fraudulent or ensure compliance with

all applicable federal and state laws as required by the Clinic Act.

153.     Had Amponsah legitimately supervised the business activities of CFL MD,

Amponsah would have noted, among other things, that:

(i)      CFL MD was operating in pervasive violation of the Clinic Act and the Patient
         Brokering Act;

(ii)     the Fraudulent Services purportedly provided by and billed through CFL MD
         were not medically necessary, and were provided – to the extent that they were
         provided at all –and pursuant to a pre-determined fraudulent protocol;

(iii)    in many cases, the Fraudulent Services purportedly provided by and billed
         through CFL MD never were provided in the first instance; and

(iv)     the billing codes used for the Fraudulent Services purportedly provided by and
         billed through CFL MD misrepresented and exaggerated the level of services
         that purportedly were provided in order to fraudulently inflate the charges
         submitted to GEICO.

154.     Accordingly, CFL MD never qualified for the exemption from licensure as a

"health care clinic" set forth in Section 400.9905(4)(g). Nor did CFL MD have a medical

director as required for a health care clinic without an exemption. As a result, CFL MD

operated – at all relevant times – in violation of the Clinic Act.

**6.     The Unlawful Operation of Touch of Health Without a Legitimate Medical
         Director**

155.     Pursuant to the Clinic Act, Korchagin could not operate Touch of Health, or

use Touch of Health as a vehicle to submit PIP billing to GEICO and other insurers, unless he

recruited a licensed physician to serve as Touch of Health's medical director. See Fla. Stat. §§

400.9905, 440.9935.

156.     However, if Korchagin recruited a legitimate physician to serve as a legitimate medical director at Touch of Health, the physician actually would be obligated to fulfill the statutory requirements applicable to a clinic medical director. See, e.g., Fla. Stat. § 400.9935(1). By extension, any such legitimate medical director would impede Korchagin's ability to use Touch of Health as a vehicle to submit a large amount of fraudulent billing to GEICO and other Florida automobile insurers.

157.     Accordingly, Korchagin required a pliable physician willing to falsely pose as the "medical director" at Touch of Health, but who – in actuality – would not even attempt to fulfill the statutory requirements applicable to a clinic medical director, and thereby would permit Korchagin to use Touch of Health as a vehicle to submit a large amount of fraudulent PIP billing to GEICO and other insurers.

158.     Therefore, in or about April 2018, Korchagin recruited Klochko, a licensed physician who was willing to falsely pose as the legitimate medical director of Touch of Health.

159.     In order to circumvent Florida law and induce the Florida Agency for Health Care Administration to maintain Touch of Health's licensure and to permit Touch of Health to operate as a clinic, Korchagin entered into a secret scheme with Klochko. In exchange for a designated salary from Korchagin and Touch of Health, Klochko agreed to falsely represent, to the Florida Agency for Health Care Administration, to the Insureds who sought treatment at Touch of Health, and to the insurers including GEICO that received PIP claims from Touch of Health, that she was the true medical director at Touch of Health, and that she truly fulfilled the statutory requirements applicable to clinic medical directors at Touch of Health.

160.   However, Klochko never genuinely served as medical director at Touch of Health. Instead, from the beginning of her association with Touch of Health as its phony "medical director", Klochko ceded all day-to-day decision-making and oversight regarding health care services at Touch of Health, and the resulting billing, to Korchagin.

161.   Klochko never legitimately served as medical director at Touch of Health, inasmuch as she never conducted systematic reviews of Touch of Health's billings to ensure that the billings were not fraudulent or unlawful, and never even made any attempt to discover the unlawful charges submitted through Touch of Health, much less take any immediate corrective action. See Fla. Stat. § 400.9935(1).

162.   Had Klochko legitimately served as Touch of Health's medical director, she would have noted, among other things, that:

(i)     Touch of Health was operating in pervasive violation of the Clinic Act, Patient Brokering Act, Anti-Kickback Act, the HME Licensing Laws, and the Chiropractor Advertising Laws;

(ii)    the Fraudulent Services purportedly provided by and billed through Touch of Health were not medically necessary, and were provided – to the extent that they were provided at all –and pursuant to a pre-determined fraudulent protocol;

(iii)   in many cases, the Fraudulent Services purportedly provided by and billed through Touch of Health never were provided in the first instance; and

(iv)    the billing codes used for the Fraudulent Services purportedly provided by and billed through Touch of Health misrepresented and exaggerated the level of services that purportedly were provided in order to fraudulently inflate the charges submitted to GEICO.

163.   In fact, true authority over the provision of health care services through Touch of Health, and the resulting billing – including the authority that would, at a legitimate clinic, be vested in the medical director – was held at all times by Korchagin.

164.    Klochko unlawfully permitted Korchagin to dictate every aspect of the manner in which Insureds would be treated at Touch of Health, and to dictate every aspect of the manner in which health care services at Touch of Health would be billed to GEICO and other insurers.

165.    Korchagin used the façade of Klochko's phony "appointment" as Touch of Health's ersatz "medical director" to do indirectly what he was forbidden from doing directly – namely: (i) to operate a clinic without a legitimate medical director; (ii) to engage in unlicensed medical decision-making with respect to the Insureds who sought treatment at Touch of Health; and (iii) to use Touch of Health as a vehicle to submit a massive amount of fraudulent PIP billing to GEICO and other insurers.

**B.    The Violations of the HME Licensing Laws**

**1.    Korchagin's Secret and Unlawful Ownership Interest in CFL Medical Supplies**

166.    As set forth above, at all relevant times, Kovalenko purported to be the sole owner and managing member of CFL Medical Supplies.

167.    However, at all relevant times, Korchagin held a secret and unlawful ownership interest in CFL Medical Supplies.

168.    In keeping with the fact that Korchagin held a secret and unlawful ownership interest in CFL Medical Supplies, CFL Medical Supplies' putative principal place of business was the Colonial Drive Office, which was also Korchagin, TOH Management, and Touch of Health's office.

169.    What is more, Kovalenko resided in and was a citizen of Massachusetts – not Orlando, Florida where CFL Medical Supplies purported to operate.

170. Because Kovalenko, at all relevant times, resided in Massachusetts, he played no role in the day-to-day operations of CFL Medical Supplies.

171. Instead, Korchagin was responsible for the day-to-day operations of CFL Medical Supplies.

172. In keeping with the fact that Korchagin was responsible for the day-to-day operations of CFL Medical Supplies, all of the billing submitted to GEICO by CFL Medical Supplies was submitted by Korchagin and TOH Management.

173. In further keeping with the fact that Korchagin was responsible for the day-to-day operations of CFL Medical Supplies, virtually all of the Insureds to whom CFL Medical Supplies provided HME were referred at Korchagin's direction from the other entities in which he held an ownership interest, including Touch of Health, Orlando Central Chiro, and Fort Myers Chiro.

174. As set forth above, HME providers that operate in violation of the HME Licensing Laws, including the ownership disclosure requirements governing HME providers, are not entitled to collect PIP Benefits.

175. In the claims identified in Exhibit "6", Korchagin, TOH Management, Kovalenko, and CFL Medical Supplies falsely represented that CFL Medical Supplies was in compliance with the pertinent ownership disclosure requirements in the HME Licensing Laws, and therefore was entitled to collect PIP Benefits, when in fact it was not because Korchagin, TOH Management, Kovalenko, and CFL Medical Supplies unlawfully failed to disclose Korchagin's ownership interest in CFL Medical Supplies.

2.      **Touch of Health, Central Florida Chiro, Orlando Central Chiro, and Fort Myers Chiro's Unlicensed Provision of HME**

176.    As set forth above, subject to limited exceptions not applicable here, any health care clinic providing HME to its patients must obtain an HME license.

177.    Insurers such as GEICO are not obligated to pay PIP Benefits to health care clinics operating in violation of the HME Licensing Laws.

178.    At all relevant times, Touch of Health, Central Florida Chiro, Orlando Central Chiro, and Fort Myers Chiro purported to provide Insureds with HME as part of the Defendants' fraudulent, pre-determined treatment protocol.

179.    However, Touch of Health, Central Florida Chiro, Orlando Central Chiro, and Fort Myers Chiro never obtained an HME license to provide HME.

180.    Accordingly, Touch of Health, Central Florida Chiro, Orlando Central Chiro, and Fort Myers Chiro operated – at all relevant times – in violation of the HME Licensing Laws.

181.    In the claims for HME identified in Exhibits "1"-"5", Korchagin, TOH Management, Hanson, Klochko, Touch of Health, Orlando Central Chiro, and Fort Myers Chiro falsely represented that Touch of Health, Central Florida Chiro, Orlando Central Chiro, and Fort Myers Chiro were in compliance with the HME Licensing Laws, when in fact Touch of Health, Central Florida Chiro, Orlando Central Chiro, and Fort Myers Chiro were not in compliance with the HME Licensing Laws, and were not entitled to collect PIP Benefits, because Touch of Health, Central Florida Chiro, Orlando Central Chiro, and Fort Myers Chiro purported to provide HME without proper licensure to do so.

**C.      The Violations of the Patient Brokering Act and the Anti-Kickback Statute**

**1.      Aleksandrova and 855LEGAL4U**

182.    As set forth above, Aleksandrova caused 855LEGAL4U to be incorporated in Florida on or about January 23, 2015, and operated 855LEGAL4U as a purported medical and legal referral service and pre-settlement funding company.

183.    Then, in exchange for payments from Korchagin and Touch of Health, and at the direction of Korchagin and Touch of Health, Aleksandrova and 855LEGAL4U unlawfully: (i) steered Insureds to Touch of Health; (ii) provided free transportation services for Insureds traveling to Touch of Health; and (iii) provided Insureds with "financial support" in exchange for receiving treatment at Touch of Health, all in violation of the Patient Brokering Act and the Anti-Kickback Statute.

184.    For example, and in keeping with the fact that Aleksandrova and 855LEGAL4U steered Insureds to Touch of Health in exchange for payments from Korchagin and Touch of Heath, 855LEGAL4U's website, www.855legal4u.com, indicated that 855LEGAL4U steered Insureds to just one health care clinic, Touch of Health, in violation of the Patient Brokering Act:

> We've analyzed the local market of medical services and found one of the best clinics in Orlando; equipped with everything needed to diagnose and treat the injuries commonly found after car crashes, as well as a talented multilingual staff (fluent in English, Spanish, and Russian) who will provide you with high-quality assistance after your accident - Touch of Health Medical Center.

185.    Moreover, and in keeping with the fact that Aleksandrova and 855LEGAL4U provided free transportation services for Insureds traveling to Touch of Health in violation of

the Patient Brokering Act, 855LEGAL4U's Facebook page indicated that 855LEGAL4U would provide free transportation to facilitate patient visits to Touch of Health.

186.    What is more, and in keeping with the fact that Aleksandrova and 855LEGAL4U paid kickbacks to Insureds in exchange for receiving "treatment" at Touch of Health in violation of the Anti-Kickback Statute, 855LEGAL4U's website indicated that 855LEGAL4U could provide Insureds with pre-settlement "financial support" if the Insureds followed 855LEGAL4U's treatment directives.

187.    As set forth above, health care providers that operate in violation of the Patient Brokering Act and the Anti-Kickback Statute are not entitled to collect PIP Benefits.

188.    In the claims identified in Exhibit "1", Korchagin, TOH Management, Klochko, and Touch of Health routinely falsely represented that the underlying health care services were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable because they were provided – to the extent that they were provided at all – pursuant an illegal patient brokering and kickback scheme.

**2.    The Unlawful Referrals from Orlando Central Chiro and Fort Myers Chiro to Touch of Health, CFL Diagnostic, CFL Medical Supplies, and CFL MD in Violation of the Patient Brokering Act**

189.    In addition, Hanson – at Korchagin's direction – routinely and unlawfully referred Insureds, or caused Insureds to be referred, to Touch of Health, CFL Diagnostic, CFL Medical Supplies, and CFL MD in exchange for compensation from Korchagin.

190.    Beginning in March 2017, in exchange for compensation from Korchagin and Touch of Health, Hanson caused a steady stream of Insureds to be referred from Orlando Central Chiro and Fort Myers Chiro to Touch of Health, CFL Diagnostic, CFL Medical

Supplies, and CFL MD for medically unnecessary Fraudulent Services. In fact, virtually all of the patients purportedly treated at CFL Diagnostic, CFL Medical Supplies, and CFL MD presented there pursuant to referrals by Hanson that were made at Korchagin's direction, and in exchange for compensation from Korchagin and Touch of Health.

191.     Beginning in March 2017, each patient referral that Hanson made or caused to be made to Touch of Health, CFL Diagnostic, CFL Medical Supplies, and CFL MD violated the Patient Brokering Act, in that the referrals were made in exchange for compensation from Korchagin and Touch of Health.

192.     For example:

(i)      On or about August 28, 2017, Hanson referred an Insured named DA from Orlando Central Chiro to CFL Medical Supplies for purported HME, and to Touch of Health for x-ray services. Both referrals violated the Patient Brokering Act in that they were provided in exchange for compensation paid to Hanson by Korchagin and Touch of Health.

(ii)     On or about October 16, 2017, Hanson referred an Insured named MA from Orlando Central Chiro to CFL Medical Supplies for purported HME, and to Touch of Health for x-ray services. Then, on or about November 27, 2017, Hanson again referred MA to CFL Medical Supplies for purported HME. All three referrals violated the Patient Brokering Act in that they were provided in exchange for compensation paid to Hanson by Korchagin and Touch of Health.

(iii)    On or about November 27, 2017, Hanson referred an Insured named MW from Orlando Central Chiro to CFL Medical Supplies for purported HME. The referral violated the Patient Brokering Act in that it was provided in exchange for compensation paid Hanson by Korchagin and Touch of Health.

(iv)     On or about December 28, 2017, Hanson referred an Insured named GA from Orlando Central Chiro to CFL Medical Supplies for purported HME. Then, on or about January 8, 2018, Hanson referred GA to Touch of Health for x-ray services. Both referrals violated the Patient Brokering Act in that they were provided in exchange for compensation paid to Hanson by Korchagin and Touch of Health.

(v)     On or about August 6, 2018, Hanson referred an Insured named KB from Orlando Central Chiro to Touch of Health for x-ray services. Then, on or about August 24, 2018, Hanson referred KB to CFL Diagnostic for putative MRI services. Then, on or about September 4, 2018, Hanson referred KB to CFL Medical Supplies for purported HME. All three referrals violated the Patient Brokering Act in that they were provided in exchange for compensation paid to Hanson by Korchagin and Touch of Health.

(vi)    On or about September 17, 2018, Hanson referred an Insured named BA from Orlando Central Chiro to Touch of Health for x-ray services. Then, on or about September 27, 2018, Hanson referred BA to CFL Diagnostic for putative MRI services. Both referrals violated the Patient Brokering Act in that they were provided in exchange for compensation paid to Hanson by Korchagin and Touch of Health.

(vii)   On or about August 23, 2018, Hanson referred an Insured named KW form Orlando Central Chiro to CFL Diagnostic for putative MRI services. Then, on or about August 29, 2018, Hanson referred KW to CFL Medical Supplies for purported HME. Both referrals violated the Patient Brokering Act in that they were provided in exchange for compensation paid to Hanson by Korchagin and Touch of Health.

(viii)  On or about December 17, 2018, Pearce – at Hanson's direction – referred an Insured named GA from Fort Myers Chiro to CFL Medical Supplies for purported HME. The referral violated the Patient Brokering Act in that they were provided in exchange for compensation paid to Hanson by Korchagin and Touch of Health.

(ix)    On or about January 3, 2019, Pearce – at Hanson's direction – referred an Insured named TA from Fort Myers Chiro to CFL Medical Supplies for purported HME. The referral violated the Patient Brokering Act in that they were provided in exchange for compensation paid to Hanson by Korchagin and Touch of Health.

(x)     On or about January 10, 2019, Pearce – at Hanson's direction – referred an Insured named RT from Fort Myers Chiro to CFL Medical Supplies for purported HME. The referral violated the Patient Brokering Act in that they were provided in exchange for compensation paid to Hanson by Korchagin and Touch of Health.

(xi)    On or about April 24, 2019, Hanson referred an Insured named CA from Orlando Central Chiro to CFL MD. The referral violated the Patient Brokering Act in that it was provided in exchange for compensation paid to Hanson by Korchagin and Touch of Health.

(xii)     On or about April 24, 2019, Mohammadi – at Hanson's direction – referred an Insured named TE from Orlando Central Chiro to CFL MD. Then, on or about April 25, 2019, Mohammadi – at Hanson's direction – referred TE from Orlando Central Chiro to CFL Diagnostic for putative MRI services. Both referrals violated the Patient Brokering Act in that it was provided in exchange for compensation paid to Hanson by Korchagin and Touch of Health.

(xiii)    On or about May 2, 2019, Hanson caused an Insured named MA to be referred from Fort Myers Chiro to CFL MD. The referral violated the Patient Brokering Act in that it was provided in exchange for compensation paid to Hanson by Korchagin and Touch of Health.

(xiv)    On or about May 6, 2019, Pearce – at Hanson's direction – referred an Insured named PF from Fort Myers Chiro to CFL MD. The referral violated the Patient Brokering Act in that it was provided in exchange for compensation paid to Hanson by Korchagin and Touch of Health.

(xv)     On or about May 7, 2019, Pearce – at Hanson's direction – referred an Insured named DG from Fort Myers Chiro to CFL MD. The referral violated the Patient Brokering Act in that it was provided in exchange for compensation paid to Hanson by Korchagin and Touch of Health.

(xvi)    On or about June 12, 2019, Mohammadi – at Hanson's direction – referred an Insured named MB from Orlando Central Chiro to CFL MD. The referral violated the Patient Brokering Act in that it was provided in exchange for compensation paid to Hanson by Korchagin and Touch of Health.

(xvii)   On or about June 10, 2019, Mohammadi – at Hanson's direction – referred an Insured named JL from Orlando Central Chiro to CFL MD. The referral violated the Patient Brokering Act in that it was provided in exchange for compensation paid to Hanson by Korchagin and Touch of Health.

(xviii)  On or about June 25, 2019, Mohammadi – at Hanson's direction – referred an Insured named DA from Orlando Central Chiro to CFL MD. The referral violated the Patient Brokering Act in that it was provided in exchange for compensation paid to Hanson by Korchagin and Touch of Health.

(xix)    On or about June 19, 2019, Pearce – at Hanson's direction – referred an Insured named FB from Fort Myers Chiro to CFL MD. The referral violated the Patient Brokering Act in that it was provided in exchange for compensation paid to Hanson by Korchagin and Touch of Health.

(xx)   On or about June 19, 2019, Pearce – at Hanson's direction – referred an Insured named ME from Fort Myers Chiro to CFL MD. The referral violated the Patient Brokering Act in that it was provided in exchange for compensation paid to Hanson by Korchagin and Touch of Health.

193.   These are only representative examples. In the claims identified in Exhibits "1", "3", "4", "5", and "6", Hanson routinely caused Insureds to be referred to Touch of Health, CFL Diagnostic, CFL Medical Supplies, and CFL MD in violation of the Patient Brokering Act.

**3.    The Unlawful Referrals from Touch of Health to CFL Diagnostic, CFL Medical Supplies, and CFL MD in Violation of the Patient Brokering Act**

194.   Moreover, Hanson, Penza, and Roldos – at Korchagin's direction – routinely referred Insureds, or caused Insureds to be referred, from Touch of Health to CFL Diagnostic and CFL Medical Supplies in exchange for compensation from Korchagin and Touch of Health.

195.   Each of these referrals by Hanson, Penza, and Roldos from Touch of Health to CFL Diagnostic and CFL Medical Supplies violated the Patient Brokering Act, in that the referrals were made in exchange for compensation that Korchagin and Touch of Health paid to Hanson, Penza, and Roldos.

196.   For example:

(i)    On or about August 11, 2017, Roldos – at Korchagin's direction – referred an Insured named RP from Touch of Health to CFL Medical Supplies for purported HME. The referral violated the Patient Brokering Act in that it was provided in exchange for compensation paid to Roldos by Korchagin and Touch of Health.

(ii)   On or about November 8, 2017, Roldos – at Korchagin's direction – referred an Insured named LS from Touch of Health to CFL Medical Supplies for purported HME. The referral violated the Patient Brokering Act in that it was

provided in exchange for compensation paid to Roldos by Korchagin and Touch of Health.

(iii)     On or about June 27, 2018, Penza – at Korchagin's direction – referred an Insured named IF from Touch of Health to CFL Diagnostic for putative MRI services. Then, on or about July 12, 2018, Hanson – at Korchagin's direction – referred IF from Touch of Health to CFL Medical Supplies for purported HME. Both referrals violated the Patient Brokering Act in that they were provided in exchange for compensation paid to Penza and Hanson by Korchagin and Touch of Health.

(iv)     On or about November 19, 2018, Hanson – at Korchagin's direction – referred an Insured named LH from Touch of Health to CFL Medical Supplies for purported HME. Then, on or about November 30, 2018, Hanson – at Korchagin's direction – referred LH from Touch of Health to CFL Diagnostic for putative MRI services. Both referrals violated the Patient Brokering Act in that they were provided in exchange for compensation paid to Hanson by Korchagin and Touch of Health.

(v)     On or about November 19, 2018, Hanson – at Korchagin's direction – referred an Insured named AM from Touch of Health to CFL Medical Supplies for purported HME. Then, on or about November 29, 2018, Hanson – at Korchagin's direction – referred AM from Touch of Health to CFL Diagnostic for putative MRI services. Both referrals violated the Patient Brokering Act in that they were provided in exchange for compensation paid to Hanson by Korchagin and Touch of Health.

(vi)     On or about December 13, 2018, Roldos – at Korchagin's direction – referred an Insured named EE from Touch of Health to CFL Medical Supplies for purported HME. The referral violated the Patient Brokering Act in that it was provided in exchange for compensation paid to Roldos by Korchagin and Touch of Health.

(vii)     On or about December 27, 2018, Hanson – at Korchagin's direction – referred an Insured named MC from Touch of Health to CFL Diagnostic for putative MRI services. Then, on or about January 2, 2019, Penza – at Korchagin's direction – referred MC from Touch of Health to CFL Medical Supplies for purported HME. Both referrals violated the Patient Brokering Act in that they were provided in exchange for compensation paid to Penza and Hanson by Korchagin and Touch of Health.

(viii)     On or about December 27, 2018, Penza – at Korchagin's direction – referred an Insured named FD from Touch of Health to CFL Diagnostic for putative MRI services. The referral violated the Patient Brokering Act in that is was

provided in exchange for compensation paid to Penza by Korchagin and Touch of Health.

(ix)     On or about December 27, 2018, Penza – at Korchagin's direction – referred an Insured named FM from Touch of Health to CFL Diagnostic for putative MRI services. Then, on or about January 2, 2019, Penza – at Korchagin's direction – referred FM from Touch of Health to CFL Medical Supplies for purported HME. Both referrals violated the Patient Brokering Act in that they were provided in exchange for compensation paid to Penza by Korchagin and Touch of Health.

(x)      On or about January 2, 2019, Penza – at Korchagin's direction – referred an Insured named FR from Touch of Health to CFL Medical Supplies for purported HME.  Then, on or about January 17, 2019, Penza – at Korchagin's direction – referred FR from Touch of Health to CFL Diagnostic for putative MRI services. Both referrals violated the Patient Brokering Act in that they were provided in exchange for compensation paid to Penza by Korchagin and Touch of Health.

(xi)     On or about March 22, 2019, Hanson – at Korchagin's direction – referred an Insured named TN from Touch of Health to CFL Diagnostic for putative MRI services. Then, on or about April 29, 2019, Biondi – at Korchagin's direction – referred TN from Touch of Health to CFL MD. Both referrals violated the Patient Brokering Act in that they were provided in exchange for compensation paid to Hanson and Biondi by Korchagin and Touch of Health.

(xii)    On or about April 22, 2019, Biondi – at Korchagin's direction – referred an Insured named JP from Touch of Health to CFL MD. The referral violated the Patient Brokering Act in that it was provided in exchange for compensation paid to Biondi by Korchagin and Touch of Health.

(xiii)   On or about April 22, 2019, Biondi – at Korchagin's direction – referred an Insured named CA from Touch of Health to CFL MD. The referral violated the Patient Brokering Act in that it was provided in exchange for compensation paid to Biondi by Korchagin and Touch of Health.

(xiv)    On or about May 28, 2019, Biondi – at Korchagin's direction – referred an Insured named CA from Touch of Health to CFL MD. The referral violated the Patient Brokering Act in that it was provided in exchange for compensation paid to Biondi by Korchagin and Touch of Health.

(xv)     On or about June 25, 2019, Biondi – at Korchagin's direction – referred an Insured named DA from Touch of Health to CFL MD. The referral violated the

Patient Brokering Act in that it was provided in exchange for compensation paid to Biondi by Korchagin and Touch of Health.

197.     These are only representative examples. In the claims identified in Exhibits "5"- "7", Hanson, Penza, Biondi, and Roldos routinely caused Insureds to be referred from Touch of Health to CFL Diagnostic and CFL Medical Supplies in exchange for compensation from Korchagin and Touch of Health, in violation the Patient Brokering Act.

**D.     The Violations of the Self-Referral Act**

198.     As set forth above, the Self-Referral Act prohibits any health care provider from referring patients for certain designated health care services to any entity in which the health care provider is an investor or has an investment interest. See Fla. Stat. § 456.053.

199.     In the context of the Self-Referral Act, Hanson – as a licensed chiropractor – was a "health care provider".

200.     In the context of the Self-Referral Act, the putative physical therapy and rehabilitative services that Orlando Central Chiro and Fort Myers Chiro purported to provide to Insureds were "designated health care services".

201.     In the context of the Self-Referral Act, Hanson – who purported to be an owner and member of Orlando Central Chiro and Fort Myers Chiro – was both an investor in and had an investment interest in Orlando Central Chiro and Fort Myers Chiro.

202.     Accordingly, Hanson could not lawfully self-refer Insureds to Orlando Central Chiro and Fort Myers Chiro – directly or indirectly – for designated health care services such as the putative physical therapy and rehabilitative services that Orlando Central Chiro and Fort Myers Chiro purported to provide.

1.      **The Unlawful Self-Referrals by Hanson and Complete Injury to Orlando Central Chiro and Fort Myers Chiro**

203.    Even so, after causing Complete Injury to be organized in Florida on or about October 10, 2018, Hanson operated Complete Injury as a purported health care referral service, and used Complete Injury to unlawfully self-refer Insureds to Orlando Central Chiro and Fort Myers Chiro.

204.    In fact, Complete Injury's own website, www.complete-injury.com, indicated that Complete Injury routinely referred Insureds to Orlando Central Chiro and Fort Myers Chiro. For example, the Complete Injury website set forth a very limited list of affiliated health care providers to which it referred patients, including Orlando Central Chiro and Fort Myers Chiro.

205.    Upon information and belief based on Complete Injury's website, which indicated that Complete Injury routinely referred Insureds to Orlando Central Chiro and Fort Myers Chiro, between October 2018 and the present Hanson and Complete Injury caused Insureds to be self-referred to Orlando Central Chiro and Fort Myers Chiro in violation of the Self-Referral Act.

206.    In the claims identified in Exhibits "3" – "4", Korchagin, Hanson, Orlando Central Chiro, and Fort Myers Chiro routinely falsely represented that the underlying health care services were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable because Orlando Central Chiro and Fort Myers Chiro operated in violation of the Self-Referral Act.

2.     **The Unlawful Self-Referrals by Hanson from Touch of Health to Orlando Central Chiro**

207.     As set forth above, in addition to his putative ownership of Central Florida Chiro, Orlando Central Chiro, and Fort Myers Chiro, Hanson purported to perform many of the Fraudulent Services at Touch of Health.

208.     In particular, Hanson routinely purported to perform putative ligament laxity testing services on behalf of Touch of Health at the Colonial Drive Office.

209.     In many instances, Hanson would refer – or cause to be referred – an Insured from Orlando Central Chiro to Touch of Health for the putative ligament laxity testing services.

210.     Then, Hanson would appear at Touch of Health and purport to provide the putative ligament laxity testing on the Insured he had referred – or caused to be referred – to Touch of Health in the first instance.

211.     Then, at the conclusion of the putative ligament laxity testing services, Hanson would unlawfully self-refer the Insured back to Orlando Central Chiro for the continued provision of medically unnecessary chiropractic services.

212.     For example:

(i)      On or about April 14, 2017, Hanson referred an Insured named NC from Orlando Central Chiro to Touch of Health for purported ligament laxity testing services. On April 18, 2017, the putative ligament laxity testing services were performed by Hanson at Touch of Health. Then, at the conclusion of the ligament laxity testing services, Hanson unlawfully self-referred NC back to Orlando Central Chiro for the continued provision of medically unnecessary chiropractic services.

(ii)     On or about August 17, 2017, Hanson referred an Insured named WC from Orlando Central Chiro to Touch of Health for purported ligament laxity testing services. That same day, the putative ligament laxity testing services were

performed by Hanson at Touch of Health. Then, at the conclusion of the ligament laxity testing services, Hanson unlawfully self-referred WC back to Orlando Central Chiro for the continued provision of medically unnecessary chiropractic services.

(iii)     On or about November 30, 2017, Hanson referred an Insured named CC from Orlando Central Chiro to Touch of Health for purported ligament laxity testing services. That same day, the putative ligament laxity testing services were performed by Hanson at Touch of Health. Then, at the conclusion of the ligament laxity testing services, Hanson unlawfully self-referred CC back to Orlando Central Chiro for the continued provision of medically unnecessary chiropractic services.

(iv)     On or about January 12, 2018, Hanson referred an Insured named JJ from Orlando Central Chiro to Touch of Health for purported ligament laxity testing services. On January 16, 2018, the putative ligament laxity testing services were performed by Hanson at Touch of Health. Then, at the conclusion of the ligament laxity testing services, Hanson unlawfully self-referred JJ back to Orlando Central Chiro for the continued provision of medically unnecessary chiropractic services.

(v)     On or about May 9, 2018, Hanson referred an Insured named AF from Orlando Central Chiro to Touch of Health for purported ligament laxity testing services. On May 14, 2018, the putative ligament laxity testing services were performed by Hanson at Touch of Health. Then, at the conclusion of the ligament laxity testing services, Hanson unlawfully self-referred AF back to Orlando Central Chiro for the continued provision of medically unnecessary chiropractic services.

(vi)     On or about June 20, 2018, Hanson referred an Insured named MA from Orlando Central Chiro to Touch of Health for purported ligament laxity testing services. On June 25, 2018, the putative ligament laxity testing services were performed by Hanson at Touch of Health. Then, at the conclusion of the ligament laxity testing services, Hanson unlawfully self-referred MA back to Orlando Central Chiro for the continued provision of medically unnecessary chiropractic services.

(vii)     On or about June 29, 2018, Hanson referred an Insured named SM from Orlando Central Chiro to Touch of Health for purported ligament laxity testing services. On July 7, 2018, the putative ligament laxity testing services were performed by Hanson at Touch of Health. Then, at the conclusion of the ligament laxity testing services, Hanson unlawfully self-referred SM back to Orlando Central Chiro for the continued provision of medically unnecessary chiropractic services.

(viii)   On or about July 30, 2018, Hanson referred an Insured named JP from Orlando Central Chiro to Touch of Health for purported ligament laxity testing services. On August 2, 2018, the putative ligament laxity testing services were performed by Hanson at Touch of Health. Then, at the conclusion of the ligament laxity testing services, Hanson unlawfully self-referred JP back to Orlando Central Chiro for the continued provision of medically unnecessary chiropractic services.

(ix)   On or about August 6, 2018, Hanson referred an Insured named KB Orlando Central Chiro to Touch of Health for purported ligament laxity testing services. On August 9, 2018, the putative ligament laxity testing services were performed by Hanson at Touch of Health. Then, at the conclusion of the ligament laxity testing services, Hanson unlawfully self-referred KB back to Orlando Central Chiro for the continued provision of medically unnecessary chiropractic services.

(x)   On or about September 18, 2018, Hanson referred an Insured named BA from Orlando Central Chiro to Touch of Health for purported ligament laxity testing services. On September 19, 2018, the putative ligament laxity testing services were performed by Hanson at Touch of Health. Then, at the conclusion of the ligament laxity testing services, Hanson unlawfully self-referred BA back to Orlando Central Chiro for the continued provision of medically unnecessary chiropractic services.

213.   These are only representative examples. In the clams identified in Exhibit "3", Hanson routinely and unlawfully self-referred Insureds from Touch of Health to Orlando Central Chiro for the continued provision of the Fraudulent Services.

214.   In the claims identified in Exhibit "3", Korchagin, TOH Management, Hanson, and Orlando Central Chiro routinely falsely represented that the underlying health care services were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable because they were provided – to the extent that they were provided at all – pursuant to an illegal self-referral scheme.

**E.    The Violations of the Chiropractor Advertising Laws**

215.   As set forth above, the Chiropractor Advertising Laws prohibit chiropractors

from – among other things –disseminating or causing the dissemination of any advertisement or advertising which represents that the chiropractor holds a license superior to a chiropractic license or contains a reference to a degree not held by the chiropractor, such as "M.D." or "D.O".

216.    Hanson and Complete Injury violated the Chiropractor Advertising Laws by causing the dissemination of advertising that contained references to degrees not held by Hanson.

217.    As set forth above, on or about October 10, 2018, Hanson caused Complete Injury to be organized as a Florida limited liability company.

218.    Thereafter, Complete Injury did not perform or provide health care services to patients.  Instead, following its organization, Complete Injury was used by Hanson as a means through which he could disseminate or cause to be disseminated advertisements which violated the Chiropractor Advertising Laws, and, by extension, to cause Insureds to be referred to Touch of Health, Orlando Central Chiro, and Fort Myers Chiro.

219.    For example, Complete Injury's website, www.complete-injury.com, represented that Complete Injury was a "one stop shop for complete injury care", and that "our physicians provide services throughout Florida", making specific reference to Touch of Health, Orlando Central Chiro, Fort Myers Chiro, CFL Medical Supplies, and CFL Diagnostic.

220.    Moreover, the Complete Injury website indicated that Complete Injury could connect patients with not only chiropractors, but "orthopedic surgeons", "pain management", "spine surgeons", "neurosurgeons", and MRI providers.

221.    In particular, the Complete Injury website indicated that Complete Injury Care would refer prospective patients to chiropractors, "orthopedic surgeons", "pain management", "spine surgeons", "neurosurgeons", and MRI providers – i.e., services requiring a medical license superior to Hanson's chiropractic license – at Touch of Health, Orlando Central Chiro, Fort Myers Chiro, CFL Medical Supplies, and CFL Diagnostic.

222.    For example, the Complete Injury website represented that "[w]e offer orthopaedic treatment of musculoskeletal injuries in patients of all ages", and "[w]e are comprised of Board Certified and Fellowship Trained physicians. The additional Fellowship training our physicians complete allows them to focus on a specific category of orthopaedics or a 'sub-specialty,' such as foot, ankle treatment, hand and wrist treatment, spine treatment and more."

223.    Similarly, the Complete Injury website represented that "[o]ur multidisciplinary team of orthopedic and neurosurgeons who specialises in treating common and complex spine disorders, such as spinal deformities, injuries and degenerative conditions", and offered the provision of invasive spinal surgeries such as laminectomies and disc replacements.

224.    In the claims identified in Exhibits "1", "3", "4", "5", and "6", Korchagin, TOH Management, Hanson, Touch of Health, Orlando Central Chiro, Fort Myers Chiro, CFL Medical Supplies, and CFL Diagnostic routinely falsely represented that the underlying health care services were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable because they were provided – to the extent that they were provided at all – pursuant to the Defendants' pervasive violation of the Chiropractor

Advertising Laws.

**F.      The Defendants' Fraudulent Treatment and Billing Protocols**

225.    The Defendants used Touch of Health, Central Florida Chiro, Orlando Central Chiro, Fort Myers Chiro, CFL Medical Supplies, and CFL MD as vehicles to submit a massive amount of fraudulent PIP billing to GEICO and other insurers.

226.    The billing not only misrepresented Touch of Health, Central Florida Chiro, Orlando Central Chiro, Fort Myers Chiro, CFL Medical Supplies, and CFL MD's compliance with the Clinic Act, Self-Referral Act, Patient Brokering Act, Anti-Kickback Statute, and Chiropractor Advertising Laws, but also misrepresented the medical necessity of the underlying health care services, and whether the underlying health care services actually were performed in the first instance.

227.    The vast majority of the Insureds whom the Defendants purported to treat were involved in relatively minor, "fender-bender" accidents, to the extent that they were involved in any actual accidents at all. Concomitantly, almost none of the Insureds whom the Defendants purported to treat suffered from any significant injuries or health problems as a result of the minor accidents they experienced or purported to experience.

228.    Even so, the Defendants purported to subject virtually every Insured to a medically unnecessary course of "treatment" that was provided pursuant to pre-determined, fraudulent protocols.

229.    These pre-determined, fraudulent protocols were designed to maximize the billing that the Defendants could submit to insurers, including GEICO, not to benefit the Insureds who purportedly were subjected to them.

230. The Defendants purported to provide their pre-determined fraudulent treatment protocols to Insureds without regard for the Insureds' individual symptoms or presentation, or – in many cases – the total absence of any actual medical problems arising from any actual automobile accidents.

231. Each step in the Defendants' fraudulent treatment protocols was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent No-Fault billing for each Insured.

232. No legitimate chiropractor, physician, physical therapist, chiropractic practice, or other health care provider would permit the fraudulent treatment and billing protocols described below to proceed under his, her, or its auspices.

233. The Defendants permitted the fraudulent treatment and billing protocols described below to proceed under their auspices because they sought to continue profiting from their fraudulent scheme.

**1.      General Requirements for Patient Examinations Billed Under CPT Codes 99203, 99204, and 99213**

234. As set forth above, the No-Fault Law's billing requirements provide that all PIP billing must – among other things – comply with the guidelines promulgated by the AMA in connection with the use of current procedural terminology, or CPT, codes. See Fla. Stat. § 627.736.

235. The primary guidelines promulgated by the AMA for the use of CPT codes are contained in the AMA's CPT Assistant.

**a.     CPT Code 99203**

236.    Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for an initial patient examination represents that the Insured presented with problems of moderate severity.

237.    The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately severe, and thereby justify the use of CPT code 99203 to bill for an initial patient examination.

238.    For example, the CPT Assistant provides the following clinical examples of presenting problems that might support the use of CPT code 99203 to bill for an initial patient examination:

(i)     Office visit for initial evaluation of a 48-year-old man with recurrent low back pain radiating to the leg. (General Surgery)

(ii)    Initial office evaluation of 49-year-old male with nasal obstruction. Detailed exam with topical anesthesia. (Plastic Surgery)

(iii)   Initial office evaluation for diagnosis and management of painless gross hematuria in new patient, without cystoscopy. (Internal Medicine)

(iv)    Initial office visit for evaluation of 13-year-old female with progressive scoliosis. (Physical Medicine and Rehabilitation)

(v)     Initial office visit with couple for counseling concerning voluntary vasectomy for sterility. Spent 30 minutes discussing procedure, risks and benefits, and answering questions. (Urology)

239.    Thus, pursuant to the CPT Assistant, the moderately severe presenting problems that could support the use of CPT code 99203 to bill for an initial patient examination typically are either chronic and relatively serious problems, acute problems requiring immediate invasive treatment, or issues that legitimately require physician counseling.

240.    Moreover, pursuant to the CPT Assistant, the use of CPT code 99203 to bill for a patient examination represents that the physician or chiropractor who performed the examination spent at least 30 minutes of face-to-face time with the patient or the patient's family.

241.    What is more, pursuant to the CPT Assistant, the use of CPT code 99203 to bill for a patient examination represents that the physician or chiropractor who performed the examination conducted a "detailed" physical examination.

242.    Pursuant to the CPT Assistant, a "detailed" physical examination requires – among other things – that the physician or chiropractor performing the examination conduct an extended examination of the affected body areas and other symptomatic or related organ systems.

243.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted an extended examination of a patient's musculoskeletal organ system unless the physician has documented findings with respect to the following:

(i)     measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

(ii)    general appearance of patient (e.g., development, nutrition, body habitus, deformities, attention to grooming);

(iii)   examination of peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin and/or other location;

(v)     brief assessment of mental status;

(vi)    examination of gait and station;

(vii)    inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(viii)   coordination;

(ix)     examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and

(x)      examination of sensation.

244.    Furthermore, pursuant to the CPT Assistant, the use of CPT 99203 to bill for a patient examination represents that the physician or chiropractor who performed the examination engaged in medical decision making of "low complexity".

245.    Pursuant to the CPT Assistant, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co–morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

**b.     CPT Code 99204**

246.    Pursuant to the CPT Assistant, the use of CPT code 99204 to bill for an initial patient examination represents that the Insured presented with problems of moderate to high severity.

247.    The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately to highly severe, and thereby justify the use of CPT code 99204 to bill for an initial patient examination.

248.    For example, the CPT Assistant provides the following clinical examples of presenting problems that support the use of CPT code 99204 to bill for an initial patient examination:

(i)     Office visit for initial evaluation of a 63-year-old male with chest pain on exertion. (Cardiology/Internal Medicine)

(ii)    Initial office visit of a 50-year-old female with progressive solid food dysphagia. (Gastroenterology)

(iii)   Initial office evaluation of a 70-year-old patient with recent onset of episodic confusion. (Internal Medicine)

(iv)    Initial office visit for 34-year-old patient with primary infertility, including counseling. (Obstetrics/Gynecology)

(v)     Initial office visit for 7-year-old female with juvenile diabetes mellitus, new to area, past history of hospitalization times three. (Pediatrics)

(vi)    Initial office evaluation of 70-year-old female with polyarthralgia. (Rheumatology)

(vii)   Initial office evaluation of a 50-year-old male with an aortic aneurysm with respect to recommendation for surgery. (Thoracic Surgery)

249.    Accordingly, pursuant to the CPT Assistant, the moderately to highly severe presenting problems that could support the use of CPT code 99204 to bill for an initial patient examination typically are problems that pose a serious threat to the patient's health, or even the patient's life.

250.    Moreover, pursuant to the CPT Assistant, the use of CPT code 99204 to bill for a patient examination represents that the physician or chiropractor who performed the examination spent at least 45 minutes of face-to-face time with the patient or the patient's family.

251.    Pursuant to the CPT Assistant, the use of CPT code 99204 to bill for a patient examination represents that the physician who performed the examination conducted a "comprehensive" physical examination.

252.    Pursuant to the CPT Assistant, a physical examination does not qualify as "comprehensive" unless the examining physician either: (i) conducts a general examination of multiple patient organ systems; or (ii) conducts a complete examination of a single patient organ system.

253.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a general examination of multiple patient organ systems unless the physician has documented findings with respect to at least eight organ systems.

254.    The CPT Assistant recognizes the following organ systems:

(i)      constitutional symptoms (e.g., fever, weight loss);

(ii)     eyes;

(iii)    ears, nose, mouth, throat;

(iv)    cardiovascular;

(v)     respiratory;

(vi)    gastrointestinal;

(vii)   genitourinary;

(viii)  musculoskeletal;

(ix)    integumentary (skin and/or breast);

(x)     neurological;

(xi)    psychiatric;

(xii)     endocrine;

(xiii)    hematologic/lymphatic; and

(xiv)    allergic/immunologic

255.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a complete examination of a patient's musculoskeletal organ system unless the physician has documented findings with respect to:

(i)      at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)     the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)    examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)     palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)      examination of gait and station;

(vi)     examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)    inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)   coordination, deep tendon reflexes, and sensation; and

(ix)     mental status, including orientation to time, place and person, as well as mood and affect.

256.     Additionally, pursuant to the CPT Assistant, the use of CPT code 99204 to bill for a patient examination represents that the physician who performed the examination engaged in "moderate complexity" medical decision-making.

**c.      CPT Code 99213**

257.     Pursuant to the CPT Assistant, the use of CPT code 99213 to bill for a follow-up examination typically requires that the patient present with problems of low to moderate severity.

258.     The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as problems of low to moderate severity, and thereby justify the use of CPT code 99213 to bill for a follow-up patient examination.

259.     For example, the CPT Assistant provides the following clinical examples of presenting problems that might qualify as problems of low to moderate severity, and therefore support the use of CPT code 99213 to bill for a follow-up patient examination:

(i)      Follow-up visit with 55-year-old male for management of hypertension, mild fatigue, on beta blocker/thiazide regimen. (Family Medicine/Internal Medicine)

(ii)     Follow-up office visit for an established patient with stable cirrhosis of the liver. (Gastroenterology)

(iii)    Outpatient visit with 37-year-old male, established patient, who is 3 years post total colectomy for chronic ulcerative colitis, presents for increased irritation at his stoma. (General Surgery)

(iv)     Routine, follow-up office evaluation at a three-month interval for a 77-year-old female with nodular small cleaved-cell lymphoma. (Hematology/Oncology)

(v)      Follow-up visit for a 70-year-old diabetic hypertensive patient with recent change in insulin requirement. (Internal Medicine/Nephrology)

(vi)   Quarterly follow-up office visit for a 45-year-old male, with stable chronic asthma, on steroid and bronchodilator therapy. (Pulmonary Medicine)

(vii)   Office visit with 80-year-old female established patient, for follow-up osteoporosis, status-post compression fractures. (Rheumatology)

260.   Accordingly, pursuant to the CPT Assistant, the low to moderate severity presenting problems that could support the use of CPT code 99213 to bill for a follow-up patient examination typically are problems that pose some ongoing, real threat to the patient's health.

**2.      The Fraudulent Treatment and Billing Protocol at Touch of Health**

**(i)      The Fraudulent Charges for Initial Examinations at Touch of Health**

261.   As an initial step in their fraudulent treatment and billing protocol, Touch of Health, Korchagin, TOH Management, Klochko, Hanson, Penza, Roldos, and Kabushinskaya purported to provide the Insureds in the claims identified in Exhibit "1" with a putative initial examination.

262.   Hanson, Penza, Roldos, and Kabushinskaya purported to perform most of the initial examinations in the claims identified in Exhibit "1".

263.   As set forth in Exhibit "1", Touch of Health, Korchagin, TOH Management, Klochko, Hanson, Penza, and Roldos then billed the initial examinations purportedly performed by Hanson, Penza, and Roldos to GEICO, or caused them to be billed to GEICO, under CPT code 99203, typically resulting in a charge of $250.00 for each initial examination that they purported to provide.

264.   Similarly, as set forth in Exhibit "1", Touch of Health, Korchagin, TOH Management, Klochko, and Kabushinskaya billed the initial examinations purportedly

performed by Kabushinskaya to GEICO, or caused them to be billed to GEICO, under CPT code 99204, typically resulting in a charge of between $365.00 and $900.00 for each initial examination that they purported to provide.

265.    In the claims for initial examinations identified in Exhibit "1", the charges for the initial examinations were fraudulent in that they misrepresented Touch of Health's eligibility to collect PIP Benefits in the first instance.

266.    In fact, and as set forth above, Touch of Health never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the Clinic Act, the Patient Brokering Act, the Anti-Kickback Statute, the HME Licensing Laws, and the Chiropractor Advertising Laws.

267.    As set forth below, the charges for the initial examinations identified in Exhibit "1" also were fraudulent in that they misrepresented the nature and extent of the initial examinations.

a.      **Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

268.    To the extent that the Insureds in the claims identified in Exhibit "1" had any presenting problems at all as the result of their relatively minor automobile accidents, the problems virtually always were low severity soft tissue injuries such as sprains and strains.

269.    For instance, and in keeping with the fact that the Insureds in the claims identified in Exhibit "1" either had no presenting problems at all as the result of their relatively minor automobile accidents, or else problems of low severity, in most of the claims identified in Exhibit "1" the contemporaneous police reports indicated that the underlying accidents involved relatively low-impact collisions, that the Insureds' vehicles were drivable

following the accidents, and that no one was seriously injured in the underlying accidents, or injured at all.

270.   What is more, and again in keeping with the fact that the Insureds in the claims identified in Exhibit "1" either had no presenting problems at all as a result of their relatively minor automobile accidents, or else problems of low severity, in many of the claims identified in Exhibit "1" the Insureds did not seek treatment at any hospital as the result of their accidents.

271.   Even so, in the claims for initial examinations identified in Exhibit "1", Touch of Health, Korchagin, TOH Management, Klochko, Hanson, Penza, Roldos, and Kabushinskaya routinely billed for their putative initial examinations using CPT codes 99203 and 99204, and thereby falsely represented that the Insureds presented with problems of moderate or moderate to high severity.

272.   For example:

(i)   On February 28, 2017, an Insured named AA was involved in an automobile accident. The contemporaneous police report indicated that AA's vehicle was drivable following the accident. The police report further indicated that AA was not injured and did not complain of any pain. In keeping with the fact that AA was not injured, AA did not visit any hospital emergency room following the accident. To the extent that AA experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following an initial examination of AA by Hanson on March 1, 2017, Hanson, Korchagin, TOH Management, Klochko, and Touch of Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(ii)   On May 12, 2017, an Insured named GM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact accident, and that GM's vehicle was drivable following the accident. The police report further indicated that GM was not injured and did not complain of any pain. In keeping with the fact that GM was not injured,

GM did not visit any hospital emergency room following the accident. To the extent that GM experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following an initial examination of GM by Hanson on May 18, 2017, Hanson, Korchagin, TOH Management, Klochko, and Touch of Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(iii)    On July 18, 2017, an Insured named RP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact accident, and that RP's vehicle was drivable following the accident. The police report further indicated that RP was not injured and did not complain of any pain. In keeping with the fact that RP was not injured, RP did not visit any hospital emergency room following the accident. To the extent that RP experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following an initial examination of RP by Roldos on July 19, 2017, Roldos, Korchagin, TOH Management, Klochko, and Touch of Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(iv)    On August 28, 2017, an Insured named OD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that OD's vehicle was drivable following the accident. The police report further indicated that OD was not injured and did not complain of any pain. In keeping with the fact that OD was not injured, OD did not visit any hospital emergency room following the accident. To the extent that OD experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following an initial examination of OD by Roldos on August 29, 2017, Roldos, Korchagin, TOH Management, Klochko, and Touch of Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(v)    On June 6, 2018, an Insured named GJ was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision. The police report further indicated that GJ was not injured and did not complain of any pain. In keeping with the fact that GJ was not injured, GJ did not visit any hospital emergency room following the accident. To the extent that GJ experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following an initial examination of GJ by Kabushinskaya on June 15, 2018, Kabushinskaya, Korchagin, TOH Management, Klochko, and Touch of Health billed GEICO for the initial examination using CPT code 99204, and thereby falsely

represented that the examination involved presenting problems of moderate to high severity.

(vi)     On June 6, 2018, an Insured named CD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision. The police report further indicated that CD was not injured and did not complain of any pain. In keeping with the fact that CD was not injured, CD did not visit any hospital emergency room following the accident. To the extent that CD experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following an initial examination of CD by Kabushinskaya on June 15, 2018, Kabushinskaya, Korchagin, TOH Management, Klochko, and Touch of Health billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the examination involved presenting problems of moderate to high severity.

(vii)    On June 13, 2018, an Insured named MA was involved in an automobile accident. In keeping with the fact that MA was not injured, MA did not visit any hospital emergency room following the accident. To the extent that MA experienced any health problems at all as the result of the accident, they were of low severity. Even so, following an initial examination of MA by Kabushinskaya on June 22, 2018, Kabushinskaya, Korchagin, TOH Management, Klochko, and Touch of Health billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the examination involved presenting problems of moderate to high severity.

(viii)   On June 26, 2018, an Insured named IF was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that IF's vehicle was drivable following the accident. The police report further indicated that IF was not injured and did not complain of any pain. In keeping with the fact that IF was not injured, IF did not visit any hospital emergency room following the accident. To the extent that IF experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following an initial examination of IF by Penza on June 27, 2018, Penza, Korchagin, TOH Management, Klochko, and Touch of Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(ix)     On June 26, 2018, an Insured named BF was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that BF's vehicle was drivable following the accident. The police report further indicated that BF was not injured and did not complain of any pain. In keeping with the fact that BF was not injured, BF

did not visit any hospital emergency room following the accident. To the extent that BF experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following an initial examination of BF by Kabushinskaya on June 27, 2018, Kabushinskaya, Korchagin, TOH Management, Klochko, and Touch of Health billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the examination involved presenting problems of moderate to high severity.

(x)      On July 8, 2018, an Insured named AD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that AD's vehicle was drivable following the accident. The police report further indicated that AD was not injured and did not complain of any pain. In keeping with the fact that AD was not injured, AD did not visit any hospital emergency room following the accident. To the extent that AD experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following an initial examination of AD by Hanson on July 9, 2018, Hanson, Korchagin, TOH Management, Klochko, and Touch of Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xi)     On August 14, 2018, an Insured named BD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that BD's vehicle was drivable following the accident. The police report further indicated that BD was not injured and did not complain of any pain. In In keeping with the fact that BD was not injured, BD did not visit any hospital emergency room following the accident. To the extent that BD experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following an initial examination of BD by Penza on August 23, 2018, Penza, Korchagin, TOH Management, Klochko, and Touch of Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xii)    On November 5, 2018, an Insured named ME was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that ME's vehicle was drivable following the accident. The police report further indicated that ME was not injured and did not complain of any pain. In keeping with the fact that ME was not injured, ME did not visit any hospital emergency room following the accident. To the extent that ME experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following an initial examination of ME by Penza on November 6, 2018, Penza, Korchagin, TOH Management, Klochko, and Touch of Health billed GEICO for the initial

examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xiii)   On November 5, 2018, an Insured named NE was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that NE's vehicle was drivable following the accident. The police report further indicated that NE was not injured and did not complain of any pain. In keeping with the fact that NE was not injured, NE did not visit any hospital emergency room following the accident. To the extent that NE experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following an initial examination of NE by Penza on November 6, 2018, Penza, Korchagin, TOH Management, Klochko, and Touch of Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xiv)   On December 15, 2018, an Insured named AK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that AK's vehicle was drivable following the accident. The police report further indicated that AK was not injured and did not complain of any pain. In keeping with the fact that AK was not injured, AK did not visit any hospital emergency room following the accident. To the extent that AK experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following an initial examination of AK by Hanson on December 19, 2018, Hanson, Korchagin, TOH Management, Klochko, and Touch of Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xv)   On December 15, 2018, an Insured named FM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that FM's vehicle was drivable following the accident. The police report further indicated that FM was not injured and did not complain of any pain. In keeping with the fact that FM was not injured, FM did not visit any hospital emergency room following the accident. To the extent that FM experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following an initial examination of FM by Penza on December 18, 2018, Penza, Korchagin, TOH Management, Klochko, and Touch of Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xvi)   On December 15, 2018, an Insured named AK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a

low-impact collision, and that AK's vehicle was drivable following the accident. The police report further indicated that AK was not injured and did not complain of any pain. In keeping with the fact that AK was not injured, AK did not visit any hospital emergency room following the accident. To the extent that AK experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following an initial examination of AK by Hanson on December 19, 2018, Hanson, Korchagin, TOH Management, Klochko, and Touch of Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xvii)   On December 15, 2018, an Insured named FM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that FM's vehicle was drivable following the accident. The police report further indicated that FM was not injured and did not complain of any pain. In keeping with the fact that FM was not injured, FM did not visit any hospital emergency room following the accident. To the extent that FM experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following an initial examination of FM by Penza on December 18, 2018, Penza, Korchagin, TOH Management, Klochko, and Touch of Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xviii)   On December 15, 2018, an Insured named FD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that FD's vehicle was drivable following the accident. The police report further indicated that FD was not injured and did not complain of any pain. In keeping with the fact that FD was not injured, FD did not visit any hospital emergency room following the accident. To the extent that FD experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following an initial examination of FD by Penza on December 18, 2018, Penza, Korchagin, TOH Management, Klochko, and Touch of Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xix)   On December 15, 2018, an Insured named FR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that FR's vehicle was drivable following the accident. The police report further indicated that FR was not injured and did not complain of any pain. In keeping with the fact that FR was not injured, FR did not visit any hospital emergency room following the accident. To the extent that FR experienced any health problems at all as the result of the minor

accident, they were of low severity. Even so, following an initial examination of FR by Penza on December 18, 2018, Penza, Korchagin, TOH Management, Klochko, and Touch of Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xx)     On December 15, 2018, an Insured named MC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that MC's vehicle was drivable following the accident. The police report further indicated that MC was not injured and did not complain of any pain. In keeping with the fact that MC was not injured, MC did not visit any hospital emergency room following the accident. To the extent that MC experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following an initial examination of MC by Hanson on December 19, 2018, Hanson, Korchagin, TOH Management, Klochko, and Touch of Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xxi)    On January 6, 2019, an Insured named AM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that AM's vehicle was drivable following the accident. The police report further indicated that AM was not injured and did not complain of any pain. In keeping with the fact that AM was not injured, AM did not visit any hospital emergency room following the accident. To the extent that AM experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following an initial examination of AM by Penza on January 9, 2019, Penza, Korchagin, TOH Management, Klochko, and Touch of Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xxii)   On March 4, 2019, an Insured named PD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that PD's vehicle was drivable following the accident. The police report further indicated that PD was not injured and did not complain of any pain. In keeping with the fact that PD was not injured, PD did not visit any hospital emergency room following the accident. To the extent that PD experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following an initial examination of PD by Penza on March 5, 2019, Penza, Korchagin, TOH Management, Klochko, and Touch of Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xxiii) On March 4, 2019, an Insured named JJ was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JJ's vehicle was drivable following the accident. The police report further indicated that JJ was not injured and did not complain of any pain. In keeping with the fact that JJ was not injured, JJ did not visit any hospital emergency room following the accident. To the extent that JJ experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following an initial examination of JJ by Penza on March 6, 2019, Penza, Korchagin, TOH Management, Klochko, and Touch of Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xxiv) On March 4, 2019, an Insured named JL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JL's vehicle was drivable following the accident. The police report further indicated that JL was not injured and did not complain of any pain. In keeping with the fact that JL was not injured, JL did not visit any hospital emergency room following the accident. To the extent that JL experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following an initial examination of JL by Penza on March 7, 2019, Penza, Korchagin, TOH Management, Klochko, and Touch of Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xxv) On March 4, 2019, an Insured named AM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that AM's vehicle was drivable following the accident. The police report further indicated that AM was not injured and did not complain of any pain. In keeping with the fact that AM was not injured, AM did not visit any hospital emergency room following the accident. To the extent that AM experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following an initial examination of AM by Penza on March 7, 2019, Penza, Korchagin, TOH Management, Klochko, and Touch of Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

273.    These are only representative examples. In the claims for initial examinations identified in Exhibit "1", Touch of Health, Korchagin, TOH Management, Klochko, Hanson,

Penza, Roldos, and Kabushinskaya routinely falsely represented that the Insureds presented with problems of moderate or moderate to high severity, when in fact the Insureds' problems were low-severity soft tissue injuries such as sprains and strains, to the limited extent that they had any presenting problems at all.

274.   In the claims for initial examinations identified in Exhibit "1", Touch of Health, Korchagin, TOH Management, Klochko, Hanson, Penza, Roldos, and Kabushinskaya routinely falsely represented that the Insureds presented with problems of moderate or moderate to high severity in order to create a false basis for their charges for the examinations under CPT codes 99203 and 99204, because examinations billable under CPT codes 99203 and 99204 are reimbursable at higher rates than examinations involving presenting problems of low severity, or no severity.

275.   In the claims for initial examinations identified in Exhibit "1", Touch of Health, Korchagin, TOH Management, Klochko, Hanson, Penza, Roldos, and Kabushinskaya also routinely falsely represented that the Insureds presented with problems of moderate severity in order to create a false basis for the other Fraudulent Services that the Defendants purported to provide to the Insureds, including medically unnecessary follow-up examinations, physical therapy services and/or chiropractic services, ligament laxity testing services, and HME.

**b.    Misrepresentations Regarding the Amount of Time Spent on the Initial Examinations**

276.   What is more, in the claims identified in Exhibit "1" for initial examinations under CPT codes 99203 and 99204, Touch of Health, Korchagin, TOH Management, Klochko, Hanson, Penza, Roldos, and Kabushinskaya routinely misrepresented and

exaggerated the amount of face-to-face time that the examining physician or chiropractor spent with the Insureds or the Insureds' families.

277.    As set forth in Exhibit "1", Touch of Health, Korchagin, TOH Management, Klochko, Hanson, Penza, Roldos, and Kabushinskaya virtually always billed for the putative initial examinations using CPT codes 99203 and 99204, and thereby represented that the physician or chiropractor who purported to conduct the examinations spent between at least 30 and 45 minutes of face-to-face time with the Insureds or the Insureds' families during the putative examinations.

278.    In fact, in most of the claims for initial examinations identified in Exhibit "1", Hanson, Penza, Roldos, and Kabushinskaya never spent more than 15 minutes – let alone 30 or 45 minutes – of face-to-face time with the Insureds or their families when purporting to conduct the examinations.

279.    For instance, and in keeping with the fact that the initial examinations in the claims identified in Exhibit "1" did not entail more than 15 minutes of face-to-face time between Hanson, Penza, Roldos, and Kabushinskaya and the Insureds or the Insureds' families, to the extent that the examinations actually were performed in the first instance, Hanson, Penza, Roldos, and Kabushinskaya used a template in purporting to conduct the initial examinations.

280.    The template that Hanson, Penza, Roldos, and Kabushinskaya used in purporting to conduct the initial examinations set forth a limited range of examination parameters.

281.    The only face-to-face time between the physicians or chiropractors and the Insureds that was reflected in the limited range of examination parameters consisted of brief patient interviews and limited examinations of the Insureds' musculoskeletal systems.

282.    These brief patient interviews and limited examinations did not require Hanson, Penza, Roldos, Kabushinskaya, nor any other physician or chiropractor associated with Touch of Health, to spend more than 15 minutes of face-to-face time with the Insureds or their families.

283.    In the claims for initial examinations identified in Exhibit "1", Touch of Health, Korchagin, TOH Management, Klochko, Hanson, Penza, Roldos, and Kabushinskaya routinely falsely represented that the initial examinations involved either 30 or 45 minutes of face-to-face time in order to create a false basis for their charges under CPT codes 99203 and 99204, because examinations billable under CPT codes 99203 and 99204 are reimbursable at higher rates than examinations that require less time to perform.

**c.    Misrepresentations Regarding "Detailed" Physical Examinations**

284.    Moreover, in the claims identified in Exhibit "1" for initial examinations under CPT code 99203, Touch of Health, Korchagin, TOH Management, Klochko, Hanson, Penza, and Roldos routinely falsely represented the extent of the underlying physical examinations.

285.    To the extent that the Insureds in the claims identified in Exhibit "1" had any actual complaints at all as the result of their relatively minor automobile accidents, the complaints were limited to minor musculoskeletal complaints, specifically sprains and strains.

286.    In the claims for initial examinations identified in Exhibit "1", when Touch of Health, Korchagin, TOH Management, Klochko, Hanson, Penza, and Roldos billed for the

initial examinations under CPT code 99203, they falsely represented that the physician or chiropractor who purported to perform the examinations – namely Hanson, Penza, and Roldos – performed "detailed" patient examinations on the Insureds they purported to treat during the initial examinations.

287.   In fact, with respect to the claims for initial examinations under CPT code 99203 that are identified in Exhibit "1", Hanson, Penza, and Roldos virtually never conducted an extended examination of the Insureds' musculoskeletal systems.

288.   For instance, in the vast majority of the claims under CPT code 99203 identified in Exhibit "1", Hanson, Penza, and Roldos did not conduct an extended examination of the Insureds' musculoskeletal systems, inasmuch as they did not document findings with respect to the following:

(i)     measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

(ii)    general appearance of patient (e.g., development, nutrition, body habitus, deformities, attention to grooming);

(iii)   examination of peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin and/or other location;

(v)     brief assessment of mental status;

(vi)    examination of gait and station;

(vii)   inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(viii)  coordination;

(ix)    examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and/or

(x)    examination of sensation.

289.    For example:

(i)    On or about March 1, 2017, Touch of Health, Korchagin, TOH Management, Klochko, and Hanson billed GEICO under CPT code 99203 for an initial examination that Hanson purported to perform on an Insured named AA, and thereby represented that Hanson had provided a "detailed" physical examination to AA. However, Hanson did not document an extended examination of AA's musculoskeletal system, despite the fact that – to the extent AA had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(ii)    On or about July 3, 2017, Touch of Health, Korchagin, TOH Management, Klochko, and Roldos billed GEICO under CPT code 99203 for an initial examination that Roldos purported to perform on an Insured named IS, and thereby represented that Roldos had provided a "detailed" physical examination to IS. However, Roldos did not document an extended examination of IS's musculoskeletal system, despite the fact that – to the extent IS had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(iii)    On or about October 13, 2017, Touch of Health, Korchagin, TOH Management, Klochko, and Hanson billed GEICO under CPT code 99203 for an initial examination that Hanson purported to perform on an Insured named ET, and thereby represented that Hanson had provided a "detailed" physical examination to ET. However, Hanson did not document an extended examination of ET's musculoskeletal system, despite the fact that – to the extent ET had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(iv)    On or about November 3, 2017, Touch of Health, Korchagin, TOH Management, Klochko, and Roldos billed GEICO under CPT code 99203 for an initial examination that Roldos purported to perform on an Insured named EC, and thereby represented that Roldos had provided a "detailed" physical examination to EC. However, Roldos did not document an extended examination of ED's musculoskeletal system, despite the fact that – to the extent EC had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(v)     On or about December 11, 2017, Touch of Health, Korchagin, TOH Management, Klochko, and Roldos billed GEICO under CPT code 99203 for an initial examination that Roldos purported to perform on an Insured named AA, and thereby represented that Roldos had provided a "detailed" physical examination to AA. However, Roldos did not document an extended examination of AA's musculoskeletal system, despite the fact that – to the extent AA had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(vi)    On or about February 5, 2018, Touch of Health, Korchagin, TOH Management, Klochko, and Roldos billed GEICO under CPT code 99203 for an initial examination that Roldos purported to perform on an Insured named JJ, and thereby represented that Roldos had provided a "detailed" physical examination to JJ. However, Roldos did not document an extended examination of JJ's musculoskeletal system, despite the fact that – to the extent JJ had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(vii)   On or about February 13, 2018, Touch of Health, Korchagin, TOH Management, Klochko, and Roldos billed GEICO under CPT code 99203 for an initial examination that Roldos purported to perform on an Insured named AD, and thereby represented that Roldos had provided a "detailed" physical examination to AD. However, Roldos did not document an extended examination of AD's musculoskeletal system, despite the fact that – to the extent AD had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(viii)  On or about April 20, 2018, Touch of Health, Korchagin, TOH Management, Klochko, and Hanson billed GEICO under CPT code 99203 for an initial examination that Hanson purported to perform on an Insured named VK, and thereby represented that Hanson had provided a "detailed" physical examination to VK. However, Hanson did not document an extended examination of VK's musculoskeletal system, despite the fact that – to the extent VK had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(ix)    On or about May 7, 2018, Touch of Health, Korchagin, TOH Management, Klochko, and Penza billed GEICO under CPT code 99203 for an initial examination that Penza purported to perform on an Insured named LB, and thereby represented that Penza had provided a "detailed" physical examination to LB. However, Penza did not document an extended examination of LB's musculoskeletal system, despite the fact that – to the extent LB had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(x) On or about May 21, 2018, Touch of Health, Korchagin, TOH Management, Klochko, and Penza billed GEICO under CPT code 99203 for an initial examination that Penza purported to perform on an Insured named VK, and thereby represented that Penza had provided a "detailed" physical examination to VK. However, Penza did not document an extended examination of VK's musculoskeletal system, despite the fact that – to the extent VK had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(xi) On or about July 17, 2018, Touch of Health, Korchagin, TOH Management, Klochko, and Penza billed GEICO under CPT code 99203 for an initial examination that Penza purported to perform on an Insured named FD, and thereby represented that Penza had provided a "detailed" physical examination to FD. However, Penza did not document an extended examination of FD's musculoskeletal system, despite the fact that – to the extent FD had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(xii) On or about November 6, 2018, Touch of Health, Korchagin, TOH Management, Klochko, and Penza billed GEICO under CPT code 99203 for an initial examination that Penza purported to perform on an Insured named ME, and thereby represented that Penza had provided a "detailed" physical examination to ME. However, Penza did not document an extended examination of ME's musculoskeletal system, despite the fact that – to the extent ME had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(xiii) On or about December 18, 2018, Touch of Health, Korchagin, TOH Management, Klochko, and Penza billed GEICO under CPT code 99203 for an initial examination that Penza purported to perform on an Insured named FR, and thereby represented that Penza had provided a "detailed" physical examination to FR. However, Penza did not document an extended examination of FR's musculoskeletal system, despite the fact that – to the extent FR had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(xiv) On or about December 19, 2018, Touch of Health, Korchagin, TOH Management, Klochko, and Hanson billed GEICO under CPT code 99203 for an initial examination that Hanson purported to perform on an Insured named AK, and thereby represented that Hanson had provided a "detailed" physical examination to AK. However, Hanson did not document an extended examination of AK's musculoskeletal system, despite the fact that – to the

extent AK had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(xv)     On or about December 19, 2018, Touch of Health, Korchagin, TOH Management, Klochko, and Hanson billed GEICO under CPT code 99203 for an initial examination that Hanson purported to perform on an Insured named MC, and thereby represented that Hanson had provided a "detailed" physical examination to MC. However, Hanson did not document an extended examination of MC's musculoskeletal system, despite the fact that – to the extent MC had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

290.     These are only representative examples. In the vast majority of the claims for initial examinations under CPT code 99203 that are identified in Exhibit "1", Touch of Health, Korchagin, TOH Management, Klochko, Hanson, Penza, and Roldos routinely falsely represented that they had provided "detailed" physical examinations. In fact, they had not provided detailed physical examinations because Hanson, Penza, and Roldos had not documented an extended examination of the affected body areas and other symptomatic or related organ systems.

291.     In the claims for initial examinations under CPT code 99203 that are identified in Exhibit "1", Touch of Health, Korchagin, TOH Management, Klochko, Hanson, Penza, and Roldos routinely falsely represented that they had provided "detailed" physical examinations to the Insureds in order to create a false basis for their charges for the examinations under CPT code 99203, because examinations billable under CPT code 99203 are reimbursable at higher rates than examinations that do not require the examining physician to provide "detailed" physical examinations.

**d.      Misrepresentations Regarding the Extent of Medical Decision-Making**

292.     When the Insureds in the claims identified in Exhibit "1" presented at Touch of Health for initial examinations, their presenting problems virtually always were limited to low severity soft tissue injuries such as acute sprains and strains, to the extent that they had any legitimate presenting problems at all.

293.     The diagnosis and treatment of these low severity sprains and strains did not require any legitimate, low- or moderate-complexity medical decision-making.

294.     First, in the claims for initial examinations identified in Exhibit "1", the initial examinations did not involve the retrieval, review, or analysis of any significant amount of medical records, diagnostic tests, or other information.

295.     When the Insureds in the claims identified in Exhibit "1" presented to Touch of Health for "treatment", they did not arrive with any medical records except, at times, basic radiology reports.

296.     Furthermore, prior to the initial examinations, Touch of Health, Korchagin, TOH Management, Klochko, Hanson, Penza, Roldos, and Kabushinskaya did not request any medical records from other providers.

297.     Second, in the claims for initial examinations identified in Exhibit "1", there was no risk of significant complications or morbidity – much less mortality – from the Insureds' relatively minor soft tissue injury complaints, to the extent that they ever had any complaints from automobile accidents at all.

298.     Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided at Touch of Health,

to the extent that Touch of Health, Korchagin, TOH Management, Klochko, Hanson, Penza, Roldos, and Kabushinskaya provided any such diagnostic procedures or treatment options in the first instance.

299.    In almost every instance, any "treatments" that Touch of Health, Korchagin, TOH Management, Klochko, Hanson, Penza, Roldos, and Kabushinskaya actually provided were limited to chiropractic treatment and/or physical therapy treatment, none of which was health– or life–threatening if properly administered.

300.    Third, in the claims for initial examinations identified in Exhibit "1", Touch of Health, Korchagin, TOH Management, Klochko, Hanson, Penza, Roldos, and Kabushinskaya did not consider any significant number of diagnoses or treatment options for the Insureds during the initial examinations.

301.    Rather, to the extent that the initial examinations were conducted in the first instance, Touch of Health, Korchagin, TOH Management, Klochko, Hanson, Penza, Roldos, and Kabushinskaya provided a phony list of soft tissue injury "diagnoses" for virtually every Insured, and prescribed a substantially similar course of treatment for every Insured.

302.    Specifically, in most of the claims identified in Exhibit "1", during the initial examinations the Insureds did not report any continuing medical problems that legitimately could be traced to an underlying automobile accident.

303.    Even so, Touch of Health, Korchagin, TOH Management, Klochko, Hanson, Penza, Roldos, and Kabushinskaya prepared initial examination reports in which they provided a phony list of soft tissue injury "diagnoses" to virtually every Insured.

304.    Then, based upon these phony "diagnoses", Touch of Health, Korchagin, TOH

Management, Klochko, Hanson, Penza, Roldos, and Kabushinskaya directed virtually every Insured to: (i) receive significant and medically unnecessary chiropractic treatment and/or physical therapy treatment; (ii) receive medically unnecessary HME from Touch of Health and/or CFL Medical Supplies; and (iii) undergo medically unnecessary diagnostic testing at Touch of Health and/or CFL Diagnostic, regardless of the Insureds' true circumstances or presentation.

305.   For example:

(i)     On February 28, 2017, an Insured named AA was involved in an automobile accident. The contemporaneous police report indicated that AA's vehicle was drivable following the accident. The police report further indicated that AA was not injured and did not complain of any pain. In keeping with the fact that AA was not injured, AA did not visit any hospital emergency room following the accident. To the extent that AA experienced any health problems at all as the result of the minor accident, they were of low severity. On March 1, 2017, Hanson purported to conduct an initial examination of AA at Touch of Health. To the extent that Hanson performed the examination in the first instance, Hanson did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Hanson did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Hanson provided AA with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither AA's presenting problems, nor the treatment plan provided to AA by Hanson, TOH Management, Klochko, and Touch of Health, presented any risk of significant complications, morbidity, or mortality. To the contrary, AA did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Hanson, Korchagin, TOH Management, Klochko, and Touch of Health consisted of medically unnecessary chiropractic services, HME, and diagnostic testing, none of which posed the least bit of risk to AA. Even so, Hanson, Korchagin, TOH Management, Klochko, and Touch of Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Hanson engaged in some legitimate, low complexity medical decision-making during the purported examination.

(ii)    On May 12, 2017, an Insured named GJ was involved in an automobile accident. The contemporaneous police report indicated that the accident was a

low-impact accident, and that GJ's vehicle was drivable following the accident. The police report further indicated that GJ was not injured and did not complain of any pain. In keeping with the fact that GJ was not injured, GJ did not visit any hospital emergency room following the accident. To the extent that GJ experienced any health problems at all as the result of the minor accident, they were of low severity. On May 18, 2017, Hanson purported to conduct an initial examination of GJ at Touch of Health. To the extent that Hanson performed the examination in the first instance, Hanson did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Hanson did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Hanson provided GJ with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither GJ's presenting problems, nor the treatment plan provided to GJ by Hanson, Korchagin, TOH Management, Klochko, and Touch of Health, presented any risk of significant complications, morbidity, or mortality. To the contrary, GJ did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Hanson, Korchagin, TOH Management, Klochko, and Touch of Health consisted of medically unnecessary chiropractic services, HME, and diagnostic testing, none of which posed the least bit of risk to GJ. Even so, Hanson, Korchagin, TOH Management, Klochko, and Touch of Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Hanson engaged in some legitimate, low complexity medical decision-making during the purported examination.

(iii)   On July 18, 2017, an Insured named RP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact accident, and that RP's vehicle was drivable following the accident. The police report further indicated that RP was not injured and did not complain of any pain. In keeping with the fact that RP was not injured, RP did not visit any hospital emergency room following the accident. To the extent that RP experienced any health problems at all as the result of the minor accident, they were of low severity.  On July 19, 2017, Roldos purported to conduct an initial examination of RP at Touch of Health. To the extent that Roldos performed the examination in the first instance, Roldos did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Roldos did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Roldos provided RP with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither RP's presenting problems, nor the treatment plan provided to RP by Roldos, Korchagin, TOH Management, Klochko, and Touch of Health, presented any risk of significant complications,

morbidity, or mortality. To the contrary, RP did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Roldos, Korchagin, TOH Management, Klochko, and Touch of Health consisted of medically unnecessary chiropractic services, HME, and diagnostic testing, none of which posed the least bit of risk to RP. Even so, Roldos, Korchagin, TOH Management, Klochko, and Touch of Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Roldos engaged in some legitimate, low complexity medical decision-making during the purported examination.

(iv)   On August 28, 2017, an Insured named OD, was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that OD's vehicle was drivable following the accident. The police report further indicated that OD was not injured and did not complain of any pain. In keeping with the fact that OD was not injured, OD did not visit any hospital emergency room following the accident. To the extent that OD experienced any health problems at all as the result of the minor accident, they were of low severity.  On August 29, 2017, Roldos purported to conduct an initial examination of OD at Touch of Health. To the extent that Roldos performed the examination in the first instance, Roldos did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Roldos did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Roldos provided OD with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither OD's presenting problems, nor the treatment plan provided to OD by Roldos, Korchagin, TOH Management, Klochko, and Touch of Health, presented any risk of significant complications, morbidity, or mortality. To the contrary, OD did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Roldos, Korchagin, TOH Management, Klochko, and Touch of Health consisted of medically unnecessary chiropractic services and diagnostic testing, none of which posed the least bit of risk to OD. Even so, Roldos, Korchagin, TOH Management, Klochko, and Touch of Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Roldos engaged in some legitimate, low complexity medical decision-making during the purported examination.

(v)   On June 6, 2018, an Insured named GJ, was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision. The police report further indicated that GJ was not injured and did not complain of any pain. In keeping with the fact that GJ was not injured, GJ did not visit any hospital emergency room following the accident. To the extent that GJ experienced any health problems at all as the

result of the minor accident, they were of low severity. On June 15, 2018, Kabushinskaya purported to conduct an initial examination of GJ at Touch of Health. To the extent that Kabushinskaya performed the examination in the first instance, Kabushinskaya did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Kabushinskaya did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Kabushinskaya provided GJ with the same, phony, list of soft tissue injury "diagnoses" provided to virtually every other Insured. Furthermore, neither GJ's presenting problems, nor the treatment plan provided to GJ by Kabushinskaya, Korchagin, TOH Management, Klochko, and Touch of Health, presented any risk of significant complications, morbidity, or mortality. To the contrary, GJ did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Kabushinskaya, Korchagin, TOH Management, Klochko, and Touch of Health consisted of medically unnecessary chiropractic services, HME, and diagnostic testing, none of which posed the least bit of risk to GJ. Even so, Kabushinskaya, Korchagin, TOH Management, Klochko, and Touch of Health billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Kabushinskaya engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(vi)     On June 6, 2018, an Insured named CD, was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision. The police report further indicated that CD was not injured and did not complain of any pain. In keeping with the fact that CD was not injured, CD did not visit any hospital emergency room following the accident. To the extent that CD experienced any health problems at all as the result of the minor accident, they were of low severity. On June 15, 2018, Kabushinskaya purported to conduct an initial examination of CD, at Touch of Health. To the extent that Kabushinskaya performed the examination in the first instance, Kabushinskaya did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Kabushinskaya did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Kabushinskaya provided CD with the same, phony, list of soft tissue injury "diagnoses" provided to virtually every other Insured. Furthermore, neither CD's presenting problems, nor the treatment plan provided to CD by Kabushinskaya, Korchagin, TOH Management, Klochko, and Touch of Health, presented any risk of significant complications, morbidity, or mortality. To the contrary, CD did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Kabushinskaya, Korchagin, TOH Management, Klochko, and Touch of Health consisted of medically unnecessary chiropractic services, HME, and diagnostic

testing, none of which posed the least bit of risk to CD. Even so, Kabushinskaya, Korchagin, TOH Management, Klochko, and Touch of Health billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Kabushinskaya engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(vii)    On June 26, 2018, an Insured named IF, was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that IF's vehicle was drivable following the accident. The police report further indicated that IF was not injured and did not complain of any pain. In keeping with the fact that IF was not injured, IF did not visit any hospital emergency room following the accident. To the extent that IF experienced any health problems at all as the result of the minor accident, they were of low severity. On June 27, 2018, Penza purported to conduct an initial examination of IF at Touch of Health. To the extent that Penza performed the examination in the first instance, Penza did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Penza did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Penza provided IF with the same, phony, list of soft tissue injury "diagnoses" provided to virtually every other Insured. Furthermore, neither IF's presenting problems, nor the treatment plan provided to IF by Penza, Korchagin, TOH Management, Klochko, and Touch of Health, presented any risk of significant complications, morbidity, or mortality. To the contrary, IF did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Penza, Korchagin, TOH Management, Klochko, and Touch of Health consisted of medically unnecessary chiropractic services, HME, and diagnostic testing, none of which posed the least bit of risk to IF. Even so, Penza, Korchagin, TOH Management, Klochko, and Touch of Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Penza engaged in some legitimate, low complexity medical decision-making during the purported examination.

(viii)   On June 26, 2018, an Insured named BF, was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that BF's vehicle was drivable following the accident. The police report further indicated that BF was not injured and did not complain of any pain. In keeping with the fact that BF was not injured, BF did not visit any hospital emergency room following the accident. To the extent that BF experienced any health problems at all as the result of the minor accident, they were of low severity. On June 27, 2018, Kabushinskaya purported to conduct an initial examination of BF at Touch of Health. To the extent that Kabushinskaya performed the examination in the first instance,

Kabushinskaya did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Kabushinskaya did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Kabushinskaya provided BF with the same, phony, list of soft tissue injury "diagnoses" provided to virtually every other Insured. Furthermore, neither BF's presenting problems, nor the treatment plan provided to BF by Kabushinskaya, Korchagin, TOH Management, Klochko, and Touch of Health, presented any risk of significant complications, morbidity, or mortality. To the contrary, BF did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Kabushinskaya, Korchagin, TOH Management, Klochko, and Touch of Health consisted of medically unnecessary chiropractic services, HME, and diagnostic testing, none of which posed the least bit of risk to BF. Even so, Kabushinskaya, Korchagin, TOH Management, Klochko, and Touch of Health billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Kabushinskaya engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(ix)     On July 8, 2018, an Insured named AD, was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that AD's vehicle was drivable following the accident. The police report further indicated that AD was not injured and did not complain of any pain. In keeping with the fact that AD was not injured, AD did not visit any hospital emergency room following the accident. To the extent that AD experienced any health problems at all as the result of the minor accident, they were of low severity. On July 9, 2018, Hanson purported to conduct an initial examination of AD at Touch of Health. To the extent that Hanson performed the examination in the first instance, Hanson did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Hanson did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Hanson provided AD with the same, phony, list of soft tissue injury "diagnoses" provided to virtually every other Insured. Furthermore, neither AD's presenting problems, nor the treatment plan provided to AD by Hanson, Korchagin, TOH Management, Klochko, and Touch of Health, presented any risk of significant complications, morbidity, or mortality. To the contrary, AD did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Hanson, Korchagin, TOH Management, Klochko, and Touch of Health consisted of medically unnecessary chiropractic services, HME, and diagnostic testing, none of which posed the least bit of risk to AD. Even so, Hanson, Korchagin, TOH Management, Klochko, and Touch of Health billed GEICO for the initial examination using CPT code 99203, and

thereby falsely represented that Hanson engaged in some legitimate, low complexity medical decision-making during the purported examination.

(x)    On August 14, 2018, an Insured named BD, was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that BD's vehicle was drivable following the accident. The police report further indicated that BD was not injured and did not complain of any pain. In In keeping with the fact that BD was not injured, BD did not visit any hospital emergency room following the accident. To the extent that BD experienced any health problems at all as the result of the minor accident, they were of low severity. On August 23, 2018, Penza purported to conduct an initial examination of BD at Touch of Health. To the extent that Penza performed the examination in the first instance, Penza did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Penza did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Penza provided BD with the same, phony, list of soft tissue injury "diagnoses" provided to virtually every other Insured. Furthermore, neither BD's presenting problems, nor the treatment plan provided to BD by Penza, Korchagin, TOH Management, Klochko, and Touch of Health, presented any risk of significant complications, morbidity, or mortality. To the contrary, BD did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Penza, Korchagin, TOH Management, Klochko, and Touch of Health consisted of medically unnecessary chiropractic services, HME, and diagnostic testing, none of which posed the least bit of risk to BD. Even so, Penza, Korchagin, TOH Management, Klochko, and Touch of Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Penza engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xi)    On November 5, 2018, an Insured named ME, was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that ME's vehicle was drivable following the accident. The police report further indicated that ME was not injured and did not complain of any pain. In keeping with the fact that ME was not injured, ME did not visit any hospital emergency room following the accident. To the extent that ME experienced any health problems at all as the result of the minor accident, they were of low severity. On November 6, 2018, Penza purported to conduct an initial examination of ME at Touch of Health. To the extent that Penza performed the examination in the first instance, Penza did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Penza did not consider any significant number of diagnoses or

management options in connection with the examination. Instead, Penza provided ME with the same, phony, list of soft tissue injury "diagnoses" provided to virtually every other Insured. Furthermore, neither ME's presenting problems, nor the treatment plan provided to ME by Penza, Korchagin, TOH Management, Klochko, and Touch of Health, presented any risk of significant complications, morbidity, or mortality. To the contrary, ME did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Penza, Korchagin, TOH Management, Klochko, and Touch of Health consisted of medically unnecessary chiropractic services, HME, and diagnostic testing, none of which posed the least bit of risk to ME. Even so, Penza, Korchagin, TOH Management, Klochko, and Touch of Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Penza engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xii)   On November 5, 2018, an Insured named NE, was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that NE's vehicle was drivable following the accident. The police report further indicated that NE was not injured and did not complain of any pain. In keeping with the fact that NE was not injured, NE did not visit any hospital emergency room following the accident. To the extent that NE experienced any health problems at all as the result of the minor accident, they were of low severity. On November 6, 2018, Penza purported to conduct an initial examination of NE at Touch of Health. To the extent that Penza performed the examination in the first instance, Penza did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Penza did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Penza provided NE with the same, phony, list of soft tissue injury "diagnoses" provided to virtually every other Insured. Furthermore, neither NE's presenting problems, nor the treatment plan provided to NE by Penza, Korchagin, TOH Management, Klochko, and Touch of Health, presented any risk of significant complications, morbidity, or mortality. To the contrary, NE did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Penza, Korchagin, TOH Management, Klochko, and Touch of Health consisted of medically unnecessary chiropractic services, HME, and diagnostic testing, none of which posed the least bit of risk to NE. Even so, Penza, Korchagin, TOH Management, Klochko, and Touch of Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Penza engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xiii)   On December 15, 2018, an Insured named AK, was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that AK's vehicle was drivable following the accident. The police report further indicated that AK was not injured and did not complain of any pain. In keeping with the fact that AK was not injured, AK did not visit any hospital emergency room following the accident. To the extent that AK experienced any health problems at all as the result of the minor accident, they were of low severity. On December 19, 2018, Hanson purported to conduct an initial examination of AK at Touch of Health. To the extent that Hanson performed the examination in the first instance, Hanson did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Hanson did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Hanson provided AK with the same, phony, list of soft tissue injury "diagnoses" provided to virtually every other Insured. Furthermore, neither AK's presenting problems, nor the treatment plan provided to AK by Hanson, Korchagin, TOH Management, Klochko, and Touch of Health, presented any risk of significant complications, morbidity, or mortality. To the contrary, AK did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Hanson, Korchagin, TOH Management, Klochko, and Touch of Health consisted of medically unnecessary chiropractic services, HME, and diagnostic testing, none of which posed the least bit of risk to AK. Even so, Hanson, Korchagin, TOH Management, Klochko, and Touch of Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Hanson engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xiv)   On December 15, 2018, an Insured named FM, was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that FM's vehicle was drivable following the accident. The police report further indicated that FM was not injured and did not complain of any pain. In keeping with the fact that FM was not injured, FM did not visit any hospital emergency room following the accident. To the extent that FM experienced any health problems at all as the result of the minor accident, they were of low severity.  On December 18, 2018, Penza purported to conduct an initial examination of FM at Touch of Health. To the extent that Penza performed the examination in the first instance, Penza did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Penza did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Penza provided FM with the same, phony, list of soft tissue injury "diagnoses" provided to virtually every other Insured. Furthermore, neither FM's presenting problems, nor the treatment

plan provided to FM by Penza, Korchagin, TOH Management, Klochko, and Touch of Health, presented any risk of significant complications, morbidity, or mortality. To the contrary, FM did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Penza, Korchagin, TOH Management, Klochko, and Touch of Health consisted of medically unnecessary chiropractic services, HME, and diagnostic testing, none of which posed the least bit of risk to FM. Even so, Penza, Korchagin, TOH Management, Klochko, and Touch of Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Penza engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xv)     On December 15, 2018, an Insured named FD, was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that FD's vehicle was drivable following the accident. The police report further indicated that FD, was not injured and did not complain of any pain. In keeping with the fact that FD was not injured, FD did not visit any hospital emergency room following the accident. To the extent that FD experienced any health problems at all as the result of the minor accident, they were of low severity. On December 18, 2018, Penza purported to conduct an initial examination of FD at Touch of Health. To the extent that Penza performed the examination in the first instance, Penza did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Penza did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Penza provided FD with the same, phony, list of soft tissue injury "diagnoses" provided to virtually every other Insured. Furthermore, neither FD's presenting problems, nor the treatment plan provided to FD by Penza, Korchagin, TOH Management, Klochko, and Touch of Health, presented any risk of significant complications, morbidity, or mortality. To the contrary, FD did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Penza, Korchagin, TOH Management, Klochko, and Touch of Health consisted of medically unnecessary chiropractic services and diagnostic testing, none of which posed the least bit of risk to FD. Even so, Penza, Korchagin, TOH Management, Klochko, and Touch of Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Penza engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xvi)    On December 15, 2018, an Insured named FR, was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that FR's vehicle was drivable following the accident. The police report further indicated that FR was not injured and did

not complain of any pain. In keeping with the fact that FR was not injured, FR did not visit any hospital emergency room following the accident. To the extent that FR experienced any health problems at all as the result of the minor accident, they were of low severity.  On December 18, 2018, Penza purported to conduct an initial examination of FR at Touch of Health. To the extent that Penza performed the examination in the first instance, Penza did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Penza did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Penza provided FR with the same, phony, list of soft tissue injury "diagnoses" provided to virtually every other Insured. Furthermore, neither FR's presenting problems, nor the treatment plan provided to FR by Penza, Korchagin, TOH Management, Klochko, and Touch of Health, presented any risk of significant complications, morbidity, or mortality. To the contrary, FR did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Penza, Korchagin, TOH Management, Klochko, and Touch of Health consisted of medically unnecessary chiropractic services, HME, and diagnostic testing, none of which posed the least bit of risk to FR. Even so, Penza, Korchagin, TOH Management, Klochko, and Touch of Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Penza engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xvii)  On December 15, 2018, an Insured named MC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that MC's vehicle was drivable following the accident. The police report further indicated that MC was not injured and did not complain of any pain. In keeping with the fact that MC was not injured, MC did not visit any hospital emergency room following the accident. To the extent that MC experienced any health problems at all as the result of the minor accident, they were of low severity. On December 19, 2018, Hanson purported to conduct an initial examination of MC at Touch of Health. To the extent that Hanson performed the examination in the first instance, Hanson did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Hanson did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Hanson provided MC with the same, phony, list of soft tissue injury "diagnoses" provided to virtually every other Insured. Furthermore, neither MC's presenting problems, nor the treatment plan provided to MC by Hanson, Korchagin, TOH Management, Klochko, and Touch of Health, presented any risk of significant complications, morbidity, or mortality. To the contrary, MC did not need any significant treatment at all as a result of the accident, and the

treatment plan provided by Hanson, Korchagin, TOH Management, Klochko, and Touch of Health consisted of medically unnecessary chiropractic services, HME, and diagnostic testing, none of which posed the least bit of risk to MC. Even so, Hanson, Korchagin, TOH Management, Klochko, and Touch of Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Hanson engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xviii)   On January 6, 2019, an Insured named AM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that AM's vehicle was drivable following the accident. The police report further indicated that AM was not injured and did not complain of any pain. In keeping with the fact that AM was not injured, AM did not visit any hospital emergency room following the accident. To the extent that AM experienced any health problems at all as the result of the minor accident, they were of low severity. On January 9, 2019, Penza purported to conduct an initial examination of AM at Touch of Health. To the extent that Penza performed the examination in the first instance, Penza did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Penza did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Penza provided AM with the same, phony, list of soft tissue injury "diagnoses" provided to virtually every other Insured. Furthermore, neither AM's presenting problems, nor the treatment plan provided to AM by Penza, Korchagin, TOH Management, Klochko, and Touch of Health, presented any risk of significant complications, morbidity, or mortality. To the contrary, AM did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Penza, Korchagin, TOH Management, Klochko, and Touch of Health consisted of medically unnecessary chiropractic services and diagnostic testing, none of which posed the least bit of risk to AM. Even so, Penza, Korchagin, TOH Management, Klochko, and Touch of Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Penza engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xix)   On March 4, 2019, an Insured named JL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JL's vehicle was drivable following the accident. The police report further indicated that JL was not injured and did not complain of any pain. In keeping with the fact that JL was not injured, JL did not visit any hospital emergency room following the accident. To the extent that JL experienced any health problems at all as the result of the minor accident, they were of low severity.  On March 7, 2019, Penza purported to

conduct an initial examination of JL at Touch of Health. To the extent that Penza performed the examination in the first instance, Penza did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Penza did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Penza provided JL with the same, phony, list of soft tissue injury "diagnoses" provided to virtually every other Insured. Furthermore, neither JL's presenting problems, nor the treatment plan provided to JL by Penza, Korchagin, TOH Management, Klochko, and Touch of Health, presented any risk of significant complications, morbidity, or mortality. To the contrary, JL did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Penza, Korchagin, TOH Management, Klochko, and Touch of Health consisted of medically unnecessary chiropractic services, HME, and diagnostic testing, none of which posed the least bit of risk to JL. Even so, Penza, Korchagin, TOH Management, Klochko, and Touch of Health billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Penza engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xx)    On March 4, 2019, an Insured named AM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that AM's vehicle was drivable following the accident. The police report further indicated that AM was not injured and did not complain of any pain. In keeping with the fact that AM was not injured, AM did not visit any hospital emergency room following the accident. To the extent that AM experienced any health problems at all as the result of the minor accident, they were of low severity. On March 7, 2019, Penza purported to conduct an initial examination of AM at Touch of Health. To the extent that Penza performed the examination in the first instance, Penza did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Penza did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Penza provided AM with the same, phony, list of soft tissue injury "diagnoses" provided to virtually every other Insured. Furthermore, neither AM's presenting problems, nor the treatment plan provided to AM by Penza, Korchagin, TOH Management, Klochko, and Touch of Health, presented any risk of significant complications, morbidity, or mortality. To the contrary, AM did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Penza, Korchagin, TOH Management, Klochko, and Touch of Health consisted of medically unnecessary chiropractic services and diagnostic testing, none of which posed the least bit of risk to AM. Even so, Penza, Korchagin, TOH Management, Klochko, and Touch of Health billed GEICO for the initial examination using

CPT code 99203, and thereby falsely represented that Penza engaged in some legitimate, low complexity medical decision-making during the purported examination.

306.    There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

307.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

308.    As set forth above, in the claims identified in Exhibit "1", virtually all of the Insureds whom Touch of Health, Korchagin, TOH Management, Klochko, Hanson, Penza, Roldos, and Kabushinskaya purported to treat were involved in relatively minor, "fender-bender" accidents, to the extent that they were involved in any actual accident at all.

309.    It is highly improbable that any two Insureds involved in any one of the relatively minor automobile accidents in the claims identified in Exhibit "1" would suffer substantially identical injuries as the result of their accidents, or require a substantially identical course of treatment.

310.    It is even more improbable – to the point of impossibility – that this would occur repeatedly, often with the Insureds presenting for initial examinations at Touch of Health with substantially identical injuries on or about the exact same dates after their accidents.

311.    Even so, in keeping with the fact that the putative "diagnoses" were phony, and in keeping with the fact that the putative initial examinations involved no actual medical decision-making at all, Touch of Health, Korchagin, TOH Management, Klochko, Hanson, Penza, Roldos, and Kabushinskaya frequently issued substantially identical "diagnoses", on or

about the same date, to more than one Insured involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds.

312.   For example:

(i)     On June 28, 2017, two Insureds – ES and IS – were involved in the same automobile accident. Thereafter, ES and IS presented – incredibly – on the exact same date, July 3, 2017, at Touch of Health for initial examinations by Roldos. ES and IS were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that ES and IS suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Roldos, Korchagin, TOH Management, Klochko, and Touch of Health provided ES and IS with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(ii)    On April 3, 2018, two Insureds – SL and MT – were involved in the same automobile accident. Thereafter, on April 9, 2018, MT presented to Touch of Health for an initial examination by Penza. Then, on April 10, 2018, SL too presented to Touch of Health for an initial examination by Roldos. SL and MT were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that SL and MT suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Roldos, Korchagin, TOH Management, Klochko, and Touch of Health provided SL and MT with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(iii)   On June 11, 2018, two Insureds – CH and RR – were involved in the same automobile accident. Thereafter, CH and RR presented – incredibly – on the exact same date, July 6, 2018, to Touch of Health for initial examinations by Kabushinskaya. CH and RR were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that CH and RR suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Kabushinskaya, Korchagin, TOH Management, Klochko, and Touch of Health provided CH and RR with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(iv)    On June 26, 2018, two Insureds – BF and IF – were involved in the same automobile accident. Thereafter, on June 27, 2018, IF presented to Touch of Health for an initial examination by Penza. Then, on July 6, 2018, BF too presented to Touch of Health for an initial examination by Penza. BF and IF

were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that BF and IF suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Penza, Korchagin, TOH Management, Klochko, and Touch of Health provided BF and IF with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(v)     On July 12, 2018, two Insureds – SS and CP – were involved in the same automobile accident. Thereafter, SS and CP presented – incredibly – on the exact same date, July 20, 2018, to Touch of Health for initial examinations by Kabushinskaya. SS and CP were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that SS and CP suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Kabushinskaya, Korchagin, TOH Management, Klochko, and Touch of Health provided SS and CP with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(vi)    On July 30, 2018, two Insureds – KB and EJ – were involved in the same automobile accident. Thereafter, KB and EJ presented – incredibly – on the exact same date, August 8, 2018, to Touch of Health for initial examinations by Kabushinskaya. KB and EJ were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that KB and EJ suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Kabushinskaya, Korchagin, TOH Management, Klochko, and Touch of Health provided KB and EJ with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(vii)   On August 24, 2018, two Insureds – LV and NV – were involved in the same automobile accident. Thereafter, LV and NV presented – incredibly – on the exact same date, August 27, 2018, at Touch of Health for initial examinations by Penza. LV and NV were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that LV and NV suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Penza, Korchagin, TOH Management, Klochko, and Touch of Health provided LV and NV with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(viii)  On November 13, 2018, two Insureds – BA and HL – were involved in the same automobile accident. Thereafter, BA and HL presented – incredibly – on the exact same date, November 19, 2018, at Touch of Health for initial examinations

by Penza. BA and HL were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that BA and HL suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Penza, Korchagin, TOH Management, Klochko, and Touch of Health provided BA and HL with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(ix)    On November 18, 2018, two Insureds – TB and AM – were involved in the same automobile accident. Thereafter, TB and AM presented – incredibly – on the exact same date, November 19, 2018, at Touch of Health for initial examinations by Penza. TB and AM were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that TB and AM suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Penza, Korchagin, TOH Management, Klochko, and Touch of Health provided TB and AM with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(x)     On December 15, 2018, <u>three</u> Insureds – MC, FM, and FR – were involved in the same automobile accident. Thereafter, FM and FR presented – incredibly – on the exact same date, December 18, 2018, at Touch of Health for initial examinations by Penza. Then, the next day, December 19, 2018, MC too presented to Touch of Health for an initial examination by Hanson. MC, FM, and FR were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that MC, FM, and FR suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Hanson, Penza, Korchagin, TOH Management, Klochko, and Touch of Health provided MC, FM, and FR with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for all three of them.

313.    These are only representative examples. In the claims for initial examinations that are identified in Exhibit "1", Touch of Health, Korchagin, TOH Management, Klochko, Hanson, Penza, Roldos, and Kabushinskaya frequently issued substantially identical "diagnoses", on or about the same date, to more than one Insured involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds, despite the fact that the Insureds were differently situated.

314.    In the claims for initial examinations identified in Exhibit "1", Touch of Health, Korchagin, TOH Management, Klochko, Hanson, Penza, Roldos, and Kabushinskaya routinely falsely represented that the initial examinations involved medical decision-making of low or moderate complexity in order to provide a false basis to bill for the initial examinations under CPT codes 99203 and 99204, because CPT codes 99203 and 99204 are reimbursable at a higher rate than examinations that do not require low or moderate complexity medical decision-making.

315.    In the claims for initial examinations identified in Exhibit "1", Touch of Health, Korchagin, TOH Management, Klochko, Hanson, Penza, Roldos, and Kabushinskaya routinely fraudulently misrepresented that the examinations were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)      the putative examinations were illusory, with outcomes that were pre-determined to result in substantially-similar, phony "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)     the charges for the putative examinations misrepresented the nature and extent of the examinations; and

(iii)    Touch of Health never was eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as it was operated in violation of the Clinic Act, the Patient Brokering Act, the Anti-Kickback Statute, the HME Licensing Laws, and the Chiropractor Advertising Laws.

316.    In this context, Klochko – who at all relevant times purported to serve as the "medical director" at Touch of Health – did not, and could not have, "[c]onduct[ed] systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful." See Fla. Stat. § 400.9935(1).

317.   Had Klochko actually fulfilled her statutory role as medical director at Touch of Health, she would have noted – among other things – that Touch of Health, Korchagin, TOH Management, Hanson, Penza, Roldos, and Kabushinskaya routinely and fraudulently represented in Touch of Health's billing that the putative initial examinations were legitimately and lawfully performed.

318.   Klochko failed to do so, because she never actually served as a legitimate medical director at Touch of Health in the first instance.

**(ii)     The Fraudulent Charges for Ligament Laxity Testing at Touch of Health**

319.   As part of the Defendants' fraudulent scheme, at the conclusion of the putative initial examinations, Touch of Health, Korchagin, TOH Management, Hanson, Penza, Roldos, and Kabushinskaya directed virtually every Insured to receive putative ligament laxity testing services at Touch of Health.

320.   Hanson and Roldos purported to perform virtually all of the ligament laxity testing services at Touch of Health.

321.   As set forth in Exhibit "1", Touch of Health, Korchagin, TOH Management, Klochko, Hanson, and Roldos then billed the purported ligament laxity testing to GEICO under CPT code 76499, resulting in a charge of $450.00 for each purported round of tests.

322.   As set forth below, the charges for the putative ligament laxity testing were fraudulent because the ligament laxity testing services were medically unnecessary and were provided – to the extent they were provided at all – pursuant to the Defendants' pre-determined fraudulent treatment and billing protocol, and not to treat or otherwise benefit the Insureds who were subjected to it.

323.   Furthermore, the charges for ligament laxity testing were fraudulent in that they misrepresented Touch of Health's eligibility to collect PIP Benefits in the first instance.

324.   In a legitimate clinical setting, the laxity – or instability – of spinal ligaments may be assessed and diagnosed through a routine MRI.

325.   By contrast, ligament laxity testing purports to use a digital x-ray device to quantify the extent of ligament laxity in particular spinal levels.

326.   There is a dearth of quality scientific evidence to support the use of ligament laxity testing to diagnose soft tissue injuries in patients involved in automobile accidents.

327.   Thus, even assuming that there was some diagnostic value for the ligament laxity testing (and there was not), in the context of patients involved in automobile accidents, the ligament laxity testing was duplicative of the MRIs that the Insureds received or were referred to receive and that, in any case, provided far more specific, sensitive, and reliable diagnostic information than the ligament laxity testing that Touch of Health, Korchagin, TOH Management, Klochko, Hanson, and Roldos purported to provide.

328.   Moreover, and in keeping with the fact that the ligament laxity testing purportedly provided at Touch of Health was medically unnecessary, Touch of Health, Korchagin, TOH Management, Klochko, Hanson, and Roldos never incorporated the results of the putative ligament laxity testing into the supposed treatment "plan" they provided Insureds.

329.   Instead, following the putative ligament laxity testing, Touch of Health, Korchagin, TOH Management, Klochko, Hanson, and Roldos routinely directed the Insureds

identified in Exhibit "1" to continue to receive a virtually identical course of treatment as had

been recommended for the Insureds prior to the supposed ligament laxity testing.

330.     For example:

(i)      On June 28, 2017, an Insured named VS was involved in an automobile accident. Thereafter, on July 3, 2017, VS presented to Touch of Health for an initial examination by Roldos. At the conclusion of the putative examination, Roldos, Klochko, Korchagin, TOH Management, and Touch of Health provided VS with substantially the same soft tissue injury "diagnoses" they provided to virtually every Insured, and recommended that VS begin substantially the same course of putative "treatment" they recommended to virtually every other Insured. Then, on July 5, 2017, Hanson, Klochko, Korchagin, TOH Management, and Touch of Health purported to provide VS with a putative ligament laxity test at Touch of Health. However – and in keeping with the fact that the putative ligament laxity test was medically unnecessary – the "results" of the putative ligament laxity testing were never incorporated into VS's supposed "treatment" plan, and VS thereafter received substantially the same treatment as had been recommended to her prior to the ligament laxity testing being provided.

(ii)     On September 29, 2017, an Insured named SG was involved in an automobile accident. Thereafter, on October 2, 2017, SG presented to Touch of Health for an initial examination by Roldos. At the conclusion of the putative examination, Roldos, Klochko, Korchagin, TOH Management, and Touch of Health provided SG with substantially the same soft tissue injury "diagnoses" they provided to virtually every Insured, and recommended that SG begin substantially the same course of putative "treatment" they recommended to virtually every other Insured. Then, on October 3, 2017, Roldos, Klochko, Korchagin, TOH Management, and Touch of Health purported to provide SG with a putative ligament laxity test at Touch of Health. However – and in keeping with the fact that the putative ligament laxity test was medically unnecessary – the "results" of the putative ligament laxity testing were never incorporated into SG's supposed "treatment" plan, and SG thereafter received substantially the same treatment as had been recommended to her prior to the ligament laxity testing being provided.

(iii)    On October 8, 2017, an Insured named ET was involved in an automobile accident. Thereafter, on October 13, 2017, ET presented to Touch of Health for an initial examination by Hanson.  At the conclusion of the putative examination, Hanson, Klochko, Korchagin, TOH Management, and Touch of Health provided ET with substantially the same soft tissue injury "diagnoses" they provided to virtually every Insured, and recommended that ET begin

substantially the same course of putative "treatment" they recommended to virtually every other Insured. Then, on October 18, 2017, Hanson, Klochko, Korchagin, TOH Management, and Touch of Health purported to provide ET with a putative ligament laxity test at Touch of Health. However – and in keeping with the fact that the putative ligament laxity test was medically unnecessary – the "results" of the putative ligament laxity testing were never incorporated into ET's supposed "treatment" plan, and ET thereafter received substantially the same treatment as had been recommended to her prior to the ligament laxity testing being provided.

(iv)     On October 8, 2017, an Insured named CA was involved in an automobile accident. Thereafter, on October 13, 2017, CA presented to Touch of Health for an initial examination by Roldos. At the conclusion of the putative examination, Roldos, Klochko, Korchagin, TOH Management, and Touch of Health provided CA with substantially the same soft tissue injury "diagnoses" they provided to virtually every Insured, and recommended that CA begin substantially the same course of putative "treatment" they recommended to virtually every other Insured. Then, on October 17, 2017, Hanson, Klochko, Korchagin, TOH Management, and Touch of Health purported to provide CA with a putative ligament laxity test at Touch of Health. However – and in keeping with the fact that the putative ligament laxity test was medically unnecessary – the "results" of the putative ligament laxity testing were never incorporated into CA's supposed "treatment" plan, and CA thereafter received substantially the same treatment as had been recommended to him prior to the ligament laxity testing being provided.

(v)      On December 1, 2017, an Insured named JS was involved in an automobile accident. Thereafter, on December 5, 2017, JS presented to Touch of Health for an initial examination by Hanson.  At the conclusion of the putative examination, Hanson, Klochko, Korchagin, TOH Management, and Touch of Health provided JS with substantially the same soft tissue injury "diagnoses" they provided to virtually every Insured, and recommended that JS begin substantially the same course of putative "treatment" they recommended to virtually every other Insured. Then, on December 6, 2017, Hanson, Klochko, Korchagin, TOH Management, and Touch of Health purported to provide JS with a putative ligament laxity test at Touch of Health. However – and in keeping with the fact that the putative ligament laxity test was medically unnecessary – the "results" of the putative ligament laxity testing were never incorporated into JS's supposed "treatment" plan, and JS thereafter received substantially the same treatment as had been recommended to him prior to the ligament laxity testing being provided.

(vi)     On February 5, 2018, an Insured named MR was involved in an automobile accident. That same day, MR presented to Touch of Health for an initial

107

examination by Roldos. At the conclusion of the putative examination, Roldos, Klochko, Korchagin, TOH Management, and Touch of Health provided SG with substantially the same soft tissue injury "diagnoses" they provided to virtually every Insured, and recommended that MR begin substantially the same course of putative "treatment" they recommended to virtually every other Insured. Then, on February 6, 2018, Roldos, Klochko, Korchagin, TOH Management, and Touch of Health purported to provide MR with a putative ligament laxity test at Touch of Health. However – and in keeping with the fact that the putative ligament laxity test was medically unnecessary – the "results" of the putative ligament laxity testing were never incorporated into MR's supposed "treatment" plan, and MR thereafter received substantially the same treatment as had been recommended to her prior to the ligament laxity testing being provided.

(vii)    On April 3, 2018, an Insured named MT was involved in an automobile accident. Thereafter, on April 9, 2018, MT presented to Touch of Health for an initial examination by Roldos. At the conclusion of the putative examination, Roldos, Klochko, Korchagin, TOH Management, and Touch of Health provided MT with substantially the same soft tissue injury "diagnoses" they provided to virtually every Insured, and recommended that MT begin substantially the same course of putative "treatment" they recommended to virtually every other Insured. Then, on April 10, 2018, Hanson, Klochko, Korchagin, TOH Management, and Touch of Health purported to provide MT with a putative ligament laxity test at Touch of Health. However – and in keeping with the fact that the putative ligament laxity test was medically unnecessary – the "results" of the putative ligament laxity testing were never incorporated into MT's supposed "treatment" plan, and MT thereafter received substantially the same treatment as had been recommended to her prior to the ligament laxity testing being provided.

(viii)    On April 19, 2018, an Insured named VK was involved in an automobile accident. Thereafter, on April 20, 2018, VK presented to Touch of Health for an initial examination by Hanson.   At the conclusion of the putative examination, Hanson, Klochko, Korchagin, TOH Management, and Touch of Health provided VK with substantially the same soft tissue injury "diagnoses" they provided to virtually every Insured, and recommended that VK begin substantially the same course of putative "treatment" they recommended to virtually every other Insured. Then, on April 23, 2018, Hanson, Klochko, Korchagin, TOH Management, and Touch of Health purported to provide VK with a putative ligament laxity test at Touch of Health. However –  and in keeping with the fact that the putative ligament laxity test was medically unnecessary – the "results" of the putative ligament laxity testing were never incorporated into VK's supposed "treatment" plan, and VK thereafter received

substantially the same treatment as had been recommended to her prior to the ligament laxity testing being provided.

(ix)   On May 19, 2018, an Insured named VK was involved in an automobile accident. Thereafter, on May 21, 2018, VK presented to Touch of Health for an initial examination by Penza. At the conclusion of the putative examination, Penza, Klochko, Korchagin, TOH Management, and Touch of Health provided VK with substantially the same soft tissue injury "diagnoses" they provided to virtually every Insured, and recommended that VK begin substantially the same course of putative "treatment" they recommended to virtually every other Insured. Then, on May 22, 2018, Hanson, Klochko, Korchagin, TOH Management, and Touch of Health purported to provide VK with a putative ligament laxity test at Touch of Health. However – and in keeping with the fact that the putative ligament laxity test was medically unnecessary – the "results" of the putative ligament laxity testing were never incorporated into VK's supposed "treatment" plan, and VK thereafter received substantially the same treatment as had been recommended to him prior to the ligament laxity testing being provided.

(x)   On August 24, 2018, an Insured named LV was involved in an automobile accident. Thereafter, on August 27, 2018, LV presented to Touch of Health for an initial examination by Penza. At the conclusion of the putative examination, Penza, Klochko, Korchagin, TOH Management, and Touch of Health provided LV with substantially the same soft tissue injury "diagnoses" they provided to virtually every Insured, and recommended that LV begin substantially the same course of putative "treatment" they recommended to virtually every other Insured. Then, on August 28, 2018, Hanson, Klochko, Korchagin, TOH Management, and Touch of Health purported to provide LV with a putative ligament laxity test at Touch of Health. However –  and in keeping with the fact that the putative ligament laxity test was medically unnecessary – the "results" of the putative ligament laxity testing were never incorporated into LV's supposed "treatment" plan, and LV thereafter received substantially the same treatment as had been recommended to her prior to the ligament laxity testing being provided.

(xi)   On September 8, 2018, an Insured named SJ was involved in an automobile accident. Thereafter, on September 17, 2018, SJ presented to Touch of Health for an initial examination by Penza. At the conclusion of the putative examination, Penza, Klochko, Korchagin, TOH Management, and Touch of Health provided SJ with substantially the same soft tissue injury "diagnoses" they provided to virtually every Insured, and recommended that SJ begin substantially the same course of putative "treatment" they recommended to virtually every other Insured. Then, on September 21, 2018, Hanson, Klochko, Korchagin, TOH Management, and Touch of Health purported to provide SJ

with a putative ligament laxity test at Touch of Health. However – and in keeping with the fact that the putative ligament laxity test was medically unnecessary – the "results" of the putative ligament laxity testing were never incorporated into SJ's supposed "treatment" plan, and SJ thereafter received substantially the same treatment as had been recommended to him prior to the ligament laxity testing being provided.

(xii)   On December 13, 2018, an Insured named AS was involved in an automobile accident. Thereafter, on December 17, 2018, AS presented to Touch of Health for an initial examination by Penza. At the conclusion of the putative examination, Penza, Klochko, Korchagin, TOH Management, and Touch of Health provided AS with substantially the same soft tissue injury "diagnoses" they provided to virtually every Insured, and recommended that AS begin substantially the same course of putative "treatment" they recommended to virtually every other Insured. Then, on January 4, 2019, Hanson, Klochko, Korchagin, TOH Management, and Touch of Health purported to provide AS with a putative ligament laxity test at Touch of Health. However –  and in keeping with the fact that the putative ligament laxity test was medically unnecessary – the "results" of the putative ligament laxity testing were never incorporated into AS's supposed "treatment" plan, and AS thereafter received substantially the same treatment as had been recommended to him prior to the ligament laxity testing being provided.

(xiii)  On December 13, 2018, an Insured named YS was involved in an automobile accident. Thereafter, on December 17, 2018, YS presented to Touch of Health for an initial examination by Penza. At the conclusion of the putative examination, Penza, Klochko, Korchagin, TOH Management, and Touch of Health provided YS with substantially the same soft tissue injury "diagnoses" they provided to virtually every Insured, and recommended that YS begin substantially the same course of putative "treatment" they recommended to virtually every other Insured. Then, on January 4, 2019, Hanson, Klochko, Korchagin, TOH Management, and Touch of Health purported to provide YS with a putative ligament laxity test at Touch of Health. However –  and in keeping with the fact that the putative ligament laxity test was medically unnecessary – the "results" of the putative ligament laxity testing were never incorporated into YS's supposed "treatment" plan, and YS thereafter received substantially the same treatment as had been recommended to her prior to the ligament laxity testing being provided.

(xiv)   On February 28, 2019, an Insured named TN was involved in an automobile accident. Thereafter, on March 4, 2019, TN presented to Touch of Health for an initial examination by Penza. At the conclusion of the putative examination, Penza, Klochko, Korchagin, TOH Management, and Touch of Health provided TN with substantially the same soft tissue injury "diagnoses" they provided to

virtually every Insured, and recommended that TN begin substantially the same course of putative "treatment" they recommended to virtually every other Insured. Then, on March 5, 2019, Hanson, Klochko, Korchagin, TOH Management, and Touch of Health purported to provide TN with a putative ligament laxity test at Touch of Health. However –  and in keeping with the fact that the putative ligament laxity test was medically unnecessary – the "results" of the putative ligament laxity testing were never incorporated into TN's supposed "treatment" plan, and TN thereafter received substantially the same treatment as had been recommended to her prior to the ligament laxity testing being provided.

(xv)     On March 4, 2019, an Insured named PD was involved in an automobile accident. Thereafter, on March 5, 2019, PD presented to Touch of Health for an initial examination by Penza. At the conclusion of the putative examination, Penza, Klochko, Korchagin, TOH Management, and Touch of Health provided PD with substantially the same soft tissue injury "diagnoses" they provided to virtually every Insured, and recommended that PD begin substantially the same course of putative "treatment" they recommended to virtually every other Insured. Then, on March 7, 2019, Hanson, Klochko, Korchagin, TOH Management, and Touch of Health purported to provide PD with a putative ligament laxity test at Touch of Health. However –  and in keeping with the fact that the putative ligament laxity test was medically unnecessary – the "results" of the putative ligament laxity testing were never incorporated into PD's supposed "treatment" plan, and PD thereafter received substantially the same treatment as had been recommended to him prior to the ligament laxity testing being provided.

331.    These are only representative examples. In the claims identified in Exhibit "1", Touch of Health, Korchagin, TOH Management, Klochko, Hanson, and Roldos routinely misrepresented the medical necessity of the putative ligament laxity testing.

**(iii)   The Fraudulent Charges for HME Through Touch of Health**

332.    As part of their fraudulent scheme, at the conclusion of the putative initial examinations, Touch of Health, Korchagin, TOH Management, Klochko, Hanson, and Roldos purported to prescribe HME to many Insureds.

111

333.     As discussed below, much of the HME was purportedly provided and billed through CFL Medical Supplies, which was secretly owned by Touch of Health's owner, Korchagin, and which operated from the same Colonial Drive Office as Touch of Health.

334.     In addition, Touch of Health, Korchagin, TOH Management, Klochko, Hanson, Penza, and Roldos purported to prescribe many Insureds with HME – namely, a lower back brace known as a lumbosacral orthotic ("LSO") – that was purportedly provided by and billed through Touch of Health.

335.     As set forth in Exhibit "1", Touch of Health, Hanson, Penza, Roldos, Klochko, TOH Management, and Korchagin then billed GEICO for the LSOs under Health Care Common Procedure Coding System ("HCPCS") code L0627, typically resulting in a charge of $800.00 per LSO.

336.     The LSO is a rigid, custom-fitted, lower-back brace designed to restrict the movement of the patient's torso and support the patient's lumbar spine. Because of its rigidity and required placement on a patient's lower back, an LSO must be custom-fitted in order for it to be properly utilized by the patient.

337.     In a legitimate clinical setting, an LSO is reserved for patients who exhibit spinal instability or for patients who have recently undergone spinal surgery.

338.     Because the LSO is designed to limit a patient's lumbar spine range of motion, its prescription is inconsistent with the goals of treatment designed to restore and increase range of motion and functionality of the lumbar spine.

339.     Along similar lines, the prescription and use of an LSO is counterproductive to the goals of physical therapy and chiropractic treatment modalities, which seek to restore movement and functionality to the lumbar spine.

340.     In fact, the medically unnecessary prescription of an LSO – and resulting immobilization of the lumbar spine – may put the patient at considerable risk of weakening muscles or even muscle atrophy of muscles in the lower back.

341.     In this context, in a legitimate clinical setting, an LSO should not be prescribed to a patient before that patient has attempted and failed a legitimate course of conservative treatment.

342.     None of the Insureds in the claims identified in Exhibit "1" suffered from spinal instability. In fact, virtually none of the Insureds in the claims identified in Exhibit "1" suffered any significant injuries at all as the result of their accidents, much less health problems requiring spinal surgery and subsequent immobilization of their spine.

343.     None of the Insureds in the claims identified in Exhibit "1" had attempted and failed a legitimate course of conservative treatment prior to their receipt of a prescription for an LSO.

344.     Even so, following their fraudulent initial examinations, Touch of Health, Korchagin, TOH Management, Klochko, Hanson, Penza, and Roldos purported to provide many Insureds with an LSO, despite that fact that:

(i)     none of the Insureds suffered from spinal instability or were recovering from spinal surgery;

(ii)    neither Korchagin, Klochko, Hanson, Penza, Roldos, nor any other individual associated with Touch of Health ever measured or fitted the device for the Insureds;

(iii)    the Insureds had not yet failed any legitimate course of conservative treatment and, in fact, were prescribed the LSO within days – and, in some instances, the very same day – of their minor accidents; and

(iv)    the Insureds were concomitantly referred for physical therapy and chiropractic treatment at Touch of Health, the putative purpose of which was to restore the range of motion and functionality of, among other things, the Insureds' lumbar spines.

345.    For example:

(i)    On February 28, 2017, an Insured named AA was involved in an automobile accident. The next day, March 1, 2017, AA presented to Touch of Health for an initial examination by Hanson. At the conclusion of the purported initial examination, Hanson, Klochko, Korchagin, TOH Management, and Touch of Health provided AA with a medically unnecessary LSO, despite the fact that AA: (a) was never fitted for the device; (b) did not suffer from spinal instability and was not recovering from spinal surgery; and (c) had not yet failed a legitimate course of conservative treatment, and, in fact, was concomitantly referred by Hanson for physical therapy and chiropractic treatment at Touch of Health, the putative purpose of which was to increase, rather than decrease, AA's range of motion. Hanson, Klochko, Korchagin, TOH Management, and Touch of Health then submitted a bill to GEICO under HCPCS code L0627, seeking reimbursement of $800.00 for the medically unnecessary LSO.

(ii)    On May 9, 2017, an Insured named FS was involved in an automobile accident. Just one week later, on May 16, 2017, FS presented to Touch of Health for an initial examination by Hanson. At the conclusion of the purported initial examination, Hanson, Klochko, Korchagin, TOH Management, and Touch of Health provided FS with a medically unnecessary LSO, despite the fact that FS: (a) was never fitted for the device; (b) did not suffer from spinal instability and was not recovering from spinal surgery; and (c) had not yet failed a legitimate course of conservative treatment, and, in fact, was concomitantly referred by Hanson for physical therapy and chiropractic treatment at Touch of Health, the putative purpose of which was to increase, rather than decrease, FS's range of motion. Hanson, Klochko, Korchagin, TOH Management, and Touch of Health then submitted a bill to GEICO under HCPCS code L0627, seeking reimbursement of $800.00 for the medically unnecessary LSO.

(iii)    On May 12, 2017, an Insured named GM was involved in an automobile accident. Just one week later, on May 16, 2017, GM presented to Touch of

Health for an initial examination by Hanson. At the conclusion of the purported initial examination, Hanson, Klochko, Korchagin, TOH Management, and Touch of Health provided GM with a medically unnecessary LSO, despite the fact that GM: (a) was never fitted for the device; (b) did not suffer from spinal instability and was not recovering from spinal surgery; and (c) had not yet failed a legitimate course of conservative treatment, and, in fact, was concomitantly referred by Hanson for physical therapy and chiropractic treatment at Touch of Health, the putative purpose of which was to increase, rather than decrease, GM's range of motion. Hanson, Klochko, Korchagin, TOH Management, and Touch of Health then submitted a bill to GEICO under HCPCS code L0627, seeking reimbursement of $800.00 for the medically unnecessary LSO.

(iv)     On August 9, 2017, an Insured named GS was involved in an automobile accident. Just one week later, on August 16, 2017, GS presented to Touch of Health for an initial examination by Roldos. At the conclusion of the purported initial examination, Roldos, Klochko, Korchagin, TOH Management, and Touch of Health provided GS with a medically unnecessary LSO, despite the fact that GS: (a) was never fitted for the device; (b) did not suffer from spinal instability and was not recovering from spinal surgery; and (c) had not yet failed a legitimate course of conservative treatment, and, in fact, was concomitantly referred by Hanson for physical therapy and chiropractic treatment at Touch of Health, the putative purpose of which was to increase, rather than decrease, GS's range of motion. Roldos, Klochko, Korchagin, TOH Management, and Touch of Health then submitted a bill to GEICO under HCPCS code L0627, seeking reimbursement of $800.00 for the medically unnecessary LSO.

(v)      On December 1, 2017, an Insured named JS was involved in an automobile accident. Just five days later, on December 6, 2017, JS presented to Touch of Health for an initial examination by Hanson. At the conclusion of the purported initial examination, Hanson, Klochko, Korchagin, TOH Management, and Touch of Health provided JS with a medically unnecessary LSO, despite the fact that JS: (a) was never fitted for the device; (b) did not suffer from spinal instability and was not recovering from spinal surgery; and (c) had not yet failed a legitimate course of conservative treatment, and, in fact, was concomitantly referred by Hanson for physical therapy and chiropractic treatment at Touch of Health, the putative purpose of which was to increase, rather than decrease, JS's range of motion. Hanson, Klochko, Korchagin, TOH Management, and Touch of Health then submitted a bill to GEICO under HCPCS code L0627, seeking reimbursement of $800.00 for the medically unnecessary LSO.

(vi)     On December 1, 2017, an Insured named OK was involved in an automobile accident. Just five days later, on December 6, 2017, OK presented to Touch of Health for an initial examination by Hanson. At the conclusion of the purported initial examination, Hanson, Klochko, Korchagin, TOH Management, and Touch of Health provided OK with a medically unnecessary LSO, despite the fact that OK: (a) was never fitted for the device; (b) did not suffer from spinal instability and was not recovering from spinal surgery; and (c) had not yet failed a legitimate course of conservative treatment, and, in fact, was concomitantly referred by Hanson for physical therapy and chiropractic treatment at Touch of Health, the putative purpose of which was to increase, rather than decrease, OK's range of motion. Hanson, Klochko, Korchagin, TOH Management, and Touch of Health then submitted a bill to GEICO under HCPCS code L0627, seeking reimbursement of $800.00 for the medically unnecessary LSO.

(vii)    On December 1, 2017, an Insured named SK was involved in an automobile accident. Just five days later, on December 6, 2017, SK presented to Touch of Health for an initial examination by Roldos. At the conclusion of the purported initial examination, Roldos, Klochko, Korchagin, TOH Management, and Touch of Health provided SK with a medically unnecessary LSO, despite the fact that SK: (a) was never fitted for the device; (b) did not suffer from spinal instability and was not recovering from spinal surgery; and (c) had not yet failed a legitimate course of conservative treatment, and, in fact, was concomitantly referred by Hanson for physical therapy and chiropractic treatment at Touch of Health, the putative purpose of which was to increase, rather than decrease, SK's range of motion. Roldos, Klochko, Korchagin, TOH Management, and Touch of Health then submitted a bill to GEICO under HCPCS code L0627, seeking reimbursement of $800.00 for the medically unnecessary LSO.

(viii)   On February 5, 2018, an Insured named JJ was involved in an automobile accident. Just two days later, on February 7, 2018, JJ presented to Touch of Health for an initial examination by Roldos. At the conclusion of the purported initial examination, Roldos, Klochko, Korchagin, TOH Management, and Touch of Health provided JJ with a medically unnecessary LSO, despite the fact that JJ: (a) was never fitted for the device; (b) did not suffer from spinal instability and was not recovering from spinal surgery; and (c) had not yet failed a legitimate course of conservative treatment, and, in fact, was concomitantly referred by Hanson for physical therapy and chiropractic treatment at Touch of Health, the putative purpose of which was to increase, rather than decrease, JJ's range of motion. Roldos, Klochko, Korchagin, TOH Management, and Touch of Health then submitted a bill to GEICO under HCPCS code L0627, seeking reimbursement of $800.00 for the medically unnecessary LSO.

116

(ix)     On February 5, 2018, an Insured named MR was involved in an automobile accident. Just two days later, on February 7, 2018, MR presented to Touch of Health for an initial examination by Roldos. At the conclusion of the purported initial examination, Roldos, Klochko, Korchagin, TOH Management, and Touch of Health provided MR with a medically unnecessary LSO, despite the fact that MR: (a) was never fitted for the device; (b) did not suffer from spinal instability and was not recovering from spinal surgery; and (c) had not yet failed a legitimate course of conservative treatment, and, in fact, was concomitantly referred by Hanson for physical therapy and chiropractic treatment at Touch of Health, the putative purpose of which was to increase, rather than decrease, MR's range of motion. Roldos, Klochko, Korchagin, TOH Management, and Touch of Health then submitted a bill to GEICO under HCPCS code L0627, seeking reimbursement of $800.00 for the medically unnecessary LSO.

(x)      On April 3, 2018, an Insured named MT was involved in an automobile accident. Less than two weeks later, on April 16, 2018, MT presented to Touch of Health for an initial examination by Roldos. At the conclusion of the purported initial examination, Roldos, Klochko, Korchagin, TOH Management, and Touch of Health provided MT with a medically unnecessary LSO, despite the fact that MT: (a) was never fitted for the device; (b) did not suffer from spinal instability and was not recovering from spinal surgery; and (c) had not yet failed a legitimate course of conservative treatment, and, in fact, was concomitantly referred by Hanson for physical therapy and chiropractic treatment at Touch of Health, the putative purpose of which was to increase, rather than decrease, MT's range of motion. Roldos, Klochko, Korchagin, TOH Management, and Touch of Health then submitted a bill to GEICO under HCPCS code L0627, seeking reimbursement of $800.00 for the medically unnecessary LSO.

(xi)     On June 6, 2018, an Insured named GJ was involved in an automobile accident. The next day, June 7, 2018, GJ presented to Touch of Health for an initial examination by Penza. At the conclusion of the purported initial examination, Penza, Klochko, Korchagin, TOH Management, and Touch of Health provided GJ with a medically unnecessary LSO, despite the fact that GJ: (a) was never fitted for the device; (b) did not suffer from spinal instability and was not recovering from spinal surgery; and (c) had not yet failed a legitimate course of conservative treatment, and, in fact, was concomitantly referred by Hanson for physical therapy and chiropractic treatment at Touch of Health, the putative purpose of which was to increase, rather than decrease, GJ's range of motion. Penza, Klochko, and Touch of Health then submitted a bill to GEICO under HCPCS code L0627, seeking reimbursement of $800.00 for the medically unnecessary LSO.

(xii)    On June 6, 2018, an Insured named CD was involved in an automobile accident. Just two days later, on June 8, 2018, CD presented to Touch of Health for an initial examination by Penza. At the conclusion of the purported initial examination, Penza, Klochko, Korchagin, TOH Management, and Touch of Health provided CD with a medically unnecessary LSO, despite the fact that CD: (a) was never fitted for the device; (b) did not suffer from spinal instability and was not recovering from spinal surgery; and (c) had not yet failed a legitimate course of conservative treatment, and, in fact, was concomitantly referred by Hanson for physical therapy and chiropractic treatment at Touch of Health, the putative purpose of which was to increase, rather than decrease, CD's range of motion. Penza, Klochko, and Touch of Health then submitted a bill to GEICO under HCPCS code L0627, seeking reimbursement of $800.00 for the medically unnecessary LSO.

(xiii)   On June 26, 2018, an Insured named IF was involved in an automobile accident. The next day, June 27, 2018, IF presented to Touch of Health for an initial examination by Penza. At the conclusion of the purported initial examination, Penza, Klochko, Korchagin, TOH Management, and Touch of Health provided IF with a medically unnecessary LSO, despite the fact that IF: (a) was never fitted for the device; (b) did not suffer from spinal instability and was not recovering from spinal surgery; and (c) had not yet failed a legitimate course of conservative treatment, and, in fact, was concomitantly referred by Hanson for physical therapy and chiropractic treatment at Touch of Health, the putative purpose of which was to increase, rather than decrease, IF's range of motion. Penza, Klochko, and Touch of Health then submitted a bill to GEICO under HCPCS code L0627, seeking reimbursement of $800.00 for the medically unnecessary LSO.

(xiv)   On November 5, 2018, an Insured named ME was involved in an automobile accident. The next day, November 6, 2018, ME presented to Touch of Health for an initial examination by Penza. At the conclusion of the purported initial examination, Penza, Klochko, Korchagin, TOH Management, and Touch of Health provided ME with a medically unnecessary LSO, despite the fact that ME: (a) was never fitted for the device; (b) did not suffer from spinal instability and was not recovering from spinal surgery; and (c) had not yet failed a legitimate course of conservative treatment, and, in fact, was concomitantly referred by Hanson for physical therapy and chiropractic treatment at Touch of Health, the putative purpose of which was to increase, rather than decrease, ME's range of motion. Penza, Klochko, and Touch of Health then submitted a bill to GEICO under HCPCS code L0627, seeking reimbursement of $800.00 for the medically unnecessary LSO.

(xv)     On November 18, 2018, an Insured named AM was involved in an automobile accident. The next day, November 19, 2018, AM presented to Touch of Health for an initial examination by Penza. At the conclusion of the purported initial examination, Penza, Klochko, Korchagin, TOH Management, and Touch of Health provided AM with a medically unnecessary LSO, despite the fact that AM: (a) was never fitted for the device; (b) did not suffer from spinal instability and was not recovering from spinal surgery; and (c) had not yet failed a legitimate course of conservative treatment, and, in fact, was concomitantly referred by Hanson for physical therapy and chiropractic treatment at Touch of Health, the putative purpose of which was to increase, rather than decrease, AM's range of motion. Penza, Klochko, and Touch of Health then submitted a bill to GEICO under HCPCS code L0627, seeking reimbursement of $800.00 for the medically unnecessary LSO.

346.     These are only representative examples. In virtually all of the claims for LSOs identified in Exhibit "1", Touch of Health, Korchagin, TOH Management, Klochko, Hanson, Penza, and Roldos falsely represented that the prescribed LSOs were medically necessary, when in fact they were not.

**(iv)     The Fraudulent Charges for Surface Electromyography Testing Services at Touch of Health**

347.     As set forth in Exhibit "1", as part of the Defendants' fraudulent scheme, at the conclusion of the putative initial examinations, Touch of Health, Korchagin, TOH Management, Hanson, Penza, Roldos, and Kabushinskaya directed virtually every Insured to receive putative surface electromyography ("SEMG") services at Touch of Health.

348.     Hanson, Penza, and Roldos purported to perform virtually all of the SEMG services at Touch of Health.

349.     As set forth in Exhibit "1", Touch of Health, Korchagin, TOH Management, Klochko, Hanson, Penza, and Roldos then billed the putative SEMG services to GEICO under CPT codes 96002 and 96004, typically resulting in a total charge of between $310.00 and $620.00.

350.     As set forth below, the charges for the putative SEMG services were fraudulent because the SEMG services were medically unnecessary and were provided – to the extent they were provided at all – pursuant to the Defendants' pre-determined fraudulent treatment and billing protocol, and not to treat or otherwise benefit the Insureds who were subjected to it.

351.     Furthermore, the charges for putative SEMG services were fraudulent in that they misrepresented Touch of Health's eligibility to collect PIP Benefits in the first instance.

352.     "Surface electromyography" is a technique in which electrodes are placed on (not into) the skin overlying a muscle to detect the electrical activity of the muscle.

353.     These electrodes are then used to measure muscle activity and – supposedly – to evaluate and diagnose patients with neuromuscular disorders, lower back pain, and kineseological disorders.

354.     However, according to a review of the literature published by the American Academy of Neurology, "SEMG is considered unacceptable as a clinical tool in the diagnosis" of neuromuscular disease and low back pain. See S.L. Pulman, M.D., Clinical Utility of Surface EMG, Report of therapeutics and technology Assessment Subcommittee of the American Academy of Neurology 2000.

355.     Even so, in the claims identified in Exhibit "1", Touch of Health, Korchagin, TOH Management, Klochko, Hanson, Penza, and Roldos purported to provide virtually every Insured with medically unnecessary SEMG testing on the Insureds' cervical and lumbar spines, despite the fact that the putative SEMG testing could not provide any clinically significant data to assist in the "treatment" of the Insureds' supposed injuries.

356.    In keeping with the fact that the SEMG testing was of no diagnostic value, Touch of Health, Korchagin, TOH Management, Klochko, Hanson, Penza, and Roldos never incorporated the putative "results" of the SEMG testing into the Insureds' treatment plans.

357.    Instead, following the putative SEMG testing, Touch of Health, Korchagin, TOH Management, Klochko, Hanson, Penza, and Roldos routinely directed the Insureds identified in Exhibit "1" to receive the same course of medically unnecessary treatment as had been recommended to the Insureds prior to the supposed SEMG testing.

358.    For example:

(i)      On August 9, 2017, an Insured named GS was involved in an automobile accident. Thereafter, on August 16, 2017, GS presented to Touch of Health for an initial examination by Roldos. At the conclusion of the putative examination, Roldos, Klochko, Korchagin, TOH Management, and Touch of Health provided GS with substantially the same soft tissue injury "diagnoses" they provided to virtually every Insured, and recommended that GS begin substantially the same course of putative "treatment" they recommended to virtually every other Insured. Then, on August 18, 2017, Hanson, Klochko, Korchagin, TOH Management, and Touch of Health purported to provide GS with putative SEMG testing at Touch of Health. However – and in keeping with the fact that the putative SEMG testing was medically unnecessary – the "results" of the putative SEMG testing were never incorporated into GS's supposed "treatment" plan, and GS thereafter received substantially the same treatment as had been recommended to her prior to the SEMG testing being provided.

(ii)     On April 3, 2018, an Insured named MT was involved in an automobile accident. Thereafter, on April 9, 2018, MT presented to Touch of Health for an initial examination by Roldos. At the conclusion of the putative examination, Roldos, Klochko, Korchagin, TOH Management, and Touch of Health provided GS with substantially the same soft tissue injury "diagnoses" they provided to virtually every Insured, and recommended that MT begin substantially the same course of putative "treatment" they recommended to virtually every other Insured. Then, on April 11, 2018, Hanson, Klochko, Korchagin, TOH Management, and Touch of Health purported to provide MT with putative SEMG testing at Touch of Health. However – and in keeping with the fact that the putative SEMG testing was medically unnecessary – the "results" of the putative SEMG testing were never incorporated into MT's

supposed "treatment" plan, and MT thereafter received substantially the same treatment as had been recommended to her prior to the SEMG testing being provided.

(iii)    On May 17, 2018, an Insured named NU was involved in an automobile accident. Thereafter, on May 18, 2018, NU presented to Touch of Health for an initial examination by Penza. At the conclusion of the putative examination, Penza, Klochko, Korchagin, TOH Management, and Touch of Health provided NU with substantially the same soft tissue injury "diagnoses" they provided to virtually every Insured, and recommended that NU begin substantially the same course of putative "treatment" they recommended to virtually every other Insured. Then, on June 1, 2018, Penza, Klochko, Korchagin, TOH Management, and Touch of Health purported to provide NU with putative SEMG testing at Touch of Health. However – and in keeping with the fact that the putative SEMG testing was medically unnecessary – the "results" of the putative SEMG testing were never incorporated into NU's supposed "treatment" plan, and NU thereafter received substantially the same treatment as had been recommended to him prior to the SEMG testing being provided.

(iv)    On December 13, 2018, an Insured named AS was involved in an automobile accident. Thereafter, on December 17, 2018, AS presented to Touch of Health for an initial examination by Penza. At the conclusion of the putative examination, Penza, Klochko, Korchagin, TOH Management, and Touch of Health provided AS with substantially the same soft tissue injury "diagnoses" they provided to virtually every Insured, and recommended that AS begin substantially the same course of putative "treatment" they recommended to virtually every other Insured. Then, on December 20, 2018, Penza, Klochko, Korchagin, TOH Management, and Touch of Health purported to provide AS with putative SEMG testing at Touch of Health. However – and in keeping with the fact that the putative SEMG testing was medically unnecessary – the "results" of the putative SEMG testing were never incorporated into AS's supposed "treatment" plan, and AS thereafter received substantially the same treatment as had been recommended to him prior to the SEMG testing being provided.

(v)    On December 13, 2018, an Insured named YS was involved in an automobile accident. Thereafter, on December 17, 2018, YS presented to Touch of Health for an initial examination by Penza. At the conclusion of the putative examination, Penza, Klochko, Korchagin, TOH Management, and Touch of Health provided YS with substantially the same soft tissue injury "diagnoses" they provided to virtually every Insured, and recommended that YS begin substantially the same course of putative "treatment" they recommended to virtually every other Insured. Then, on December 20, 2018, Penza, Klochko, Korchagin, TOH Management, and Touch of Health purported to provide YS

with putative SEMG testing at Touch of Health. However –  and in keeping with the fact that the putative SEMG testing was medically unnecessary – the "results" of the putative SEMG testing were never incorporated into YS's supposed "treatment" plan, and YS thereafter received substantially the same treatment as had been recommended to her prior to the SEMG testing being provided.

359.    These are only representative examples. In the claims for SEMG testing identified in Exhibit "1", Touch of Health, Korchagin, TOH Management, Klochko, Hanson, and Roldos always misrepresented the medical necessity of the putative SEMG testing.

360.    In fact, the SEMG testing was never medically necessary, as Touch of Health, Korchagin, TOH Management, Klochko, Hanson, and Roldos never incorporated the results of the putative "tests" into the diagnosis or treatment of the Insureds who presented to Touch of Health.

**(v)     The Fraudulent Charges for Follow-Up Examinations at Touch of Health**

361.    In addition to their fraudulent initial examinations, Touch of Health, Korchagin, TOH Management, Klochko, Hanson, Penza, and Roldos purported to subject many of the Insureds in the claims identified in Exhibit "1" to multiple, fraudulent follow-up examinations during the course of their fraudulent treatment protocol.

362.    Hanson, Penza, and Roldos purported to personally perform the majority of the follow-up examinations in the claims identified in Exhibit "1".

363.    As set forth in Exhibit "1", Touch of Health, Korchagin, TOH Management, Klochko, Hanson, Penza, and Roldos then billed the follow-up examinations to GEICO under: (i) CPT code 99211, typically resulting in a charge of $45.00 for each putative examination; (ii) 99212, typically resulting in a charge of $105.00 for each putative examination; or (iii) 99213, typically resulting in a charge of $160.00 for each putative examination.

364.    In the claims for follow-up examinations identified in Exhibit "1", the charges for the follow-up examinations were fraudulent in that they misrepresented Touch of Health's eligibility to collect PIP Benefits in the first instance.

365.    In fact, and as set forth above, Touch of Health never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the Clinic Act, the Patient Brokering Act, the Patient Brokering Act, the Anti-Kickback Statute, the HME Licensing Laws, and the Chiropractor Advertising Laws.

366.    As set forth below, Touch of Health, Korchagin, TOH Management, Klochko, Hanson, Penza, and Roldos's charges for the follow-up examinations identified in Exhibit "1" also were fraudulent in that they misrepresented the nature and extent of the examinations.

a.      **The Fraudulent Charges for Illusory Follow-Up Examinations**

367.    As discussed in detail below, Touch of Health, Korchagin, TOH Management, Klochko, Hanson, Penza, and Roldos purported to provide virtually every Insured with a course of in-office chiropractic manipulation.

368.    Touch of Health, Korchagin, TOH Management, Klochko, Hanson, Penza, and Roldos then billed the chiropractic manipulation to GEICO using CPT codes 98940 and 98941.

369.    Pursuant to the CPT Assistant, a pre-manipulation patient assessment was part and parcel of the putative chiropractic manipulation services billed by Touch of Health, Korchagin, TOH Management, Klochko, Hanson, Penza, and Roldos under CPT codes 98940 and 98941.

370. Moreover, pursuant to the CPT Assistant, a separate examination may be billed independent of charges for chiropractic manipulation only if the patient's condition requires an examination above and beyond the usual pre- and post- manipulation assessment associated with chiropractic services.

371. Even so, Touch of Health, Korchagin, TOH Management, Klochko, Hanson, Penza, and Roldos routinely billed GEICO for putative follow-up examinations under CPT code 99211, despite the fact that the examinations purportedly were provided contemporaneously with chiropractic manipulation services billed under CPT codes 98940 and 98941.

372. However, these supposed "examinations" were never truly separate services from the putative chiropractic manipulation services that were provided to the Insureds on the same dates as the supposed examinations.

373. In keeping with the fact that the follow-up examinations were illusory, Touch of Health, Korchagin, TOH Management, Klochko, Hanson, Penza, and Roldos never submitted any reports, notes, or any substantiating documentation whatsoever in connection with the phony follow-up examinations billed under CPT code 99211.

374. Moreover, virtually none of the Insureds in the claims identified in Exhibit "1" required additional examination services above and beyond the usual pre- and post-manipulation assessments that they received as a component of the chiropractic manipulation they received on the same dates of service as the purported examinations.

375.     Even so, Touch of Health, Korchagin, TOH Management, Klochko, Hanson, Penza, and Roldos routinely submitted duplicative charges under CPT code 99211 for illusory follow-up examinations.

376.     For example:

(i)     Touch of Health, Korchagin, TOH Management, Klochko, and Roldos billed GEICO for purported follow-up examinations under CPT code 99211 that were supposedly provided to an Insured named JJ contemporaneously with chiropractic manipulation services on February 6, 2018 and May 17, 2018. This, despite the fact that: (a) no legitimate, separate follow-up examinations were provided; (b) the patient's condition did not require examination above and beyond the usual pre- and post- manipulation assessment associated with chiropractic services; and (c) to the extent that Touch of Health, Korchagin, TOH Management, Klochko, and Roldos provided any patient assessments at all, they were part and parcel of the chiropractic services billed under CPT codes 98940 and 98941.

(ii)     Touch of Health, Korchagin, TOH Management, Klochko, and Roldos billed GEICO for purported follow-up examinations under CPT code 99211 that were supposedly provided to an Insured named MR contemporaneously with chiropractic manipulation services on February 6, 2018 and May 17, 2018. This, despite the fact that: (a) no legitimate, separate follow-up examinations were provided; (b) the patient's condition did not require examination above and beyond the usual pre- and post- manipulation assessment associated with chiropractic services; and (c) to the extent that Touch of Health, Korchagin, TOH Management, Klochko, and Roldos provided any patient assessments at all, they were part and parcel of the chiropractic services billed under CPT code 98941.

(iii)     Touch of Health, Korchagin, TOH Management, Klochko, and Penza billed GEICO for purported follow-up examinations under CPT code 99211 that were supposedly provided to an Insured named VM contemporaneously with chiropractic manipulation services on July 23, 2018, July 25, 2018, and August 22, 2018. This, despite the fact that: (a) no legitimate, separate follow-up examinations were provided; (b) the patient's condition did not require examination above and beyond the usual pre- and post- manipulation assessment associated with chiropractic services; and (c) to the extent that Touch of Health, Korchagin, TOH Management, Klochko, and Penza provided any patient assessments at all, they were part and parcel of the chiropractic services billed under CPT code 98941.

(iv)     Touch of Health, Korchagin, TOH Management, Klochko, and Penza billed GEICO for purported follow-up examinations under CPT code 99211 that were supposedly provided to an Insured named CD contemporaneously with chiropractic manipulation services on July 27, 2018, August 6, 2018, and August 20, 2018. This, despite the fact that: (a) no legitimate, separate follow-up examinations were provided; (b) the patient's condition did not require examination above and beyond the usual pre- and post- manipulation assessment associated with chiropractic services; and (c) to the extent that Touch of Health, Korchagin, TOH Management, Klochko, and Penza provided any patient assessments at all, they were part and parcel of the chiropractic services billed under CPT codes 98940 and 98941.

(v)      Touch of Health, Korchagin, TOH Management, Klochko, and Penza billed GEICO for purported follow-up examinations under CPT code 99211 that were supposedly provided to an Insured named JH contemporaneously with chiropractic manipulation services on September 5, 2018, October 10, 2018, and November 20, 2018. This, despite the fact that: (a) no legitimate, separate follow-up examinations were provided; (b) the patient's condition did not require examination above and beyond the usual pre- and post- manipulation assessment associated with chiropractic services; and (c) to the extent that Touch of Health, Korchagin, TOH Management, Klochko, and Penza provided any patient assessments at all, they were part and parcel of the chiropractic services billed under CPT code 98940.

(vi)     Touch of Health, Korchagin, TOH Management, Klochko, and Penza billed GEICO for purported follow-up examinations under CPT code 99211 that were supposedly provided to an Insured named IF contemporaneously with chiropractic manipulation services on September 7, 2018, September 21, 2018, and October 3, 2018. This, despite the fact that: (a) no legitimate, separate follow-up examinations were provided; (b) the patient's condition did not require examination above and beyond the usual pre- and post- manipulation assessment associated with chiropractic services; and (c) to the extent that Touch of Health, Korchagin, TOH Management, Klochko, and Penza provided any patient assessments at all, they were part and parcel of the chiropractic services billed under CPT code 98940.

(vii)    Touch of Health, Korchagin, Klochko, Hanson, and Penza billed GEICO for purported follow-up examinations under CPT code 99211 that were supposedly provided to an Insured named SJ contemporaneously with chiropractic manipulation services on September 19, 2018, October 29, 2018, and December 27, 2018. This, despite the fact that: (a) no legitimate, separate follow-up examinations were provided; (b) the patient's condition did not require examination above and beyond the usual pre- and post- manipulation assessment associated with chiropractic services; and (c) to the extent that

Touch of Health, Korchagin, TOH Management, Klochko, and Penza provided any patient assessments at all, they were part and parcel of the chiropractic services billed under CPT code 98940.

(viii)   Touch of Health, Korchagin, TOH Management, Klochko, and Penza billed GEICO for purported follow-up examinations under CPT code 99211 that were supposedly provided to an Insured named ME contemporaneously with chiropractic manipulation services on November 14, 2018, November 16, 2018, November 20, 2018, and January 10, 2019. This, despite the fact that: (a) no legitimate, separate follow-up examinations were provided; (b) the patient's condition did not require examination above and beyond the usual pre- and post- manipulation assessment associated with chiropractic services; and (c) to the extent that Touch of Health, Korchagin, TOH Management, Klochko, and Penza provided any patient assessments at all, they were part and parcel of the chiropractic services billed under CPT code 98941.

(ix)   Touch of Health, Korchagin, TOH Management, Klochko, and Penza billed GEICO for purported follow-up examinations under CPT code 99211 that were supposedly provided to an Insured named FM contemporaneously with chiropractic manipulation services on January 4, 2019, January 8, 2019, and January 9, 2019. This, despite the fact that: (a) no legitimate, separate follow-up examinations were provided; (b) the patient's condition did not require examination above and beyond the usual pre- and post- manipulation assessment associated with chiropractic services; and (c) to the extent that Touch of Health, Korchagin, TOH Management, Klochko, and Penza provided any patient assessments at all, they were part and parcel of the chiropractic services billed under CPT code 98941.

(x)   Touch of Health, Korchagin, TOH Management, Klochko, and Penza billed GEICO for purported follow-up examinations under CPT code 99211 that were supposedly provided to an Insured named FR contemporaneously with chiropractic manipulation services on January 8, 2019, January 10, 2019, and January 23, 2019. This, despite the fact that: (a) no legitimate, separate follow-up examinations were provided; (b) the patient's condition did not require examination above and beyond the usual pre- and post- manipulation assessment associated with chiropractic services; and (c) to the extent that Touch of Health, Korchagin, TOH Management, Klochko, and Penza provided any patient assessments at all, they were part and parcel of the chiropractic services billed under CPT code 98941.

377.   These are only representative examples. Touch of Health, Korchagin, TOH Management, Klochko, Hanson, Penza, and Roldos routinely submitted duplicative charges

for illusory follow-up examinations, despite the fact that: (i) no legitimate follow-up examination services were provided; (ii) the patient's condition did not require examination above and beyond the usual pre- and post- manipulation assessment associated with chiropractic services; and (iii) a pre-manipulation patient assessment was part and parcel of the putative chiropractic manipulation services billed by Touch of Health, Korchagin, TOH Management, Klochko, Hanson, Penza, and Roldos under CPT codes 98940 and 98941.

378.    Touch of Health, Korchagin, TOH Management, Klochko, Hanson, Penza, and Roldos submitted charges for the duplicative and illusory follow-up examinations in order to maximize the amount of fraudulent billing they could submit to insurers, including GEICO.

379.    In this context, Klochko – who at all times purported to serve as the "medical director" at Touch of Health – did not, and could not have, "[c]onduct[ed] systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful." See Fla. Stat. § 400.9935(1).

380.    Had Klochko actually fulfilled her statutory role as medical director at Touch of Health, she would have noted – among other things – that the Defendants routinely fraudulently represented in Touch of Health's billing that the putative follow-up examinations were legitimately and lawfully performed and billed to GEICO.

381.    Klochko failed to do so, because she never actually served as a legitimate medical director at Touch of Health in the first instance.

b.      **Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

382.    As set forth above, the use of CPT code 99213 to bill for a follow-up examination typically requires that the patient present with problems of low to moderate severity.

383.    By contrast, and as set forth above, to the limited extent that the Insureds in the claims identified in Exhibit "1" suffered any injuries at all in their relatively minor automobile accidents, the injuries were garden-variety soft tissue injuries such as sprains and strains, which were not severe at all.

384.    These injuries – to the extent they existed in the first instance – were of low severity at the outset, and were of minimal severity by the time the Insureds presented for the purported follow-up examinations, typically weeks or even months after the underlying accidents.

385.    Even so, in the claims for follow-up examinations identified in Exhibit "1", Touch of Health, Korchagin, Klochko, Hanson, and Penza routinely billed for their putative follow-up examinations under CPT code 99213, and thereby falsely represented that the Insureds continued to suffer from presenting problems of low to moderate severity at the time of the purported follow-up examinations.

386.    For example:

(i)      On June 6, 2018, an Insured named GJ was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision. The police report further indicated that GJ was not injured and did not complain of any pain. In keeping with the fact that GJ was not injured, GJ did not visit any hospital emergency room following the accident. To the extent that GJ experienced any health problems at all as the result of the minor accident, they were of low severity at the outset, and either had completely resolved or were minimal within a few weeks of the accident.

Even so, following a purported follow-up examination of GJ by Penza on July 18, 2018, Touch of Health, Korchagin, TOH Management, Klochko, and Penza billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that GJ presented with problems of low to moderate severity at the follow-up examination.

(ii)     On June 6, 2018, an Insured named CD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision. The police report further indicated that CD was not injured and did not complain of any pain. In keeping with the fact that CD was not injured, CD did not visit any hospital emergency room following the accident. To the extent that CD experienced any health problems at all as the result of the minor accident, they were of low severity at the outset, and either had completely resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of CD by Penza on August 21, 2018, Touch of Health, Korchagin, TOH Management, Klochko, and Penza billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that CD presented with problems of low to moderate severity at the follow-up examination.

(iii)    On June 26, 2018, an Insured named BF was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that BF's vehicle was drivable following the accident. The police report further indicated that BF was not injured and did not complain of any pain. In keeping with the fact that BF was not injured, BF did not visit any hospital emergency room following the accident. To the extent that BF experienced any health problems at all as the result of the minor accident, they were of low severity at the outset, and either had completely resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of BF by Penza on September 7, 2018, Touch of Health, Korchagin, TOH Management, Klochko, and Penza billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that BF presented with problems of low to moderate severity at the follow-up examination.

(iv)     On June 26, 2018, an Insured named IF was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that IF's vehicle was drivable following the accident. The police report further indicated that IF was not injured and did not complain of any pain. In keeping with the fact that IF was not injured, IF did not visit any hospital emergency room following the accident. To the extent that IF experienced any health problems at all as the result of the minor accident, they were of low severity at the outset, and either had completely resolved or were minimal within a few weeks of the accident. Even so, following a purported

follow-up examination of BF by Penza on October 9, 2018 – more than three months after the minor accident – Touch of Health, Korchagin, TOH Management, Klochko, and Penza billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that BF presented with problems of low to moderate severity at the follow-up examination.

(v)     On September 11, 2018, an Insured named BA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that BA's vehicle was drivable following the accident. The police report further indicated that BA was not injured and did not complain of any pain. In keeping with the fact that BA was not injured, BA did not visit any hospital emergency room following the accident. To the extent that BA experienced any health problems at all as the result of the minor accident, they were of low severity at the outset, and either had completely resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of BA by a physician named Roger Walker, D.O. ("Walker") on December 20, 2018 – more than three months after the minor accident – Touch of Health, Korchagin, and Klochko billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that BA presented with problems of low to moderate severity at the follow-up examination.

(vi)    On September 11, 2018, an Insured named JS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that JS's vehicle was drivable following the accident. The police report further indicated that JS was not injured and did not complain of any pain. In keeping with the fact that JS was not injured, JS did not visit any hospital emergency room following the accident. To the extent that JS experienced any health problems at all as the result of the minor accident, they were of low severity at the outset, and either had completely resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of JS by Walker on December 20, 2018 – more than three months after the minor accident – Touch of Health, Korchagin, and Klochko billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that JS presented with problems of low to moderate severity at the follow-up examination.

(vii)   On November 5, 2018, an Insured named ME was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that ME's vehicle was drivable following the accident. The police report further indicated that ME was not injured and did not complain of any pain. In keeping with the fact that ME was not injured, ME did not visit any hospital emergency room following the accident. To the

extent that ME experienced any health problems at all as the result of the minor accident, they were of low severity at the outset, and either had completely resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of ME by Penza on December 18, 2018, Touch of Health, Korchagin, TOH Management, Klochko, and Penza billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that ME presented with problems of low to moderate severity at the follow-up examination.

(viii)   On November 5, 2018, an Insured named NE was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that NE's vehicle was drivable following the accident. The police report further indicated that NE was not injured and did not complain of any pain. In keeping with the fact that NE was not injured, NE did not visit any hospital emergency room following the accident. To the extent that NE experienced any health problems at all as the result of the minor accident, they were of low severity at the outset, and either had completely resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of NE by Penza on December 18, 2018, Touch of Health, Korchagin, TOH Management, Klochko, and Penza billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that NE presented with problems of low to moderate severity at the follow-up examination.

(ix)   On December 15, 2018, an Insured named FM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that FM's vehicle was drivable following the accident. The police report further indicated that FM was not injured and did not complain of any pain. In keeping with the fact that FM was not injured, FM did not visit any hospital emergency room following the accident. To the extent that FM experienced any health problems at all as the result of the minor accident, they were of minimal severity. Even so, following a purported follow-up examination of FM by Penza on December 18, 2018, Touch of Health, Korchagin, TOH Management, Klochko, and Penza billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that FM presented with problems of low to moderate severity at the follow-up examination.

(x)   On December 15, 2018, an Insured named MC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that MC's vehicle was drivable following the accident. The police report further indicated that MC was not injured and did not complain of any pain. In keeping with the fact that MC was not injured, MC did not visit any hospital emergency room following the accident. To the

extent that MC experienced any health problems at all as the result of the minor accident, they were of low severity at the outset, and either had completely resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of MC by Penza on January 7, 2019, Touch of Health, Korchagin, TOH Management, Klochko, and Penza billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that MC presented with problems of low to moderate severity at the follow-up examination.

387.    These are only representative examples. In many of the claims for follow-up examinations identified in Exhibit "1", Touch of Health, Korchagin, Klochko, Hanson, and Penza falsely represented that the Insureds presented with problems of low to moderate severity, when in fact the Insureds either did not have any genuine presenting problems at all as the result of their relatively minor automobile accidents at the time of the follow-up examinations, or else their presenting problems were minimal.

388.    In the claims for follow-up examinations identified in Exhibit "1", Touch of Health, Korchagin, Klochko, Hanson, and Penza routinely falsely represented that the Insureds presented with problems of low to moderate severity in order to create a false basis for their charges for the examinations under CPT code 99213, because follow-up examinations billable under CPT code 99213 are reimbursable at higher rates than examinations involving presenting problems of minimal severity, or no severity.

389.    In the claims for follow-up examinations identified in Exhibit "1", Touch of Health, Korchagin, Klochko, Hanson, and Penza also routinely falsely represented that the Insureds presented with problems of low to moderate severity in order to create a false basis for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

c.      **Misrepresentations Regarding the Results of the Follow-Up Examinations**

390.    Pursuant to the CPT Assistant, when Touch of Health, Korchagin, TOH Management, Klochko, Hanson, Penza, and Roldos billed for their putative follow-up examinations under CPT code 99213, they represented that Hanson, Penza, and Roldos performed at least two of the following three components: (i) took an "expanded problem focused" patient history; (ii) conducted an "expanded problem focused physical examination"; and (iii) engaged in medical decision-making of "low complexity".

391.    Similarly, when Touch of Health, Korchagin, TOH Management, Klochko, Hanson, Penza, and Roldos billed for their putative follow-up examinations under CPT code 99212, they represented that Hanson, Penza, and Roldos performed at least two of the following three components: (i) took a "problem focused" patient history; (ii) a "problem focused" physical examination; and (iii) engaged in straightforward medical decision-making.

392.    In actuality, however, in the claims for follow-up examinations identified in Exhibit "1", Hanson, Penza, and Roldos did not take any legitimate patient histories, conduct any legitimate physical examinations, or engage in any legitimate medical decision-making at all.

393.    Rather, following their purported follow-up examinations, Touch of Health, Korchagin, TOH Management, Klochko, Hanson, Penza, and Roldos simply: (i) reiterated the false, boilerplate "diagnoses" from the Insureds' initial examinations; and either (ii) referred the Insureds back to Touch of Health for even more medically unnecessary physical therapy services and/or chiropractic services, despite the fact that the Insureds purportedly already had received significant physical therapy services and/or chiropractic services from Touch of

Health that supposedly had not been successful in resolving their purported pain symptoms; or (iii) discharged the Insureds from "treatment", to the extent that their PIP Benefits had been exhausted.

394.    In the claims for follow-up examinations identified in Exhibit "1", Touch of Health, Korchagin, TOH Management, Klochko, Hanson, Penza, and Roldos routinely fraudulently misrepresented that the examinations were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)    the putative examinations were illusory, with outcomes that were pre-determined to result in substantially-similar, phony "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)   the charges for the putative examinations misrepresented the nature and extent of the examinations; and

(iii)  Touch of Health never was eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as it was operated in violation of the Clinic Act, the Patient Broking Act, the Anti-Kickback Statute, the HME Licensing Laws, and the Chiropractor Advertising Laws.

395.    In this context, Klochko – who at all times purported to serve as the "medical director" at Touch of Health – did not, and could not have, "[c]onduct[ed] systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful." See Fla. Stat. § 400.9935(1).

396.    Had Klochko actually fulfilled her statutory role as medical director at Touch of Health, she would have noted – among other things – that the Defendants routinely fraudulently represented in Touch of Health's billing that the putative follow-up examinations were legitimately and lawfully performed.

**(vi)** **The Fraudulent Charges for Computerized Range of Motion and Muscle Strength Tests at Touch of Health**

397.    In an attempt to maximize the fraudulent billing that they submit or cause to be submitted for each Insured, after purporting to provide initial examinations at Touch of Health, Korchagin, TOH Management, Klochko, Hanson, Penza, and Roldos directed many Insureds to return for one or more rounds of medically useless computerized range of motion and muscle strength tests.

398.    As set forth in Exhibit "1", Touch of Health, Korchagin, TOH Management, Klochko, Hanson, Penza, and Roldos then purported to provide, and billed, the computerized range of motion tests to GEICO under CPT code 95851, and the muscle strength tests to GEICO under CPT codes 95831 and 95832, typically resulting in at least $390.00 in total charges for every Insured who supposedly received the tests.

399.    In the claims for computerized range of motion and muscle strength tests identified in Exhibit "1", the charges for the computerized range of motion and muscle strength tests also were fraudulent in that they misrepresented Touch of Health's eligibility to collect PIP Benefits in the first instance.

400.    In fact, and as set forth above, Touch of Health never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the Clinic Act, the Self-Referral Act, the Patient Brokering Act, the Anti-Kickback Statute., the HME Licensing Laws, and the Chiropractor Advertising Laws.

401.    As set forth below, Touch of Health, Korchagin, TOH Management, Klochko, Hanson, Penza, and Roldos' charges for the computerized range of motion and muscle

strength tests identified in Exhibit "1" also were fraudulent in that they misrepresented the medical necessity of the putative computerized range of motion and muscle strength tests.

**a.      Traditional Tests to Evaluate the Human Body's Range of Motion and Muscle Strength**

402.    The adult human body is made up of 206 bones joined together at various joints that either are of the fixed, hinged or ball-and-socket variety.  The body's hinged joints and ball-and-socket joints facilitate movement, allowing a person to – for example – bend a leg, rotate a shoulder, or move the neck to one side.

403.    The measurement of the capacity of a particular joint to perform its full and proper function represents the joint's "range of motion".  Stated in a more illustrative way, range of motion is the amount that a joint will move from a straight position to its bent or hinged position.

404.    A traditional, or manual, range of motion test consists of a non-electronic measurement of the joint's ability to move in comparison with an unimpaired or "ideal" joint. In a traditional range of motion test, the physician asks the patient to move his or her joints at various angles, or the physician moves the joints. The physician then evaluates the patient's range of motion either by sight or through the use of a manual inclinometer or a goniometer (i.e., a device used to measure angles).

405.    Similarly, a traditional muscle strength test consists of a non-electronic measurement of muscle strength, which is accomplished by having the patient move his/her body in a given direction against resistance applied by the physician.  For example, if a physician wanted to measure muscle strength in the muscles surrounding a patient's knee, he

would apply resistance against the patient's leg while having him/her move the leg up, then apply resistance against the patient's leg while having him/her move the leg down.

406.   Physical examinations performed on patients with soft-tissue trauma – the alleged complaint advanced by virtually every Insured who treated with Touch of Health – necessarily require range of motion and muscle strength tests, inasmuch as these tests provide a starting point for injury assessment and treatment planning.  Unless a physician knows the extent of a given patient's joint or muscle strength impairment, there is no way to properly diagnose or treat the patient's injuries. Evaluation of range of motion and muscle strength is an essential component of the "hands-on" examination of a trauma patient.

407.   Since range of motion and muscle strength tests must be conducted as an element of a soft-tissue trauma patient's initial examination, as well as during any follow-up examinations, the Fee Schedule provides that range of motion and muscle strength tests are to be reimbursed as an element of the initial consultations and follow-up examinations.

408.   In other words, health care providers cannot conduct and bill for an initial consultation or follow-up examination, then bill separately for contemporaneously-provided computerized range of motion and muscle strength tests.

**b.     The Duplicate Billing for Medically Unnecessary Computerized Range of Motion Tests**

409.   To the extent that Touch of Health, Korchagin, TOH Management, Klochko, Hanson, Penza, Roldos, and Kabushinskaya actually provided initial examinations and follow-up examinations in the first instance, practitioners associated with Touch of Health – typically Hanson, Penza, Roldos, or Kabushinskaya – purported to conduct manual range of

motion and manual muscle tests on virtually every Insured during each initial and/or follow-up examination.

410.    The charges for these manual range of motion and manual muscle tests were part and parcel of the charges that Touch of Health, Korchagin, TOH Management, Klochko, Hanson, Penza, Roldos, and Kabushinskaya routinely submitted for the initial examinations under CPT codes 99203 and 99204 and for the follow-up examinations under CPT codes 99212 and 99213.

411.    Despite the fact that every Insured already purportedly had undergone manual range of motion and muscle testing during their initial examinations and/or follow-up examinations, and despite the fact that reimbursement for range of motion and muscle testing already had been paid by GEICO as a component of reimbursement for the initial examinations and/or follow-up examinations, Touch of Health, Korchagin, TOH Management, Klochko, Hanson, Penza, and Roldos systemically billed for, and purported to provide, a series of computerized range of motion and muscle strength tests to most Insureds.

412.    Though the Insureds routinely visited Touch of Health several times per month for follow-up examinations and other Fraudulent Services, Touch of Health, Korchagin, Klochko, Hanson, Penza, Roldos often deliberately scheduled separate appointments for computerized range of motion and muscle strength tests so that they could bill for those procedures separately, without having to include them in the billing for the follow-up examinations.

413.    Touch of Health, Korchagin, TOH Management, Klochko, Hanson, Penza, and Roldos purported to provide the computerized range of motion and muscle strength tests by

placing a digital inclinometer or goniometer on various parts of the Insureds' bodies (affixed by Velcro straps) while the Insured was asked to attempt various motions and movements. The test was virtually identical to the manual range of motion testing that is described above and that purportedly was performed during each initial examination and follow-up examination.

414.     Touch of Health, Korchagin, Klochko, Hanson, Penza, Roldos purported to provide the muscle strength tests by placing a strain gauge-type measurement apparatus against a stationary object, against which the patient pressed three-to-four separate times using various muscle groups. As with the computerized range of motion and muscle strength tests, this computerized muscle strength test was virtually identical to the manual muscle strength testing that is described above and that purportedly was performed during the initial examinations and/or follow-up examinations – except that a digital printout was obtained.

415.     The information gained through the use of the computerized range of motion and muscle strength tests was not significantly different from the information obtained through the manual testing that was part and parcel of virtually every Insured's initial examination and follow-up examinations.

416.     In the relatively minor soft-tissue injuries allegedly sustained by the Insureds – to the extent that any of the Insureds suffered any injuries at all as the result of the automobile accidents they purported to experience – the difference of a few percentage points in the Insureds' range of motion reading or pounds of resistance in the Insureds' muscle strength testing was meaningless. This is evidenced by the fact that neither Hanson, Penza, Roldos, Kabushinskaya, nor any other health care provider associated with Touch of Health, ever

incorporated the results of computerized range of motion and muscle strength tests into the rehabilitation programs of any of the Insureds whom they purported to treat.

417.    The computerized range of motion and muscle strength tests were part and parcel of the Defendants' fraudulent scheme, inasmuch as the "service" was rendered pursuant to a pre-established protocol that: (i) in no way aided in the assessment and treatment of the Insureds; and (ii) was designed solely to financially enrich the Defendants.

**c.    The Fraudulent Unbundling of Charges for the Computerized Range of Motion and Muscle Tests**

418.    Not only did Touch of Health, Korchagin, Klochko, Hanson, Penza, Roldos deliberately purport to provide duplicative, medically unnecessary computerized range of motion and muscle tests, they also unbundled their billing for the tests in order to maximize the fraudulent charges that they could submit through Touch of Health to GEICO.

419.    Pursuant to the CPT Assistant, when computerized range of motion testing and muscle testing are performed on the same date, all of the testing should be reported and billed using CPT code 97750.

420.    CPT code 97750 is a "time-based" code that allows for a separate charge for every 15 minutes of testing that is performed.

421.    Thus, if a health care provider performed 15 minutes of computerized range of motion and muscle testing, it would be permitted a single charge under CPT code 97750. If the provider performed 30 minutes of computerized range of motion and muscle testing, it would be permitted to submit two charges under CPT code 97750, and so forth.

422.    In many of the claims for computerized range of motion and muscle tests that are identified in Exhibits "1", Touch of Health, Korchagin, TOH Management, Klochko,

Hanson, Penza, and Roldos purported to provide the computerized range of motion and muscle tests to Insureds on the same dates of service.

423.    To the extent that Touch of Health, Korchagin, TOH Management, Klochko, Hanson, Penza, and Roldos actually provided the computerized range of motion and muscle tests to Insureds in the first instance, the computerized range of motion and muscle tests – together – virtually never took more than 15 minutes to perform. Thus, even if the computerized range of motion and muscle tests that Touch of Health, Korchagin, TOH Management, Klochko, Hanson, Penza, and Roldos purported to provide were medically necessary, and performed in the first instance, Touch of Health, Korchagin, TOH Management, Klochko, Hanson, Penza, and Roldos would be limited to a single, time-based charge under CPT code 97750 for each date of service on which they performed computerized range of motion and muscle tests on an Insured.

424.    However, in order to maximize their fraudulent billing for the computerized range of motion and muscle tests, Touch of Health, Korchagin, TOH Management, Klochko, Hanson, Penza, and Roldos routinely unbundled what should have been – at most – a single charge under CPT code 97750 for both computerized range of motion and muscle testing into: (i) charges under CPT codes 95831 and 95832 (for the muscle tests); and a charge under CPT code 95851 (for the range of motion tests).

425.    By unbundling what should – at most – have been a single charge under CPT code 97750 into multiple charges under CPT codes 95831, 95832, and 95851, Touch of Health, Korchagin, TOH Management, Klochko, Hanson, Penza, and Roldos generally

submitted charges of at least $390.00 per Insured for each round of computerized range of motion and muscle testing they purported to provide.

### (vii)   The Fraudulent Charges for Physical Therapy and/or Chiropractic Treatment at Touch of Health

426.    In addition to the fraudulent initial examinations and follow-up examinations, Touch of Health, Korchagin, TOH Management, Klochko, Hanson, Penza, Biondi, and Roldos routinely purported to subject each of the Insureds in the claims identified in Exhibit "1" to medically unnecessary physical therapy and/or chiropractic treatment.

427.    Hanson, Penza, Biondi, and Roldos purported to perform the vast majority of the putative physical therapy and/or chiropractic treatment services.

428.    As set forth in Exhibit "1", Touch of Health, Korchagin, TOH Management, Klochko, Hanson, Penza, Biondi, and Roldos routinely billed the purported physical therapy services and/or chiropractic services to GEICO under:

(i)     CPT code 97012, for putative mechanical traction therapy, typically resulting in a charge of $40.00 for each round of mechanical traction therapy they purported to provide;

(ii)    CPT code 97014, for putative electrical stimulation, typically resulting in a charge of $55.00 for each round of electrical stimulation they purported to provide;

(iii)   CPT code 97016, for putative vasopneumatic therapy, resulting in a charge of $50.00 for each round of mechanical traction therapy they purported to provide;

(iv)    CPT code 97026, for putative infrared therapy , resulting in a charge of $15.00 for each round of electrical stimulation they purported to provide;

(v)     CPT code 97035, for putative ultrasound, typically resulting in a charge of $30.00 for each round of ultrasound they purported to provide;

(vi)    CPT code 97110, for putative therapeutic exercises, typically resulting in a

charge of between $75.00 and $150.00 for each round of therapeutic exercises they purported to provide;

(vii)   CPT code 97112, for putative neuromuscular reeducation, typically resulting in a charge of $80.00 for each round of neuromuscular reeducation they purported to provide;

(viii)  CPT code 97140, for putative manual therapy, typically resulting in a charge of $70.00 for each round of manual therapy they purported to provide;

(ix)    CPT code 97150, for putative group therapeutic procedures, typically resulting in a charge of $40.00 for each round of group therapeutic procedures they purported to provide; and

(x)     CPT codes 98940, 98941, and 98943 for putative chiropractic manipulation services, typically resulting in a charge of between $50.00 and $100.00 for each round of putative chiropractic manipulation services they purported to provide.

429.    In a legitimate clinical setting, each individual patient's physical therapy and/or chiropractic treatment schedule, and the specific modalities that will be used, must be tailored to the specific patient's circumstances, symptomatology, and presentation.

430.    In a legitimate clinical setting, the nature of, extent of, and schedule for physical therapy and/or chiropractic treatment is constantly adjusted for each individual patient based on each patient's treatment progress, as assessed during each patient's follow-up examinations and on an ongoing basis as they receive the physical therapy and/or chiropractic treatment.

431.    By contrast, at Touch of Health, the nature and extent of the physical therapy and/or chiropractic treatment that each Insured purportedly received was pre-determined, and had no legitimate connection to the Insureds' individual circumstances, presentation, or progress through the Defendants' fraudulent treatment and billing protocol. Accordingly, the physical therapy and/or chiropractic treatment was medically unnecessary.

432.    In the claims for physical therapy services and/or chiropractic services identified in Exhibit "1", the charges for the physical therapy services and/or chiropractic services also were fraudulent in that they misrepresented Touch of Health's eligibility to collect PIP Benefits in the first instance.

433.    In fact, and as set forth above, Touch of Health never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the Clinic Act, the Patient Brokering Act, the Anti-Kickback Statute, the Self-Referral Act, the HME Licensing Laws, and the Chiropractor Advertising Laws.

434.    As set forth above, in order for a health care service to be eligible for PIP reimbursement, it must be "lawfully" provided. See Fla. Stat. § 627.736.

435.    Pursuant to the No-Fault Law, "lawful" or "lawfully" means "in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of state and federal law related to the provision of medical services or treatment." See Fla. Stat. § 627.732.

436.    In each of the claims for physical therapy services and/or chiropractic services identified in Exhibit "1", Touch of Health, Korchagin, TOH Management, Klochko, Hanson, Penza, Biondi, and Roldos falsely represented that the services were lawfully provided and eligible for PIP reimbursement.

**3.**     **The Fraudulent Treatment and Billing Protocol at Central Florida Chiro**

**(i)**     **The Fraudulent Charges for Initial Examinations at Central Florida Chiro**

437.     As an initial step in their fraudulent treatment and billing protocol, Central Florida Chiro, Hanson, and Vega purported to provide the Insureds in the claims identified in Exhibit "2" with a putative initial examination.

438.     Hanson and Vega purported to personally perform virtually all of the initial examinations in the claims identified in Exhibit "2".

439.     As set forth in Exhibit "2", Central Florida Chiro, Hanson, and Vega then billed the initial examinations purportedly performed by Hanson and Vega to GEICO, or caused them to be billed to GEICO, under CPT code 99203, typically resulting in a charge of between $250.00 and $300.00 for each initial examination that they purported to provide.

440.     In the claims for initial examinations identified in Exhibit "2", the charges for the initial examinations were fraudulent in that they misrepresented Central Florida Chiro's eligibility to collect PIP Benefits in the first instance.

441.     In fact, and as set forth above, Central Florida Chiro never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the Clinic Act and the HME Licensing Laws.

442.     As set forth below, the charges for the initial examinations identified in Exhibit "2" also were fraudulent in that they misrepresented the nature and extent of the initial examinations.

a.      **Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

443.    To the extent that the Insureds in the claims identified in Exhibit "2" had any presenting problems at all as the result of their relatively minor automobile accidents, the problems virtually always were low severity soft tissue injuries such as sprains and strains.

444.    For instance, and in keeping with the fact that the Insureds in the claims identified in Exhibit "2" either had no presenting problems at all as the result of their relatively minor automobile accidents, or else problems of low severity, in most of the claims identified in Exhibit "2" the contemporaneous police reports indicated that the underlying accidents involved relatively low-impact collisions, that the Insureds' vehicles were drivable following the accidents, and that no one was seriously injured in the underlying accidents, or injured at all.

445.    What is more, and again in keeping with the fact that the Insureds in the claims identified in Exhibit "2" either had no presenting problems at all as a result of their relatively minor automobile accidents, or else problems of low severity, in many of the claims identified in Exhibit "2" the Insureds did not seek treatment at any hospital as the result of their accidents.

446.    Even so, in the claims for initial examinations identified in Exhibit "2", Central Florida Chiro, Hanson, and Vega routinely billed for their putative initial examinations using CPT code 99203, and thereby falsely represented that the Insureds presented with problems of moderate severity.

447.    For example:

(i)    On February 18, 2014, an Insured named JN was involved in an automobile accident. The contemporaneous police report indicated that the accident was a

low-speed, low-impact collision, and that JN's vehicle was drivable following the accident. The police report further indicated that JN was not injured and did not complain of any pain. In keeping with the fact that JN was not injured, JN did not visit any hospital emergency room following the accident. To the extent that JN experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following an initial examination of JN by Vega on February 19, 2014, Vega, Hanson, and Central Florida Chiro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(ii)     On February 18, 2014, an Insured named JF was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JF's vehicle was drivable following the accident. The police report further indicated that JF was not injured and did not complain of any pain. In keeping with the fact that JF was not injured, JF did not visit any hospital emergency room following the accident. To the extent that JF experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following an initial examination of JF by Vega on February 19, 2014, Vega, Hanson, and Central Florida Chiro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(iii)    On June 20, 2014, an Insured named AJ was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that AJ's vehicle was drivable following the accident. The police report further indicated that AJ was not injured and did not complain of any pain. In keeping with the fact that AJ was not injured, AJ did not visit any hospital emergency room following the accident. To the extent that AJ experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following an initial examination of AJ by Vega on June 23, 2014, Vega, Hanson, and Central Florida Chiro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(iv)    On June 20, 2014, an Insured named TS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that TS's vehicle was drivable following the accident. The police report further indicated that TS was not injured and did not complain of any pain. In keeping with the fact that TS was not injured, TS did not visit any hospital emergency room following the accident. To the extent that TS experienced any health problems at all as the result of the minor

accident, they were of low severity. Even so, following an initial examination of TS by Vega on June 23, 2014, Vega, Hanson, and Central Florida Chiro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(v)   On June 20, 2014, an Insured named TS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that TS's vehicle was drivable following the accident. The police report further indicated that TS was not injured and did not complain of any pain. In keeping with the fact that TS was not injured, TS did not visit any hospital emergency room following the accident. To the extent that TS experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following an initial examination of TS by Vega on June 23, 2014, Vega, Hanson, and Central Florida Chiro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(vi)   On July 7, 2014, an Insured named LG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that LG was not injured and did not complain of any pain at the scene. In keeping with the fact that LG was not injured, LG did not visit any hospital emergency room following the accident. To the extent that LG experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following an initial examination of LG by Vega on July 8, 2014, Vega, Hanson, and Central Florida Chiro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(vii)   On July 7, 2014, an Insured named JG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that JG was not injured and did not complain of any pain at the scene. In keeping with the fact that JG was not injured, JG did not visit any hospital emergency room following the accident. To the extent that JG experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following an initial examination of JG by Vega on July 8, 2014, Vega, Hanson, and Central Florida Chiro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(viii)   On July 7, 2014, an Insured named WL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a

low-impact collision, and that WL was not injured and did not complain of any pain at the scene. In keeping with the fact that WL was not injured, WL did not visit any hospital emergency room following the accident. To the extent that WL experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following an initial examination of WL by Vega on July 8, 2014, Vega, Hanson, and Central Florida Chiro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(ix)     On December 12, 2014, an Insured named MV was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MV's vehicle was drivable following the accident. The police report further indicated that MV was not injured and did not complain of any pain. In keeping with the fact that MV was not injured, MV did not visit any hospital emergency room following the accident. To the extent that MV experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following an initial examination of MV by Vega on December 15, 2014, Vega, Hanson, and Central Florida Chiro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(x)      On December 12, 2014, an Insured named AS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that AS's vehicle was drivable following the accident. The police report further indicated that AS was not injured and did not complain of any pain. In keeping with the fact that AS was not injured, AS did not visit any hospital emergency room following the accident. To the extent that AS experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following an initial examination of AS by Vega on December 15, 2014, Vega, Hanson, and Central Florida Chiro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xi)     On March 17, 2015, an Insured named JR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that JR's vehicle was drivable following the accident. The police report further indicated that JR was not injured and did not complain of any pain. In keeping with the fact that JR was not injured, JR did not visit any hospital emergency room following the accident. To the extent that JR experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following an initial examination

of JR by Hanson on March 18, 2015, Hanson and Central Florida Chiro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xii)     On May 8, 2015, an Insured named EA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that EA's vehicle was drivable following the accident. The police report further indicated that EA was not injured and did not complain of any pain. In keeping with the fact that EA was not injured, EA did not visit any hospital emergency room following the accident. To the extent that EA experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following an initial examination of EA by Vega on May 11, 2015, Vega, Hanson, and Central Florida Chiro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xiii)    On May 8, 2015, an Insured named MP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MP's vehicle was drivable following the accident. The police report further indicated that MP was not injured and did not complain of any pain. In keeping with the fact that MP was not injured, MP did not visit any hospital emergency room following the accident. To the extent that MP experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following an initial examination of MP by Vega on May 11, 2015, Vega, Hanson, and Central Florida Chiro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xiv)     On December 11, 2015, an Insured named JB was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JB's vehicle was drivable following the accident. The police report further indicated that JB was not injured and did not complain of any pain. In keeping with the fact that JB was not injured, JB did not visit any hospital emergency room following the accident. To the extent that JB experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following an initial examination of JB by Vega on December 11, 2015, Vega, Hanson, and Central Florida Chiro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xv)     On October 1, 2016, an Insured named MT was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MT's vehicle was drivable following the accident. The police report further indicated that MT was not injured and did not complain of any pain. In keeping with the fact MT was not injured, MT did not visit any hospital emergency room following the accident. To the extent that MT experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following an initial examination of MT by Hanson on October 3, 2016, Hanson and Central Florida Chiro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

448.     These are only representative examples. In the claims for initial examinations identified in Exhibit "2", Central Florida Chiro, Hanson, and Vega routinely falsely represented that the Insureds presented with problems of moderate severity, when in fact the Insureds' problems were low-severity soft tissue injuries such as sprains and strains, to the limited extent that they had any presenting problems at all.

449.     In the claims for initial examinations identified in Exhibit "2", Central Florida Chiro, Hanson, and Vega routinely falsely represented that the Insureds presented with problems of moderate severity in order to create a false basis for their charges for the examinations under CPT code 99203, because examinations billable under CPT code 99203 are reimbursable at higher rates than examinations involving presenting problems of low severity, or no severity.

450.     In the claims for initial examinations identified in Exhibit "2", Central Florida Chiro, Hanson, and Vega also routinely falsely represented that the Insureds presented with problems of moderate severity in order to create a false basis for the other Fraudulent Services that Central Florida Chiro, Hanson, and Vega purported to provide to the Insureds, including

medically unnecessary follow-up examinations, diagnostic imaging services, laser therapy services, physical therapy services and/or chiropractic services, and HME.

**b.      Misrepresentations Regarding the Amount of Time Spent on the Initial Examinations**

451.    What is more, in the claims identified in Exhibit "2" for initial examinations under CPT code 99203, Central Florida Chiro, Hanson, and Vega routinely misrepresented and exaggerated the amount of face-to-face time that the examining physician or chiropractor spent with the Insureds or the Insureds' families.

452.    As set forth above, pursuant to the CPT Assistant, the use of CPT code 99203 to bill for a patient examination represents that the physician or chiropractor who performed the examination spent at least 30 minutes of face-to-face time with the patient or the patient's family.

453.    However, in most of the claims for initial examinations identified in Exhibit "2", Hanson and Vega never spent more than 15 minutes – much less 30 minutes – of face-to-face time with the Insureds or their families when purporting to conduct the examinations.

454.    For instance, and in keeping with the fact that the initial examinations in the claims identified in Exhibit "2" did not entail more than 15 minutes of face-to-face time between Hanson and Vega and the Insureds or the Insureds' families, to the extent that the examinations actually were performed in the first instance, Hanson and Vega used a template in purporting to conduct the initial examinations.

455.    The template that Hanson and Vega used in purporting to conduct the initial examinations set forth a limited range of examination parameters.

456.    The only face-to-face time between the physicians or chiropractors and the Insureds that was reflected in the limited range of examination parameters consisted of brief patient interviews and limited examinations of the Insureds' musculoskeletal systems.

457.    These brief patient interviews and limited examinations did not require Hanson, Vega, nor any other physician or chiropractor associated with Central Florida Chiro, to spend more than 15 minutes of face-to-face time with the Insureds or their families.

458.    In the claims for initial examinations identified in Exhibit "2", Central Florida Chiro, Hanson, and Vega routinely falsely represented that the initial examinations involved 30 minutes of face-to-face time in order to create a false basis for their charges under CPT code 99203 because examinations billable under CPT code 99203 are reimbursable at higher rates than examinations that require less time to perform.

c.    **Misrepresentations Regarding "Detailed" Physical Examinations**

459.    Moreover, in many of the claims identified in Exhibit "2" for initial examinations under CPT code 99203, Central Florida Chiro, Hanson, and Vega routinely falsely represented the extent of the underlying physical examinations.

460.    In the claims for initial examinations identified in Exhibit "2", when Central Florida Chiro, Hanson, and Vega billed for the initial examinations under CPT code 99203, they falsely represented that the chiropractor who purported to perform the examinations – namely Hanson and Vega – performed "detailed" patient examinations on the Insureds they purported to treat during the initial examinations.

461.    In fact, with respect to the claims for initial examinations under CPT code 99203 that are identified in Exhibit "2", Central Florida Chiro, Hanson, and Vega virtually never conducted an extended examination of the Insureds' musculoskeletal systems.

462.    For instance, in the vast majority of the claims under CPT code 99203 identified in Exhibit "2", Central Florida Chiro, Hanson, and Vega did not conduct an extended examination of the Insureds' musculoskeletal systems, inasmuch as they did not document findings with respect to the following:

(i)      measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

(ii)     general appearance of patient (e.g., development, nutrition, body habitus, deformities, attention to grooming);

(iii)    examination of peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)     palpation of lymph nodes in neck, axillae, groin and/or other location;

(v)      brief assessment of mental status;

(vi)     examination of gait and station;

(vii)    inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(viii)   coordination;

(ix)     examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and/or

(x)      examination of sensation.

463.    For example:

(i)  On or about February 18, 2014, Central Florida Chiro, Hanson, and Vega billed GEICO under CPT code 99203 for an initial examination that Vega purported to perform on an Insured named JK, and thereby represented that Vega had provided a "detailed" physical examination to JK. However, Vega did not document an extended examination of JK's musculoskeletal system, despite the fact that – to the extent JK had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(ii)  On or about February 18, 2014, Central Florida Chiro and Hanson billed GEICO under CPT code 99203 for an initial examination that Hanson purported to perform on an Insured named SK, and thereby represented that Hanson had provided a "detailed" physical examination to SK. However, Hanson did not document an extended examination of SK's musculoskeletal system, despite the fact that – to the extent SK had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(iii)  On or about March 13, 2014, Central Florida Chiro, Hanson, and Vega billed GEICO under CPT code 99203 for an initial examination that Vega purported to perform on an Insured named GD, and thereby represented that Hanson had provided a "detailed" physical examination to GD. However, Vega did not document an extended examination of GD's musculoskeletal system, despite the fact that – to the extent GD had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(iv)  On or about July 3, 2014, Central Florida Chiro and Hanson billed GEICO under CPT code 99203 for an initial examination that Hanson purported to perform on an Insured named ST, and thereby represented that Hanson had provided a "detailed" physical examination to ST. However, Hanson did not document an extended examination of ST's musculoskeletal system, despite the fact that – to the extent ST had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(v)  On or about July 18, 2014, Central Florida Chiro, Hanson, and Vega billed GEICO under CPT code 99203 for an initial examination that Vega purported to perform on an Insured named TB, and thereby represented that Hanson had provided a "detailed" physical examination to TB. However, Vega did not document an extended examination of TB's musculoskeletal system, despite the fact that – to the extent TB had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(vi)  On or about December 5, 2014, Central Florida Chiro and Hanson billed GEICO under CPT code 99203 for an initial examination that Hanson purported to perform on an Insured named AS, and thereby represented that

Hanson had provided a "detailed" physical examination to AS. However, Hanson did not document an extended examination of AS's musculoskeletal system, despite the fact that – to the extent AS had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(vii)    On or about December 15, 2014, Central Florida Chiro, Hanson, and Vega billed GEICO under CPT code 99203 for an initial examination that Vega purported to perform on an Insured named AS, and thereby represented that Vega had provided a "detailed" physical examination to AS. However, Vega did not document an extended examination of AS's musculoskeletal system, despite the fact that – to the extent AS had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(viii)   On or about March 18, 2015, Central Florida Chiro and Hanson billed GEICO under CPT code 99203 for an initial examination that Hanson purported to perform on an Insured named JR, and thereby represented that Hanson had provided a "detailed" physical examination to JR. However, Hanson did not document an extended examination of JR's musculoskeletal system, despite the fact that – to the extent JR had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(ix)     On or about May 21, 2015, Central Florida Chiro, Hanson, and Vega billed GEICO under CPT code 99203 for an initial examination that Vega purported to perform on an Insured named NP, and thereby represented that Vega had provided a "detailed" physical examination to NP. However, Hanson did not document an extended examination of NP's musculoskeletal system, despite the fact that – to the extent NP had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(x)      On or about October 9, 2015, Central Florida Chiro, Hanson, and Vega billed GEICO under CPT code 99203 for an initial examination that Vega purported to perform on an Insured named SG, and thereby represented that Hanson had provided a "detailed" physical examination to SG. However, Vega did not document an extended examination of SG's musculoskeletal system, despite the fact that – to the extent SG had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(xi)     On or about April 26, 2016, Central Florida Chiro, Hanson, and Vega billed GEICO under CPT code 99203 for an initial examination that Vega purported to perform on an Insured named KU, and thereby represented that Hanson had provided a "detailed" physical examination to KU. However, Vega did not document an extended examination of KU's musculoskeletal system, despite

the fact that – to the extent KU had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(xii)   On or about September 23, 2016, Central Florida Chiro and Hanson billed GEICO under CPT code 99203 for an initial examination that Hanson purported to perform on an Insured named Perry Suggs, and thereby represented that Hanson had provided a "detailed" physical examination to PS. However, Hanson did not document an extended examination of PS's musculoskeletal system, despite the fact that – to the extent PS had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(xiii)  On or about October 3, 2016, Central Florida Chiro and Hanson billed GEICO under CPT code 99203 for an initial examination that Hanson purported to perform on an Insured named MT, and thereby represented that Hanson had provided a "detailed" physical examination to MT. However, Hanson did not document an extended examination of MT's musculoskeletal system, despite the fact that – to the extent MT had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(xiv)  On or about October 13, 2016, Central Florida Chiro and Hanson billed GEICO under CPT code 99203 for an initial examination that Hanson purported to perform on an Insured named JJ, and thereby represented that Hanson had provided a "detailed" physical examination to JJ. However, Hanson did not document an extended examination of JJ's musculoskeletal system, despite the fact that – to the extent JJ had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(xv)   On or about November 2, 2016, Central Florida Chiro, Hanson, and Vega billed GEICO under CPT code 99203 for an initial examination that Vega purported to perform on an Insured named ED, and thereby represented that Hanson had provided a "detailed" physical examination to ED. However, Vega did not document an extended examination of ED's musculoskeletal system, despite the fact that – to the extent ED had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

464.   These are only representative examples. In the vast majority of the claims for initial examinations under CPT code 99203 that are identified in Exhibit "2", Central Florida Chiro, Hanson, and Vega routinely falsely represented that they had provided "detailed" physical examinations. In fact, they had not provided detailed physical examinations because

Hanson and Vega had not documented an extended examination of the affected body areas and other symptomatic or related organ systems.

465.    In the claims for initial examinations under CPT code 99203 that are identified in Exhibit "2", Central Florida Chiro, Hanson, and Vega routinely falsely represented that they had provided "detailed" physical examinations to the Insureds in order to create a false basis for their charges for the examinations under CPT code 99203, because examinations billable under CPT code 99203 are reimbursable at higher rates than examinations that do not require the examining physician to provide "detailed" physical examinations.

**d.    Misrepresentations Regarding the Extent of Medical Decision-Making**

466.    Furthermore, as set forth above, pursuant to the CPT Assistant, the use of CPT 99203 to bill for a patient examination represents that the physician or chiropractor who performed the examination engaged in medical decision making of "low complexity".

467.    When the Insureds in the claims identified in Exhibit "2" presented at Central Florida Chiro for initial examinations, their presenting problems virtually always were limited to low severity soft tissue injuries such as acute sprains and strains, to the extent that they had any legitimate presenting problems at all.

468.    The diagnosis and treatment of these low severity sprains and strains did not require any legitimate, low-complexity medical decision-making.

469.    First, in the claims for initial examinations identified in Exhibit "2", the initial examinations did not involve the retrieval, review, or analysis of any significant amount of medical records, diagnostic tests, or other information.

470.    When the Insureds in the claims identified in Exhibit "2" presented to Central

Florida Chiro for "treatment", they did not arrive with any medical records except, at times, basic radiology reports.

471.    Furthermore, prior to the initial examinations, Central Florida Chiro, Hanson, and Vega did not request any medical records from other providers.

472.    Second, in the claims for initial examinations identified in Exhibit "2", there was no risk of significant complications or morbidity – much less mortality – from the Insureds' relatively minor soft tissue injury complaints, to the extent that they ever had any complaints from automobile accidents at all.

473.    Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided at Central Florida Chiro, to the extent that Central Florida Chiro, Hanson, and Vega provided any such diagnostic procedures or treatment options in the first instance.

474.    In almost every instance, any "treatments" that Central Florida Chiro, Hanson, and Vega actually provided were limited to chiropractic treatment and/or physical therapy treatment, none of which was health– or life–threatening if properly administered.

475.    Third, in the claims for initial examinations identified in Exhibit "2", Central Florida Chiro, Hanson, and Vega did not consider any significant number of diagnoses or treatment options for the Insureds during the initial examinations.

476.    Rather, to the extent that the initial examinations were conducted in the first instance, Central Florida Chiro, Hanson, and Vega provided a phony list of soft tissue injury "diagnoses" for virtually every Insured, and prescribed a substantially similar course of treatment for every Insured.

477.    Specifically, in most of the claims identified in Exhibit "2", during the initial examinations the Insureds did not report any continuing medical problems that legitimately could be traced to an underlying automobile accident.

478.    Even so, Central Florida Chiro, Hanson, and Vega prepared initial examination reports in which they provided a phony list of soft tissue injury "diagnoses" to virtually every Insured.

479.    Then, based upon these phony "diagnoses", Central Florida Chiro, Hanson, and Vega directed virtually every Insured to: (i) receive significant and medically unnecessary chiropractic treatment and/or physical therapy treatment; (ii) receive medically unnecessary HME; and (iii) undergo medically unnecessary diagnostic testing, regardless of the Insureds' true circumstances or presentation.

480.    For example:

(i)      On June 20, 2014, an Insured named TS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that TS's vehicle was drivable following the accident. The police report further indicated that TS was not injured and did not complain of any pain. In keeping with the fact that TS was not injured, TS did not visit any hospital emergency room following the accident. To the extent that TS experienced any health problems at all as the result of the minor accident, they were of low severity. On June 23, 2014, Vega purported to conduct an initial examination of TS at Central Florida Chiro. To the extent that Vega performed the examination in the first instance, Vega did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Vega did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Vega provided TS with the same, phony, list of soft tissue injury "diagnoses" that she provided to virtually every other Insured. Furthermore, neither TS's presenting problems, nor the treatment plan provided to TS by Vega, Hanson, and Central Florida Chiro presented any risk of significant complications, morbidity, or mortality. To the contrary, TS did not need any significant treatment at all as a result of the accident, and the treatment plan provided by

Vega, Hanson, and Central Florida Chiro consisted of medically unnecessary chiropractic services, HME, and diagnostic testing, none of which posed the least bit of risk to TS. Even so, Vega, Hanson, and Central Florida Chiro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Vega engaged in some legitimate, low complexity medical decision-making during the purported examination.

(ii)    On June 20, 2014, an Insured named TS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that TS's vehicle was drivable following the accident. The police report further indicated that TS was not injured and did not complain of any pain. In keeping with the fact that TS was not injured, TS did not visit any hospital emergency room following the accident. To the extent that TS experienced any health problems at all as the result of the minor accident, they were of low severity. On June 23, 2014, Vega purported to conduct an initial examination of TS at Central Florida Chiro. To the extent that Vega performed the examination in the first instance, Vega did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Vega did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Vega provided TS with the same, phony, list of soft tissue injury "diagnoses" that she provided to virtually every other Insured. Furthermore, neither TS's presenting problems, nor the treatment plan provided to TS by Vega, Hanson, and Central Florida Chiro presented any risk of significant complications, morbidity, or mortality. To the contrary, TS did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Vega, Hanson, and Central Florida Chiro consisted of medically unnecessary chiropractic services, HME, and diagnostic testing, none of which posed the least bit of risk to TS. Even so, Vega, Hanson, and Central Florida Chiro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Vega engaged in some legitimate, low complexity medical decision-making during the purported examination.

(iii)    On July 7, 2014, an Insured named LG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that LG was not injured and did not complain of any pain at the scene. In keeping with the fact that LG was not injured, LG did not visit any hospital emergency room following the accident. To the extent that LG experienced any health problems at all as the result of the minor accident, they were of low severity. On July 8, 2014, Vega purported to conduct an initial examination of LG at Central Florida Chiro. To the extent that Vega performed the examination in the first instance, Vega did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other

information in connection with the examination. Moreover, Vega did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Vega provided LG with the same, phony, list of soft tissue injury "diagnoses" that she provided to virtually every other Insured. Furthermore, neither LG's presenting problems, nor the treatment plan provided to LG by Vega, Hanson, and Central Florida Chiro presented any risk of significant complications, morbidity, or mortality. To the contrary, LG did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Vega, Hanson, and Central Florida Chiro consisted of medically unnecessary chiropractic services and HME, none of which posed the least bit of risk to LG. Even so, Vega, Hanson, and Central Florida Chiro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Vega engaged in some legitimate, low complexity medical decision-making during the purported examination.

(iv)     On July 7, 2014, an Insured named JG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that JG was not injured and did not complain of any pain at the scene. In keeping with the fact that JG was not injured, JG did not visit any hospital emergency room following the accident. To the extent that JG experienced any health problems at all as the result of the minor accident, they were of low severity. On July 8, 2014, Vega purported to conduct an initial examination of JG at Central Florida Chiro. To the extent that Vega performed the examination in the first instance, Vega did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Vega did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Vega provided JG with the same, phony, list of soft tissue injury "diagnoses" that she provided to virtually every other Insured. Furthermore, neither JG's presenting problems, nor the treatment plan provided to JG by Vega, Hanson, and Central Florida Chiro presented any risk of significant complications, morbidity, or mortality. To the contrary, LG did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Vega, Hanson, and Central Florida Chiro consisted of medically unnecessary chiropractic services, diagnostic testing, and HME, none of which posed the least bit of risk to JG. Even so, Vega, Hanson, and Central Florida Chiro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Vega engaged in some legitimate, low complexity medical decision-making during the purported examination.

(v)     On July 7, 2014, an Insured named WL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a

low-impact collision, and that WL was not injured and did not complain of any pain at the scene. In keeping with the fact that WL was not injured, WL did not visit any hospital emergency room following the accident. To the extent that WL experienced any health problems at all as the result of the minor accident, they were of low severity. On July 8, 2014, Vega purported to conduct an initial examination of WL at Central Florida Chiro. To the extent that Vega performed the examination in the first instance, Vega did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Vega did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Vega provided WL with the same, phony, list of soft tissue injury "diagnoses" that she provided to virtually every other Insured. Furthermore, neither WL's presenting problems, nor the treatment plan provided to WL by Vega, Hanson, and Central Florida Chiro presented any risk of significant complications, morbidity, or mortality. To the contrary, WL did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Vega, Hanson, and Central Florida Chiro consisted of medically unnecessary chiropractic services, diagnostic testing, and HME, none of which posed the least bit of risk to WL. Even so, Vega, Hanson, and Central Florida Chiro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Vega engaged in some legitimate, low complexity medical decision-making during the purported examination.

(vi)   On August 13, 2014, an Insured named IS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that IS's vehicle was drivable following the accident. The police report further indicated that IS was not injured and did not complain of any pain. In keeping with the fact that IS was not injured, IS did not visit any hospital emergency room following the accident. To the extent that IS experienced any health problems at all as the result of the minor accident, they were of low severity. On August 14, 2014, Vega purported to conduct an initial examination of IS at Central Florida Chiro. To the extent that Vega performed the examination in the first instance, Vega did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Vega did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Vega provided IS with the same, phony, list of soft tissue injury "diagnoses" that she provided to virtually every other Insured. Furthermore, neither IS's presenting problems, nor the treatment plan provided to IS by Vega, Hanson, and Central Florida Chiro presented any risk of significant complications, morbidity, or mortality. To the contrary, IS did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Vega, Hanson, and Central Florida Chiro consisted

of medically unnecessary chiropractic services, diagnostic testing, and HME, none of which posed the least bit of risk to IS. Even so, Vega, Hanson, and Central Florida Chiro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Vega engaged in some legitimate, low complexity medical decision-making during the purported examination.

(vii)   On March 17, 2015, an Insured named JR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that JR's vehicle was drivable following the accident. The police report further indicated that JR was not injured and did not complain of any pain. In keeping with the fact that JR was not injured, JR did not visit any hospital emergency room following the accident. To the extent that JR experienced any health problems at all as the result of the minor accident, they were of low severity. On August 14, 2014, Hanson purported to conduct an initial examination of JR at Central Florida Chiro. To the extent that Hanson performed the examination in the first instance, Hanson did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Hanson did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Hanson provided JR with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither JR's presenting problems, nor the treatment plan provided to JR by Hanson and Central Florida Chiro presented any risk of significant complications, morbidity, or mortality. To the contrary, JR did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Hanson and Central Florida Chiro consisted of medically unnecessary chiropractic services, diagnostic testing, and HME, none of which posed the least bit of risk to JR. Even so, Hanson and Central Florida Chiro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Vega engaged in some legitimate, low complexity medical decision-making during the purported examination.

(viii)   On May 8, 2015, an Insured named MP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MP's vehicle was drivable following the accident. The police report further indicated that MP was not injured and did not complain of any pain. In keeping with the fact that MP was not injured, MP did not visit any hospital emergency room following the accident. To the extent that MP experienced any health problems at all as the result of the minor accident, they were of low severity. On May 11, 2015, Vega purported to conduct an initial examination of MP at Central Florida Chiro. To the extent that Vega performed the examination in the first instance, Vega did not retrieve, review, or analyze any significant amount of medical records,

diagnostic tests, or other information in connection with the examination. Moreover, Vega did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Vega provided MP with the same, phony, list of soft tissue injury "diagnoses" that she provided to virtually every other Insured. Furthermore, neither MP's presenting problems, nor the treatment plan provided to MP by Vega, Hanson, and Central Florida Chiro presented any risk of significant complications, morbidity, or mortality. To the contrary, MP did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Vega, Hanson, and Central Florida Chiro consisted of medically unnecessary chiropractic services, diagnostic testing, and HME, none of which posed the least bit of risk to MP. Even so, Vega, Hanson, and Central Florida Chiro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Vega engaged in some legitimate, low complexity medical decision-making during the purported examination.

(ix)    On July 7, 2015, an Insured named AM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that AM's vehicle was drivable following the accident. The police report further indicated that AM was not injured and did not complain of any pain. In keeping with the fact that AM was not injured, AM did not visit any hospital emergency room following the accident. To the extent that AM experienced any health problems at all as the result of the minor accident, they were of low severity. On July 7, 2015, Vega purported to conduct an initial examination of AM at Central Florida Chiro. To the extent that Vega performed the examination in the first instance, Vega did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Vega did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Vega provided AM with the same, phony, list of soft tissue injury "diagnoses" that she provided to virtually every other Insured. Furthermore, neither AM's presenting problems, nor the treatment plan provided to AM by Vega, Hanson, and Central Florida Chiro presented any risk of significant complications, morbidity, or mortality. To the contrary, AM did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Vega, Hanson, and Central Florida Chiro consisted of medically unnecessary chiropractic services, diagnostic testing, and HME, none of which posed the least bit of risk to AM. Even so, Vega, Hanson, and Central Florida Chiro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Vega engaged in some legitimate, low complexity medical decision-making during the purported examination.

(x)     On October 1, 2016, an Insured named MT was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MT's vehicle was drivable following the accident. The police report further indicated that MT was not injured and did not complain of any pain. In keeping with the fact MT was not injured, MT did not visit any hospital emergency room following the accident. To the extent that MT experienced any health problems at all as the result of the minor accident, they were of low severity. On October 3, 2016, Hanson purported to conduct an initial examination of MT at Central Florida Chiro. To the extent that Hanson performed the examination in the first instance, Hanson did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Hanson did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Hanson provided MT with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither MT's presenting problems, nor the treatment plan provided to MT by Hanson and Central Florida Chiro presented any risk of significant complications, morbidity, or mortality. To the contrary, MT did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Hanson and Central Florida Chiro consisted of medically unnecessary chiropractic services, diagnostic testing, and HME, none of which posed the least bit of risk to MT. Even so, Hanson and Central Florida Chiro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Vega engaged in some legitimate, low complexity medical decision-making during the purported examination.

481.    There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

482.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

483.    As set forth above, in the claims identified in Exhibit "2", virtually all of the Insureds whom Central Florida Chiro, Hanson, and Vega purported to treat were involved in relatively minor, "fender-bender" accidents, to the extent that they were involved in any actual accident at all.

484. It is highly improbable that any two Insureds involved in any one of the relatively minor automobile accidents in the claims identified in Exhibit "2" would suffer substantially identical injuries as the result of their accidents, or require a substantially identical course of treatment.

485. It is even more improbable – to the point of impossibility – that this would occur repeatedly, often with the Insureds presenting for initial examinations by Central Florida Chiro, Hanson, and Vega with substantially identical injuries on or about the exact same dates after their accidents.

486. Even so, in keeping with the fact that the putative "diagnoses" were phony, and in keeping with the fact that the putative initial examinations involved no actual medical decision-making at all, Central Florida Chiro, Hanson, and Vega frequently issued substantially identical "diagnoses", on or about the same date, to more than one Insured involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds.

487. For example:

(i) On March 12, 2014, three Insureds – RD, GD, and PN– were involved in the same automobile accident. Incredibly, the next day, March 13, 2014, RD, GD, and PN all presented at Central Florida Chiro for initial examinations by Vega. RD, GD, and PN were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that RD, GD, and PN suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Vega, Hanson, and Central Florida Chiro provided RD, GD, and PN with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for all three of them.

(ii) On June 20, 2014, three Insureds – AJ, TS, and TS – were involved in the same automobile accident. Incredibly, three days later, on June 23, 2014, AJ, TS, and TS all presented at Central Florida Chiro for initial examinations by Vega. AJ,

TS, and TS were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that AJ, TS, and TS suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Vega, Hanson, and Central Florida Chiro provided AJ, TS, and TS with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for all three of them.

(iii)    On July 3, 2014, two Insureds – YA and MR– were involved in the same automobile accident. Incredibly, four days later, on July 7, 2014, YA and MR both presented at Central Florida Chiro for initial examinations by Vega. YA and MR were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that YA and MR suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Vega, Hanson, and Central Florida Chiro provided YA and MR with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(iv)    On May 8, 2015, two Insureds – AE and MP – were involved in the same automobile accident. Incredibly, three days later, on May 11, 2015, AE and MP both presented at Central Florida Chiro for initial examinations by Vega. AE and MP were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that AE and MP suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Vega, Hanson, and Central Florida Chiro provided AE and MP with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(v)    On May 20, 2015, two Insureds – NP and CP – were involved in the same automobile accident. Incredibly, the next day, May 21, 2015, NP and CP both presented at Central Florida Chiro for initial examinations by Vega. NP and CP were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that NP and CP suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Vega, Hanson, and Central Florida Chiro provided NP and CP with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(vi)    On May 20, 2015, two Insureds – SD and WB – were involved in the same automobile accident. Incredibly, the next day, May 21, 2015, SD and WB both presented at Central Florida Chiro for initial examinations by Vega. SD and WB

were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that SD and WB suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Vega, Hanson, and Central Florida Chiro provided SD and WB with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(vii)     On July 14, 2015, two Insureds – FD and YH – were involved in the same automobile accident. The next day, July 15, 2015, YH presented at Central Florida Chiro for an initial examination by Vega. Then, the next day, July 16, 2015, FD too presented at Central Florida Chiro for an initial examination by Vega. YH and FD were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that YH and FD suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Vega, Hanson, and Central Florida Chiro provided YH and FD with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(viii)    On January 4, 2016, two Insureds – AB and OH– were involved in the same automobile accident. Incredibly, the next day, January 5, 2016, AB and OH both presented at Central Florida Chiro for initial examinations by Vega. AB and OH were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that AB and OH suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Vega, Hanson, and Central Florida Chiro provided AB and OH with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(ix)      On January 14, 2016, three Insureds – OB, ML, and JL – were involved in the same automobile accident. Incredibly, the next day, January 15, 2016, OB, ML, and JL all presented at Central Florida Chiro for initial examinations by Vega. OB, ML, and JL were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that OB, ML, and JL suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Vega, Hanson, and Central Florida Chiro provided OB, ML, and JL with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for all three of them.

(x)       On February 20, 2016, two Insureds – AP and DW– were involved in the same automobile accident. Two days later, on February 22, 2016, AP presented at

Central Florida Chiro for an initial examination by Vega. Then, the next day, February 23, 2016, DW too presented at Central Florida Chiro for an initial examination by Vega. AP and DW were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that AP and DW suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Vega, Hanson, and Central Florida Chiro provided AP and DW with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

488.    These are only representative examples. In the claims for initial examinations that are identified in Exhibit "2", Central Florida Chiro, Hanson, and Vega frequently issued substantially identical "diagnoses", on or about the same date, to more than one Insured involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds, despite the fact that the Insureds were differently situated.

489.    In the claims for initial examinations identified in Exhibit "2", Central Florida Chiro, Hanson, and Vega routinely falsely represented that the initial examinations involved medical decision-making of low complexity in order to provide a false basis to bill for the initial examinations under CPT code 99203, because examinations billed under CPT code 99203 are reimbursable at a higher rate than examinations that do not require low complexity medical decision-making.

**(ii)       The Fraudulent Charges for Ligament Laxity Testing at Central Florida Chiro**

490.    As part of the Defendants' fraudulent scheme, at the conclusion of the putative initial examinations, Central Florida Chiro, Hanson, and Vega directed virtually every Insured to receive putative ligament laxity testing services at Central Florida Chiro.

491.    Hanson and Vega purported to perform virtually all of the ligament laxity testing services at Central Florida Chiro.

492.    As set forth in Exhibit "2", Central Florida Chiro, Hanson, and Vega then billed the purported ligament laxity testing to GEICO under CPT code 76499, resulting in a charge of $450.00 for each purported round of tests.

493.    As set forth below, the charges for the putative ligament laxity testing were fraudulent because the ligament laxity testing services were medically unnecessary and were provided – to the extent they were provided at all – pursuant to the Defendants' pre-determined fraudulent treatment and billing protocol, and not to treat or otherwise benefit the Insureds who were subjected to it.

494.    Furthermore, the charges for ligament laxity testing were fraudulent in that they misrepresented Central Florida Chiro's eligibility to collect PIP Benefits in the first instance.

495.    In a legitimate clinical setting, the laxity – or instability – of spinal ligaments may be assessed and diagnosed through a routine MRI.

496.    By contrast, putative ligament laxity testing purports to use a digital x-ray device to quantify the extent of ligament laxity in particular spinal levels.

497.    There is a dearth of quality supportive scientific evidence for the use of ligament laxity testing to diagnose soft tissue injuries in patients involved in automobile accidents.

498.    Moreover, whatever supposed quantitative findings the putative ligament laxity testing generated could not have been legitimately incorporated into the provision of in-office chiropractic and/or physical therapy services provided at Central Florida Chiro.

499.    Thus, even assuming that there was some diagnostic value for the ligament laxity testing (and there was not), in the context of patients involved in automobile accident, the ligament laxity testing was duplicative of the MRIs that the Insureds received or were referred to receive and that, in any case, provided far more specific, sensitive, and reliable diagnostic information than the ligament laxity testing that Central Florida Chiro, Hanson, and Vega purported to provide.

500.    Moreover, and in keeping with the fact that the ligament laxity testing purportedly provided at Central Florida Chiro was medically unnecessary, Central Florida Chiro, Hanson, and Vega never incorporated the results of the putative ligament laxity testing into the supposed treatment "plan" they provided Insureds.

501.    Instead, following the putative ligament laxity testing, Central Florida Chiro, Hanson, and Vega routinely directed the Insureds identified in Exhibit "2" to receive a virtually identical course of treatment as had been recommended for that Insured prior to the supposed ligament laxity testing.

502.    For example:

(i)      On March 17, 2015, an Insured named WG was involved in an automobile accident. Thereafter, on March 18, 2015, WG presented to Central Florida Chiro for an initial examination by Vega. At the conclusion of the putative examination, Vega, Hanson, and Central Florida Chiro provided WG with substantially the same soft tissue injury "diagnoses" they provided to virtually every Insured, and recommended that WG begin substantially the same course of putative "treatment" they recommended to virtually every other Insured. Then, that same day, Vega, Hanson, and Central Florida Chiro purported to

provide WG with a putative ligament laxity test at Central Florida Chiro. However – and in keeping with the fact that the putative ligament laxity test was medically unnecessary – the "results" of the putative ligament laxity testing were never incorporated into WG's supposed "treatment" plan, and WG thereafter received substantially the same treatment as had been recommended to her prior to the ligament laxity testing being provided.

(ii)    On May 8, 2015, an Insured named CF was involved in an automobile accident. Thereafter, on May 11, 2015, CF presented to Central Florida Chiro for an initial examination by Vega. At the conclusion of the putative examination, Vega, Hanson, and Central Florida Chiro provided CF with substantially the same soft tissue injury "diagnoses" they provided to virtually every Insured, and recommended that CF begin substantially the same course of putative "treatment" they recommended to virtually every other Insured. Then, on May 14, 2015, Vega, Hanson, and Central Florida Chiro purported to provide CF with a putative ligament laxity test at Central Florida Chiro. However – and in keeping with the fact that the putative ligament laxity test was medically unnecessary – the "results" of the putative ligament laxity testing were never incorporated into CF's supposed "treatment" plan, and CF thereafter received substantially the same treatment as had been recommended to her prior to the ligament laxity testing being provided.

(iii)   On May 12, 2015, an Insured named EA was involved in an automobile accident. Thereafter, on May 14, 2015, EA presented to Central Florida Chiro for an initial examination by Vega. At the conclusion of the putative examination, Vega, Hanson, and Central Florida Chiro provided EA with substantially the same soft tissue injury "diagnoses" they provided to virtually every Insured, and recommended that EA begin substantially the same course of putative "treatment" they recommended to virtually every other Insured. Then, on May 15, 2015, Vega, Hanson, and Central Florida Chiro purported to provide EA with a putative ligament laxity test at Central Florida Chiro. However – and in keeping with the fact that the putative ligament laxity test was medically unnecessary – the "results" of the putative ligament laxity testing were never incorporated into EA's supposed "treatment" plan, and EA thereafter received substantially the same treatment as had been recommended to her prior to the ligament laxity testing being provided.

(iv)    On May 24, 2015, an Insured named ME was involved in an automobile accident. Thereafter, on May 26, 2015, ME presented to Central Florida Chiro for an initial examination by Vega. At the conclusion of the putative examination, Vega, Hanson, and Central Florida Chiro provided ME with substantially the same soft tissue injury "diagnoses" they provided to virtually every Insured, and recommended that ME begin substantially the same course of putative "treatment" they recommended to virtually every other Insured.

Then, on May 27, 2015, Vega, Hanson, and Central Florida Chiro purported to provide ME with a putative ligament laxity test at Central Florida Chiro. However – and in keeping with the fact that the putative ligament laxity test was medically unnecessary – the "results" of the putative ligament laxity testing were never incorporated into ME's supposed "treatment" plan, and ME thereafter received substantially the same treatment as had been recommended to her prior to the ligament laxity testing being provided.

(v)     On September 26, 2015, an Insured named MB was involved in an automobile accident. Thereafter, on September 28, 2015, MB presented to Central Florida Chiro for an initial examination by Vega. At the conclusion of the putative examination, Vega, Hanson, and Central Florida Chiro provided MB with substantially the same soft tissue injury "diagnoses" they provided to virtually every Insured, and recommended that MB begin substantially the same course of putative "treatment" they recommended to virtually every other Insured. Then, on October 14, 2015, Vega, Hanson, and Central Florida Chiro purported to provide MB with a putative ligament laxity test at Central Florida Chiro. However – and in keeping with the fact that the putative ligament laxity test was medically unnecessary – the "results" of the putative ligament laxity testing were never incorporated into MB's supposed "treatment" plan, and MB thereafter received substantially the same treatment as had been recommended to her prior to the ligament laxity testing being provided.

(vi)    On January 6, 2016, an Insured named JH was involved in an automobile accident. Thereafter, on January 7, 2016, JH presented to Central Florida Chiro for an initial examination by Vega. At the conclusion of the putative examination, Vega, Hanson, and Central Florida Chiro provided JH with substantially the same soft tissue injury "diagnoses" they provided to virtually every Insured, and recommended that JH begin substantially the same course of putative "treatment" they recommended to virtually every other Insured. Then, on January 12, 2016, Vega, Hanson, and Central Florida Chiro purported to provide JH with a putative ligament laxity test at Central Florida Chiro. However – and in keeping with the fact that the putative ligament laxity test was medically unnecessary – the "results" of the putative ligament laxity testing were never incorporated into JH's supposed "treatment" plan, and JH thereafter received substantially the same treatment as had been recommended to her prior to the ligament laxity testing being provided.

(vii)   On February 2, 2016, an Insured named AA was involved in an automobile accident. Thereafter, on February 4, 2016, AA presented to Central Florida Chiro for an initial examination by Vega. At the conclusion of the putative examination, Vega, Hanson, and Central Florida Chiro provided AA with substantially the same soft tissue injury "diagnoses" they provided to virtually every Insured, and recommended that AA begin substantially the same course

176

of putative "treatment" they recommended to virtually every other Insured. Then, on February 9, 2016, Vega, Hanson, and Central Florida Chiro purported to provide AA with a putative ligament laxity test at Central Florida Chiro. However – and in keeping with the fact that the putative ligament laxity test was medically unnecessary – the "results" of the putative ligament laxity testing were never incorporated into AA's supposed "treatment" plan, and AA thereafter received substantially the same treatment as had been recommended to her prior to the ligament laxity testing being provided.

(viii)   On February 4, 2016, an Insured named CB was involved in an automobile accident. Thereafter, on February 5, 2016, CB presented to Central Florida Chiro for an initial examination by Vega. At the conclusion of the putative examination, Vega, Hanson, and Central Florida Chiro provided CB with substantially the same soft tissue injury "diagnoses" they provided to virtually every Insured, and recommended that CB begin substantially the same course of putative "treatment" they recommended to virtually every other Insured. Then, on February 5, 2016, Vega, Hanson, and Central Florida Chiro purported to provide CB with a putative ligament laxity test at Central Florida Chiro. However – and in keeping with the fact that the putative ligament laxity test was medically unnecessary – the "results" of the putative ligament laxity testing were never incorporated into CB's supposed "treatment" plan, and CB thereafter received substantially the same treatment as had been recommended to her prior to the ligament laxity testing being provided.

(ix)   On April 8, 2016, an Insured named AC was involved in an automobile accident. Thereafter, on April 21, 2016, AC presented to Central Florida Chiro for an initial examination by Vega. At the conclusion of the putative examination, Vega, Hanson, and Central Florida Chiro provided AC with substantially the same soft tissue injury "diagnoses" they provided to virtually every Insured, and recommended that AC begin substantially the same course of putative "treatment" they recommended to virtually every other Insured. Then, on May 12, 2016, Hanson and Central Florida Chiro purported to provide AC with a putative ligament laxity test at Central Florida Chiro. However – and in keeping with the fact that the putative ligament laxity test was medically unnecessary – the "results" of the putative ligament laxity testing were never incorporated into AC's supposed "treatment" plan, and AC thereafter received substantially the same treatment as had been recommended to her prior to the ligament laxity testing being provided.

503.   These are only representative examples. In the claims identified in Exhibit "2", Central Florida Chiro, Hanson, and Vega misrepresented the medical necessity of the putative ligament laxity testing.

504.     In fact, the ligament laxity testing was never medically necessary, as Central Florida Chiro, Hanson, and Vega never incorporated the results of the putative "tests" into the diagnosis or treatment of the Insureds who presented to Central Florida Chiro.

**(iii)     The Fraudulent Charges for HME Through Central Florida Chiro**

505.     As part of their fraudulent scheme, at the conclusion of the putative initial examinations, Central Florida Chiro, Hanson, and Vega purported to prescribe many Insureds with HME.

506.     In particular, Central Florida Chiro, Hanson, and Vega purported to prescribe many Insureds with HME – namely, LSOs, transcutaneous electrical nerve stimulation ("TENS") units, knee orthotics, and cervical traction ("CT") units – that were purportedly provided and billed through Central Florida Chiro.

507.     As set forth in Exhibit "2", Central Florida Chiro, Hanson, and Vega billed GEICO for the LSOs under HCPCS code L0627, typically resulting in a charge of $750.00.

508.     As set forth in Exhibit "2", Central Florida Chiro, Hanson, and Vega billed GEICO for the TENS units under HCPCS code E0720, typically resulting in a charge of $771.00 for each putative TENS unit.

509.     As set forth in Exhibit "2", Central Florida Chiro, Hanson, and Vega billed GEICO for the knee orthotics under HCPCS code L1832, typically resulting in a charge of $1,450.00.

510.     As set forth in Exhibit "2", Central Florida Chiro, Hanson, and Vega billed GEICO for the CT units using HCPCS code E0849, typically resulting in a charge of $1,050.00 for each putative CT unit.

511.    In the claims for HME identified in Exhibit "2", the charges for the HME were fraudulent in that they misrepresented Central Florida Chiro's eligibility to collect PIP Benefits in the first instance.

512.    In fact, and as set forth above, Central Florida Chiro never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the Clinic Act and the HME Licensing Laws.

513.    As set forth below, Central Florida Chiro, Hanson, and Vega's charges for the HME identified in Exhibit "2" also were fraudulent in that they misrepresented the medical necessity of the putative HME.

**a.    The Fraudulent Charges for the Medically Unnecessary LSOs**

514.    The LSO is a rigid, custom-fitted, lower-back brace designed to restrict the movement of the patient's torso and support the patient's lumbar spine. Because of its rigidity and required placement on a patient's lower back, an LSO must be custom-fitted in order for it to be properly utilized by the patient.

515.    In a legitimate clinical setting, an LSO is reserved for patients who exhibit spinal instability or for patients who have recently undergone spinal surgery.

516.    Because the LSO is designed to limit a patient's lumbar spine range of motion, its prescription is inconsistent with the goals of treatment designed to restore and increase range of motion and functionality of the lumbar spine.

517.    Along similar lines, the prescription and use of an LSO is counterproductive to the goals of physical therapy and chiropractic treatment modalities, which seek to restore movement and functionality to the lumbar spine.

518.    In fact, the medically unnecessary prescription of an LSO – and resulting immobilization of the lumbar spine – may put the patient at considerable risk of weakening muscles or even muscle atrophy of muscles in the lower back.

519.    Moreover, in a legitimate clinical setting, an LSO should not be prescribed to a patient before that patient failed a legitimate course of conservative treatment.

520.    None of the Insureds in the claims identified in Exhibit "2" suffered from spinal instability. In fact, virtually none of the Insureds in the claims identified in Exhibit "2" suffered any serious injuries at all, much less health problems requiring spinal surgery and subsequent immobilization of their spine.

521.    None of the Insureds in the claims identified in Exhibit "2" had attempted and failed a legitimate course of conservative treatment prior to their receipt of a prescription for an LSO.

522.    Even so, following their fraudulent initial examinations, boilerplate examination reports, and duplicative and medically-impossible diagnoses, Central Florida Chiro, Hanson, and Vega purported to prescribe many Insureds with an LSO, despite that fact that:

    (i)     none of the Insureds suffered from spinal instability or were recovering from spinal surgery;

    (ii)    neither Hanson, Vega, nor any other individual associated with Central Florida ever measured or fitted the device for the Insureds;

    (iii)   the Insureds had not yet failed any legitimate course of conservative treatment and, in fact, were prescribed the LSO within days – and, in some instances, the very same day – of their minor accidents; and

    (iv)   the Insureds were concomitantly referred for physical therapy and chiropractic treatment at Central Florida Chiro, the putative purpose of which was to restore

180

the range of motion and functionality of, among other things, the Insureds' lumbar spine.

523.   For example:

(i)   On November 1, 2015, an Insured named MR was involved in an automobile accident. The next day, November 2, 2015, MR presented to Central Florida Chiro for an initial examination by Vega. At the conclusion of the purported initial examination, Vega, Hanson, and Central Florida Chiro prescribed MR with a medically unnecessary LSO, despite the fact that MR: (a) was never fitted for the device; (b) did not suffer from spinal instability and was not recovering from spinal surgery; and (c) had not yet failed a legitimate course of conservative treatment, and, in fact, was concomitantly referred by Hanson for physical therapy and chiropractic treatment at Central Florida Chiro, the putative purpose of which was to increase, rather than decrease, MR's range of motion. Vega, Hanson, and Central Florida Chiro then submitted a bill to GEICO under HCPCS code L0627, seeking reimbursement of $750.00 for the medically unnecessary LSO.

(ii)   On January 11, 2016, an Insured named EA was involved in an automobile accident. The next day, January 12, 2016, EA presented to Central Florida Chiro for an initial examination by Vega. At the conclusion of the purported initial examination, Vega, Hanson, and Central Florida Chiro prescribed EA with a medically unnecessary LSO, despite the fact that EA: (a) was never fitted for the device; (b) did not suffer from spinal instability and was not recovering from spinal surgery; and (c) had not yet failed a legitimate course of conservative treatment, and, in fact, was concomitantly referred by Hanson for physical therapy and chiropractic treatment at Central Florida Chiro, the putative purpose of which was to increase, rather than decrease, EA's range of motion. Vega, Hanson, and Central Florida Chiro then submitted a bill to GEICO under HCPCS code L0627, seeking reimbursement of $750.00 for the medically unnecessary LSO.

(iii)   On January 25, 2016, an Insured named BJ was involved in an automobile accident. The next day, January 26, 2016, BJ presented to Central Florida Chiro for an initial examination by Vega. At the conclusion of the purported initial examination, Vega, Hanson, and Central Florida Chiro prescribed BJ with a medically unnecessary LSO, despite the fact that BJ: (a) was never fitted for the device; (b) did not suffer from spinal instability and was not recovering from spinal surgery; and (c) had not yet failed a legitimate course of conservative treatment, and, in fact, was concomitantly referred by Hanson for physical therapy and chiropractic treatment at Central Florida Chiro, the putative purpose of which was to increase, rather than decrease, BJ's range of motion. Vega, Hanson, and Central Florida Chiro then submitted a bill to

GEICO under HCPCS code L0627, seeking reimbursement of $750.00 for the medically unnecessary LSO.

(iv)     On January 27, 2016, an Insured named MC was involved in an automobile accident. Just two days later, on January 29, 2016, MC presented to Central Florida Chiro for an initial examination by Vega. At the conclusion of the purported initial examination, Vega, Hanson, and Central Florida Chiro prescribed MC with a medically unnecessary LSO, despite the fact that MC: (a) was never fitted for the device; (b) did not suffer from spinal instability and was not recovering from spinal surgery; and (c) had not yet failed a legitimate course of conservative treatment, and, in fact, was concomitantly referred by Hanson for physical therapy and chiropractic treatment at Central Florida Chiro, the putative purpose of which was to increase, rather than decrease, MC's range of motion. Vega, Hanson, and Central Florida Chiro then submitted a bill to GEICO under HCPCS code L0627, seeking reimbursement of $750.00 for the medically unnecessary LSO.

(v)      On February 25, 2016, an Insured named HP was involved in an automobile accident. That same day, HP presented to Central Florida Chiro for an initial examination by Vega. At the conclusion of the purported initial examination, Vega, Hanson, and Central Florida Chiro prescribed HP with a medically unnecessary LSO, despite the fact that HP: (a) was never fitted for the device; (b) did not suffer from spinal instability and was not recovering from spinal surgery; and (c) had not yet failed a legitimate course of conservative treatment, and, in fact, was concomitantly referred by Hanson for physical therapy and chiropractic treatment at Central Florida Chiro, the putative purpose of which was to increase, rather than decrease, HP's range of motion. Vega, Hanson, and Central Florida Chiro then submitted a bill to GEICO under HCPCS code L0627, seeking reimbursement of $750.00 for the medically unnecessary LSO.

524.     These are only representative examples. In virtually all of the claims for LSOs identified in Exhibit "2", Central Florida Chiro, Hanson, and Vega falsely represented that the prescribed LSOs were medically necessary, when in fact they were not.

**b.      The Fraudulent Charges for the Medically Unnecessary TENS Units**

525.     In a legitimate clinical setting, electrostimulation treatment of the kind provided by TENS units may be prescribed and used to treat pain. The device transmits

electrical signals to the brain that compete with pain signals from the brain, resulting in a reduction in the patient's perception of pain.

526.    However, there is a dearth of quality scientific evidence supporting the use of the kind of therapeutic electrical stimulation provided by a TENS unit when administered contemporaneously with a regular course of conservative treatment such as chiropractic and/or physical therapy.

527.    What is more, the prescription and provision of a TENS unit is duplicative and medically unnecessary when provided contemporaneously with a regular course of in-office electrostimulation services.

528.    Even so, Central Florida Chiro, Hanson, and Vega routinely provided TENS units to Insureds despite the fact that:

(i)     the Insureds suffered only minor soft-tissue injuries, to the limited extent they suffered any injuries at all, that did not require the use of a TENS unit in the first instance; and

(ii)    the Insureds were contemporaneously receiving – or had received – a course of in-office electrical stimulation services, rendering the home-use TENS unit duplicative and medically unnecessary.

529.    For example:

(i)     On June 20, 2014, an Insured named TS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that TS's vehicle was drivable following the accident. The police report further indicated that TS was not injured and did not complain of any pain. In keeping with the fact that TS was not injured, TS did not visit any hospital emergency room following the accident. To the extent that TS experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, on June 23, 2014, Vega, Hanson, and Central Florida Chiro purported to provide TS with a TENS unit, despite the fact TS was simultaneously directed to receive a course of in-office electrical stimulation services, rendering the TENS unit duplicative and medically unnecessary. Even so, Vega, Hanson, and Central Florida Chiro then

submitted a bill to GEICO under HCPCS code E0720, seeking reimbursement of $771.00 for the medically unnecessary TENS unit.

(ii)     On June 20, 2014, an Insured named TS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that TS's vehicle was drivable following the accident. The police report further indicated that TS was not injured and did not complain of any pain. In keeping with the fact that TS was not injured, TS did not visit any hospital emergency room following the accident. To the extent that TS experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, on June 23, 2014, Vega, Hanson, and Central Florida Chiro purported to provide TS with a TENS unit, despite the fact TS was simultaneously directed to receive a course of in-office electrical stimulation services, rendering the TENS unit duplicative and medically unnecessary. Even so, Vega, Hanson, and Central Florida Chiro then submitted a bill to GEICO under HCPCS code E0720, seeking reimbursement of $771.00 for the medically unnecessary TENS unit.

(iii)    On July 7, 2014, an Insured named LG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that LG was not injured and did not complain of any pain at the scene. In keeping with the fact that LG was not injured, LG did not visit any hospital emergency room following the accident. To the extent that LG experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, on July 8, 2014, Vega, Hanson, and Central Florida Chiro purported to provide LG with a TENS unit, despite the fact LG was simultaneously directed to receive a course of in-office electrical stimulation services, rendering the TENS unit duplicative and medically unnecessary. Even so, Vega, Hanson, and Central Florida Chiro then submitted a bill to GEICO under HCPCS code E0720, seeking reimbursement of $771.00 for the medically unnecessary TENS unit.

(iv)    On March 17, 2015, an Insured named JR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that JR's vehicle was drivable following the accident. The police report further indicated that JR was not injured and did not complain of any pain. In keeping with the fact that JR was not injured, JR did not visit any hospital emergency room following the accident. To the extent that JR experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, on March 18, 2015, Vega, Hanson, and Central Florida Chiro purported to provide JR with a TENS unit, despite the fact JR was simultaneously directed to receive a course of in-office electrical stimulation services, rendering the TENS unit duplicative and medically unnecessary. Even so, Vega, Hanson, and Central Florida Chiro then

submitted a bill to GEICO under HCPCS code E0720, seeking reimbursement of $771.00 for the medically unnecessary TENS unit.

(v)     On May 8, 2015, an Insured named MP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MP's vehicle was drivable following the accident. The police report further indicated that MP was not injured and did not complain of any pain. In keeping with the fact that MP was not injured, MP did not visit any hospital emergency room following the accident. To the extent that MP experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, on May 11, 2015, Vega, Hanson, and Central Florida Chiro purported to provide MP with a TENS unit, despite the fact MP was simultaneously directed to receive a course of in-office electrical stimulation services, rendering the TENS unit duplicative and medically unnecessary. Even so, Vega, Hanson, and Central Florida Chiro then submitted a bill to GEICO under HCPCS code E0720, seeking reimbursement of $771.00 for the medically unnecessary TENS unit.

530.    These are only representative examples. In virtually all of the claims for TENS units identified in Exhibit "2", Central Florida Chiro, Hanson, and Vega purported to provide HME to Insureds despite the fact that: (i) the Insureds suffered only minor soft-tissue injuries, to the limited extent they suffered any injuries at all, that did not require the use of a TENS unit in the first instance; and (ii) the TENS units were provided to Insureds who were contemporaneously prescribed a course of in-office electrical stimulation services, rendering the TENS unit duplicative and medically unnecessary.

**c.      The Fraudulent Charges for the Medically Unnecessary Knee Orthotics**

531.    Moreover, in the claims identified in Exhibit "2", Central Florida Chiro, Hanson, and Vega routinely purported to prescribe medically unnecessary knee orthotics to Insureds who had not suffered any significant injuries at all, much less knee injuries necessitating an orthotic device.

532.    For example:

185

(i)     On June 20, 2014, an Insured named AJ was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that AJ's vehicle was drivable following the accident. The police report further indicated that AJ was not injured and did not complain of any pain. In keeping with the fact that AJ was not injured, AJ did not visit any hospital emergency room following the accident. To the extent that AJ experienced any health problems at all as the result of the minor accident, they were of low severity and did not include any knee injuries. Even so, on July 3, 2014, Vega, Hanson, and Central Florida purported to provide AJ with a medically unnecessary knee orthotic. Vega, Hanson, and Central Florida Chiro then submitted a bill to GEICO under HCPCS code L1832, seeking reimbursement of $1,450.00 for the medically unnecessary knee orthotic.

(ii)    On October 1, 2016, an Insured named OJ was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that OJ's vehicle was drivable following the accident. The police report further indicated that OJ was not injured and did not complain of any pain. In keeping with the fact OJ was not injured, OJ did not visit any hospital emergency room following the accident. To the extent that OJ experienced any health problems at all as the result of the minor accident, they were of low severity, and did not include any knee injuries. Even so, on October 18, 2016 Hanson and Central Florida purported to provide OJ with a medically unnecessary knee orthotic. Hanson and Central Florida Chiro then submitted a bill to GEICO under HCPCS code L1832, seeking reimbursement of $1,450.00 for the medically unnecessary knee orthotic.

(iii)   On May 8, 2015, an Insured named MP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MP's vehicle was drivable following the accident. The police report further indicated that MP was not injured and did not complain of any pain. In keeping with the fact that MP was not injured, MP did not visit any hospital emergency room following the accident. To the extent that MP experienced any health problems at all as the result of the minor accident, they were of low severity, and did not include any knee injuries. Even so, on August 25, 2015, Vega, Hanson, and Central Florida purported to provide MP with a medically unnecessary knee orthotic. Vega, Hanson, and Central Florida Chiro then submitted a bill to GEICO under HCPCS code L1832, seeking reimbursement of $1,450.00 for the medically unnecessary knee orthotic.

(iv)    On October 20, 2015, an Insured named CM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that CM's vehicle was drivable following

the accident. The police report further indicated that CM was not injured and did not complaint of any pain at the scene. In keeping with the fact that CM was not injured, CM did not visit any hospital emergency room following the accident. To the extent that CM experienced any health problems at all as the result of the minor accident, they were of low severity, and did not include any knee injuries. Even so, on October 22, 2015, Vega, Hanson, and Central Florida purported to provide CM with a medically unnecessary knee orthotic. Vega, Hanson, and Central Florida Chiro then submitted a bill to GEICO under HCPCS code L1832, seeking reimbursement of $1,450.00 for the medically unnecessary knee orthotic.

533.     These are only representative examples. In the claims for knee orthotics identified in Exhibit "2', Vega, Hanson, and Central Florida Chiro routinely purported to provide knee orthotics to Insureds, despite the fact that the Insureds never suffered from any serious injuries at all, much less any knee injuries requiring the use of an orthotic device.

**d.     The Fraudulent Charges for the Medically Unnecessary CT Units**

534.     The prescription and provision of a CT unit is duplicative and medically unnecessary when provided contemporaneously with a regular course of in-office cervical traction services.

535.     Even so, Central Florida Chiro, Hanson, and Vega routinely provided TENS units to Insureds despite the fact that the Insureds were contemporaneously receiving – or had received – a course of in-office cervical traction services, rendering the home-use CT unit duplicative and medically unnecessary.

536.     For example:

(i)      On April 29, 2016, an Insured named AS was involved in an automobile accident. Thereafter, between April and May 2016, AS received putative chiropractic and physical therapy "treatment" – which included in-office cervical traction services – from Hanson and Central Florida Chiro. Then, on May 23, 2016, Hanson and Central Florida Chiro purported to prescribe and provide AS with a CT unit for home use, despite the fact that AS: (a) had been receiving a course of in-office cervical traction services which had supposedly

been unsuccessful in resolving AS's supposed symptoms; and (b) was simultaneously directed to continue receiving in-office chiropractic and physical therapy services, including in-office cervical traction services. Hanson and Central Florida Chiro then submitted a bill to GEICO under HCPCS code E0849, seeking reimbursement of $1,050.00 for the duplicative and medically unnecessary CT unit.

(ii) On July 15, 2016, and Insured named ASF was involved in an automobile accident. Thereafter, between July and August 2016, AS received putative chiropractic and physical therapy "treatment" – which included in-office cervical traction services – from Hanson and Central Florida Chiro. Then, on August 19, 2016, Hanson and Central Florida Chiro purported to prescribe and provide ASF with a CT unit for home use, despite the fact that ASF: (a) had been receiving a course of in-office cervical traction services which had supposedly been unsuccessful in resolving ASF's supposed symptoms; and (b) was simultaneously directed to continue receiving in-office chiropractic and physical therapy services, including in-office cervical traction services. Hanson and Central Florida Chiro then submitted a bill to GEICO under HCPCS code E0849, seeking reimbursement of $1,050.00 for the duplicative and medically unnecessary CT unit.

(iii) On August 6, 2016, an Insured named SW was involved in an automobile accident. Thereafter, in August 2016, SW received putative chiropractic and physical therapy "treatment" – which included in-office cervical traction services – from Hanson and Central Florida Chiro. Then, on August 23, 2016, Hanson and Central Florida Chiro purported to prescribe and provide SW with a CT unit for home use, despite the fact that SW: (a) had been receiving a course of in-office cervical traction services which had supposedly been unsuccessful in resolving SW's supposed symptoms; and (b) was simultaneously directed to continue receiving in-office chiropractic and physical therapy services, including in-office cervical traction services. Hanson and Central Florida Chiro then submitted a bill to GEICO under HCPCS code E0849, seeking reimbursement of $1,050.00 for the duplicative and medically unnecessary CT unit.

(iv) On September 18, 2016, an Insured named PS was involved in an automobile accident. Thereafter, between September and October 2016, PS received putative chiropractic and physical therapy "treatment" – which included in-office cervical traction services – from Vega, Hanson, and Central Florida Chiro. Then, on October 21, 2016, Hanson and Central Florida Chiro purported to prescribe and provide PS with a CT unit for home use, despite the fact that PS: (a) had been receiving a course of in-office cervical traction services which had supposedly been unsuccessful in resolving PS's supposed symptoms; and (b) was simultaneously directed to continue receiving in-office chiropractic

and physical therapy services, including in-office cervical traction services. Hanson and Central Florida Chiro then submitted a bill to GEICO under HCPCS code E0849, seeking reimbursement of $1,050.00 for the duplicative and medically unnecessary CT unit.

(v)     On October 1, 2016, an Insured named MT was involved in an automobile accident. Thereafter, between October and November 2016, MT received putative chiropractic and physical therapy "treatment" – which included in-office cervical traction services – from Vega, Hanson, and Central Florida Chiro. Then, on November 1, 2016, Hanson and Central Florida Chiro purported to prescribe and provide MT with a CT unit for home use, despite the fact that MT: (a) had been receiving a course of in-office cervical traction services which had supposedly been unsuccessful in resolving MT's supposed symptoms; and (b) was simultaneously directed to continue receiving in-office chiropractic and physical therapy services, including in-office cervical traction services. Hanson and Central Florida Chiro then submitted a bill to GEICO under HCPCS code E0849, seeking reimbursement of $1,050.00 for the duplicative and medically unnecessary CT unit.

537.    These are only representative examples. In virtually all of the claims for CT units identified in Exhibit "2", Central Florida Chiro, Hanson, and Vega purported to provide CT units to Insureds despite the fact that the CT units were provided to Insureds who were contemporaneously receiving a course of in-office cervical traction services, rendering the CT unit duplicative and medically unnecessary.

**(iv)    The Fraudulent Charges for Surface Electromyography Testing Services at Central Florida Chiro**

538.    As set forth in Exhibit "2", as part of the Defendants' fraudulent scheme, at the conclusion of the putative initial examinations, Central Florida Chiro, Hanson, and Vega directed virtually every Insured to receive SEMG services at Central Florida Chiro.

539.    Hanson, Penza, and Roldos purported to perform virtually all of the SEMG services at Central Florida Chiro.

540.    As set forth in Exhibit "2", Central Florida Chiro, Hanson, and Vega then billed the putative SEMG services to GEICO under CPT codes 96002 and 96004, typically resulting in a total charge of between $325.00 and $650.00.

541.    As set forth below, the charges for the putative SEMG services were fraudulent because the SEMG services were medically unnecessary and were provided – to the extent they were provided at all – pursuant to the Defendants' pre-determined fraudulent treatment and billing protocol, and not to treat or otherwise benefit the Insureds who were subjected to it.

542.    Furthermore, the charges for putative SEMG services were fraudulent in that they misrepresented Central Florida Chiro's eligibility to collect PIP Benefits in the first instance.

543.    "Surface electromyography" is a technique in which electrodes are placed on (not into) the skin overlying a muscle to detect the electrical activity of the muscle.

544.    These electrodes are then used to measure muscle activity and – supposedly – to evaluate and diagnose patients with neuromuscular disorders, lower back pain, and kineseological disorders.

545.    However, according to a review of the literature published by the American Academy of Neurology, "SEMG is considered unacceptable as a clinical tool in the diagnosis" of neuromuscular disease and low back pain. See S.L. Pulman, M.D., Clinical Utility of Surface EMG, Report of Therapeutics and Technology Assessment Subcommittee of the American Academy of Neurology 2000.

546.    Even so, in the claims identified in Exhibit "2", Central Florida Chiro, Hanson, and Vega purported to provide virtually every Insured with medically unnecessary SEMG testing on the Insureds' cervical and lumbar spines, despite the fact that the putative SEMG testing could not provide any clinically significant data to assist in the "treatment" of the Insureds' supposed injuries.

547.    In keeping with the fact that the SEMG testing was of no diagnostic value, Central Florida Chiro, Hanson, and Vega never incorporated the putative "results" of the SEMG testing into the Insureds' treatment plans.

548.    Instead, following the putative SEMG testing, Central Florida Chiro, Hanson, and Vega routinely directed the Insureds identified in Exhibit "2" to receive a virtually identical course of treatment as had been recommended for that Insured prior to the supposed SEMG testing.

549.    For example:

(i)    On July 3, 2014, an Insured named YA was involved in an automobile accident. Thereafter, on July 7, 2014, YA presented to Central Florida Chiro for an initial examination by Vega. At the conclusion of the examination, Vega, Hanson, and Central Florida Chiro provided YA with substantially the same soft tissue injury "diagnoses" they provided to virtually every Insured, and recommended that YA begin substantially the same course of putative "treatment" they recommended to virtually every other Insured. Then, on July 25, 2014, Vega, Hanson, and Central Florida Chiro purported to provide YA with putative SEMG testing at Central Florida Chiro. However – and in keeping with the fact that the putative SEMG testing was medically unnecessary – the "results" of the putative SEMG testing were never incorporated into YA's supposed "treatment" plan, and YA thereafter received substantially the same treatment as had been recommended prior to the SEMG testing being provided.

(ii)    On December 7, 2014, an Insured named CA was involved in an automobile accident. Thereafter, on December 8, 2014, CA presented to Central Florida Chiro for an initial examination by Vega. At the conclusion of the

examination, Vega, Hanson, and Central Florida Chiro provided CA with substantially the same soft tissue injury "diagnoses" they provided to virtually every Insured, and recommended that CA begin substantially the same course of putative "treatment" they recommended to virtually every other Insured. Then, on December 23, 2014, Vega, Hanson, and Central Florida Chiro purported to provide CA with putative SEMG testing at Central Florida Chiro. However – and in keeping with the fact that the putative SEMG testing was medically unnecessary – the "results" of the putative SEMG testing were never incorporated into CA's supposed "treatment" plan, and CA thereafter received substantially the same treatment as had been recommended prior to the SEMG testing being provided.

(iii)   On May 23, 2015, an Insured named JA was involved in an automobile accident. Thereafter, on May 25, 2015, JA presented to Central Florida Chiro for an initial examination by Vega. At the conclusion of the examination, Vega, Hanson, and Central Florida Chiro provided JA with substantially the same soft tissue injury "diagnoses" they provided to virtually every Insured, and recommended that JA begin substantially the same course of putative "treatment" they recommended to virtually every other Insured. Then, on June 15, 2015, Vega, Hanson, and Central Florida Chiro purported to provide JA with putative SEMG testing at Central Florida Chiro. However – and in keeping with the fact that the putative SEMG testing was medically unnecessary – the "results" of the putative SEMG testing were never incorporated into JA's supposed "treatment" plan, and JA thereafter received substantially the same treatment as had been recommended prior to the SEMG testing being provided.

(iv)   On February 2, 2016, an Insured named AA was involved in an automobile accident. Thereafter, on February 4, 2016, AA presented to Central Florida Chiro for an initial examination by Vega. At the conclusion of the examination, Vega, Hanson, and Central Florida Chiro provided AA with substantially the same soft tissue injury "diagnoses" they provided to virtually every Insured, and recommended that AA begin substantially the same course of putative "treatment" they recommended to virtually every other Insured. Then, on February 8, 2016, Vega, Hanson, and Central Florida Chiro purported to provide AA with putative SEMG testing at Central Florida Chiro. However – and in keeping with the fact that the putative SEMG testing was medically unnecessary – the "results" of the putative SEMG testing were never incorporated into AA's supposed "treatment" plan, and AA thereafter received substantially the same treatment as had been recommended prior to the SEMG testing being provided.

(v)   On July 17, 2016, an Insured named QA was involved in an automobile accident. Thereafter, on July 19, 2016, QA presented to Central Florida Chiro

for an initial examination by Vega. At the conclusion of the examination, Hanson and Central Florida Chiro provided QA with substantially the same soft tissue injury "diagnoses" they provided to virtually every Insured, and recommended that QA begin substantially the same course of putative "treatment" they recommended to virtually every other Insured. Then, on November 4, 2016, Hanson and Central Florida Chiro purported to provide QA with putative SEMG testing at Central Florida Chiro. However – and in keeping with the fact that the putative SEMG testing was medically unnecessary – the "results" of the putative SEMG testing were never incorporated into QA's supposed "treatment" plan, and QA thereafter received substantially the same treatment as had been recommended prior to the SEMG testing being provided.

550. These are only representative examples. In the claims identified in Exhibit "2", Central Florida Chiro, Hanson, and Vega routinely misrepresented the medical necessity of the putative SEMG testing.

**(v)      The Fraudulent Charges for Follow-Up Examinations at Central Florida Chiro**

551. In addition to their fraudulent initial examinations, Central Florida Chiro, Hanson, Vega, and Arocho purported to subject many of the Insureds in the claims identified in Exhibit "2" to multiple, fraudulent follow-up examinations during the course of their fraudulent treatment protocol.

552. Hanson, Vega, and Arocho purported to personally perform the majority of the follow-up examinations in the claims identified in Exhibit "2".

553. As set forth in Exhibit "2", Central Florida Chiro, Hanson, Vega, and Arocho then billed the follow-up examinations to GEICO under: (i) CPT code 99211, typically resulting in a charge of between $50.00 and $60.00 for each putative examination; or (ii) 99212, typically resulting in a charge of between $100.00 and $105.00 for each putative examination.

554.    In the claims for follow-up examinations identified in Exhibit "2", the charges for the follow-up examinations were fraudulent in that they misrepresented Central Florida Chiro's eligibility to collect PIP Benefits in the first instance.

555.    In fact, and as set forth above, Central Florida Chiro never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the Clinic Act and the HME Licensing Laws.

556.    As set forth below, Central Florida Chiro, Hanson, Vega, and Arocho's charges for the follow-up examinations identified in Exhibit "2" also were fraudulent in that they misrepresented the nature and extent of the examinations.

**a.      The Fraudulent Charges for Illusory Follow-Up Examinations**

557.    As discussed in detail below, Central Florida Chiro, Hanson, Vega, and Arocho purported to provide virtually every Insured with a course of in-office chiropractic manipulation.

558.    Central Florida Chiro, Hanson, Vega, and Arocho then billed the chiropractic manipulation to GEICO using CPT codes 98940, 98941, and 98943.

559.    Pursuant to the CPT Assistant, a pre-manipulation patient assessment is part and parcel of the putative chiropractic manipulation services billed by Central Florida Chiro, Hanson, Vega, and Arocho under CPT codes 98940, 98941, and 98943.

560.    Moreover, pursuant to the CPT Assistant, a separate examination may be billed only if the patient's condition requires an examination above and beyond the usual pre- and post- manipulation assessment associated with chiropractic manipulation.

561.    Even so, Central Florida Chiro, Hanson, Vega, and Arocho routinely billed GEICO for putative follow-up examinations under CPT code 99211 provided to Insureds at the same time when the Insureds supposedly received chiropractic manipulation services billed under CPT codes 98940, 98941, and 98943.

562.    However, these supposed "examinations" were never truly separate services from the putative chiropractic manipulation services.

563.    In keeping with the fact that the follow-up examinations purportedly provided contemporaneous to the chiropractic manipulations services were illusory, Central Florida Chiro, Hanson, Vega, and Arocho never submitted any reports, notes, or any substantiating documentation whatsoever in connection with the phony follow-up examinations billed under CPT code 99211.

564.    Moreover, virtually none of the Insureds in the claims identified in Exhibit "2" required additional examination services above and beyond the usual pre- and post-manipulation assessment associated with chiropractic services.

565.    Even so, Central Florida Chiro, Hanson, Vega, and Arocho routinely submitted duplicative charges under CPT code 99211 for illusory follow-up examinations that were provided at the same time as putative chiropractic manipulation services.

566.    For example:

(i)    Central Florida Chiro and Hanson billed GEICO for purported follow-up examinations under CPT code 99211 that were supposedly provided to an Insured named MC contemporaneous with chiropractic manipulation services on December 16, 2014 and February 5, 2015. This, despite the fact that: (a) no legitimate, separate follow-up examinations were provided; (b) the patient's condition did not require examination above and beyond the usual pre- and post- manipulation assessment associated with chiropractic services; and (c) to the extent that Central Florida Chiro and Hanson provided any patient

assessments at all, they were part and parcel of the chiropractic services billed under CPT codes 98940 and 98941.

(ii)     Central Florida Chiro, Hanson, and Arocho billed GEICO for purported follow-up examinations under CPT code 99211 that were supposedly provided to an Insured named JS contemporaneous with chiropractic manipulation services on October 5, 2015 and December 9, 2015. This, despite the fact that: (a) no legitimate, separate follow-up examinations were provided; (b) the patient's condition did not require examination above and beyond the usual pre- and post- manipulation assessment associated with chiropractic services; and (c) to the extent that Central Florida Chiro, Hanson, and Arocho provided any patient assessments at all, they were part and parcel of the chiropractic services billed under CPT codes 98940 and 98941.

(iii)    Central Florida Chiro, Hanson, and Arocho billed GEICO for purported follow-up examinations under CPT code 99211 that were supposedly provided to an Insured named VK contemporaneous with chiropractic manipulation services on July 12, 2016 and August 22, 2016. This, despite the fact that: (a) no legitimate, separate follow-up examinations were provided; (b) the patient's condition did not require examination above and beyond the usual pre- and post- manipulation assessment associated with chiropractic services; and (c) to the extent that Central Florida Chiro, Hanson, and Arocho provided any patient assessments at all, they were part and parcel of the chiropractic services billed under CPT codes 98940 and 98941.

(iv)     Central Florida Chiro, Hanson, and Arocho billed GEICO for purported follow-up examinations under CPT code 99211 that were supposedly provided to an Insured named VS contemporaneous with chiropractic manipulation services on August 5, 2016 and August 17, 2016. This, despite the fact that: (a) no legitimate, separate follow-up examinations were provided; (b) the patient's condition did not require examination above and beyond the usual pre- and post- manipulation assessment associated with chiropractic services; and (c) to the extent that Central Florida Chiro, Hanson, and Arocho provided any patient assessments at all, they were part and parcel of the chiropractic services billed under CPT codes 98940, 98941, and 98943.

(v)      Central Florida Chiro and Hanson billed GEICO for purported follow-up examinations under CPT code 99211 that were supposedly provided to an Insured named NM contemporaneous with chiropractic manipulation services on September 6, 2016 and September 14, 2016. This, despite the fact that: (a) no legitimate, separate follow-up examinations were provided; (b) the patient's condition did not require examination above and beyond the usual pre- and post- manipulation assessment associated with chiropractic services; and (c) to the extent that Central Florida Chiro and Hanson provided any patient

assessments at all, they were part and parcel of the chiropractic services billed under CPT codes 98940 and 98941.

567.    These are only representative examples. Central Florida Chiro, Hanson, Vega, and Arocho routinely submitted duplicative charges for illusory follow-up examinations and chiropractic manipulation services, despite the fact that: (i) no legitimate follow-up examination services were provided; (ii) the patient's condition did not require examination above and beyond the usual pre- and post- manipulation assessment associated with chiropractic services; and (iii) a pre-manipulation patient assessment was part and parcel of the contemporaneous chiropractic manipulation services billed by Central Florida Chiro, Hanson, Vega, and Arocho under CPT codes 98940, 98941, and 98943.

568.    Central Florida Chiro, Hanson, Vega, and Arocho submitted charges for the duplicative and illusory follow-up examinations in order to maximize the amount of fraudulent billing they could submit to insurers, including GEICO.

**b.      Misrepresentations Regarding the Results of the Follow-Up Examinations**

569.    When Central Florida Chiro, Hanson, Vega, and Arocho billed for their putative follow-up examinations under CPT code 99212, they represented that Hanson, Vega, and Arocho performed at least two of the following three components: (i) took a "problem focused" patient history; (ii) a "problem focused" physical examination; and (iii) engaged in straightforward medical decision-making.

570.    In actuality, however, in the claims for follow-up examinations identified in Exhibit "2", Hanson, Vega, and Arocho did not take any legitimate patient histories, conduct any legitimate physical examinations, or engage in any legitimate medical decision-making at all.

571.    Rather, following their purported follow-up examinations, Central Florida Chiro, Hanson, Vega, and Arocho simply: (i) reiterated the false, boilerplate "diagnoses" from the Insureds' initial examinations; and either (ii) referred the Insureds back to Central Florida Chiro for even more medically unnecessary physical therapy services and/or chiropractic services, despite the fact that the Insureds purportedly already had received significant physical therapy services and/or chiropractic services from Central Florida Chiro that supposedly had not been successful in resolving their purported pain symptoms; or (iii) discharged the Insureds from "treatment", to the extent that their PIP Benefits had been exhausted.

572.    In the claims for follow-up examinations identified in Exhibit "2", Central Florida Chiro, Hanson, Vega, and Arocho routinely fraudulently misrepresented that the examinations were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)     the putative examinations were illusory, with outcomes that were pre-determined to result in substantially-similar, phony "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)    the charges for the putative examinations misrepresented the nature and extent of the examinations; and

(iii)   Central Florida Chiro never was eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as it was operated in violation of the Clinic Act and the HME Licensing Laws.

**(vi)    The Fraudulent Charges for Computerized Range of Motion Tests at Central Florida Chiro**

573.    In an attempt to maximize the fraudulent billing that they submit or cause to be submitted for each Insured, after purporting to provide initial examinations at Central Florida

Chiro, Hanson, Vega, and Arocho directed many Insureds to return for one or more rounds of medically useless computerized range of motion tests.

574.    As set forth in Exhibit "2", Central Florida Chiro, Hanson, Vega, and Arocho then purported to provide, and billed, the computerized range of motion tests to GEICO under CPT code 95851, typically resulting in a charge of between $40.00 and $45.00 for each putative test.

575.    The charges for the computerized range of motion tests were fraudulent in that the computerized range of motion tests were medically unnecessary and were performed pursuant to the Defendants' fraudulent treatment and billing protocol, not to legitimately treat or otherwise benefit the Insureds who were subjected to them.

576.    In the claims for computerized range of motion tests identified in Exhibit "2", the charges for the computerized range of motion tests were fraudulent in that they misrepresented Central Florida Chiro's eligibility to collect PIP Benefits in the first instance.

577.    In fact, and as set forth above, Central Florida Chiro never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the Clinic Act and the HME Licensing Laws.

578.    As set forth below, Central Florida Chiro, Hanson, Vega, and Arocho's charges for the computerized range of motion tests identified in Exhibit "2" also were fraudulent in that they misrepresented the medical necessity of the putative computerized range of motion tests.

a.       **Traditional Tests to Evaluate the Human Body's Range of Motion**

579.   The adult human body is made up of 206 bones joined together at various joints that either are of the fixed, hinged or ball-and-socket variety.  The body's hinged joints and ball-and-socket joints facilitate movement, allowing a person to – for example – bend a leg, rotate a shoulder, or move the neck to one side.

580.   The measurement of the capacity of a particular joint to perform its full and proper function represents the joint's "range of motion".  Stated in a more illustrative way, range of motion is the amount that a joint will move from a straight position to its bent or hinged position.

581.   A traditional, or manual, range of motion test consists of a non-electronic measurement of the joint's ability to move in comparison with an unimpaired or "ideal" joint. In a traditional range of motion test, the physician asks the patient to move his or her joints at various angles, or the physician moves the joints. The physician then evaluates the patient's range of motion either by sight or through the use of a manual inclinometer or a goniometer (i.e., a device used to measure angles).

582.   Physical examinations performed on patients with soft-tissue trauma – the alleged complaint advanced by virtually every Insured who treated with Central Florida Chiro – necessarily require range of motion and muscle strength tests, inasmuch as these tests provide a starting point for injury assessment and treatment planning.  Unless a physician knows the extent of a given patient's joint or muscle strength impairment, there is no way to properly diagnose or treat the patient's injuries. Evaluation of range of motion is an essential component of the "hands-on" examination of a trauma patient.

583.    Since range of motion tests must be conducted as an element of a soft-tissue trauma patient's initial examination, as well as during any follow-up examinations, the Fee Schedule provides that range of motion tests are to be reimbursed as an element of the initial consultations and follow-up examinations.

584.    In other words, health care providers cannot conduct and bill for an initial consultation or follow-up examination, then bill separately for contemporaneously-provided computerized range of motion tests.

**b.      The Duplicate Billing for Medically Unnecessary Computerized Range of Motion Tests**

585.    To the extent that Central Florida Chiro, Hanson, Vega, and Arocho actually provided initial examinations and follow-up examinations in the first instance, practitioners associated with Central Florida Chiro – typically Hanson, Vega, or Arocho – purported to conduct manual range of motion tests on virtually every Insured during each initial and/or follow-up examination.

586.    The charges for these manual range of motion tests were part and parcel of the charges that Central Florida Chiro, Hanson, Vega, and Arocho routinely submitted for the initial examinations under CPT code 99203 and for the follow-up examinations under CPT code 99212.

587.    Despite the fact that every Insured already purportedly had undergone manual range of motion testing during their initial examinations and/or follow-up examinations, and despite the fact that reimbursement for range of motion testing already had been paid by GEICO as a component of reimbursement for the initial examinations and/or follow-up

examinations, Central Florida Chiro, Hanson, Vega, and Arocho systemically billed for, and purported to provide, a series of computerized range of motion tests to most Insureds.

588.    Though the Insureds routinely visited Interstate several times per month for follow-up examinations and other Fraudulent Services, Central Florida Chiro, Hanson, Vega, Arocho often deliberately scheduled separate appointments for computerized range of motion tests so that they could bill for those procedures separately, without having to include them in the billing for the follow-up examinations.

589.    Central Florida Chiro, Hanson, Vega, and Arocho purported to provide the computerized range of motion tests by placing a digital inclinometer or goniometer on various parts of the Insureds' bodies (affixed by Velcro straps) while the Insured was asked to attempt various motions and movements.   The test was virtually identical to the manual range of motion testing that is described above and that purportedly was performed during each initial examination and follow-up examination.

590.    The information gained through the use of the computerized range of motion tests was not significantly different from the information obtained through the manual testing that was part and parcel of virtually every Insured's initial examination and follow-up examinations.

591.    In the relatively minor soft-tissue injuries allegedly sustained by the Insureds – to the extent that any of the Insureds suffered any injuries at all as the result of the automobile accidents they purported to experience – the difference of a few percentage points in the Insureds' range of motion reading was meaningless. This is evidenced by the fact that neither Hanson, Vega, Arocho, nor any other health care provider associated with Central Florida

Chiro, ever incorporated the results of computerized range of motion tests into the rehabilitation programs of any of the Insureds whom they purported to treat.

592. The computerized range of motion tests were part and parcel of the Defendants' fraudulent scheme, inasmuch as the "service" was rendered pursuant to a pre-established protocol that: (i) in no way aided in the assessment and treatment of the Insureds; and (ii) was designed solely to financially enrich the Defendants.

**(vii)   The Fraudulent Charges for Physical Therapy and/or Chiropractic Treatment at Central Florida Chiro**

593. In addition to the fraudulent initial examinations and follow-up examinations, Central Florida Chiro, Hanson, Vega, and Arocho routinely purported to subject each of the Insureds in the claims identified in Exhibit "2" to medically unnecessary physical therapy and/or chiropractic treatment.

594. Hanson, Vega, and Arocho purported to perform the vast majority of the putative physical therapy and/or chiropractic treatment services.

595. As set forth in Exhibit "2", Central Florida Chiro, Hanson, Vega, and Arocho routinely billed the purported physical therapy services and/or chiropractic services to GEICO under:

(i)     CPT code 97010 for putative hot/cold/compression treatments, resulting in a charge of $25.00 for each round of hot/cold/compression treatments they purported to provide;

(ii)    CPT code 97012, for putative mechanical traction therapy, typically resulting in a charge of $40.00 for each round of mechanical traction therapy they purported to provide;

(iii)   CPT code 97014, for putative electrical stimulation, typically resulting in a charge of $55.00 for each round of electrical stimulation they purported to provide;

(iv)   CPT code 97016, for putative vasopneumatic therapy, resulting in a charge of $50.00 for each round of mechanical traction therapy they purported to provide;

(v)   CPT code 97026, for putative infrared therapy , resulting in a charge of $15.00 for each round of electrical stimulation they purported to provide;

(vi)   CPT code 97035, for putative ultrasound, typically resulting in a charge of $30.00 for each round of ultrasound they purported to provide;

(vii)   CPT code 97112, for putative neuromuscular reeducation, typically resulting in a charge of $80.00 for each round of neuromuscular reeducation they purported to provide;

(viii)   CPT code 97140, for putative manual therapy, typically resulting in a charge of $70.00 for each round of manual therapy they purported to provide;

(ix)   CPT code 97150, for putative group therapeutic procedures, typically resulting in a charge of $40.00 for each round of group therapeutic procedures they purported to provide;

(x)   HCPCS code S8948 for putative low-level laser treatment, typically resulting in a charge of $65.00 for each round of purported laser treatment they purported to provider; and

(xi)   CPT codes 98940, 98941, and 98943 for putative chiropractic manipulation services, typically resulting in a charge of between $40.00 and $85.00 for each round of putative chiropractic manipulation services they purported to provide.

596.   In a legitimate clinical setting, each individual patient's physical therapy and/or chiropractic treatment schedule, and the specific physical therapy modalities that will be used, must be tailored to the specific patient's circumstances, symptomatology, and presentation.

597.   In a legitimate clinical setting, the nature of, extent of, and schedule for physical therapy and/or chiropractic treatment is constantly adjusted for each individual patient based on each patient's treatment progress, as assessed during each patient's follow-up

examinations and on an ongoing basis as they receive the physical therapy and/or chiropractic treatment.

598.    By contrast, at Central Florida Chiro, the nature and extent of the physical therapy and/or chiropractic treatment that each Insured purportedly received was pre-determined, and had no legitimate connection to the Insureds' individual circumstances, presentation, or progress through the Defendants' fraudulent treatment and billing protocol. Accordingly, the physical therapy and/or chiropractic treatment was medically unnecessary.

599.    In the claims for physical therapy services and/or chiropractic services identified in Exhibit "2", the charges for the physical therapy services and/or chiropractic services also were fraudulent in that they misrepresented Central Florida Chiro's eligibility to collect PIP Benefits in the first instance.

600.    In fact, and as set forth above, Central Florida Chiro never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the Clinic Act and the HME Licensing Laws.

601.    As set forth above, in order for a health care service to be eligible for PIP reimbursement, it must be "lawfully" provided. See Fla. Stat. § 627.736.

602.    Pursuant to the No-Fault Law, "lawful" or "lawfully" means "in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of state and federal law related to the provision of medical services or treatment." See Fla. Stat. § 627.732.

603.    In each of the claims for physical therapy services and/or chiropractic services identified in Exhibit "2", Central Florida Chiro, Hanson, Vega, and Arocho falsely represented that the services were lawfully provided and eligible for PIP reimbursement.

**4.      The Fraudulent Treatment and Billing Protocol at Orlando Central Chiro**

**(i)      The Fraudulent Charges for Initial Examinations at Orlando Central Chiro**

604.    As an initial step in their fraudulent treatment and billing protocol, Orlando Central Chiro, Hanson, TOH Management, and Korchagin purported to provide the Insureds in the claims identified in Exhibit "3" with a putative initial examination.

605.    Hanson purported to personally perform virtually all of the initial examinations in the claims identified in Exhibit "3".

606.    As set forth in Exhibit "3", Orlando Central Chiro, Hanson, TOH Management, and Korchagin then billed the initial examinations to GEICO, or caused them to be billed to GEICO, under CPT code 99203, resulting in a charge of $250.00 for each initial examination that they purported to provide.

607.    In the claims for initial examinations identified in Exhibit "3", the charges for the initial examinations were fraudulent in that they misrepresented Orlando Central Chiro's eligibility to collect PIP Benefits in the first instance.

608.    In fact, and as set forth above, Orlando Central Chiro never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the Clinic Act, the Self-Referral Act, the Patient Brokering Act, the HME Licensing Laws, and the Chiropractor Advertising Laws.

609.    As set forth below, the charges for the initial examinations identified in Exhibit "3" also were fraudulent in that they misrepresented the nature and extent of the initial examinations.

**a.    Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

610.    To the extent that the Insureds in the claims identified in Exhibit "3" had any presenting problems at all as the result of their relatively minor automobile accidents, the problems virtually always were low severity soft tissue injuries such as sprains and strains.

611.    For instance, and in keeping with the fact that the Insureds in the claims identified in Exhibit "3" either had no presenting problems at all as the result of their relatively minor automobile accidents, or else problems of low severity, in most of the claims identified in Exhibit "3" the contemporaneous police reports indicated that the underlying accidents involved relatively low-impact collisions, that the Insureds' vehicles were drivable following the accidents, and that no one was seriously injured in the underlying accidents, or injured at all.

612.    What is more, and again in keeping with the fact that the Insureds in the claims identified in Exhibit "3" either had no presenting problems at all as a result of their relatively minor automobile accidents, or else problems of low severity, in many of the claims identified in Exhibit "3" the Insureds did not seek treatment at any hospital as the result of their accidents.

613.    Even so, in the claims for initial examinations identified in Exhibit "3", Orlando Central Chiro, Hanson, TOH Management, and Korchagin routinely billed for their

putative initial examinations using CPT code 99203, and thereby falsely represented that the

Insureds presented with problems of moderate severity.

614.   For example:

(i)   On December 8, 2016, an Insured named MR was involved in an automobile accident. The contemporaneous police report indicated that MR's vehicle was drivable following the accident. The police report further indicated that MR was not injured and did not complain of any pain. In keeping with the fact that MR was not injured, MR did not visit any hospital emergency room following the accident. To the extent that MR experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following an initial examination of MR by Hanson on December 13, 2016, Hanson, Korchagin, TOH Management, and Orlando Central Chiro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(ii)   On February 9, 2017, an Insured named LS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact accident, and that LS's vehicle was drivable following the accident. The police report further indicated that LS was not injured and did not complain of any pain. In keeping with the fact that LS was not injured, LS did not visit any hospital emergency room following the accident. To the extent that LS experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following an initial examination of LS by Hanson on February 22, 2017, Hanson, Korchagin, TOH Management, and Orlando Central Chiro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(iii)   On July 5, 2017, an Insured named MP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MP's vehicle was drivable following the accident. The police report further indicated that MP was not injured and did not complain of any pain. In keeping with the fact that MP was not injured, MP did not visit any hospital emergency room following the accident. To the extent that MP experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following an initial examination of MP by Hanson on July 6, 2017, Hanson, Korchagin, TOH Management, and Orlando Central Chiro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(iv)     On July 5, 2017, an Insured named JJ was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JJ's vehicle was drivable following the accident. The police report further indicated that JJ was not injured and did not complain of any pain. In keeping with the fact that JJ was not injured, JJ did not visit any hospital emergency room following the accident. To the extent that JJ experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following an initial examination of JJ by Hanson on July 6, 2017, Hanson, Korchagin, TOH Management, and Orlando Central Chiro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(v)      On October 1, 2017, an Insured named DH was involved in an automobile accident. In keeping with the fact that DH was not injured, DH did not visit any hospital emergency room following the accident. To the extent that DH experienced any health problems at all as the result of the accident, they were of low severity. Even so, following an initial examination of DH by Hanson on October 2, 2017, Hanson, Korchagin, TOH Management, and Orlando Central Chiro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(vi)     On March 22, 2018, an Insured named SP was involved in an automobile accident. In keeping with the fact that SP was not injured, SP did not visit any hospital emergency room following the accident. To the extent that SP experienced any health problems at all as the result of the accident, they were of low severity. Even so, following an initial examination of SP by Hanson on March 23, 2018, Hanson, Korchagin, TOH Management, and Orlando Central Chiro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(vii)    On May 14, 2018, an Insured named JP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact accident, and that JP's vehicle was drivable following the accident. The police report further indicated that JP was not injured and did not complain of any pain. In keeping with the fact that JP was not injured, JP did not visit any hospital emergency room following the accident. To the extent that JP experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following an initial examination of JP by Hanson on May 15, 2018, Hanson, Korchagin, TOH Management, and Orlando Central Chiro billed GEICO for the initial examination using CPT

code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(viii)   On May 15, 2018, an Insured named WP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that WP's vehicle was drivable following the accident. The police report further indicated that WP was not injured and did not complain of any pain. In keeping with the fact that WP was not injured, WP did not visit any hospital emergency room following the accident. To the extent that WP experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following an initial examination of WP by Hanson on May 21, 2018, Hanson, Korchagin, TOH Management, and Orlando Central Chiro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(ix)   On September 11, 2018, an Insured named BA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that BA's vehicle was drivable following the accident. The police report further indicated that BA was not injured and did not complain of any pain. In keeping with the fact that BA was not injured, BA did not visit any hospital emergency room following the accident. To the extent that BA experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following an initial examination of BA by Hanson on September 12, 2018, Hanson, Korchagin, TOH Management, and Orlando Central Chiro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(x)   On September 11, 2018, an Insured named JS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that JS's vehicle was drivable following the accident. The police report further indicated that JS was not injured and did not complain of any pain. In keeping with the fact that JS was not injured, JS did not visit any hospital emergency room following the accident. To the extent that JS experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following an initial examination of JS by Hanson on September 12, 2018, Hanson, Korchagin, TOH Management, and Orlando Central Chiro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

615.     These are only representative examples. In the claims for initial examinations identified in Exhibit "3", Orlando Central Chiro, Hanson, TOH Management, and Korchagin routinely falsely represented that the Insureds presented with problems of moderate severity, when in fact the Insureds' problems were low-severity soft tissue injuries such as sprains and strains, to the limited extent that they had any presenting problems at all.

616.     In the claims for initial examinations identified in Exhibit "3", Orlando Central Chiro, Hanson, TOH Management, and Korchagin routinely falsely represented that the Insureds presented with problems of moderate severity in order to create a false basis for their charges for the examinations under CPT code 99203, because examinations billable under CPT code 99203 are reimbursable at higher rates than examinations involving presenting problems of low severity, or no severity.

617.     In the claims for initial examinations identified in Exhibit "3", Orlando Central Chiro, Hanson, TOH Management, and Korchagin also routinely falsely represented that the Insureds presented with problems of moderate severity in order to create a false basis for the other Fraudulent Services that Orlando Central Chiro, Hanson, TOH Management, and Korchagin purported to provide to the Insureds, including medically unnecessary follow-up examinations, diagnostic imaging services, physical therapy services and/or chiropractic services, and HME.

**b.     Misrepresentations Regarding the Amount of Time Spent on the Initial Examinations**

618.     What is more, in the claims identified in Exhibit "3" for initial examinations under CPT code 99203, Orlando Central Chiro, Hanson, TOH Management, and Korchagin

routinely misrepresented and exaggerated the amount of face-to-face time that the examining physician or chiropractor spent with the Insureds or the Insureds' families.

619.    As set forth above, pursuant to the CPT Assistant, the use of CPT code 99203 to bill for a patient examination represents that the physician or chiropractor who performed the examination spent at least 30 minutes of face-to-face time with the patient or the patient's family.

620.    As set forth in Exhibit "3", Orlando Central Chiro, Hanson, TOH Management, and Korchagin virtually always billed for the putative initial examinations using CPT code 99203, and thereby represented that the chiropractor who purported to conduct the examinations spent at least 30 minutes of face-to-face time with the Insureds or the Insureds' families during the putative examinations.

621.    In fact, in most of the claims for initial examinations identified in Exhibit "3", Hanson never spent more than 15 minutes – much less 30 minutes – of face-to-face time with the Insureds or their families when purporting to conduct the examinations.

622.    For instance, and in keeping with the fact that the initial examinations in the claims identified in Exhibit "3" did not entail more than 15 minutes of face-to-face time between Hanson and the Insureds or the Insureds' families, to the extent that the examinations actually were performed in the first instance, Hanson used a template in purporting to conduct the initial examinations.

623.    The template that Hanson used in purporting to conduct the initial examinations set forth a limited range of examination parameters.

624.    The only face-to-face time between the physicians or chiropractors and the Insureds that was reflected in the limited range of examination parameters consisted of brief patient interviews and limited examinations of the Insureds' musculoskeletal systems.

625.    These brief patient interviews and limited examinations did not require Hanson, Vega, nor any other physician or chiropractor associated with Orlando Central Chiro, to spend more than 15 minutes of face-to-face time with the Insureds or their families.

626.    In the claims for initial examinations identified in Exhibit "3", Orlando Central Chiro, Hanson, TOH Management, and Korchagin routinely falsely represented that the initial examinations involved 30 minutes of face-to-face time in order to create a false basis for their charges under CPT code 99203 because examinations billable under CPT code 99203 are reimbursable at higher rates than examinations that require less time to perform.

c.    **Misrepresentations Regarding "Detailed" Physical Examinations**

627.    Moreover, in many of the claims identified in Exhibit "3" for initial examinations under CPT code 99203, Orlando Central Chiro, Hanson, TOH Management, and Korchagin routinely falsely represented the extent of the underlying physical examinations.

628.    To the extent that the Insureds in the claims identified in Exhibit "3" had any actual complaints at all as the result of their relatively minor automobile accidents, the complaints were limited to minor musculoskeletal complaints, specifically sprains and strains.

629.    In the claims for initial examinations identified in Exhibit "3", when Orlando Central Chiro, Hanson, TOH Management, and Korchagin billed for the initial examinations under CPT code 99203, they falsely represented that the chiropractor who purported to

perform the examinations – namely Hanson – performed "detailed" patient examinations on the Insureds they purported to treat during the initial examinations.

630.   In fact, with respect to the claims for initial examinations under CPT code 99203 that are identified in Exhibit "3", Orlando Central Chiro, Hanson, TOH Management, and Korchagin virtually never conducted an extended examination of the Insureds' musculoskeletal systems.

631.   For instance, in the vast majority of the claims under CPT code 99203 identified in Exhibit "3", Orlando Central Chiro, Hanson, TOH Management, and Korchagin did not conduct an extended examination of the Insureds' musculoskeletal systems, inasmuch as they did not document findings with respect to the following:

> (i)    measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

> (ii)   general appearance of patient (e.g., development, nutrition, body habitus, deformities, attention to grooming);

> (iii)  examination of peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

> (iv)   palpation of lymph nodes in neck, axillae, groin and/or other location;

> (v)    brief assessment of mental status;

> (vi)   examination of gait and station;

> (vii)  inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

> (viii) coordination;

(ix)     examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and/or

(x)      examination of sensation.

632.     For example:

(i)      On or about November 10, 2016, Orlando Central Chiro, Hanson, TOH Management, and Korchagin billed GEICO under CPT code 99203 for an initial examination Hanson purported to perform on an Insured named AH, and thereby represented that Hanson had provided a "detailed" physical examination to AH. However, Hanson did not document an extended examination of AH's musculoskeletal system, despite the fact that – to the extent AH had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(ii)     On or about January 19, 2017, Orlando Central Chiro, Hanson, TOH Management, and Korchagin billed GEICO under CPT code 99203 for an initial examination Hanson purported to perform on an Insured named TN, and thereby represented that Hanson had provided a "detailed" physical examination to TN. However, Hanson did not document an extended examination of TN's musculoskeletal system, despite the fact that – to the extent TN had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(iii)    On or about July 7, 2017, Orlando Central Chiro, Hanson, TOH Management, and Korchagin billed GEICO under CPT code 99203 for an initial examination Hanson purported to perform on an Insured named PT, and thereby represented that Hanson had provided a "detailed" physical examination to PT. However, Hanson did not document an extended examination of PT's musculoskeletal system, despite the fact that – to the extent PT had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(iv)     On or about October 16, 2017, Orlando Central Chiro, Hanson, TOH Management, and Korchagin billed GEICO under CPT code 99203 for an initial examination Hanson purported to perform on an Insured named CL, and thereby represented that Hanson had provided a "detailed" physical examination to CL. However, Hanson did not document an extended examination of CL's musculoskeletal system, despite the fact that – to the extent CL had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(v)     On or about April 8, 2018, Orlando Central Chiro, Hanson, TOH Management, and Korchagin billed GEICO under CPT code 99203 for an initial examination Hanson purported to perform on an Insured named PJ, and thereby represented that Hanson had provided a "detailed" physical examination to PJ. However, Hanson did not document an extended examination of PJ's musculoskeletal system, despite the fact that – to the extent PJ had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(vi)    On or about June 13, 2018, Orlando Central Chiro, Hanson, TOH Management, and Korchagin billed GEICO under CPT code 99203 for an initial examination Hanson purported to perform on an Insured named EJ, and thereby represented that Hanson had provided a "detailed" physical examination to EJ. However, Hanson did not document an extended examination of EJ's musculoskeletal system, despite the fact that – to the extent EJ had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(vii)   On or about July 14, 2018, Orlando Central Chiro, Hanson, TOH Management, and Korchagin billed GEICO under CPT code 99203 for an initial examination Hanson purported to perform on an Insured named SS, and thereby represented that Hanson had provided a "detailed" physical examination to SS. However, Hanson did not document an extended examination of SS's musculoskeletal system, despite the fact that – to the extent SS had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(viii)  On or about August 29, 2018, Orlando Central Chiro, Hanson, TOH Management, and Korchagin billed GEICO under CPT code 99203 for an initial examination Hanson purported to perform on an Insured named KC, and thereby represented that Hanson had provided a "detailed" physical examination to KC. However, Hanson did not document an extended examination of KC's musculoskeletal system, despite the fact that – to the extent KC had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(ix)    On or about September 12, 2018, Orlando Central Chiro, Hanson, TOH Management, and Korchagin billed GEICO under CPT code 99203 for an initial examination Hanson purported to perform on an Insured named JS, and thereby represented that Hanson had provided a "detailed" physical examination to JS. However, Hanson did not document an extended examination of JS's musculoskeletal system, despite the fact that – to the extent JS had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(x)      On or about November 16, 2018, Orlando Central Chiro, Hanson, TOH Management, and Korchagin billed GEICO under CPT code 99203 for an initial examination Hanson purported to perform on an Insured named JE, and thereby represented that Hanson had provided a "detailed" physical examination to JE. However, Hanson did not document an extended examination of JE's musculoskeletal system, despite the fact that – to the extent JE had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

633.    These are only representative examples. In the vast majority of the claims for initial examinations under CPT code 99203 that are identified in Exhibit "3", Orlando Central Chiro, Hanson, TOH Management, and Korchagin routinely falsely represented that they had provided "detailed" physical examinations. In fact, they had not provided detailed physical examinations because Hanson had not documented an extended examination of the affected body areas and other symptomatic or related organ systems.

634.    In the claims for initial examinations under CPT code 99203 that are identified in Exhibit "3", Orlando Central Chiro, Hanson, TOH Management, and Korchagin routinely falsely represented that they had provided "detailed" physical examinations to the Insureds in order to create a false basis for their charges for the examinations under CPT code 99203, because examinations billable under CPT code 99203 are reimbursable at higher rates than examinations that do not require the examining physician to provide "detailed" physical examinations.

**d.**    **Misrepresentations Regarding the Extent of Medical Decision-Making**

635.    When the Insureds in the claims identified in Exhibit "3" presented at Orlando Central Chiro for initial examinations, their presenting problems virtually always were limited

to low severity soft tissue injuries such as acute sprains and strains, to the extent that they had any legitimate presenting problems at all.

636.    The diagnosis and treatment of these low severity sprains and strains did not require any legitimate, low-complexity medical decision-making.

637.    First, in the claims for initial examinations identified in Exhibit "3", the initial examinations did not involve the retrieval, review, or analysis of any significant amount of medical records, diagnostic tests, or other information.

638.    When the Insureds in the claims identified in Exhibit "3" presented to Orlando Central Chiro for "treatment", they did not arrive with any medical records except, at times, basic radiology reports.

639.    Furthermore, prior to the initial examinations, Orlando Central Chiro, Hanson, TOH Management, and Korchagin did not request any medical records from other providers.

640.    Second, in the claims for initial examinations identified in Exhibit "3", there was no risk of significant complications or morbidity – much less mortality – from the Insureds' relatively minor soft tissue injury complaints, to the extent that they ever had any complaints from automobile accidents at all.

641.    Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided at Orlando Central Chiro, to the extent that Orlando Central Chiro, Hanson, TOH Management, and Korchagin provided any such diagnostic procedures or treatment options in the first instance.

642.    In almost every instance, any "treatments" that Orlando Central Chiro, Hanson, TOH Management, and Korchagin actually provided were limited to chiropractic treatment

and/or physical therapy treatment, none of which was health– or life–threatening if properly administered.

643.     Third, in the claims for initial examinations identified in Exhibit "3", Orlando Central Chiro, Hanson, TOH Management, and Korchagin did not consider any significant number of diagnoses or treatment options for the Insureds during the initial examinations.

644.     Rather, to the extent that the initial examinations were conducted in the first instance, Orlando Central Chiro, Hanson, TOH Management, and Korchagin provided a phony list of soft tissue injury "diagnoses" for virtually every Insured, and prescribed a substantially similar course of treatment for every Insured.

645.     Specifically, in most of the claims identified in Exhibit "3", during the initial examinations the Insureds did not report any continuing medical problems that legitimately could be traced to an underlying automobile accident.

646.     Even so, Orlando Central Chiro, Hanson, TOH Management, and Korchagin prepared initial examination reports in which they provided a phony list of soft tissue injury "diagnoses" to virtually every Insured.

647.     Then, based upon these phony "diagnoses", Orlando Central Chiro, Hanson, TOH Management, and Korchagin directed virtually every Insured to: (i) receive significant and medically unnecessary chiropractic treatment and/or physical therapy treatment; (ii) receive medically unnecessary HME; and (iii) undergo medically unnecessary diagnostic testing, regardless of the Insureds' true circumstances or presentation.

648.     For example:

(i)      On December 8, 2016, an Insured named MR was involved in an automobile accident. The contemporaneous police report indicated that MR's vehicle was

drivable following the accident. The police report further indicated that MR was not injured and did not complain of any pain. In keeping with the fact that MR was not injured, MR did not visit any hospital emergency room following the accident. To the extent that MR experienced any health problems at all as the result of the minor accident, they were of low severity. On December 13, 2016, Hanson purported to conduct an initial examination of MR at Orlando Central Chiro. To the extent that Hanson performed the examination in the first instance, Hanson did not retrieve, review, or analyze any significant amount of medical records, diagnostic testing, or other information in connection with the examination. Moreover, Hanson did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Hanson provided MR with the same, phony, list of soft tissue injury "diagnoses" that she provided to virtually every other Insured. Furthermore, neither MR's presenting problems, nor the treatment plan provided to MR by Hanson, Korchagin, TOH Management, and Orlando Central Chiro presented any risk of significant complications, morbidity, or mortality. To the contrary, MR did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Hanson, Korchagin, TOH Management, and Orlando Central Chiro consisted of medically unnecessary chiropractic services, HME, and diagnostic testing, none of which posed the least bit of risk to MR. Even so, Hanson, Korchagin, TOH Management, and Orlando Central Chiro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Hanson engaged in some legitimate, low complexity medical decision-making during the purported examination.

(ii)     On February 9, 2017, an Insured named LS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact accident, and that LS's vehicle was drivable following the accident. The police report further indicated that LS was not injured and did not complain of any pain. In keeping with the fact that LS was not injured, LS did not visit any hospital emergency room following the accident. To the extent that LS experienced any health problems at all as the result of the minor accident, they were of low severity. On February 22, 2017, Hanson purported to conduct an initial examination of LS at Orlando Central Chiro. To the extent that Hanson performed the examination in the first instance, Hanson did not retrieve, review, or analyze any significant amount of medical records, diagnostic testing, or other information in connection with the examination. Moreover, Hanson did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Hanson provided LS with the same, phony, list of soft tissue injury "diagnoses" that she provided to virtually every other Insured. Furthermore, neither LS's presenting problems, nor the treatment plan provided to LS by Hanson, Korchagin, TOH Management, and Orlando Central Chiro presented any risk of significant complications, morbidity, or mortality. To the contrary, LS did

not need any significant treatment at all as a result of the accident, and the treatment plan provided by Hanson, Korchagin, TOH Management, and Orlando Central Chiro consisted of medically unnecessary chiropractic services and diagnostic testing, none of which posed the least bit of risk to LS. Even so, Hanson, Korchagin, TOH Management, and Orlando Central Chiro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Hanson engaged in some legitimate, low complexity medical decision-making during the purported examination.

(iii)    On July 5, 2017, an Insured named MP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MP's vehicle was drivable following the accident. The police report further indicated that MP was not injured and did not complain of any pain. In keeping with the fact that MP was not injured, MP did not visit any hospital emergency room following the accident. To the extent that MP experienced any health problems at all as the result of the minor accident, they were of low severity. On July 6, 2017, Hanson purported to conduct an initial examination of MP at Orlando Central Chiro. To the extent that Hanson performed the examination in the first instance, Hanson did not retrieve, review, or analyze any significant amount of medical records, diagnostic testing, or other information in connection with the examination. Moreover, Hanson did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Hanson provided MP with the same, phony, list of soft tissue injury "diagnoses" that she provided to virtually every other Insured. Furthermore, neither MP's presenting problems, nor the treatment plan provided to MP by Hanson, Korchagin, TOH Management, and Orlando Central Chiro presented any risk of significant complications, morbidity, or mortality. To the contrary, MP did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Hanson, Korchagin, TOH Management, and Orlando Central Chiro consisted of medically unnecessary chiropractic services, HME, and diagnostic testing, none of which posed the least bit of risk to MP. Even so, Hanson, Korchagin, TOH Management, and Orlando Central Chiro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Hanson engaged in some legitimate, low complexity medical decision-making during the purported examination.

(iv)    On July 5, 2017, an Insured named JJ was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JJ's vehicle was drivable following the accident. The police report further indicated that JJ was not injured and did not complain of any pain. In keeping with the fact that JJ was not injured, JJ did not visit any hospital emergency room following the accident. To the extent that JJ experienced any health problems at all as the result of the minor

accident, they were of low severity. On July 6, 2017, Hanson purported to conduct an initial examination of JJ at Orlando Central Chiro. To the extent that Hanson performed the examination in the first instance, Hanson did not retrieve, review, or analyze any significant amount of medical records, diagnostic testing, or other information in connection with the examination. Moreover, Hanson did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Hanson provided JJ with the same, phony, list of soft tissue injury "diagnoses" that she provided to virtually every other Insured. Furthermore, neither JJ's presenting problems, nor the treatment plan provided to JJ by Hanson, Korchagin, TOH Management, and Orlando Central Chiro presented any risk of significant complications, morbidity, or mortality. To the contrary, JJ did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Hanson, Korchagin, TOH Management, and Orlando Central Chiro consisted of medically unnecessary chiropractic services, HME, and diagnostic testing, none of which posed the least bit of risk to JJ. Even so, Hanson, Korchagin, TOH Management, and Orlando Central Chiro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Hanson engaged in some legitimate, low complexity medical decision-making during the purported examination.

(v)     On October 1, 2017, an Insured named DH was involved in an automobile accident. In keeping with the fact that DH was not injured, DH did not visit any hospital emergency room following the accident. To the extent that DH experienced any health problems at all as the result of the accident, they were of low severity. On October 2, 2017, Hanson purported to conduct an initial examination of DH at Orlando Central Chiro. To the extent that Hanson performed the examination in the first instance, Hanson did not retrieve, review, or analyze any significant amount of medical records, diagnostic testing, or other information in connection with the examination. Moreover, Hanson did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Hanson provided DH with the same, phony, list of soft tissue injury "diagnoses" that she provided to virtually every other Insured. Furthermore, neither DH's presenting problems, nor the treatment plan provided to DH by Hanson, Korchagin, TOH Management, and Orlando Central Chiro presented any risk of significant complications, morbidity, or mortality. To the contrary, DH did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Hanson, Korchagin, TOH Management, and Orlando Central Chiro consisted of medically unnecessary chiropractic services, HME, and diagnostic testing, none of which posed the least bit of risk to DH. Even so, Hanson, Korchagin, TOH Management, and Orlando Central Chiro billed GEICO for the initial examination using CPT code 99203, and thereby falsely

represented that Hanson engaged in some legitimate, low complexity medical decision-making during the purported examination.

(vi)     On March 22, 2018, an Insured named SP was involved in an automobile accident. In keeping with the fact that SP was not injured, SP did not visit any hospital emergency room following the accident. To the extent that SP experienced any health problems at all as the result of the accident, they were of low severity. On March 23, 2018, Hanson purported to conduct an initial examination of SP at Orlando Central Chiro. To the extent that Hanson performed the examination in the first instance, Hanson did not retrieve, review, or analyze any significant amount of medical records, diagnostic testing, or other information in connection with the examination. Moreover, Hanson did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Hanson provided SP with the same, phony, list of soft tissue injury "diagnoses" that she provided to virtually every other Insured. Furthermore, neither SP's presenting problems, nor the treatment plan provided to SP by Hanson, Korchagin, TOH Management, and Orlando Central Chiro presented any risk of significant complications, morbidity, or mortality. To the contrary, SP did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Hanson, Korchagin, TOH Management, and Orlando Central Chiro consisted of medically unnecessary chiropractic services and diagnostic testing, none of which posed the least bit of risk to SP. Even so, Hanson, Korchagin, TOH Management, and Orlando Central Chiro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Hanson engaged in some legitimate, low complexity medical decision-making during the purported examination.

(vii)    On May 14, 2018, an Insured named JP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact accident, and that JP's vehicle was drivable following the accident. The police report further indicated that JP was not injured and did not complain of any pain. In keeping with the fact that JP was not injured, JP did not visit any hospital emergency room following the accident. To the extent that JP experienced any health problems at all as the result of the minor accident, they were of low severity. On May 15, 2018, Hanson purported to conduct an initial examination of JP at Orlando Central Chiro. To the extent that Hanson performed the examination in the first instance, Hanson did not retrieve, review, or analyze any significant amount of medical records, diagnostic testing, or other information in connection with the examination. Moreover, Hanson did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Hanson provided JP with the same, phony, list of soft tissue injury "diagnoses" that she provided to virtually every other Insured. Furthermore, neither JP's presenting

problems, nor the treatment plan provided to JP by Hanson, Korchagin, TOH Management, and Orlando Central Chiro presented any risk of significant complications, morbidity, or mortality. To the contrary, JP did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Hanson, Korchagin, TOH Management, and Orlando Central Chiro consisted of medically unnecessary chiropractic services and HME, none of which posed the least bit of risk to JP. Even so, Hanson, Korchagin, TOH Management, and Orlando Central Chiro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Hanson engaged in some legitimate, low complexity medical decision-making during the purported examination.

(viii)   On May 15, 2018, an Insured named WP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that WP's vehicle was drivable following the accident. The police report further indicated that WP was not injured and did not complain of any pain. In keeping with the fact that WP was not injured, WP did not visit any hospital emergency room following the accident. To the extent that WP experienced any health problems at all as the result of the minor accident, they were of low severity. On May 21, 2018, Hanson purported to conduct an initial examination of WP at Orlando Central Chiro. To the extent that Hanson performed the examination in the first instance, Hanson did not retrieve, review, or analyze any significant amount of medical records, diagnostic testing, or other information in connection with the examination. Moreover, Hanson did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Hanson provided WP with the same, phony, list of soft tissue injury "diagnoses" that she provided to virtually every other Insured. Furthermore, neither WP's presenting problems, nor the treatment plan provided to WP by Hanson, Korchagin, TOH Management, and Orlando Central Chiro presented any risk of significant complications, morbidity, or mortality. To the contrary, WP did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Hanson, Korchagin, TOH Management, and Orlando Central Chiro consisted of medically unnecessary chiropractic services and diagnostic testing, none of which posed the least bit of risk to WP. Even so, Hanson, Korchagin, TOH Management, and Orlando Central Chiro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Hanson engaged in some legitimate, low complexity medical decision-making during the purported examination.

(ix)   On September 11, 2018, an Insured named BA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that BA's vehicle was drivable following the accident. The police report further indicated that BA was not injured and did

not complain of any pain. In keeping with the fact that BA was not injured, BA did not visit any hospital emergency room following the accident. To the extent that BA experienced any health problems at all as the result of the minor accident, they were of low severity. On September 12, 2018, Hanson purported to conduct an initial examination of BA at Orlando Central Chiro. To the extent that Hanson performed the examination in the first instance, Hanson did not retrieve, review, or analyze any significant amount of medical records, diagnostic testing, or other information in connection with the examination. Moreover, Hanson did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Hanson provided BA with the same, phony, list of soft tissue injury "diagnoses" that she provided to virtually every other Insured. Furthermore, neither BA's presenting problems, nor the treatment plan provided to BA by Hanson, Korchagin, TOH Management, and Orlando Central Chiro presented any risk of significant complications, morbidity, or mortality. To the contrary, BA did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Hanson, Korchagin, TOH Management, and Orlando Central Chiro consisted of medically unnecessary chiropractic services, HME, and diagnostic testing, none of which posed the least bit of risk to BA. Even so, Hanson, Korchagin, TOH Management, and Orlando Central Chiro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Hanson engaged in some legitimate, low complexity medical decision-making during the purported examination.

(x)     On September 11, 2018, an Insured named JS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that JS's vehicle was drivable following the accident. The police report further indicated that JS was not injured and did not complain of any pain. In keeping with the fact that JS was not injured, JS did not visit any hospital emergency room following the accident. To the extent that JS experienced any health problems at all as the result of the minor accident, they were of low severity. On September 12, 2018, Hanson purported to conduct an initial examination of BA at Orlando Central Chiro. To the extent that Hanson performed the examination in the first instance, Hanson did not retrieve, review, or analyze any significant amount of medical records, diagnostic testing, or other information in connection with the examination. Moreover, Hanson did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Hanson provided JS with the same, phony, list of soft tissue injury "diagnoses" that she provided to virtually every other Insured. Furthermore, neither JS's presenting problems, nor the treatment plan provided to JS by Hanson, Korchagin, TOH Management, and Orlando Central Chiro presented any risk of significant complications, morbidity, or mortality. To the contrary, JS did not need any significant treatment at all as a result of the accident, and the treatment plan

225

provided by Hanson, Korchagin, TOH Management, and Orlando Central Chiro consisted of medically unnecessary chiropractic services, HME, and diagnostic testing, none of which posed the least bit of risk to JS. Even so, Hanson, Korchagin, TOH Management, and Orlando Central Chiro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Hanson engaged in some legitimate, low complexity medical decision-making during the purported examination.

649.    There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

650.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

651.    As set forth above, in the claims identified in Exhibit "3", virtually all of the Insureds whom Orlando Central Chiro, Hanson, TOH Management, and Korchagin purported to treat were involved in relatively minor, "fender-bender" accidents, to the extent that they were involved in any actual accident at all.

652.    It is highly improbable that any two Insureds involved in any one of the relatively minor automobile accidents in the claims identified in Exhibit "3" would suffer substantially identical injuries as the result of their accidents, or require a substantially identical course of treatment.

653.    It is even more improbable – to the point of impossibility – that this would occur repeatedly, often with the Insureds presenting for initial examinations by Orlando Central Chiro, Hanson, TOH Management, and Korchagin with substantially identical injuries on or about the exact same dates after their accidents.

654.    Even so, in keeping with the fact that the putative "diagnoses" were phony, and in keeping with the fact that the putative initial examinations involved no actual medical decision-making at all, Orlando Central Chiro, Hanson, TOH Management, and Korchagin frequently issued substantially identical "diagnoses", on or about the same date, to more than one Insured involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds.

655.    For example:

(i)    On July 19, 2017, three Insureds – EF, LM, and KN – were involved in the same automobile accident. Incredibly, the next day, July 20, 2017, EF, LM, and KN all presented at Orlando Central Chiro for initial examinations by Hanson. EF, LM, and KN were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that EF, LM, and KN suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Hanson, Korchagin, TOH Management, and Orlando Central Chiro provided EF, LM, and KN with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for all three of them.

(ii)    On November 26, 2017, five insureds – BF, CF, IF, SP, and MW – were involved in the same automobile accident. Incredibly, the next day, November 27, 2017, BF, CF, IF, SP, and MW all presented at Orlando Central Chiro for initial examinations by Hanson. BF, CF, IF, SP, and MW were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that BF, CF, IF, SP, and MW suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Hanson, Korchagin, TOH Management, and Orlando Central Chiro provided BF, CF, IF, SP, and MW with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for all five of them.

(iii)    On December 15, 2017, three Insureds – JD, MD, and RD – were involved in the same automobile accident. The next day, December 16, 2017, RD presented at Orlando Central Chiro for an initial examination by Hanson. Then, five days later, on December 21, 2017, JD and MD both presented at Orlando Central Chiro for initial examinations by Hanson. JD, MD, and RD were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that JD, MD, and RD suffered any injuries

at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Hanson, Korchagin, TOH Management, and Orlando Central Chiro provided JD, MD, and RD with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for all three of them.

(iv)   On May 1, 2018, two Insureds – FD and YN – were involved in the same automobile accident. Two days later, on May 3, 2018, YN presented at Orlando Central Chiro for an initial examination by Hanson. Then, the next day, May 4, 2018, FD too presented to Orlando Central Chiro for an initial examination by Hanson. FD and YN were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that FD and YN suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Hanson, Korchagin, TOH Management, and Orlando Central Chiro provided FD and YN with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(v)   On June 11, 2018, three Insureds – CH, EJ, and RR – were involved in the same automobile accident. Incredibly, two days later, on June 13, 2018, CH, EJ, and RR all presented at Orlando Central Chiro for initial examinations by Hanson. CH, EJ, and RR were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that CH, EJ, and RR suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Hanson, Korchagin, TOH Management, and Orlando Central Chiro provided CH, EJ, and RR with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for all three of them.

(vi)   On July 12, 2018, three Insureds – JP CP, and SS – were involved in the same automobile accident. Incredibly, two days later, on July 14, 2018, JP, CP, and SS all presented at Orlando Central Chiro for initial examinations by Hanson. JP, CP, and SS were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that JP, CP, and SS suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Hanson, Korchagin, TOH Management, and Orlando Central Chiro provided JP, CP, and SS with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for all three of them.

(vii)   On July 30, 2018, two Insureds – KB and EJ – were involved in the same automobile accident. Incredibly, two days later, on August 1, 2018, KB and EJ both presented at Orlando Central Chiro for initial examinations by Hanson. KB and EJ were different ages, in different physical condition, and experienced the

impact from different locations in the vehicle. To the extent that KB and EJ suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Hanson, Korchagin, TOH Management, and Orlando Central Chiro provided KB and EJ with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(viii)   On September 11, 2018, two Insureds – BA and JS – were involved in the same automobile accident. Incredibly, the next day, September 12, 2018, BA and JS both presented at Orlando Central Chiro for initial examinations by Hanson. BA and JS were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that BA and JS suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Hanson, Korchagin, TOH Management, and Orlando Central Chiro provided BA and JS with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(ix)   On October 4, 2018, three Insureds – SB, YM, and MT – were involved in the same automobile accident. The next day, YM presented at Orlando Central Chiro for an initial examination by Hanson. Then, three days later, on October 8, 2018, SB too presented at Orlando Central Chiro for an initial examination by Hanson. Then, four days after that, on October 12, 2018, MT too presented to Orlando Central Chiro for an initial examination by Hanson. SB, YM, and MT were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that SB, YM, and MT suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Hanson, Korchagin, TOH Management, and Orlando Central Chiro provided SB, YM, and MT with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for all three of them.

(x)   On November 11, 2018, two Insureds – SP and OJ – were involved in the same automobile accident. Incredibly, two days later, on November 13, 2018, SP and OJ both presented at Orlando Central Chiro for initial examinations by Hanson. SP and OJ were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that SP and OJ suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Hanson, Korchagin, TOH Management, and Orlando Central Chiro provided SP and OJ with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

656.    These are only representative examples. In the claims for initial examinations that are identified in Exhibit "3", Orlando Central Chiro, Hanson, TOH Management, and Korchagin frequently issued substantially identical "diagnoses", on or about the same date, to more than one Insured involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds, despite the fact that the Insureds were differently situated.

657.    In the claims for initial examinations identified in Exhibit "3", Orlando Central Chiro, Hanson, TOH Management, and Korchagin routinely falsely represented that the initial examinations involved medical decision-making of moderate complexity in order to provide a false basis to bill for the initial examinations under CPT code 99203, because examinations billed under CPT code 99203 are reimbursable at a higher rate than examinations that do not require moderate complexity medical decision-making.

**(ii)    The Fraudulent Charges for HME Through Orlando Central Chiro**

658.    As part of their fraudulent scheme, at the conclusion of the putative initial examinations, Orlando Central Chiro, Hanson, TOH Management, and Korchagin purported to prescribe many Insureds with HME.

659.    In particular, Orlando Central Chiro, Hanson, TOH Management, and Korchagin purported to prescribe many Insureds with LSOs that were purportedly provided and billed for through Orlando Central Chiro.

660.    As set forth in Exhibit "3", Orlando Central Chiro, Hanson, TOH Management, and Korchagin billed GEICO for the LSOs under HCPCS code L0627, typically resulting in a charge of between $750.00 and $800.00.

661.    In the claims for HME identified in Exhibit "3", the charges for the HME were fraudulent in that they misrepresented Orlando Central Chiro's eligibility to collect PIP Benefits in the first instance.

662.    In fact, and as set forth above, Orlando Central Chiro never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the Clinic Act, the Self-Referral Act, the Patient Brokering Act, the HME Licensing Laws, and the Chiropractor Advertising Laws.

663.    As set forth below, Orlando Central Chiro, Hanson, TOH Management, and Korchagin's charges for the HME identified in Exhibit "3" also were fraudulent in that they misrepresented the medical necessity of the putative HME.

664.    The LSO is a rigid, custom-fitted, lower-back brace designed to restrict the movement of the patient's torso and support the patient's lumbar spine. Because of its rigidity and required placement on a patient's lower back, an LSO must be custom-fitted in order for it to be properly utilized by the patient.

665.    In a legitimate clinical setting, an LSO is reserved for patients who exhibit spinal instability or for patients who have recently undergone spinal surgery, and its prescription is inconsistent with the goals of physical therapy and chiropractic treatment designed to restore and increase range of motion and functionality of the lumbar spine.

666.    Moreover, in a legitimate clinical setting, an LSO should not be prescribed to a patient before that patient had attempted and failed a legitimate course of conservative treatment, much simultaneous to a prescription for conservative treatment such as physical therapy.

667.    As set forth above, and in keeping with the fact that the Insureds in the claims identified in Exhibit "3" almost never suffered any injuries more serious than garden-variety soft tissue injuries such as sprains and strains, in the vast majority of the claims identified in Exhibit "3" the Insureds did not seek treatment at any hospital as the result of their accidents.

668.    To the limited extent that the Insureds did report to a hospital after their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way after a few hours with, at most, a minor sprain or strain diagnosis.

669.    Furthermore, in the vast majority of cases, contemporaneous police reports indicated that the underlying accidents involved low-speed, low-impact collisions, that the Insureds' vehicles were drivable following the accidents, and that no one was seriously injured in the underlying accidents, or injured at all.

670.    Ordinary strains and sprains virtually always resolve after a short course of conservative treatment such as rest, ice, compression, and elevation, or no treatment at all.

671.    None of the Insureds in the claims identified in Exhibit "3" suffered from spinal instability. In fact, virtually none of the Insureds in the claims identified in Exhibit "3" suffered any serious injuries at all, much less health problems requiring spinal surgery and subsequent immobilization of their spine.

672.    None of the Insureds in the claims identified in Exhibit "3" had attempted and failed a legitimate course of conservative treatment prior to their receipt of a prescription for an LSO.

673.    Even so, following their fraudulent initial examinations, boilerplate examination reports, and duplicative and medically-impossible diagnoses, Orlando Central

Chiro, Hanson, TOH Management, and Korchagin purported to prescribe many Insureds with

an LSO, despite that fact that:

(i)     none of the Insureds suffered from spinal instability or were recovering from spinal surgery;

(ii)    neither Hanson nor any other individual associated with Orlando Central Chiro ever measured or fitted the device for the Insureds;

(iii)   the Insureds had not yet failed any legitimate course of conservative treatment and, in fact, were prescribed the LSO within days – and, in some instances, the very same day – of their minor accidents; and

(iv)    the Insureds were concomitantly referred for physical therapy and chiropractic treatment at Orlando Central Chiro, the putative purpose of which was to restore the range of motion and functionality of, among other things, the Insureds' lumbar spine.

674.    For example:

(i)     On October 22, 2017, an Insured named EK was involved in an automobile accident. The next day, October 23, 2017, EK presented to Orlando Central Chiro for an initial examination by Hanson. At the conclusion of the purported initial examination, Hanson and Orlando Central Chiro prescribed EK with a medically unnecessary LSO, despite the fact that EK: (a) was never fitted for the device; (b) did not suffer from spinal instability and was not recovering from spinal surgery; and (c) had not yet failed a legitimate course of conservative treatment, and, in fact, was concomitantly referred by Hanson for physical therapy and chiropractic treatment at Orlando Central Chiro, the putative purpose of which was to increase, rather than decrease, EK's range of motion. Hanson, Korchagin, TOH Management, and Orlando Central Chiro then submitted a bill to GEICO under HCPCS code L0627, seeking reimbursement of $800.00 for the medically unnecessary LSO.

(ii)    On December 3, 2017, an Insured named CB was involved in an automobile accident. The next day, December 4, 2017, CB presented to Orlando Central Chiro for an initial examination by Hanson. At the conclusion of the purported initial examination, Hanson and Orlando Central Chiro prescribed CB with a medically unnecessary LSO, despite the fact that CB: (a) was never fitted for the device; (b) did not suffer from spinal instability and was not recovering from spinal surgery; and (c) had not yet failed a legitimate course of conservative treatment, and, in fact, was concomitantly referred by Hanson for physical therapy and chiropractic treatment at Orlando Central Chiro, the

putative purpose of which was to increase, rather than decrease, CB's range of motion. Hanson, Korchagin, TOH Management, and Orlando Central Chiro then submitted a bill to GEICO under HCPCS code L0627, seeking reimbursement of $800.00 for the medically unnecessary LSO.

(iii)  On December 15, 2017, an Insured named RD was involved in an automobile accident. The next day, December 16, 2017, RD presented to Orlando Central Chiro for an initial examination by Hanson. At the conclusion of the purported initial examination, Hanson and Orlando Central Chiro prescribed RD with a medically unnecessary LSO, despite the fact that RD: (a) was never fitted for the device; (b) did not suffer from spinal instability and was not recovering from spinal surgery; and (c) had not yet failed a legitimate course of conservative treatment, and, in fact, was concomitantly referred by Hanson for physical therapy and chiropractic treatment at Orlando Central Chiro, the putative purpose of which was to increase, rather than decrease, RD's range of motion. Hanson, Korchagin, TOH Management, and Orlando Central Chiro then submitted a bill to GEICO under HCPCS code L0627, seeking reimbursement of $800.00 for the medically unnecessary LSO.

(iv)  On April 28, 2018, an Insured named AF was involved in an automobile accident. Two days later, on April 30, 2018, AF presented to Orlando Central Chiro for an initial examination by Hanson. At the conclusion of the purported initial examination, Hanson and Orlando Central Chiro prescribed RD with a medically unnecessary LSO, despite the fact that AF: (a) was never fitted for the device; (b) did not suffer from spinal instability and was not recovering from spinal surgery; and (c) had not yet failed a legitimate course of conservative treatment, and, in fact, was concomitantly referred by Hanson for physical therapy and chiropractic treatment at Orlando Central Chiro, the putative purpose of which was to increase, rather than decrease, AF's range of motion. Hanson, Korchagin, TOH Management, and Orlando Central Chiro then submitted a bill to GEICO under HCPCS code L0627, seeking reimbursement of $800.00 for the medically unnecessary LSO.

(v)  On May 14, 2018, an Insured named PJ was involved in an automobile accident. The next day, May 15, 2018, PJ presented to Orlando Central Chiro for an initial examination by Hanson. At the conclusion of the purported initial examination, Hanson and Orlando Central Chiro prescribed PJ with a medically unnecessary LSO, despite the fact that PJ: (a) was never fitted for the device; (b) did not suffer from spinal instability and was not recovering from spinal surgery; and (c) had not yet failed a legitimate course of conservative treatment, and, in fact, was concomitantly referred by Hanson for physical therapy and chiropractic treatment at Orlando Central Chiro, the putative purpose of which was to increase, rather than decrease, PJ's range of motion. Hanson, Korchagin, TOH Management, and Orlando Central Chiro

then submitted a bill to GEICO under HCPCS code L0627, seeking reimbursement of $800.00 for the medically unnecessary LSO.

675.     These are only representative examples. In virtually all of the claims for LSOs identified in Exhibit "3", Orlando Central Chiro, Hanson, TOH Management, and Korchagin falsely represented that the prescribed LSOs were medically necessary, when in fact they were not.

**(iii)     The Fraudulent Charges for Surface Electromyography Testing Services at Orlando Central Chiro**

676.     As set forth in Exhibit "3", as part of the Defendants' fraudulent scheme, at the conclusion of the putative initial examinations, Orlando Central Chiro, Hanson, TOH Management, and Korchagin directed virtually every Insured to receive putative SEMG services at Orlando Central Chiro.

677.     Hanson purported to perform virtually all of the SEMG services at Orlando Central Chiro.

678.     As set forth in Exhibit "3", Orlando Central Chiro, Hanson, TOH Management, and Korchagin then billed the putative SEMG services to GEICO under CPT codes 96002 and 96004, typically resulting in a total charge of between $310.00 and $650.00.

679.     As set forth below, the charges for the putative SEMG services were fraudulent because the SEMG services were medically unnecessary and were provided – to the extent they were provided at all – pursuant to the Defendants' pre-determined fraudulent treatment and billing protocol, and not to treat or otherwise benefit the Insureds who were subjected to it.

680.    Furthermore, the charges for putative SEMG services were fraudulent in that they misrepresented Orlando Central Chiro's eligibility to collect PIP Benefits in the first instance.

681.    "Surface electromyography" is a technique in which electrodes are placed on (not into) the skin overlying a muscle to detect the electrical activity of the muscle.

682.    These electrodes are then used to measure muscle activity and – supposedly – to evaluate and diagnose patients with neuromuscular disorders, lower back pain, and kineseological disorders.

683.    However, according to a review of the literature published by the American Academy of Neurology, "SEMG is considered unacceptable as a clinical tool in the diagnosis" of neuromuscular disease and low back pain. See S.L. Pulman, M.D., Clinical Utility of Surface EMG, Report of therapeutics and technology Assessment Subcommittee of the American Academy of Neurology 2000.

684.    Even so, in the claims identified in Exhibit "3", Orlando Central Chiro, Hanson, TOH Management, and Korchagin purported to provide virtually every Insured with medically unnecessary SEMG testing on the Insureds' cervical and lumbar spines, despite the fact that the putative SEMG testing could not provide any clinically significant data to assist in the "treatment" of the Insureds' supposed injuries.

685.    In keeping with the fact that the SEMG testing was of no diagnostic value, Orlando Central Chiro, Hanson, TOH Management, and Korchagin never incorporated the putative "results" of the SEMG testing into the Insureds' treatment plans.

686.   Instead, following the putative SEMG testing, Orlando Central Chiro, Hanson, TOH Management, and Korchagin routinely directed the Insureds identified in Exhibit "3" to receive a virtually identical course of treatment as had been recommended for that Insured prior to the supposed SEMG testing.

687.   For example:

(i)   On April 28, 2017, an Insured named LA was involved in an automobile accident. Thereafter, on May 3, 2017, LA presented to Orlando Central Chiro for an initial examination by Hanson. At the conclusion of the examination, Hanson, Korchagin, TOH Management, and Orlando Central Chiro provided LA with substantially the same soft tissue "diagnoses" they provided to virtually every Insured, and recommended that LA begin substantially the same course of putative "treatment" they recommended to virtually every other Insured. Then, on May 12, 2017, Hanson, Korchagin, TOH Management, and Orlando Central Chiro purported to provide LA with putative SEMG testing at Orlando Central Chiro. However – and in keeping with the fact that the putative SEMG testing was medically unnecessary – the "results" of the putative SEMG testing were never incorporated into LA's supposed "treatment" plan, and LA thereafter received substantially the same treatment as had been recommended prior to the SEMG testing being provided.

(ii)   On August 7, 2017, an Insured named DA was involved in an automobile accident. Thereafter, on August 21, 2017, DA presented to Orlando Central Chiro for an initial examination by Hanson. At the conclusion of the examination, Hanson, Korchagin, TOH Management, and Orlando Central Chiro provided DA with substantially the same soft tissue "diagnoses" they provided to virtually every Insured, and recommended that DA begin substantially the same course of putative "treatment" they recommended to virtually every other Insured. Then, on August 30, 2017, Hanson, Korchagin, TOH Management, and Orlando Central Chiro purported to provide DA with putative SEMG testing at Orlando Central Chiro. However – and in keeping with the fact that the putative SEMG testing was medically unnecessary – the "results" of the putative SEMG testing were never incorporated into DA's supposed "treatment" plan, and DA thereafter received substantially the same treatment as had been recommended prior to the SEMG testing being provided.

(iii)   On November 26, 2017, an Insured named MW was involved in an automobile accident. Thereafter, on November 27, 2017, MW presented to Orlando Central Chiro for an initial examination by Hanson. At the conclusion of the examination, Hanson, Korchagin, TOH Management, and Orlando Central

Chiro provided MW with substantially the same soft tissue "diagnoses" they provided to virtually every Insured, and recommended that MW begin substantially the same course of putative "treatment" they recommended to virtually every other Insured. Then, on December 4, 2017, Hanson, Korchagin, TOH Management, and Orlando Central Chiro purported to provide MW with putative SEMG testing at Orlando Central Chiro. However – and in keeping with the fact that the putative SEMG testing was medically unnecessary – the "results" of the putative SEMG testing were never incorporated into MW's supposed "treatment" plan, and MW thereafter received substantially the same treatment as had been recommended prior to the SEMG testing being provided.

(iv)     On July 30, 2018, an Insured named KB was involved in an automobile accident. Thereafter, on August 1, 2018, KB presented to Orlando Central Chiro for an initial examination by Hanson. At the conclusion of the examination, Hanson, Korchagin, TOH Management, and Orlando Central Chiro provided KB with substantially the same soft tissue "diagnoses" they provided to virtually every Insured, and recommended that KB begin substantially the same course of putative "treatment" they recommended to virtually every other Insured. Then, on August 14, 2018, Hanson, Korchagin, TOH Management, and Orlando Central Chiro purported to provide BA with putative SEMG testing at Orlando Central Chiro. However – and in keeping with the fact that the putative SEMG testing was medically unnecessary – the "results" of the putative SEMG testing were never incorporated into KB's supposed "treatment" plan, and KB thereafter received substantially the same treatment as had been recommended prior to the SEMG testing being provided.

(v)      On September 11, 2018, an Insured named BA was involved in an automobile accident. Thereafter, on September 12, 2018, BA presented to Orlando Central Chiro for an initial examination by Hanson. At the conclusion of the examination, Hanson, Korchagin, TOH Management, and Orlando Central Chiro provided BA with substantially the same soft tissue "diagnoses" they provided to virtually every Insured, and recommended that BA begin substantially the same course of putative "treatment" they recommended to virtually every other Insured. Then, on September 17, 2018, Hanson, Korchagin, TOH Management, and Orlando Central Chiro purported to provide BA with putative SEMG testing at Orlando Central Chiro. However – and in keeping with the fact that the putative SEMG testing was medically unnecessary – the "results" of the putative SEMG testing were never incorporated into BA's supposed "treatment" plan, and BA thereafter received substantially the same treatment as had been recommended prior to the SEMG testing being provided.

688.     These are only representative examples. In the claims identified in Exhibit "3",

Orlando Central Chiro, Hanson, TOH Management, and Korchagin misrepresented the

medical necessity of the putative SEMG testing.

**(iv)     The Fraudulent Charges for Follow-Up Examinations at Orlando Central Chiro**

689.     In addition to their fraudulent initial examinations, Orlando Central Chiro,

Hanson, TOH Management, and Korchagin purported to subject many of the Insureds in the

claims identified in Exhibit "3" to multiple, fraudulent follow-up examinations during the

course of their fraudulent treatment protocol.

690.     Hanson purported to personally perform virtually all of the follow-up

examinations in the claims identified in Exhibit "3".

691.     As set forth in Exhibit "3", Orlando Central Chiro, Hanson, TOH

Management, and Korchagin then then billed the follow-up examinations to GEICO under: (i)

CPT code 99211, typically resulting in a charge of between $45.00 and $50.00 for each

putative examination; or (ii) 99212, typically resulting in a charge of $105.00 for each

putative examination.

692.     In the claims for follow-up examinations identified in Exhibit "3", the charges

for the follow-up examinations were fraudulent in that they misrepresented Orlando Central

Chiro's eligibility to collect PIP Benefits in the first instance.

693.     In fact, and as set forth above, Orlando Central Chiro never was eligible to

collect PIP Benefits, inasmuch as it was operated in violation of the Clinic Act, the Patient

Brokering Act, the Self-Referral Act, the HME Licensing Laws, and the Chiropractor

Advertising Laws.

694.     As set forth below, Orlando Central Chiro, Hanson, TOH Management, and Korchagin's charges for the follow-up examinations identified in Exhibit "3" also were fraudulent in that they misrepresented the nature and extent of the examinations.

**a.      The Fraudulent Charges for Illusory Follow-Up Examinations**

695.     As discussed in detail below, Orlando Central Chiro, Hanson, TOH Management, and Korchagin purported to provide virtually every Insured with a course of in-office chiropractic manipulation.

696.     Orlando Central Chiro, Hanson, TOH Management, and Korchagin then billed the chiropractic manipulation to GEICO using CPT codes 98940, 98941, and 98943.

697.     Pursuant to the CPT Assistant, a pre-manipulation patient assessment is part and parcel of the putative chiropractic manipulation services billed by Orlando Central Chiro, Hanson, TOH Management, and Korchagin under CPT codes 98940, 98941, and 98943.

698.     Moreover, pursuant to the CPT Assistant, a separate examination may be billed only if the patient's condition requires an examination above and beyond the usual pre- and post- manipulation assessment associated with chiropractic manipulation services.

699.     Even so, Orlando Central Chiro, Hanson, TOH Management, and Korchagin routinely billed GEICO for a putative follow-up examination under CPT code 99211 contemporaneous with their supposed provision of chiropractic manipulation services billed under CPT codes 98940, 98941, and 98943.

700.     However, these supposed "examinations" were never truly separate services from the putative chiropractic manipulation services.

701.    Instead, Orlando Central Chiro, Hanson, TOH Management, and Korchagin billed GEICO for the illusory follow-up examinations under CPT code 99211 in order to maximize the fraudulent billing they submitted to GEICO.

702.    In keeping with the fact that the follow-up examinations purportedly provided contemporaneous to the chiropractic manipulations services were illusory, Orlando Central Chiro, Hanson, TOH Management, and Korchagin never submitted any reports, notes, or any substantiating documentation whatsoever in connection with the phony follow-up examinations billed under CPT code 99211.

703.    Moreover, virtually none of the Insureds in the claims identified in Exhibit "3" required additional examination services above and beyond the usual pre- and post-manipulation assessment associated with chiropractic manipulation services.

704.    Even so, Orlando Central Chiro, Hanson, TOH Management, and Korchagin routinely submitted duplicative charges under CPT code 99211 for illusory follow-up examinations contemporaneous to charges for putative chiropractic manipulation services.

705.    For example:

(i)     Orlando Central Chiro, Hanson, TOH Management, and Korchagin billed GEICO for purported follow-up examinations under CPT code 99211 that were supposedly provided to an Insured named KB contemporaneous with chiropractic manipulation services on June 21, 2017, August 13, 2017, August 27, 2017, September 4, 2017, September 5, 2017, October 16, 2017, and October 19, 2017. This, despite the fact that: (a) no legitimate, separate follow-up examinations were provided; (b) the patient's condition did not require examination above and beyond the usual pre- and post- manipulation assessment associated with chiropractic services; and (c) to the extent that Orlando Central Chiro, Hanson, TOH Management, and Korchagin provided any patient assessments at all, they were part and parcel of the chiropractic services billed under CPT codes 98940 and 98941.

(ii)    Orlando Central Chiro, Hanson, TOH Management, and Korchagin billed GEICO for purported follow-up examinations under CPT code 99211 that were supposedly provided to an Insured named LA contemporaneous with chiropractic manipulation services on July 7, 2017 and November 10, 2017. This, despite the fact that: (a) no legitimate, separate follow-up examinations were provided; (b) the patient's condition did not require examination above and beyond the usual pre- and post- manipulation assessment associated with chiropractic services; and (c) to the extent that Orlando Central Chiro, Hanson, TOH Management, and Korchagin provided any patient assessments at all, they were part and parcel of the chiropractic services billed under CPT code 98941.

(iii)    Orlando Central Chiro, Hanson, TOH Management, and Korchagin billed GEICO for purported follow-up examinations under CPT code 99211 that were supposedly provided to an Insured named MA contemporaneous with chiropractic manipulation services on October 18, 2017, October 24, 2017, October 28, 2017, and November 28, 2017. This, despite the fact that: (a) no legitimate, separate follow-up examinations were provided; (b) the patient's condition did not require examination above and beyond the usual pre- and post- manipulation assessment associated with chiropractic services; and (c) to the extent that Orlando Central Chiro, Hanson, TOH Management, and Korchagin provided any patient assessments at all, they were part and parcel of the chiropractic services billed under CPT code 98941.

(iv)    Orlando Central Chiro, Hanson, TOH Management, and Korchagin billed GEICO for purported follow-up examinations under CPT code 99211 that were supposedly provided to an Insured named CC contemporaneous with chiropractic manipulation services on November 15, 2017, November 27, 2017, December 7, 2017, and December 21, 2017. This, despite the fact that: (a) no legitimate, separate follow-up examinations were provided; (b) the patient's condition did not require examination above and beyond the usual pre- and post- manipulation assessment associated with chiropractic services; and (c) to the extent that Orlando Central Chiro, Hanson, TOH Management, and Korchagin provided any patient assessments at all, they were part and parcel of the chiropractic services billed under CPT codes 98940 and 98941.

(v)    Orlando Central Chiro, Hanson, TOH Management, and Korchagin billed GEICO for purported follow-up examinations under CPT code 99211 that were supposedly provided to an Insured named CB contemporaneous with chiropractic manipulation services on December 19, 2017, January 4, 2018, and January 29, 2018. This, despite the fact that: (a) no legitimate, separate follow-up examinations were provided; (b) the patient's condition did not require examination above and beyond the usual pre- and post- manipulation assessment associated with chiropractic services; and (c) to the extent that

Orlando Central Chiro, Hanson, TOH Management, and Korchagin provided any patient assessments at all, they were part and parcel of the chiropractic services billed under CPT code 98940.

(vi)     Orlando Central Chiro, Hanson, TOH Management, and Korchagin billed GEICO for purported follow-up examinations under CPT code 99211 that were supposedly provided to an Insured named BA contemporaneous with chiropractic manipulation services on December 26, 2017, December 30, 2017, January 10, 2018, and January 31, 2018. This, despite the fact that: (a) no legitimate, separate follow-up examinations were provided; (b) the patient's condition did not require examination above and beyond the usual pre- and post- manipulation assessment associated with chiropractic services; and (c) to the extent that Orlando Central Chiro, Hanson, TOH Management, and Korchagin provided any patient assessments at all, they were part and parcel of the chiropractic services billed under CPT codes 98940 and 98941.

(vii)    Orlando Central Chiro, Hanson, TOH Management, and Korchagin billed GEICO for purported follow-up examinations under CPT code 99211 that were supposedly provided to an Insured named MC contemporaneous with chiropractic manipulation services on January 10, 2018, January 12, 2018, February 28, 2018, and March 1, 2018. This, despite the fact that: (a) no legitimate, separate follow-up examinations were provided; (b) the patient's condition did not require examination above and beyond the usual pre- and post- manipulation assessment associated with chiropractic services; and (c) to the extent that Orlando Central Chiro, Hanson, TOH Management, and Korchagin provided any patient assessments at all, they were part and parcel of the chiropractic services billed under CPT code 98941.

(viii)   Orlando Central Chiro, Hanson, TOH Management, and Korchagin billed GEICO for purported follow-up examinations under CPT code 99211 that were supposedly provided to an Insured named LC contemporaneous with chiropractic manipulation services on January 16, 2018, January 18, 2018, January 30, 2018, February 3, 2018, March 12, 2018, and March 22, 2018. This, despite the fact that: (a) no legitimate, separate follow-up examinations were provided; (b) the patient's condition did not require examination above and beyond the usual pre- and post- manipulation assessment associated with chiropractic services; and (c) to the extent that Orlando Central Chiro, Hanson, TOH Management, and Korchagin provided any patient assessments at all, they were part and parcel of the chiropractic services billed under CPT codes 98940 and 98941.

(ix)     Orlando Central Chiro, Hanson, TOH Management, and Korchagin billed GEICO for purported follow-up examinations under CPT code 99211 that were supposedly provided to an Insured named BA contemporaneous with

chiropractic manipulation services on September 18, 2018, September 24, 2018, September 25, 2018, October 2, 2018, October 24, 2018, and October 29, 2018. This, despite the fact that: (a) no legitimate, separate follow-up examinations were provided; (b) the patient's condition did not require examination above and beyond the usual pre- and post- manipulation assessment associated with chiropractic services; and (c) to the extent that Orlando Central Chiro, Hanson, TOH Management, and Korchagin provided any patient assessments at all, they were part and parcel of the chiropractic services billed under CPT codes 98940 and 98941.

(x)     Orlando Central Chiro, Hanson, TOH Management, and Korchagin billed GEICO for purported follow-up examinations under CPT code 99211 that were supposedly provided to an Insured named SB contemporaneous with chiropractic manipulation services on October 22, 2018, October 24, 2018, October 25, 2018, and November 13, 2018. This, despite the fact that: (a) no legitimate, separate follow-up examinations were provided; (b) the patient's condition did not require examination above and beyond the usual pre- and post- manipulation assessment associated with chiropractic services; and (c) to the extent that Orlando Central Chiro, Hanson, TOH Management, and Korchagin provided any patient assessments at all, they were part and parcel of the chiropractic services billed under CPT code 98941.

706.     These are only representative examples. Orlando Central Chiro, Hanson, TOH Management, and Korchagin routinely submitted duplicative charges for illusory follow-up examinations and chiropractic manipulation services, despite the fact that: (i) no legitimate follow-up examination services were provided; (ii) the patient's condition did not require examination above and beyond the usual pre- and post- manipulation assessment associated with chiropractic manipulation  services; and (iii) a pre-manipulation patient assessment is part and parcel of the putative chiropractic manipulation services billed by Orlando Central Chiro, Hanson, TOH Management, and Korchagin under CPT codes 98940, 98941, and 98943.

707. Orlando Central Chiro, Hanson, TOH Management, and Korchagin submitted charges for the duplicative and illusory follow-up examinations in order to maximize the amount of fraudulent billing they could submit to insurers, including GEICO.

**b.** **Misrepresentations Regarding the Results of the Follow-Up Examinations**

708. When Orlando Central Chiro, Hanson, TOH Management, and Korchagin billed for their putative follow-up examinations under CPT code 99212, they represented that Hanson performed at least two of the following three components: (i) took a "problem focused" patient history; (ii) a "problem focused" physical examination; and (iii) engaged in straightforward medical decision-making.

709. In actuality, however, in the claims for follow-up examinations identified in Exhibit "3", Hanson did not take any legitimate patient histories, conduct any legitimate physical examinations, or engage in any legitimate medical decision-making at all.

710. Rather, following their purported follow-up examinations, Orlando Central Chiro, Hanson, TOH Management, and Korchagin simply: (i) reiterated the false, boilerplate "diagnoses" from the Insureds' initial examinations; and either (ii) referred the Insureds back to Orlando Central Chiro for even more medically unnecessary physical therapy services and/or chiropractic services, despite the fact that the Insureds purportedly already had received significant physical therapy services and/or chiropractic services from Orlando Central Chiro that supposedly had not been successful in resolving their purported pain symptoms; or (iii) discharged the Insureds from "treatment", to the extent that their PIP Benefits had been exhausted.

711.    In the claims for follow-up examinations identified in Exhibit "3", Orlando Central Chiro, Hanson, TOH Management, and Korchagin routinely fraudulently misrepresented that the examinations were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)     the putative examinations were illusory, with outcomes that were pre-determined to result in substantially-similar, phony "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)    the charges for the putative examinations misrepresented the nature and extent of the examinations; and

(iii)   Orlando Central Chiro never was eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as it was operated in violation of the Clinic Act, the Patient Brokering Act, the Self-Referral Act, the HME Licensing Laws, and the Chiropractor Advertising Laws.

**(v)    The Fraudulent Charges for Computerized Range of Motion and Muscle Strength Tests at Orlando Central Chiro**

712.    In an attempt to maximize the fraudulent billing that they submit or cause to be submitted for each Insured, after purporting to provide initial examinations at Orlando Central Chiro, Hanson, TOH Management, and Korchagin directed many Insureds to return for one or more rounds of medically useless computerized range of motion and muscle strength tests.

713.    As set forth in Exhibit "3", Orlando Central Chiro, Hanson, TOH Management, and Korchagin then purported to provide, and billed, the computerized range of motion tests to GEICO under CPT code 95851, and the muscle strength tests to GEICO under CPT codes 95831 and 95832, typically resulting in at least $275.00 in total charges for every Insured who supposedly received the tests.

714.    The charges for the computerized range of motion and muscle strength tests were fraudulent in that the computerized range of motion and muscle strength tests were medically unnecessary and were performed pursuant to the Defendants' fraudulent treatment and billing protocol, not to legitimately treat or otherwise benefit the Insureds who were subjected to them.

715.    In the claims for computerized range of motion and muscle strength tests identified in Exhibit "3", the charges for the computerized range of motion and muscle strength tests also were fraudulent in that they misrepresented Orlando Central Chiro's eligibility to collect PIP Benefits in the first instance.

716.    In fact, and as set forth above, Orlando Central Chiro never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the Clinic Act, the Patient Brokering Act, the Self-Referral Act, the HME Licensing Laws, and the Chiropractor Advertising Laws.

717.    As set forth below, Orlando Central Chiro, Hanson, TOH Management, and Korchagin's charges for the computerized range of motion and muscle strength tests identified in Exhibit "3" also were fraudulent in that they misrepresented the medical necessity of the putative computerized range of motion and muscle strength tests.

**a.      Traditional Tests to Evaluate the Human Body's Range of Motion and Muscle Strength**

718.    The adult human body is made up of 206 bones joined together at various joints that either are of the fixed, hinged or ball-and-socket variety.  The body's hinged joints and ball-and-socket joints facilitate movement, allowing a person to – for example – bend a leg, rotate a shoulder, or move the neck to one side.

719.   The measurement of the capacity of a particular joint to perform its full and proper function represents the joint's "range of motion".  Stated in a more illustrative way, range of motion is the amount that a joint will move from a straight position to its bent or hinged position.

720.   A traditional, or manual, range of motion test consists of a non-electronic measurement of the joint's ability to move in comparison with an unimpaired or "ideal" joint. In a traditional range of motion test, the physician asks the patient to move his or her joints at various angles, or the physician moves the joints. The physician then evaluates the patient's range of motion either by sight or through the use of a manual inclinometer or a goniometer (i.e., a device used to measure angles).

721.   Similarly, a traditional muscle strength test consists of a non-electronic measurement of muscle strength, which is accomplished by having the patient move his/her body in a given direction against resistance applied by the physician.  For example, if a physician wanted to measure muscle strength in the muscles surrounding a patient's knee, he would apply resistance against the patient's leg while having him/her move the leg up, then apply resistance against the patient's leg while having him/her move the leg down.

722.   Physical examinations performed on patients with soft-tissue trauma – the alleged complaint advanced by virtually every Insured who treated with Orlando Central Chiro – necessarily require range of motion and muscle strength tests, inasmuch as these tests provide a starting point for injury assessment and treatment planning.  Unless a physician knows the extent of a given patient's joint or muscle strength impairment, there is no way to

properly diagnose or treat the patient's injuries. Evaluation of range of motion and muscle strength is an essential component of the "hands-on" examination of a trauma patient.

723.    Since range of motion and muscle strength tests must be conducted as an element of a soft-tissue trauma patient's initial examination, as well as during any follow-up examinations, the Fee Schedule provides that range of motion and muscle strength tests are to be reimbursed as an element of the initial consultations and follow-up examinations.

724.    In other words, health care providers cannot conduct and bill for an initial consultation or follow-up examination, then bill separately for contemporaneously-provided computerized range of motion and muscle strength tests.

**b.      The Duplicate Billing for Medically Unnecessary Computerized Range of Motion Tests**

725.    To the extent that Orlando Central Chiro, Hanson, TOH Management, and Korchagin actually provided initial examinations and follow-up examinations in the first instance, a practitioner associated with Orlando Central Chiro – typically Hanson – purported to conduct manual range of motion and manual muscle tests on virtually every Insured during each initial and/or follow-up examination.

726.    The charges for these manual range of motion and manual muscle tests were part and parcel of the charges that Orlando Central Chiro, Hanson, TOH Management, and Korchagin routinely submitted for the initial examinations under CPT code 99203 and for the follow-up examinations under CPT code 99212.

727.    Despite the fact that every Insured already purportedly had undergone manual range of motion and muscle testing during their initial examinations and/or follow-up examinations, and despite the fact that reimbursement for range of motion and muscle testing

already had been paid by GEICO as a component of reimbursement for the initial examinations and/or follow-up examinations, Orlando Central Chiro, Hanson, TOH Management, and Korchagin systemically billed for, and purported to provide, a series of computerized range of motion and muscle strength tests to most Insureds.

728.    Though the Insureds routinely visited Orlando Central Chiro several times per month for follow-up examinations and other Fraudulent Services, Orlando Central Chiro, Hanson, TOH Management, and Korchagin often deliberately scheduled separate appointments for computerized range of motion and muscle strength tests so that they could bill for those procedures separately, without having to include them in the billing for the follow-up examinations.

729.    Orlando Central Chiro, Hanson, TOH Management, and Korchagin purported to provide the computerized range of motion and muscle strength tests by placing a digital inclinometer or goniometer on various parts of the Insureds' bodies (affixed by Velcro straps) while the Insured was asked to attempt various motions and movements.   The test was virtually identical to the manual range of motion testing that is described above and that purportedly was performed during each initial examination and follow-up examination.

730.    Orlando Central Chiro, Hanson, TOH Management, and Korchagin purported to provide the muscle strength tests by placing a strain gauge-type measurement apparatus against a stationary object, against which the patient pressed three-to-four separate times using various muscle groups. As with the computerized range of motion and muscle strength tests, this computerized muscle strength test was virtually identical to the manual muscle

strength testing that is described above and that purportedly was performed during the initial examinations and/or follow-up examinations – except that a digital printout was obtained.

731.    The information gained through the use of the computerized range of motion and muscle strength tests was not significantly different from the information obtained through the manual testing that was part and parcel of virtually every Insured's initial examination and follow-up examinations.

732.    In the relatively minor soft-tissue injuries allegedly sustained by the Insureds – to the extent that any of the Insureds suffered any injuries at all as the result of the automobile accidents they purported to experience – the difference of a few percentage points in the Insureds' range of motion reading or pounds of resistance in the Insureds' muscle strength testing was meaningless. This is evidenced by the fact that neither Hanson nor any other health care provider associated with Orlando Central Chiro, ever incorporated the results of computerized range of motion and muscle strength tests into the rehabilitation programs of any of the Insureds whom they purported to treat.

733.    The computerized range of motion and muscle strength tests were part and parcel of the Defendants' fraudulent scheme, inasmuch as the "service" was rendered pursuant to a pre-established protocol that: (i) in no way aided in the assessment and treatment of the Insureds; and (ii) was designed solely to financially enrich the Defendants.

c.    **The Fraudulent Unbundling of Charges for the Computerized Range of Motion and Muscle Tests**

734.    Not only did Orlando Central Chiro, Hanson, TOH Management, and Korchagin deliberately purport to provide duplicative, medically unnecessary computerized range of motion and muscle tests, they also unbundled their billing for the tests in order to

maximize the fraudulent charges that they could submit through Orlando Central Chiro to GEICO.

735. Pursuant to the CPT Assistant, when computerized range of motion testing and muscle testing are performed on the same date, all of the testing should be reported and billed using CPT code 97750.

736. CPT code 97750 is a "time-based" code that allows for a separate charge for every 15 minutes of testing that is performed.

737. Thus, if a health care provider performed 15 minutes of computerized range of motion and muscle testing, it would be permitted a single charge under CPT code 97750. If the provider performed 30 minutes of computerized range of motion and muscle testing, it would be permitted to submit two charges under CPT code 97750, and so forth.

738. In many of the claims for computerized range of motion and muscle tests that are identified in Exhibits "3", Orlando Central Chiro, Hanson, TOH Management, and Korchagin purported to provide the computerized range of motion and muscle tests to Insureds on the same dates of service.

739. To the extent that Orlando Central Chiro, Hanson, TOH Management, and Korchagin actually provided the computerized range of motion and muscle tests to Insureds in the first instance, the computerized range of motion and muscle tests – together – virtually never took more than 15 minutes to perform. Thus, even if the computerized range of motion and muscle tests that Orlando Central Chiro, Hanson, TOH Management, and Korchagin purported to provide were medically necessary, and performed in the first instance, Orlando Central Chiro, Hanson, TOH Management, and Korchagin would be limited to a single, time-

based charge under CPT code 97750 for each date of service on which they performed computerized range of motion and muscle tests on an Insured.

740.   However, in order to maximize their fraudulent billing for the computerized range of motion and muscle tests, Orlando Central Chiro, Hanson, TOH Management, and Korchagin routinely unbundled what should have been – at most – a single charge under CPT code 97750 for both computerized range of motion and muscle testing into: (i) charges under CPT codes 95831 and 95832 (for the muscle tests); and a charge under CPT code 95851 (for the range of motion tests).

741.   By unbundling what should – at most – have been a single charge under CPT code 97750 into multiple charges under CPT codes 95831, 95832, and 95851, Orlando Central Chiro, Hanson, TOH Management, and Korchagin generally submitted charges of at least $275.00 per Insured for each round of computerized range of motion and muscle testing they purported to provide.

**(vi)    The Fraudulent Charges for Physical Therapy and/or Chiropractic Treatment at Orlando Central Chiro**

742.   In addition to the fraudulent initial examinations and follow-up examinations, Orlando Central Chiro, Hanson, Mohammadi, Vega, Arocho, TOH Management, and Korchagin routinely purported to subject each of the Insureds in the claims identified in Exhibit "3" to medically unnecessary physical therapy and/or chiropractic treatment.

743.   Hanson, Vega, Mohammadi, and Arocho purported to perform the vast majority of the putative physical therapy and/or chiropractic treatment services on behalf of Orlando Central Chiro.

744.   As set forth in Exhibit "3", Orlando Central Chiro, Hanson, Mohammadi,

Vega, Arocho, TOH Management, and Korchagin routinely billed the purported physical

therapy services and/or chiropractic services to GEICO under:

(i)     CPT code 97012, for putative mechanical traction therapy, typically resulting in a charge of $40.00 for each round of mechanical traction therapy they purported to provide;

(ii)    CPT code 97014, for putative electrical stimulation, typically resulting in a charge of $55.00 for each round of electrical stimulation they purported to provide;

(iii)   CPT code 97016, for putative vasopneumatic therapy, resulting in a charge of $50.00 for each round of mechanical traction therapy they purported to provide;

(iv)    CPT code 97026, for putative infrared therapy , resulting in a charge of $15.00 for each round of electrical stimulation they purported to provide;

(v)     CPT code 97035, for putative ultrasound, typically resulting in a charge of $30.00 for each round of ultrasound they purported to provide;

(vi)    CPT code 97110, for putative therapeutic exercises, typically resulting in a charge of between $75.00 and $150.00 for each round of therapeutic exercises they purported to provide;

(vii)   CPT code 97112, for putative neuromuscular reeducation, typically resulting in a charge of $80.00 for each round of neuromuscular reeducation they purported to provide;

(viii)  CPT code 97139, for putative "unlisted" therapeutic procedures, typically resulting in a charge of $65.00 for each round of therapeutic procedures they purported to provide;

(ix)    CPT code 97140, for putative manual therapy, typically resulting in a charge of $70.00 for each round of manual therapy they purported to provide;

(x)     CPT code 97150, for putative group therapeutic procedures, typically resulting in a charge of $40.00 for each round of group therapeutic procedures they purported to provide; and

(xi)    CPT codes 98940, 98941, and 98943 for putative chiropractic manipulation services, typically resulting in a charge of between $50.00 and $100.00 for each round of putative chiropractic manipulation services they purported to

provide.

745.    In a legitimate clinical setting, each individual patient's physical therapy and/or chiropractic treatment schedule, and the specific physical therapy modalities that will be used, must be tailored to the specific patient's circumstances, symptomatology, and presentation.

746.    In a legitimate clinical setting, the nature of, extent of, and schedule for physical therapy and/or chiropractic treatment is constantly adjusted for each individual patient based on each patient's treatment progress, as assessed during each patient's follow-up examinations and on an ongoing basis as they receive the physical therapy and/or chiropractic treatment.

747.    By contrast, at Orlando Central Chiro, the nature and extent of the physical therapy and/or chiropractic treatment that each Insured purportedly received was pre-determined, and had no legitimate connection to the Insureds' individual circumstances, presentation, or progress through the Defendants' fraudulent treatment and billing protocol. Accordingly, the physical therapy and/or chiropractic treatment was medically unnecessary.

748.    In the claims for physical therapy services and/or chiropractic services identified in Exhibit "3", the charges for the physical therapy services and/or chiropractic services also were fraudulent in that they misrepresented Orlando Central Chiro's eligibility to collect PIP Benefits in the first instance.

749.    In fact, and as set forth above, Orlando Central Chiro never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the Clinic Act, the Patient

Brokering Act, the Self-Referral Act, the HME Licensing Laws, and the Chiropractor Advertising Laws.

750.    As set forth above, in order for a health care service to be eligible for PIP reimbursement, it must be "lawfully" provided. See Fla. Stat. § 627.736.

751.    Pursuant to the No-Fault Law, "lawful" or "lawfully" means "in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of state and federal law related to the provision of medical services or treatment." See Fla. Stat. § 627.732.

752.    In each of the claims for physical therapy services and/or chiropractic services identified in Exhibit "3", Orlando Central Chiro, Hanson, Mohammadi, Vega, Arocho, TOH Management, and Korchagin falsely represented that the services were lawfully provided and eligible for PIP reimbursement.

**5.      The Fraudulent Treatment and Billing Protocol at Fort Myers Chiro**

**(i)      The Fraudulent Charges for Initial Examinations at Fort Myers Chiro**

753.    As an initial step in their fraudulent treatment and billing protocol, Fort Myers Chiro, Hanson, Korchagin, TOH Management, and Pearce purported to provide the Insureds in the claims identified in Exhibit "4" with a putative initial examination.

754.    Pearce purported to personally perform virtually all of the initial examinations in the claims identified in Exhibit "4".

755.    As set forth in Exhibit "4", Fort Myers Chiro, Hanson, Korchagin, TOH Management, and Pearce then billed the initial examinations to GEICO, or caused them to be

billed to GEICO, under CPT code 99203, resulting in a charge of $250.00 for each initial examination that they purported to provide.

756. In the claims for initial examinations identified in Exhibit "4", the charges for the initial examinations were fraudulent in that they misrepresented Fort Myers Chiro's eligibility to collect PIP Benefits in the first instance.

757. In fact, and as set forth above, Fort Myers Chiro never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the Clinic Act, the Self-Referral Act, the Patient Brokering Act, the HME Licensing Laws, and the Chiropractor Advertising Laws.

758. As set forth below, the charges for the initial examinations identified in Exhibit "4" also were fraudulent in that they misrepresented the nature and extent of the initial examinations.

a. **Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

759. To the extent that the Insureds in the claims identified in Exhibit "4" had any presenting problems at all as the result of their relatively minor automobile accidents, the problems virtually always were low severity soft tissue injuries such as sprains and strains.

760. For instance, and in keeping with the fact that the Insureds in the claims identified in Exhibit "4" either had no presenting problems at all as the result of their relatively minor automobile accidents, or else problems of low severity, in most of the claims identified in Exhibit "4" the contemporaneous police reports indicated that the underlying accidents involved relatively low-impact collisions, that the Insureds' vehicles were drivable following the accidents, and that no one was seriously injured in the underlying accidents, or injured at all.

761.    What is more, and again in keeping with the fact that the Insureds in the claims identified in Exhibit "4" either had no presenting problems at all as a result of their relatively minor automobile accidents, or else problems of low severity, in many of the claims identified in Exhibit "4" the Insureds did not seek treatment at any hospital as the result of their accidents.

762.    Even so, in the claims for initial examinations identified in Exhibit "4", Fort Myers Chiro, Hanson, Korchagin, TOH Management, and Pearce routinely billed for their putative initial examinations using CPT code 99203, and thereby falsely represented that the Insureds presented with problems of moderate severity.

763.    For example:

(i)    On October 5, 2018, an Insured named JR was involved in an automobile accident. The contemporaneous police report indicated that JR was not injured and did not complain of any pain. In keeping with the fact that JR was not injured, JR did not visit any hospital emergency room following the accident. To the extent that JR experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following an initial examination of JR by Pearce on December 6, 2018, Pearce, Hanson, Korchagin, TOH Management, and Fort Myers Chiro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(ii)   On October 5, 2018, an Insured named BC was involved in an automobile accident. In keeping with the fact that BC was not seriously injured, BC did not visit any hospital emergency room following the accident. To the extent that BC experienced any health problems at all as the result of the accident, they were of low severity. Even so, following an initial examination of BC by Pearce on December 6, 2018, Pearce, Hanson, Korchagin, TOH Management, and Fort Myers Chiro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(iii)  On December 21, 2018, an Insured named TA was involved in an automobile accident. The contemporaneous police report indicated that TA's vehicle was drivable following the accident. The police report further indicated that,

although TA complained of back pain, TA refused medical attention at the scene. In keeping with the fact that TA was not seriously injured, TA did not visit any hospital emergency room following the accident. To the extent that TA experienced any health problems at all as the result of the accident, they were of low severity. Even so, following an initial examination of TA by Pearce on January 3, 2019, Pearce, Hanson, Korchagin, TOH Management, and Fort Myers Chiro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(iv)    On December 24, 2018, an Insured named JT was involved in an automobile accident. The contemporaneous police report indicated that JT was not injured and did not complain of any pain. In keeping with the fact that JT was not injured, JT did not visit any hospital emergency room following the accident. To the extent that JT experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following an initial examination of JT by Pearce on January 2, 2019, Pearce, Hanson, Korchagin, TOH Management, and Fort Myers Chiro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(v)     On December 24, 2018, an Insured named RT was involved in an automobile accident. The contemporaneous police report indicated that RT was not injured and did not complain of any pain. In keeping with the fact that RT was not injured, RT did not visit any hospital emergency room following the accident. To the extent that RT experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following an initial examination of RT by Pearce on January 2, 2019, Pearce, Hanson, Korchagin, and Fort Myers Chiro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(vi)    On February 1, 2019, an Insured named SG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that SG's vehicle was drivable following the accident. The police report further indicated that SG was not injured and did not complain of any pain. In keeping with the fact that SG was not injured, SG did not visit any hospital emergency room following the accident. To the extent that SG experienced any health problems at all as the result of the accident, they were of low severity. Even so, following an initial examination of SG by Pearce on February 5, 2019, Pearce, Hanson, Korchagin, TOH Management, and Fort Myers Chiro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

259

(vii)   On March 23, 2019, an Insured named DG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that DG's vehicle was drivable following the accident. The police report further indicated that DG was not injured and did not complain of any pain. In keeping with the fact that DG was not injured, DG did not visit any hospital emergency room following the accident. To the extent that DG experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following an initial examination of DG by Pearce on March 26, 2019, Pearce, Hanson, Korchagin, TOH Management, and Fort Myers Chiro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(viii)   On March 23, 2019, an Insured named MA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MA's vehicle was drivable following the accident. The police report further indicated that MA was not injured and did not complain of any pain. In keeping with the fact that MA was not injured, MA did not visit any hospital emergency room following the accident. To the extent that MA experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following an initial examination of MA by Pearce on March 27, 2019, Pearce, Hanson, Korchagin, TOH Management, and Fort Myers Chiro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

764.   These are only representative examples. In the claims for initial examinations identified in Exhibit "4", Fort Myers Chiro, Hanson, Korchagin, TOH Management, and Pearce routinely falsely represented that the Insureds presented with problems of moderate, when in fact the Insureds' problems were low-severity soft tissue injuries such as sprains and strains, to the limited extent that they had any presenting problems at all.

765.   In the claims for initial examinations identified in Exhibit "4", Fort Myers Chiro, Hanson, Korchagin, TOH Management, and Pearce routinely falsely represented that the Insureds presented with problems of moderate severity in order to create a false basis for their charges for the examinations under CPT code 99203, because examinations billable

under CPT code 99203 are reimbursable at higher rates than examinations involving presenting problems of low severity, or no severity.

766.    In the claims for initial examinations identified in Exhibit "4", Fort Myers Chiro, Hanson, Korchagin, TOH Management, and Pearce also routinely falsely represented that the Insureds presented with problems of moderate severity in order to create a false basis for the other Fraudulent Services that Fort Myers Chiro, Hanson, Korchagin, TOH Management, and Pearce purported to provide to the Insureds, including medically unnecessary physical therapy services and/or chiropractic services.

**b.**    **Misrepresentations Regarding the Amount of Time Spent on the Initial Examinations**

767.    What is more, in the claims identified in Exhibit "4" for initial examinations under CPT code 99203, Fort Myers Chiro, Hanson, Pearce, TOH Management, and Korchagin routinely misrepresented and exaggerated the amount of face-to-face time that the examining physician or chiropractor spent with the Insureds or the Insureds' families.

768.    As set forth above, pursuant to the CPT Assistant, the use of CPT code 99203 to bill for a patient examination represents that the physician or chiropractor who performed the examination spent at least 30 minutes of face-to-face time with the patient or the patient's family.

769.    However, in most of the claims for initial examinations identified in Exhibit "4", Pearce never spent more than 15 minutes – much less 30 minutes – of face-to-face time with the Insureds or their families when purporting to conduct the examinations.

770.    For instance, and in keeping with the fact that the initial examinations in the claims identified in Exhibit "4" did not entail more than 15 minutes of face-to-face time

between Pearce and the Insureds or the Insureds' families, to the extent that the examinations actually were performed in the first instance, Pearce used a template in purporting to conduct the initial examinations.

771.    The template that Pearce used in purporting to conduct the initial examinations set forth a limited range of examination parameters.

772.    The only face-to-face time between the physicians or chiropractors and the Insureds that was reflected in the limited range of examination parameters consisted of brief patient interviews and limited examinations of the Insureds' musculoskeletal systems.

773.    These brief patient interviews and limited examinations did not require Pearce nor any other physician or chiropractor associated with Central Florida Chiro, to spend more than 15 minutes of face-to-face time with the Insureds or their families.

774.    In the claims for initial examinations identified in Exhibit "4", Fort Myers Chiro, Hanson, Pearce, TOH Management, and Korchagin routinely falsely represented that the initial examinations involved 30 minutes of face-to-face time in order to create a false basis for their charges under CPT code 99203 because examinations billable under CPT code 99203 are reimbursable at higher rates than examinations that require less time to perform.

**c.      Misrepresentations Regarding "Detailed" Physical Examinations**

775.    Moreover, in many of the claims identified in Exhibit "4" for initial examinations under CPT code 99203, Fort Myers Chiro, Hanson, Pearce, TOH Management, and Korchagin routinely falsely represented the extent of the underlying physical examinations.

776.    In the claims for initial examinations identified in Exhibit "4", when Fort Myers Chiro, Hanson, Pearce, TOH Management, and Korchagin billed for the initial examinations under CPT code 99203, they falsely represented that the physician or chiropractor who purported to perform the examinations – namely Pearce – performed "detailed" patient examinations on the Insureds they purported to treat during the initial examinations.

777.    In fact, with respect to the claims for initial examinations under CPT code 99203 that are identified in Exhibit "4", Fort Myers Chiro, Hanson, Pearce, TOH Management, and Korchagin virtually never conducted an extended examination of the Insureds' musculoskeletal systems.

778.    For instance, in the vast majority of the claims under CPT code 99203 identified in Exhibit "4", Fort Myers Chiro, Hanson, Pearce, TOH Management, and Korchagin did not conduct an extended examination of the Insureds' musculoskeletal systems, inasmuch as they did not document findings with respect to the following:

(i)     measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

(ii)    general appearance of patient (e.g., development, nutrition, body habitus, deformities, attention to grooming);

(iii)   examination of peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin and/or other location;

(v)     brief assessment of mental status;

(vi)    examination of gait and station;

(vii)    inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(viii)   coordination;

(ix)    examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and/or

(x)    examination of sensation.

779.    For example:

(i)    On or about December 6, 2018, Fort Myers Chiro, Hanson, Pearce, TOH Management, and Korchagin billed GEICO under CPT code 99203 for an initial examination that Pearce purported to perform on an Insured named BC, and thereby represented that Pearce had provided a "detailed" physical examination to BC. However, Pearce did not document an extended examination of BC's musculoskeletal system, despite the fact that – to the extent BC had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(ii)    On or about December 6, 2018, Fort Myers Chiro, Hanson, Pearce, TOH Management, and Korchagin billed GEICO under CPT code 99203 for an initial examination that Pearce purported to perform on an Insured named DC, and thereby represented that Pearce had provided a "detailed" physical examination to DC. However, Pearce did not document an extended examination of DC's musculoskeletal system, despite the fact that – to the extent DC had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(iii)   On or about December 6, 2018, Fort Myers Chiro, Hanson, Pearce, TOH Management, and Korchagin billed GEICO under CPT code 99203 for an initial examination that Pearce purported to perform on an Insured named JR, and thereby represented that Pearce had provided a "detailed" physical examination to JR. However, Pearce did not document an extended examination of JR's musculoskeletal system, despite the fact that – to the extent JR had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(iv)   On or about December 10, 2018, Fort Myers Chiro, Hanson, Pearce, TOH Management, and Korchagin billed GEICO under CPT code 99203 for an initial examination that Pearce purported to perform on an Insured named GA,

and thereby represented that Pearce had provided a "detailed" physical examination to GA. However, Pearce did not document an extended examination of GA's musculoskeletal system, despite the fact that – to the extent GA had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(v)     On or about February 5, 2019, Fort Myers Chiro, Hanson, Pearce, TOH Management, and Korchagin billed GEICO under CPT code 99203 for an initial examination that Pearce purported to perform on an Insured named SG, and thereby represented that Pearce had provided a "detailed" physical examination to SG. However, Pearce did not document an extended examination of SG's musculoskeletal system, despite the fact that – to the extent SG had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

780.    These are only representative examples. In the vast majority of the claims for initial examinations under CPT code 99203 that are identified in Exhibit "4", Fort Myers Chiro, Hanson, Pearce, TOH Management, and Korchagin routinely falsely represented that they had provided "detailed" physical examinations. In fact, they had not provided detailed physical examinations because Pearce had not documented an extended examination of the affected body areas and other symptomatic or related organ systems.

781.    In the claims for initial examinations under CPT code 99203 that are identified in Exhibit "4", Fort Myers Chiro, Hanson, Pearce, TOH Management, and Korchagin routinely falsely represented that they had provided "detailed" physical examinations to the Insureds in order to create a false basis for their charges for the examinations under CPT code 99203, because examinations billable under CPT code 99203 are reimbursable at higher rates than examinations that do not require the examining physician to provide "detailed" physical examinations.

d.     **Misrepresentations Regarding the Extent of Medical Decision-Making**

782.     Furthermore, as set forth above, pursuant to the CPT Assistant, the use of CPT 99203 to bill for a patient examination represents that the physician or chiropractor who performed the examination engaged in medical decision making of "low complexity".

783.     When the Insureds in the claims identified in Exhibit "4" presented at Central Florida Chiro for initial examinations, their presenting problems virtually always were limited to low severity soft tissue injuries such as acute sprains and strains, to the extent that they had any legitimate presenting problems at all.

784.     The diagnosis and treatment of these low severity sprains and strains did not require any legitimate, low-complexity medical decision-making.

785.     First, in the claims for initial examinations identified in Exhibit "4", the initial examinations did not involve the retrieval, review, or analysis of any significant amount of medical records, diagnostic tests, or other information.

786.     When the Insureds in the claims identified in Exhibit "4" presented to Central Florida Chiro for "treatment", they did not arrive with any medical records except, at times, basic radiology reports.

787.     Furthermore, prior to the initial examinations, Fort Myers Chiro, Hanson, Pearce, TOH Management, and Korchagin did not request any medical records from other providers.

788.     Second, in the claims for initial examinations identified in Exhibit "4", there was no risk of significant complications or morbidity – much less mortality – from the Insureds' relatively minor soft tissue injury complaints, to the extent that they ever had any

complaints from automobile accidents at all.

789.     Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided at Central Florida Chiro, to the extent that Fort Myers Chiro, Hanson, Pearce, TOH Management, and Korchagin provided any such diagnostic procedures or treatment options in the first instance.

790.     In almost every instance, any "treatments" that Fort Myers Chiro, Hanson, Pearce, TOH Management, and Korchagin actually provided were limited to chiropractic treatment and/or physical therapy treatment, none of which was health– or life–threatening if properly administered.

791.     Third, in the claims for initial examinations identified in Exhibit "4", Fort Myers Chiro, Hanson, Pearce, TOH Management, and Korchagin did not consider any significant number of diagnoses or treatment options for the Insureds during the initial examinations.

792.     Rather, to the extent that the initial examinations were conducted in the first instance, Fort Myers Chiro, Hanson, Pearce, TOH Management, and Korchagin provided a phony list of soft tissue injury "diagnoses" for virtually every Insured, and prescribed a substantially similar course of treatment for every Insured.

793.     Specifically, in most of the claims identified in Exhibit "4", during the initial examinations the Insureds did not report any continuing medical problems that legitimately could be traced to an underlying automobile accident.

794.     Even so, Fort Myers Chiro, Hanson, Pearce, TOH Management, and Korchagin prepared initial examination reports in which they provided a phony list of soft

tissue injury "diagnoses" to virtually every Insured.

795.    Then, based upon these phony "diagnoses", Fort Myers Chiro, Hanson, Pearce, TOH Management, and Korchagin directed virtually every Insured to: (i) receive significant and medically unnecessary chiropractic treatment and/or physical therapy treatment; (ii) receive medically unnecessary HME; and (iii) undergo medically unnecessary diagnostic testing, regardless of the Insureds' true circumstances or presentation.

796.    In the claims for initial examinations identified in Exhibit "4", Fort Myers Chiro, Hanson, Pearce, TOH Management, and Korchagin routinely falsely represented that the initial examinations involved medical decision-making of low complexity in order to provide a false basis to bill for the initial examinations under CPT code 99203, because examinations billed under CPT code 99203 are reimbursable at a higher rate than examinations that do not require low complexity medical decision-making.

**(ii)    The Fraudulent Charges for HME Through Fort Myers Chiro**

797.    As part of their fraudulent scheme, at the conclusion of the putative initial examinations, Fort Myers Chiro, Hanson, Pearce, TOH Management, and Korchagin purported to prescribe many Insureds with HME.

798.    In particular, Fort Myers Chiro, Hanson, Pearce, TOH Management, and Korchagin purported to prescribe many Insureds with LSOs that were purportedly provided and billed for through Fort Myers Chiro.

799.    As set forth in Exhibit "4", Fort Myers Chiro, Hanson, Pearce, TOH Management, and Korchagin billed GEICO for the LSOs under HCPCS code L0627, typically resulting in a charge of $800.00.

800.    In the claims for HME identified in Exhibit "4", the charges for the HME were fraudulent in that they misrepresented Fort Myers Chiro's eligibility to collect PIP Benefits in the first instance.

801.    In fact, and as set forth above, Fort Myers Chiro never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the Clinic Act, the Self-Referral Act, the Patient Brokering Act, the HME Licensing Laws, and the Chiropractor Advertising Laws.

802.    As set forth below, Fort Myers Chiro, Hanson, Pearce, TOH Management, and Korchagin's charges for the HME identified in Exhibit "4" also were fraudulent in that they misrepresented the medical necessity of the putative HME.

803.    The LSO is a rigid, custom-fitted, lower-back brace designed to restrict the movement of the patient's torso and support the patient's lumbar spine. Because of its rigidity and required placement on a patient's lower back, an LSO must be custom-fitted in order for it to be properly utilized by the patient.

804.    In a legitimate clinical setting, an LSO is reserved for patients who exhibit spinal instability or for patients who have recently undergone spinal surgery, and its prescription is inconsistent with the goals of physical therapy and chiropractic treatment designed to restore and increase range of motion and functionality of the lumbar spine.

805.    Moreover, in a legitimate clinical setting, an LSO should not be prescribed to a patient before that patient had attempted and failed a legitimate course of conservative treatment, much simultaneous to a prescription for conservative treatment such as physical therapy.

806.    None of the Insureds in the claims identified in Exhibit "4" suffered from spinal instability. In fact, virtually none of the Insureds in the claims identified in Exhibit "4" suffered any serious injuries at all, much less health problems requiring spinal surgery and subsequent immobilization of their spine.

807.    None of the Insureds in the claims identified in Exhibit "4" had attempted and failed a legitimate course of conservative treatment prior to their receipt of a prescription for an LSO.

808.    Even so, following their fraudulent initial examinations, boilerplate examination reports, and duplicative and medically-impossible diagnoses, Fort Myers Chiro, Hanson, Pearce, TOH Management, and Korchagin purported to prescribe many Insureds with an LSO, despite that fact that:

(i)     none of the Insureds suffered from spinal instability or were recovering from spinal surgery;

(ii)    neither Hanson, Pearce, nor any other individual associated with Fort Myers Chiro ever measured or fitted the device for the Insureds;

(iii)   the Insureds had not yet failed any legitimate course of conservative treatment and, in fact, were prescribed the LSO within days – and, in some instances, the very same day – of their minor accidents; and

(iv)    the Insureds were concomitantly referred for physical therapy and chiropractic treatment at Fort Myers Chiro, the putative purpose of which was to restore the range of motion and functionality of, among other things, the Insureds' lumbar spine.

809.    For example:

(i)     On December 6, 2018, an Insured named GA was involved in an automobile accident. Just four days later, on December 10, 2018, GA presented to Fort Myers Chiro for an initial examination by Pearce. At the conclusion of the purported initial examination, Pearce, Hanson, Korchagin, TOH Management, and Fort Myers Chiro prescribed GA with a medically unnecessary LSO,

270

despite the fact that GA: (a) was never fitted for the device; (b) did not suffer from spinal instability and was not recovering from spinal surgery; and (c) had not yet failed a legitimate course of conservative treatment, and, in fact, was concomitantly referred by Hanson for physical therapy and chiropractic treatment at Fort Myers Chiro, the putative purpose of which was to increase, rather than decrease, GA's range of motion. Hanson, Pearce, Korchagin, and Fort Myers Chiro then submitted a bill to GEICO under HCPCS code L0627, seeking reimbursement of $800.00 for the medically unnecessary LSO.

(ii)     On March 8, 2019, an Insured named BM was involved in an automobile accident. Just three days later, on March 11, 2019, BM presented to Fort Myers Chiro for an initial examination by Pearce. At the conclusion of the purported initial examination, Pearce, Hanson, Korchagin, TOH Management, and Fort Myers Chiro prescribed BM with a medically unnecessary LSO, despite the fact that BM: (a) was never fitted for the device; (b) did not suffer from spinal instability and was not recovering from spinal surgery; and (c) had not yet failed a legitimate course of conservative treatment, and, in fact, was concomitantly referred by Hanson for physical therapy and chiropractic treatment at Fort Myers Chiro, the putative purpose of which was to increase, rather than decrease, BM's range of motion. Hanson, Pearce, Korchagin, and Fort Myers Chiro then submitted a bill to GEICO under HCPCS code L0627, seeking reimbursement of $800.00 for the medically unnecessary LSO.

(iii)    On March 23, 2019, an Insured named DG was involved in an automobile accident. Just three days later, on March 26, 2019, DG presented to Fort Myers Chiro for an initial examination by Pearce. At the conclusion of the purported initial examination, Pearce, Hanson, Korchagin, TOH Management, and Fort Myers Chiro prescribed DG with a medically unnecessary LSO, despite the fact that DG: (a) was never fitted for the device; (b) did not suffer from spinal instability and was not recovering from spinal surgery; and (c) had not yet failed a legitimate course of conservative treatment, and, in fact, was concomitantly referred by Hanson for physical therapy and chiropractic treatment at Fort Myers Chiro, the putative purpose of which was to increase, rather than decrease, DG's range of motion. Hanson, Pearce, Korchagin, and Fort Myers Chiro then submitted a bill to GEICO under HCPCS code L0627, seeking reimbursement of $800.00 for the medically unnecessary LSO.

(iv)     On June 20, 2019, an Insured named EC was involved in an automobile accident. Just five days later, on June 25, 2019, EC presented to Fort Myers Chiro for an initial examination by Pearce. At the conclusion of the purported initial examination, Pearce, Hanson, Korchagin, TOH Management, and Fort Myers Chiro prescribed EC with a medically unnecessary LSO, despite the fact that EC: (a) was never fitted for the device; (b) did not suffer from spinal instability and was not recovering from spinal surgery; and (c) had not yet

failed a legitimate course of conservative treatment, and, in fact, was concomitantly referred by Hanson for physical therapy and chiropractic treatment at Fort Myers Chiro, the putative purpose of which was to increase, rather than decrease, EC's range of motion. Hanson, Pearce, Korchagin, and Fort Myers Chiro then submitted a bill to GEICO under HCPCS code L0627, seeking reimbursement of $800.00 for the medically unnecessary LSO.

810.     These are only representative examples. In virtually all of the claims for LSOs identified in Exhibit "4", Fort Myers Chiro, Hanson, Pearce, TOH Management, and Korchagin falsely represented that the prescribed LSOs were medically necessary, when in fact they were not.

**(iii)     The Fraudulent Charges for Physical Therapy and/or Chiropractic Treatment at Fort Myers Chiro**

811.     In addition to the fraudulent initial examinations and follow-up examinations, Fort Myers Chiro, Hanson, Korchagin, TOH Management, and Pearce routinely purported to subject each of the Insureds in the claims identified in Exhibit "4" to medically unnecessary physical therapy and/or chiropractic treatment.

812.     Pearce purported to perform all of the putative physical therapy and/or chiropractic treatment services on behalf of Fort Myers Chiro.

813.     As set forth in Exhibit "4", the Fort Myers Chiro, Hanson, Korchagin, TOH Management, and Pearce routinely billed the purported physical therapy services and/or chiropractic services to GEICO under:

(i)     CPT code 97012, for putative mechanical traction therapy, typically resulting in a charge of $40.00 for each round of mechanical traction therapy they purported to provide;

(ii)     CPT code 97014, for putative electrical stimulation, typically resulting in a charge of $55.00 for each round of electrical stimulation they purported to provide;

(iii)    CPT code 97016, for putative vasopneumatic therapy, resulting in a charge of $50.00 for each round of mechanical traction therapy they purported to provide;

(iv)    CPT code 97026, for putative infrared therapy , resulting in a charge of $15.00 for each round of electrical stimulation they purported to provide;

(v)    CPT code 97110, for putative therapeutic exercises, typically resulting in a charge of between $75.00 and $150.00 for each round of therapeutic exercises they purported to provide;

(vi)    CPT code 97112, for putative neuromuscular reeducation, typically resulting in a charge of $80.00 for each round of neuromuscular reeducation they purported to provide;

(vii)    CPT code 97150, for putative group therapeutic procedures, typically resulting in a charge of $40.00 for each round of group therapeutic procedures they purported to provide;

(viii)    CPT code 97530 for putative therapeutic activities, resulting in a charge of $95.00 for each round of manual therapy they purported to provide; and

(ix)    CPT codes 98940 and 98943 for putative chiropractic manipulation services, typically resulting in a charge of between $50.00 and $100.00 for each round of putative chiropractic manipulation services they purported to provide.

814.    In a legitimate clinical setting, each individual patient's physical therapy and/or chiropractic treatment schedule, and the specific physical therapy modalities that will be used, must be tailored to the specific patient's circumstances, symptomatology, and presentation.

815.    In a legitimate clinical setting, the nature of, extent of, and schedule for physical therapy and/or chiropractic treatment is constantly adjusted for each individual patient based on each patient's treatment progress, as assessed during each patient's follow-up examinations and on an ongoing basis as they receive the physical therapy and/or chiropractic treatment.

816.    By contrast, at Fort Myers Chiro, the nature and extent of the physical therapy and/or chiropractic treatment that each Insured purportedly received was pre-determined, and had no legitimate connection to the Insureds' individual circumstances, presentation, or progress through the Defendants' fraudulent treatment and billing protocol. Accordingly, the physical therapy and/or chiropractic treatment was medically unnecessary.

817.    In the claims for physical therapy services and/or chiropractic services identified in Exhibit "4", the charges for the physical therapy services and/or chiropractic services also were fraudulent in that they misrepresented Fort Myers Chiro's eligibility to collect PIP Benefits in the first instance.

818.    In fact, and as set forth above, Fort Myers Chiro never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the Clinic Act, the Patient Brokering Act, the Self-Referral Act, the HME Licensing Laws, and the Chiropractor Advertising Laws.

**6.      The Fraudulent HME Billing Through CFL Medical Supplies**

819.    As part of the Defendants' fraudulent scheme, Touch of Health, Hanson, Orlando Central Chiro, Fort Myers Chiro, Penza, Vega, Roldos, and Pearce – at Korchagin's direction – prescribed many Insureds with putative TENS units and CT units purportedly provided through CFL Medical Supplies.

820.    As set forth in Exhibit "6", Korchagin, TOH Management, Kovalenko, and CFL Medical Supplies billed GEICO for the TENS units under HCPCS code E0720, typically resulting in a charge of $771.00 for each putative TENS unit.

821.    As set forth in Exhibit "6", Korchagin, TOH Management, Kovalenko, and CFL Medical Supplies billed GEICO for the CT units using HCPCS code E0849, typically resulting in a charge of $1,050.00 for each putative CT unit.

822.    In the claims for HME identified in Exhibit "6", the charges for the HME were fraudulent in that they misrepresented CFL Medical Supplies' eligibility to collect PIP Benefits in the first instance.

823.    In fact, and as set forth above, CFL Medical Supplies never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the Patient Brokering Act and the HME Licensing Laws.

824.    As set forth below, Korchagin, TOH Management, Kovalenko, and CFL Medical Supplies' charges for the HME identified in Exhibit "6" also were fraudulent in that they misrepresented the medical necessity of the putative HME.

a.      **The Fraudulent Charges for the Medically Unnecessary TENS Units**

825.    In a legitimate clinical setting, electrostimulation treatment of the kind provided by TENS units may be prescribed and used to treat pain. The device transmits electrical signals to the brain that compete with pain signals from the brain, resulting in a reduction in the patient's perception of pain.

826.    However, there is a dearth of quality scientific evidence supporting the use of the kind of therapeutic electrical stimulation provided by a TENS unit when administered contemporaneously with a regular course of conservative treatment such as chiropractic and/or physical therapy.

827.   What is more, the prescription and provision of a TENS unit is duplicative and medically unnecessary when provided contemporaneously with a regular course of in-office electrostimulation services.

828.   Even so, Touch of Health, Hanson, Orlando Central Chiro, Fort Myers Chiro, Penza, Vega, Roldos, and Pearce – at Korchagin's direction – routinely prescribed, and Korchagin, TOH Management, Kovalenko, and CFL Medical Supplies routinely dispensed, TENS units to Insureds despite the fact that:

(i)   the Insureds suffered only minor soft-tissue injuries, to the limited extent they suffered any injuries at all, that did not require the use of a TENS unit in the first instance; and

(ii)   the Insureds were contemporaneously receiving – or had received – a course of in-office electrical stimulation services, rendering the home-use TENS unit duplicative and medically unnecessary.

829.   For example:

(i)   On February 9, 2017, an Insured named MS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed accident, and that MS's vehicle was drivable following the accident. The police report further indicated that MS was not injured and did not complain of any pain. In keeping with the fact that MS was not injured, MS did not visit any hospital emergency room following the accident. To the extent that MS experienced any health problems at all as the result of the minor accident, they were of low severity. Nonetheless, at the conclusion of a putative "treatment" session at Orlando Central Chiro on March 10, 2017, Vega – at Korchagin's direction – prescribed MS a TENS unit from CFL Medical Supplies, despite the fact that MS was simultaneously receiving a course of in-office electrical stimulation services, rendering the TENS unit duplicative and medically unnecessary. Even so, Korchagin, TOH Management, Kovalenko, and CFL Medical Supplies then submitted a bill to GEICO under HCPCS code E0720, seeking reimbursement of $771.00 for the medically unnecessary TENS unit.

(ii)   On February 9, 2017, an Insured named JW was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed accident, and that JW's vehicle was drivable following the accident.

276

The police report further indicated that JW was not injured and did not complain of any pain. In keeping with the fact that JW was not injured, JW did not visit any hospital emergency room following the accident. To the extent that MS experienced any health problems at all as the result of the minor accident, they were of low severity. Nonetheless, at the conclusion of a putative "treatment" session at Orlando Central Chiro on March 10, 2017, Vega – at Korchagin's direction – prescribed JW a TENS unit from CFL Medical Supplies, despite the fact that JW was simultaneously receiving a course of in-office electrical stimulation services, rendering the TENS unit duplicative and medically unnecessary. Even so, Korchagin, TOH Management, Kovalenko, and CFL Medical Supplies then submitted a bill to GEICO under HCPCS code E0720, seeking reimbursement of $771.00 for the medically unnecessary TENS unit.

(iii)    On February 9, 2017, an Insured named JJ was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed accident, and that JJ's vehicle was drivable following the accident. The police report further indicated that JJ was not injured and did not complain of any pain. In keeping with the fact that JJ was not injured, JJ did not visit any hospital emergency room following the accident. To the extent that MS experienced any health problems at all as the result of the minor accident, they were of low severity. Nonetheless, at the conclusion of a putative "treatment" session at Orlando Central Chiro on March 10, 2017, Vega – at Korchagin's direction – prescribed JJ a TENS unit from CFL Medical Supplies, despite the fact that JJ was simultaneously receiving a course of in-office electrical stimulation services, rendering the TENS unit duplicative and medically unnecessary. Even so, Korchagin, TOH Management, Kovalenko, and CFL Medical Supplies then submitted a bill to GEICO under HCPCS code E0720, seeking reimbursement of $771.00 for the medically unnecessary TENS unit.

(iv)    On February 28, 2017, an Insured named AA was involved in an automobile accident. The contemporaneous police report indicated that AA's vehicle was drivable following the accident. The police report further indicated that AA was not injured and did not complain of any pain. In keeping with the fact that AA was not injured, AA did not visit any hospital emergency room following the accident. To the extent that AA experienced any health problems at all as the result of the minor accident, they were of low severity. Nonetheless, at the conclusion of a putative "treatment" session at Touch of Health on March 23, 2017, Hanson – at Korchagin's direction – prescribed AA a TENS unit from CFL Medical Supplies, despite the fact that AA was simultaneously receiving a course of in-office electrical stimulation services, rendering the TENS unit duplicative and medically unnecessary. Even so, Korchagin, TOH Management, Kovalenko, and CFL Medical Supplies then submitted a bill to

GEICO under HCPCS code E0720, seeking reimbursement of $771.00 for the medically unnecessary TENS unit.

(v)    On July 5, 2017, an Insured named JJ was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JJ's vehicle was drivable following the accident. The police report further indicated that JJ was not injured and did not complain of any pain. In keeping with the fact that JJ was not injured, JJ did not visit any hospital emergency room following the accident. To the extent that JJ experienced any health problems at all as the result of the minor accident, they were of low severity. Nonetheless, at the conclusion of a putative "treatment" session at Orlando Central Chiro on July 11, 2017, Hanson – at Korchagin's direction – prescribed JJ a TENS unit from CFL Medical Supplies, despite the fact that JJ was simultaneously receiving a course of in-office electrical stimulation services, rendering the TENS unit duplicative and medically unnecessary. Even so, Korchagin, TOH Management, Kovalenko, and CFL Medical Supplies then submitted a bill to GEICO under HCPCS code E0720, seeking reimbursement of $771.00 for the medically unnecessary TENS unit.

(vi)    On July 18, 2017, an Insured named RP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact accident, and that RP's vehicle was drivable following the accident. The police report further indicated that RP was not injured and did not complain of any pain. In keeping with the fact that RP was not injured, RP did not visit any hospital emergency room following the accident. To the extent that RP experienced any health problems at all as the result of the minor accident, they were of low severity. Nonetheless, at the conclusion of a putative "treatment" session at Touch of Health on August 11, 2017, Roldos – at Korchagin's direction – prescribed RP a TENS unit from CFL Medical Supplies, despite the fact that RP was simultaneously receiving a course of in-office electrical stimulation services, rendering the TENS unit duplicative and medically unnecessary. Even so, Korchagin, TOH Management, Kovalenko, and CFL Medical Supplies then submitted a bill to GEICO under HCPCS code E0720, seeking reimbursement of $771.00 for the medically unnecessary TENS unit.

(vii)    On October 1, 2017, an Insured named DH was involved in an automobile accident. In keeping with the fact that DH was not injured, DH did not visit any hospital emergency room following the accident. To the extent that DH experienced any health problems at all as the result of the accident, they were of low severity. Nonetheless, at the conclusion of a putative "treatment" session at Orlando Central Chiro on October 17, 2017, Hanson – at Korchagin's direction – prescribed DH a TENS unit from CFL Medical

Supplies, despite the fact that DH was simultaneously receiving a course of in-office electrical stimulation services, rendering the TENS unit duplicative and medically unnecessary. Even so, Korchagin, TOH Management, Kovalenko, and CFL Medical Supplies then submitted a bill to GEICO under HCPCS code E0720, seeking reimbursement of $771.00 for the medically unnecessary TENS unit.

(viii)   On March 22, 2018, an Insured named SP was involved in an automobile accident. In keeping with the fact that SP was not injured, SP did not visit any hospital emergency room following the accident. To the extent that SP experienced any health problems at all as the result of the accident, they were of low severity. Nonetheless, at the conclusion of a putative "treatment" session at Orlando Central Chiro on March 23, 2018, Hanson – at Korchagin's direction – prescribed SP a TENS unit from CFL Medical Supplies, despite the fact that SP was simultaneously directed to receive a course of in-office electrical stimulation services, rendering the TENS unit duplicative and medically unnecessary. Even so, Korchagin, TOH Management, Kovalenko, and CFL Medical Supplies then submitted a bill to GEICO under HCPCS code E0720, seeking reimbursement of $771.00 for the medically unnecessary TENS unit.

(ix)   On May 19, 2018, an Insured named VK was involved in an automobile accident. The contemporaneous police report indicated that VK's vehicle was drivable following the accident. The police report further indicated that VK was not injured did not complain of any pain. In keeping with the fact that VK was not injured, VK did not visit any hospital emergency room following the accident. To the extent that VK experienced any health problems at all as the result of the minor accident, they were of low severity. Nonetheless, at the conclusion of a putative "treatment" session at Touch of Health on May 24, 2018, Penza – at Korchagin's direction – prescribed VK a TENS unit from CFL Medical Supplies, despite the fact that VK was simultaneously receiving a course of in-office electrical stimulation services, rendering the TENS unit duplicative and medically unnecessary. Even so, Korchagin, TOH Management, Kovalenko, and CFL Medical Supplies then submitted a bill to GEICO under HCPCS code E0720, seeking reimbursement of $771.00 for the medically unnecessary TENS unit.

(x)   On June 6, 2018, an Insured named GJ was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision. The police report further indicated that GJ was not injured and did not complain of any pain. In keeping with the fact that GJ was not injured, GJ did not visit any hospital emergency room following the accident. To the extent that GJ experienced any health problems at all as the result of the minor accident, they were of low severity. Nonetheless, at the

conclusion of a putative "treatment" session at Touch of Health on June 7, 2018, Penza – at Korchagin's direction – prescribed GJ a TENS unit from CFL Medical Supplies, despite the fact that GJ was simultaneously directed to receive a course of in-office electrical stimulation services, rendering the TENS unit duplicative and medically unnecessary. Even so, Korchagin, TOH Management, Kovalenko, and CFL Medical Supplies then submitted a bill to GEICO under HCPCS code E0720, seeking reimbursement of $771.00 for the medically unnecessary TENS unit.

(xi)     On June 6, 2018, an Insured named CD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision. The police report further indicated that CD was not injured and did not complain of any pain. In keeping with the fact that CD was not injured, CD did not visit any hospital emergency room following the accident. To the extent that CD experienced any health problems at all as the result of the minor accident, they were of low severity. Nonetheless, at the conclusion of a putative "treatment" session at Touch of Health on June 7, 2018, Penza – at Korchagin's direction – prescribed CD a TENS unit from CFL Medical Supplies, despite the fact that CD was simultaneously directed to receive a course of in-office electrical stimulation services, rendering the TENS unit duplicative and medically unnecessary. Even so, Korchagin, TOH Management, Kovalenko, and CFL Medical Supplies then submitted a bill to GEICO under HCPCS code E0720, seeking reimbursement of $771.00 for the medically unnecessary TENS unit.

(xii)    On June 26, 2018, an Insured named IF was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that IF's vehicle was drivable following the accident. The police report further indicated that IF was not injured and did not complain of any pain. In keeping with the fact that IF was not injured, IF did not visit any hospital emergency room following the accident. To the extent that IF experienced any health problems at all as the result of the minor accident, they were of low severity. Nonetheless, at the conclusion of a putative "treatment" session at Touch of Health on June 27, 2018, Penza – at Korchagin's direction – prescribed IF a TENS unit from CFL Medical Supplies, despite the fact that IF was simultaneously directed to receive a course of in-office electrical stimulation services, rendering the TENS unit duplicative and medically unnecessary. Even so, Korchagin, TOH Management, Kovalenko, and CFL Medical Supplies then submitted a bill to GEICO under HCPCS code E0720, seeking reimbursement of $771.00 for the medically unnecessary TENS unit.

(xiii)   On June 26, 2018, an Insured named BF was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that BF's vehicle was drivable following the

accident. The police report further indicated that BF was not injured and did not complain of any pain. In keeping with the fact that BF was not injured, BF did not visit any hospital emergency room following the accident. To the extent that BF experienced any health problems at all as the result of the minor accident, they were of low severity. Nonetheless, at the conclusion of a putative "treatment" session at Touch of Health on July 6, 2018, Penza – at Korchagin's direction – prescribed BF a TENS unit from CFL Medical Supplies, despite the fact that BF was simultaneously directed to receive a course of in-office electrical stimulation services, rendering the TENS unit duplicative and medically unnecessary. Even so, Korchagin, TOH Management, Kovalenko, and CFL Medical Supplies then submitted a bill to GEICO under HCPCS code E0720, seeking reimbursement of $771.00 for the medically unnecessary TENS unit.

(xiv)   On September 11, 2018, an Insured named BA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that BA's vehicle was drivable following the accident. The police report further indicated that BA was not injured and did not complain of any pain. In keeping with the fact that BA was not injured, BA did not visit any hospital emergency room following the accident. To the extent that BA experienced any health problems at all as the result of the minor accident, they were of low severity. Nonetheless, at the conclusion of a putative "treatment" session at Orlando Central Chiro on September 12, 2018, Hanson – at Korchagin's direction – prescribed BA a TENS unit from CFL Medical Supplies, despite the fact that BA was simultaneously directed to receive a course of in-office electrical stimulation services, rendering the TENS unit duplicative and medically unnecessary. Even so, Korchagin, TOH Management, Kovalenko, and CFL Medical Supplies then submitted a bill to GEICO under HCPCS code E0720, seeking reimbursement of $771.00 for the medically unnecessary TENS unit.

(xv)    On December 21, 2018, an Insured named TA was involved in an automobile accident. The contemporaneous police report indicated that TA's vehicle was drivable following the accident. The police report further indicated that, although TA complained of back pain, TA refused medical attention at the scene. In keeping with the fact that TA was not seriously injured, TA did not visit any hospital emergency room following the accident. To the extent that TA experienced any health problems at all as the result of the accident, they were of low severity. Nonetheless, at the conclusion of a putative "treatment" session at Fort Myers Chiro on January 3, 2019, Pearce – at Korchagin's direction – prescribed TA a TENS unit from CFL Medical Supplies, despite the fact that TA was simultaneously directed to receive a course of in-office electrical stimulation services, rendering the TENS unit duplicative and medically unnecessary. Even so, Korchagin, TOH Management, Kovalenko,

and CFL Medical Supplies then submitted a bill to GEICO under HCPCS code E0720, seeking reimbursement of $771.00 for the medically unnecessary TENS unit.

830.    These are only representative examples. In virtually all of the claims for TENS units identified in Exhibit "6", Korchagin, TOH Management, Kovalenko, and CFL Medical Supplies purported to provide TENS units to Insureds despite the fact that: (i) the Insureds suffered only minor soft-tissue injuries, to the limited extent they suffered any injuries at all, that did not require the use of a TENS unit in the first instance; and (ii) the TENS units were provided to Insureds who were contemporaneously prescribed a course of in-office electrical stimulation services, rendering the TENS unit duplicative and medically unnecessary.

831.    As set forth above, there are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

832.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

833.    It is highly improbable that any two Insureds involved in any one of the relatively minor automobile accidents in the claims identified in Exhibit "6" would suffer substantially identical injuries as the result of their accidents, or require a substantially identical course of treatment.

834.    It is even more improbable – to the point of impossibility – that this would occur repeatedly, often with the Insureds being prescribed identical home-use TENS units from CFL Medical Supplies on or about the exact same dates.

835.   Even so, and in keeping with the fact that the CFL Medical Supplies TENS units prescriptions were not medically necessary, and instead were part of the Defendants' scheme to maximize the amount of fraudulent billing they could submit to GEICO and other insurers, Touch of Health, Korchagin, Hanson, Orlando Central Chiro, Roldos, and Penza routinely prescribed – and Korchagin, TOH Management, Kovalenko, and CFL Medical Supplies routinely dispensed – TENS units to more than one Insured involved in a single accident, often on the exact same dates.

(i)     On, September 23, 2017, two Insureds – SA and BC– were involved the same automobile accident, and thereafter sought "treatment" at Orlando Central Chiro. SA and BC were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that SA and BC suffered any injuries at all in their accident, the injuries were different. Even so, Hanson – at Korchagin's direction – prescribed SA and BC identical and medically unnecessary TENS units from CFL Medical Supplies on the exact same date, October 3, 2017.

(ii)    On November 26, 2017, five Insureds – MW, BF, CF IF, and SP – were involved the same automobile accident, and thereafter all sought "treatment" at Orlando Central Chiro. MW, BF, CF, IF, and SP were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that MW, BF, CF, IF, and SP suffered any injuries at all in their accident, the injuries were different. Even so, Hanson – at Korchagin's direction – prescribed MW, BF, CF, IF, and SP identical and medically unnecessary TENS units from CFL Medical Supplies on the exact same date, November 27, 2018.

(iii)   On February 5, 2018, two Insureds – JJ and MR – were involved the same automobile accident, and thereafter sought "treatment" at Touch of Health. JJ and MR were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that JJ and MR suffered any injuries at all in their accident, the injuries were different. Even so, Roldos – at Korchagin's direction – prescribed JJ and MR identical and medically unnecessary TENS units from CFL Medical Supplies on the exact same date, February 6, 2018.

(iv)    On April 10, 2018, three Insureds – KD, PJ, and BM– were involved in the same automobile accident, and thereafter all sought "treatment" at Orlando

Central Chiro. KD, PJ, and BM were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that KD, PJ, and BM suffered any injuries at all in their accident, the injuries were different. Even so, Hanson – at Korchagin's direction – prescribed KD, PJ, and BM with identical and medically unnecessary TENS units from CFL Medical Supplies <u>on the exact same date</u>, April 11, 2018.

(v)     On July 12, 2018, <u>three</u> Insureds – JP CP, and SS – were involved in the same automobile accident, and thereafter all sought "treatment" at Orlando Central Chiro. JP, CP, and SS were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that JP, CP, and SS suffered any injuries at all in their accident, the injuries were different. Even so, Hanson – at Korchagin's direction – prescribed JP, CP, and SS with identical and medically unnecessary TENS units from CFL Medical Supplies <u>on the exact same date</u>, July 16, 2018.

(vi)    On August 24, 2018, two Insureds – LV and NV – were involved the same automobile accident, and thereafter sought "treatment" at Touch of Health. LV and NV were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that LV and NV suffered any injuries at all in their accident, the injuries were different. Even so, Penza – at Korchagin's direction – prescribed LV and NV identical and medically unnecessary TENS units from CFL Medical Supplies <u>on the exact same date</u>, August 27, 2018.

(vii)   On September 11, 2018, two Insureds – BA and JS – were involved the same automobile accident, and thereafter sought "treatment" at Orlando Central Chiro. BA and JS were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that BA and JS suffered any injuries at all in their accident, the injuries were different. Even so, Hanson – at Korchagin's direction – prescribed BA and JS identical and medically unnecessary TENS units from CFL Medical Supplies <u>on the exact same date</u>, September 12, 2018.

(viii)  On, November 11, 2018, two Insureds – SP and OJ – were involved the same automobile accident, and thereafter sought "treatment" at Orlando Central Chiro. SP and OJ were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that SP and OJ suffered any injuries at all in their accident, the injuries were different. Even so, Hanson – at Korchagin's direction – prescribed SP and OJ identical and medically unnecessary TENS units from CFL Medical Supplies <u>on the exact same date</u>, November 13, 2018.

(ix)     On November 13, 2018, two Insureds – BA and HL – were involved the same automobile accident, and thereafter sought "treatment" at Touch of Health. BA and HL were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that BA and HL suffered any injuries at all in their accident, the injuries were different. Even so, Penza – at Korchagin's direction – prescribed BA and HL identical and medically unnecessary TENS units from CFL Medical Supplies on the exact same date, November 19, 2018.

(x)      On December 15, 2018, three Insureds – FM, FR and MC – were involved in the same automobile accident, and thereafter all sought "treatment" at Touch of Health. FM, FR, and MC were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that FM, FR, and MC suffered any injuries at all in their accident, the injuries were different. Even so, Penza – at Korchagin's direction – prescribed FM, FR, and MC with identical and medically unnecessary TENS units from CFL Medical Supplies on the exact same date, January 2, 2019.

836.    These are only representative examples. In the claims for TENS units identified in Exhibit "6", Touch of Health, Hanson, Orlando Central Chiro, Roldos, and Penza – at Korchagin's direction – routinely prescribed medically unnecessary TENS units to multiple Insureds who had been involved in the same underlying accident, often on the exact same date.

**b.       The Fraudulent Charges for Medically Unnecessary CT Units**

837.    The prescription and provision of a CT unit is duplicative and medically unnecessary when provided contemporaneously with a regular course of in-office cervical traction services.

838.    Even so, Touch of Health, Hanson, and Orlando Central Chiro – at Korchagin's direction – routinely prescribed, and Korchagin, TOH Management, Kovalenko, and CFL Medical Supplies routinely dispensed, home-use CT units for Insureds simultaneously receiving a course of in-office cervical traction services.

839.    For example:

(i)     On December 1, 2017, an Insured named OK was involved in an automobile accident. Thereafter, in December 2017, OK received putative chiropractic and physical therapy "treatment" – which included in-office cervical traction services – at Touch of Health. Then, on or about December 18, 2017, Mohammadi – at Korchagin's direction – prescribed OK a CT unit from CFL Medical Supplies, despite the fact that OK was simultaneously directed to continue receiving in-office chiropractic and physical therapy services, including in-office cervical traction services. Korchagin, TOH Management, Kovalenko, and CFL Medical Supplies then submitted a bill to GEICO under HCPCS code E0849, seeking reimbursement of $1,050.00 for the duplicative and medically unnecessary CT unit.

(ii)    On December 15, 2017, an Insured named MC was involved in an automobile accident. Thereafter, between December 2017 and January 2018, MC received putative chiropractic and physical therapy "treatment" – which included in-office cervical traction services – at Orlando Central Chiro. Then, on or about January 10, 2018, Hanson – at Korchagin's direction – prescribed MC a CT unit from CFL Medical Supplies, despite the fact that MC: (a) had been receiving a course of in-office cervical traction services which had supposedly been unsuccessful in resolving MC's supposed symptoms; and (b) was simultaneously directed to continue receiving in-office chiropractic and physical therapy services, including in-office cervical traction services. Korchagin, TOH Management, Kovalenko, and CFL Medical Supplies then submitted a bill to GEICO under HCPCS code E0849, seeking reimbursement of $1,050.00 for the duplicative and medically unnecessary CT unit.

(iii)   On December 15, 2017, an Insured named MD was involved in an automobile accident. Thereafter, between December 2017 and January 2018, MD received putative chiropractic and physical therapy "treatment" – which included in-office cervical traction services – at Orlando Central Chiro. Then, on or about January 26, 2018, Hanson – at Korchagin's direction – prescribed MD a CT unit from CFL Medical Supplies, despite the fact that MD: (a) had been receiving a course of in-office cervical traction services which had supposedly been unsuccessful in resolving MD's supposed symptoms; and (b) was simultaneously directed to continue receiving in-office chiropractic and physical therapy services, including in-office cervical traction services. Korchagin, TOH Management, Kovalenko, and CFL Medical Supplies then submitted a bill to GEICO under HCPCS code E0849, seeking reimbursement of $1,050.00 for the duplicative and medically unnecessary CT unit.

(iv)    On October 6, 2017, an Insured named AM was involved in an automobile accident. Thereafter, between October and November 2017, AM received

putative chiropractic and physical therapy "treatment" – which included in-office cervical traction services – at Orlando Central Chiro. Then, on or about November 28, 2017, Hanson – at Korchagin's direction – prescribed AM a CT unit from CFL Medical Supplies, despite the fact that AM: (a) had been receiving a course of in-office cervical traction services which had supposedly been unsuccessful in resolving AM's supposed symptoms; and (b) was simultaneously directed to continue receiving in-office chiropractic and physical therapy services, including in-office cervical traction services. Korchagin, TOH Management, Kovalenko, and CFL Medical Supplies then submitted a bill to GEICO under HCPCS code E0849, seeking reimbursement of $1,050.00 for the duplicative and medically unnecessary CT unit.

(v)     On October 4, 2018, an Insured named SB was involved in an automobile accident. Thereafter, between October and November 2018, SB received putative chiropractic and physical therapy "treatment" – which included in-office cervical traction services – at Orlando Central Chiro. Then, on or about November 13, 2018, Hanson – at Korchagin's direction – prescribed SB a CT unit from CFL Medical Supplies, despite the fact that SB: (a) had been receiving a course of in-office cervical traction services which had supposedly been unsuccessful in resolving SB's supposed symptoms; and (b) was simultaneously directed to continue receiving in-office chiropractic and physical therapy services, including in-office cervical traction services. Korchagin, TOH Management, Kovalenko, and CFL Medical Supplies then submitted a bill to GEICO under HCPCS code E0849, seeking reimbursement of $1,050.00 for the duplicative and medically unnecessary CT unit.

840.    These are only representative examples. In virtually all of the claims for CT units identified in Exhibit "6", Korchagin, TOH Management, Kovalenko, and CFL Medical Supplies purported to provide CT units to Insureds despite the fact that the Insureds were simultaneously receiving – or had been directed to receive – in-office cervical traction services, rendering the home-use CT units duplicative and medically unnecessary.

## 8.    The Fraudulent Charges for Initial Examinations at CFL MD

841.    As part of their fraudulent scheme, the Defendants caused many Insureds to be referred to CFL MD for putative patient examinations.

842.    Ball purported to perform all of the initial examinations at CFL MD in the claims identified in Exhibit "7".

843.    As set forth in Exhibit "7", Korchagin, TOH Management, Amponsah, Ball, and CFL MD then billed the initial examinations to GEICO under CPT code 99204, resulting in a charge of $400.00 for each initial examination they purported to perform.

844.    In the claims for initial examinations identified in Exhibit "7", the charges for initial examinations were fraudulent in that they misrepresented CFL MD's eligibility to collect PIP Benefits in the first instance.

845.    In fact, and as set forth above, CFL MD never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the Clinic Act and the Patient Brokering Act.

846.    As set forth below, the charges for the initial examinations identified in Exhibit "7" also were fraudulent in that they misrepresented the nature and extent of the initial examinations.

**(i)    Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

847.    To the extent that the Insureds in the claims identified in Exhibit "7" had any presenting problems at all as the result of their relatively minor automobile accidents, the problems virtually always were low severity soft tissue injuries such as sprains and strains.

848.    For instance, and in keeping with the fact that the Insureds in the claims identified in Exhibit "7" either had no presenting problems at all as the result of their relatively minor automobile accidents, or else problems of low severity, in most of the claims identified in Exhibit "7" the contemporaneous police reports indicated that the underlying

accidents involved relatively low-impact collisions, that the Insureds' vehicles were drivable following the accidents, and that no one was seriously injured in the underlying accidents, or injured at all.

849.    What is more, and again in keeping with the fact that the Insureds in the claims identified in Exhibit "7" either had no presenting problems at all as a result of their relatively minor automobile accidents, or else problems of low severity, in many of the claims identified in Exhibit "1" the Insureds did not seek treatment at any hospital as the result of their accidents.

850.    Even so, in the claims for initial examinations identified in Exhibit "7", Korchagin, TOH Management, Amponsah, Ball, and CFL MD routinely billed for their putative initial examinations using CPT code 99204, and thereby falsely represented that the Insureds presented with problems of moderate to high severity.

851.    For example:

(i)     On February 24, 2019, an Insured named DA was involved in an automobile accident. In keeping with the fact that DA was not seriously injured, DA did not visit any hospital emergency room following the accident. To the extent that DA experienced any health problems at all as the result of the accident, they were of low severity. Even so, following an initial examination of DA by Ball on April 30, 2019, Ball, Amponsah, Korchagin, TOH Management, and CFL MD billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the examination involved presenting problems of moderate to high severity.

(ii)    On March 4, 2019, an Insured named AM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that AM's vehicle was drivable following the accident. The police report further indicated that AM was not injured and did not complain of any pain. In keeping with the fact that AM was not injured, AM did not visit any hospital emergency room following the accident. To the extent that AM experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following an initial

examination of AM by Ball on April 22, 2019, Ball, Amponsah, Korchagin, TOH Management, and CFL MD billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the examination involved presenting problems of moderate to high severity.

(iii)    On March 23, 2019, an Insured named DG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that DG's vehicle was drivable following the accident. The police report further indicated that DG was not injured and did not complain of any pain. In keeping with the fact that DG was not injured, DG did not visit any hospital emergency room following the accident. To the extent that DG experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following an initial examination of DG by Ball on May 7, 2019, Ball, Amponsah, Korchagin, TOH Management, and CFL MD billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the examination involved presenting problems of moderate to high severity.

(iv)    On March 23, 2019, an Insured named MA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MA's vehicle was drivable following the accident. The police report further indicated that MA was not injured and did not complain of any pain. In keeping with the fact that MA was not injured, MA did not visit any hospital emergency room following the accident. To the extent that MA experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following an initial examination of MA by Ball on May 7, 2019, Ball, Amponsah, Korchagin, TOH Management, and CFL MD billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the examination involved presenting problems of moderate to high severity.

(v)    On April 25, 2019, an Insured named BL was involved in an automobile accident. The contemporaneous police report indicated that the BL was not injured and did not complain of any pain. In keeping with the fact that BL was not injured, BL did not visit any hospital emergency room following the accident. To the extent that BL experienced any health problems at all as the result of the accident, they were of low severity. Even so, following an initial examination of BL by Ball on May 15, 2019, Ball, Amponsah, Korchagin, TOH Management, and CFL MD billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the examination involved presenting problems of moderate to high severity.

852.    These are only representative examples. In the claims for initial examinations identified in Exhibit "7", Korchagin, TOH Management, Amponsah, Ball, and CFL MD routinely falsely represented that the Insureds presented with problems of moderate to high severity, when in fact the Insureds' problems were low-severity soft tissue injuries such as sprains and strains, to the limited extent that they had any presenting problems at all.

853.    In the claims for initial examinations identified in Exhibit "7", Korchagin, TOH Management, Amponsah, Ball, and CFL MD routinely falsely represented that the Insureds presented with problems of moderate to high severity in order to create a false basis for their charges for the examinations under CPT code 99204, because examinations billable under CPT code 99204 are reimbursable at higher rates than examinations involving presenting problems of low severity, or no severity.

854.    In the claims for initial examinations identified in Exhibit "7", Korchagin, TOH Management, Amponsah, Ball, and CFL MD also routinely falsely represented that the Insureds presented with problems of moderate severity in order to create a false basis for the other Fraudulent Services that the Defendants purported to provide.

**(ii)     Misrepresentations Regarding the Amount of Time Spent on Initial Examinations**

855.    What is more, in the claims identified in Exhibit "7" for initial examinations under CPT code 99204, Korchagin, TOH Management, Amponsah, Ball, and CFL MD routinely misrepresented and exaggerated the amount of face-to-fact time Ball spent with the Insureds or the Insureds' families.

856.    As set forth above, Korchagin, TOH Management, Amponsah, Ball, and CFL MD billed for the putative initial examinations using CPT code 99204, and thereby

represented that Ball spent 45 minutes of face-to-face time with the Insureds or the Insureds' families during the putative examinations.

857.    In fact, in most of the claims for initial examinations identified in Exhibit "7", Ball never spent more than 15 minutes – let alone 45 minutes – of face-to-face time with the Insureds or their families when purporting to conduct the examinations.

858.    For instance, and in keeping with the fact that the initial examinations in the claims identified in Exhibit "7" did not entail more than 15 minutes of face-to-face time between Ball and the Insureds or the Insureds' families, to the extent that the examinations actually were performed in the first instance, Ball used a template in purporting to conduct the initial examinations.

859.    The template that Ball used in purporting to conduct the initial examinations set forth a limited range of examination parameters.

860.    The only face-to-face time between Ball and the Insureds that was reflected in the limited range of examination parameters consisted of brief patient interviews and limited examinations of the Insureds' musculoskeletal systems.

861.    These brief patient interviews and limited examinations did not require Ball to spend more than 15 minutes of face-to-face time with the Insureds or their families.

862.    In the claims for initial examinations identified in Exhibit "7", Korchagin, TOH Management, Amponsah, Ball, and CFL MD falsely represented that the initial examinations involved 45 minutes of face-to-face time in order to create a false basis for their charges under CPT code 99204 because examinations billable under CPT code 99204 are reimbursable at higher rates than examinations that require less time to perform.

**(iii)    Misrepresentations Regarding the Extent of Medical Decision-Making**

863.    When the Insureds in the claims identified in Exhibit "7" presented at CFL MD for initial examinations, their presenting problems virtually always were limited to low severity soft tissue injuries such as acute sprains and strains, to the extent that they had any legitimate presenting problems at all.

864.    The diagnosis and treatment of these low severity sprains and strains did not require any legitimate, moderate-complexity medical decision-making.

865.    First, in the claims for initial examinations identified in Exhibit "7", the initial examinations did not involve the retrieval, review, or analysis of any significant amount of medical records, diagnostic tests, or other information.

866.    When the Insureds in the claims identified in Exhibit "7" presented to CFL MD for "treatment", they did not arrive with any medical records except, at times, basic radiology reports.

867.    Furthermore, prior to the initial examinations, CFL MD, Korchagin, TOH Management, Amponsah, and Ball did not request any medical records from other providers.

868.    Second, in the claims for initial examinations identified in Exhibit "7", there was no risk of significant complications or morbidity – much less mortality – from the Insureds' relatively minor soft tissue injury complaints, to the extent that they ever had any complaints from automobile accidents at all.

869.    Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided at CFL MD, to the extent that CFL MD, Korchagin, TOH Management, Amponsah, and Ball provided any such

diagnostic procedures or treatment options in the first instance.

870.    In almost every instance, any "treatments" that CFL MD, Korchagin, TOH Management, Amponsah, and Ball actually provided were limited to chiropractic treatment and/or physical therapy treatment, none of which was health– or life–threatening if properly administered.

871.    Third, in the claims for initial examinations identified in Exhibit "7", CFL MD, Korchagin, TOH Management, Amponsah, and Ball did not consider any significant number of diagnoses or treatment options for the Insureds during the initial examinations.

872.    Rather, to the extent that the initial examinations were conducted in the first instance, CFL MD, Korchagin, TOH Management, Amponsah, and Ball provided a phony list of soft tissue injury "diagnoses" for virtually every Insured, and prescribed a substantially similar course of treatment for every Insured.

873.    Specifically, in most of the claims identified in Exhibit "7", during the initial examinations the Insureds did not report any continuing medical problems that legitimately could be traced to an underlying automobile accident.

874.    Even so, CFL MD, Korchagin, TOH Management, Amponsah, and Ball prepared initial examination reports in which they provided a phony list of soft tissue injury "diagnoses" to virtually every Insured.

875.    Then, based upon these phony "diagnoses", CFL MD, Korchagin, TOH Management, Amponsah, and Ball directed virtually every Insured to continue to receive significant and medically unnecessary chiropractic treatment and/or physical therapy treatment, regardless of the Insureds' true circumstances or presentation.

876.    For example:

(i)     On February 24, 2019, an Insured named DA was involved in an automobile accident. In keeping with the fact that DA was not seriously injured, DA did not visit any hospital emergency room following the accident. To the extent that DA experienced any health problems at all as the result of the accident, they were of low severity. On April 30, 2019, Ball purported to Ball purported to conduct an initial examination of DA at CFL MD. To the extent that Ball performed the examination in the first instance, Ball did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Ball did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Ball provided DA with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither DA's presenting problems, nor the treatment plan provided to DA by Ball, Korchagin, TOH Management, Amponsah, and CFL MD, presented any risk of significant complications, morbidity, or mortality. To the contrary, DA did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Ball, Korchagin, TOH Management, Amponsah, and CFL MD consisted of medically unnecessary chiropractic services, none of which posed the least bit of risk to DA. Even so, Ball, Korchagin, TOH Management, Amponsah, and CFL MD billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Ball engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(ii)    On March 4, 2019, an Insured named AM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that AM's vehicle was drivable following the accident. The police report further indicated that AM was not injured and did not complain of any pain. In keeping with the fact that AM was not injured, AM did not visit any hospital emergency room following the accident. To the extent that AM experienced any health problems at all as the result of the minor accident, they were of low severity. On April 22, 2019, Ball purported to Ball purported to conduct an initial examination of AM at CFL MD. To the extent that Ball performed the examination in the first instance, Ball did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Ball did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Ball provided DA with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither DA's presenting problems, nor the treatment plan provided to AM by Ball, Korchagin, TOH Management, Amponsah, and CFL MD, presented any risk

of significant complications, morbidity, or mortality. To the contrary, AM did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Ball, Korchagin, TOH Management, Amponsah, and CFL MD consisted of medically unnecessary chiropractic services, none of which posed the least bit of risk to AM. Even so, Ball, Korchagin, TOH Management, Amponsah, and CFL MD billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Ball engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(iii)     On March 23, 2019, an Insured named DG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that DG's vehicle was drivable following the accident. The police report further indicated that DG was not injured and did not complain of any pain. In keeping with the fact that DG was not injured, DG did not visit any hospital emergency room following the accident. To the extent that DG experienced any health problems at all as the result of the minor accident, they were of low severity. On May 7, 2019, Ball purported to Ball purported to conduct an initial examination of DG at CFL MD. To the extent that Ball performed the examination in the first instance, Ball did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Ball did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Ball provided DG with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither DG's presenting problems, nor the treatment plan provided to DG by Ball, Korchagin, TOH Management, Amponsah, and CFL MD, presented any risk of significant complications, morbidity, or mortality. To the contrary, DG did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Ball, Korchagin, TOH Management, Amponsah, and CFL MD consisted of medically unnecessary chiropractic services, none of which posed the least bit of risk to DG. Even so, Ball, Korchagin, TOH Management, Amponsah, and CFL MD billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Ball engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(iv)     On March 23, 2019, an Insured named MA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MA's vehicle was drivable following the accident. The police report further indicated that MA was not injured and did not complain of any pain. In keeping with the fact that MA was not injured, MA did not visit any hospital emergency room following the accident. To the extent that MA experienced any health problems at all as the result of the

minor accident, they were of low severity. On May 7, 2019, Ball purported to Ball purported to conduct an initial examination of MA at CFL MD. To the extent that Ball performed the examination in the first instance, Ball did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Ball did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Ball provided MA with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither MA's presenting problems, nor the treatment plan provided to MA by Ball, Korchagin, TOH Management, Amponsah, and CFL MD, presented any risk of significant complications, morbidity, or mortality. To the contrary, MA did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Ball, Korchagin, TOH Management, Amponsah, and CFL MD consisted of medically unnecessary chiropractic services, none of which posed the least bit of risk to MA. Even so, Ball, Korchagin, TOH Management, Amponsah, and CFL MD billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Ball engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(v)     On April 25, 2019, an Insured named BL was involved in an automobile accident. The contemporaneous police report indicated that the BL was not injured and did not complain of any pain. In keeping with the fact that BL was not injured, BL did not visit any hospital emergency room following the accident. To the extent that BL experienced any health problems at all as the result of the accident, they were of low severity. On May 15, 2019, Ball purported to Ball purported to conduct an initial examination of BL at CFL MD. To the extent that Ball performed the examination in the first instance, Ball did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Ball did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Ball provided BL with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither BL's presenting problems, nor the treatment plan provided to BL by Ball, Korchagin, TOH Management, Amponsah, and CFL MD, presented any risk of significant complications, morbidity, or mortality. To the contrary, BL did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Ball, Korchagin, TOH Management, Amponsah, and CFL MD consisted of medically unnecessary chiropractic services, none of which posed the least bit of risk to BL. Even so, Ball, Korchagin, TOH Management, Amponsah, and CFL MD billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Ball

engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

877.    There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

878.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

879.    As set forth above, in the claims identified in Exhibit "7", virtually all of the Insureds whom CFL MD, Korchagin, TOH Management, Amponsah, and Ball purported to treat were involved in relatively minor, "fender-bender" accidents, to the extent that they were involved in any actual accident at all.

880.    It is highly improbable that any two Insureds involved in any one of the relatively minor automobile accidents in the claims identified in Exhibit "7" would suffer substantially identical injuries as the result of their accidents, or require a substantially identical course of treatment.

881.    It is even more improbable – to the point of impossibility – that this would occur repeatedly, often with the Insureds presenting for initial examinations by CFL MD, Korchagin, TOH Management, Amponsah, and Ball with substantially identical injuries on or about the exact same dates after their accidents.

882.    Even so, in keeping with the fact that the putative "diagnoses" were phony, and in keeping with the fact that the putative initial examinations involved no actual medical decision-making at all, CFL MD, Korchagin, TOH Management, Amponsah, and Ball frequently issued substantially identical "diagnoses", on or about the same date, to more than

one Insured involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds.

883.   For example:

(i)   On February 24, 2019, two Insureds – LD and DL– were involved in the same automobile accident. Incredibly, two months later, on April 22, 2019, LD and DL both presented to CFL MD for initial examinations by Ball. LD and DL were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that LD and DL suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Ball, Korchagin, TOH Management, Amponsah, and CFL MD provided LD and DL with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(ii)   On March 4, 2019, two Insureds – AM and JP – were involved in the same automobile accident. Incredibly, nearly two months later, on April 22, 2019, AM and JP both presented to CFL MD for initial examinations by Ball. AM and JP were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that AM and JP suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Ball, Korchagin, TOH Management, Amponsah, and CFL MD provided AM and JP with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(iii)   On March 23, 2019, two Insureds – MA and DG – were involved in the same automobile accident. Incredibly, six weeks later, on May 7, 2019, MA and DG both presented to CFL MD for initial examinations by Ball. MA and DG were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that MA and DG suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Ball, Korchagin, TOH Management, Amponsah, and CFL MD provided MA and DG with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(iv)   On April 20, 2019, two Insureds – CA and SP – were involved in the same automobile accident. Incredibly, more than one month later, on May 28, 2019, CA and SP both presented to CFL MD for initial examinations by Ball. CA and SP were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that CA and SP

299

suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Ball, Korchagin, TOH Management, Amponsah, and CFL MD provided CA and SP with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(v)    On April 28, 2019, three Insureds – DD, ML, and JM – were involved in the same automobile accident. Incredibly, two weeks later, on May 10, 2019, DD, ML, and JM all presented to CFL MD for initial examinations by Ball. DD, ML, and JM were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that DD, ML, and JM suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Ball, Korchagin, TOH Management, Amponsah, and CFL MD provided DD, ML, and JM with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for all three of them.

884.    These are only representative examples. In the claims for initial examinations that are identified in Exhibit "7", CFL MD, Korchagin, TOH Management, Amponsah, and Ball frequently issued substantially identical "diagnoses", on or about the same date, to more than one Insured involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds, despite the fact that the Insureds were differently situated.

885.    In the claims for initial examinations identified in Exhibit "7", CFL MD, Korchagin, TOH Management, Amponsah, and Ball routinely falsely represented that the initial examinations involved medical decision-making of moderate complexity in order to provide a false basis to bill for the initial examinations under CPT code 99204, because initial examinations billed under CPT code 99204 are reimbursable at a higher rate than examinations that do not require low or moderate complexity medical decision-making.

### III.    The Fraudulent Claims the Defendants Submitted or Caused to be Submitted to GEICO

886.    To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of bills and treatment reports through Touch of Health, Central Florida Chiro, Orlando Central Chiro, Fort Myers Chiro, CFL Diagnostic, CFL Medical Supplies, and CFL MD to GEICO, containing thousands of individual charges, seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

887.    The claims that the Defendants submitted or caused to be submitted to GEICO were false and misleading in the following, material respects:

(i)    The bills and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that Touch of Health, Central Florida Chiro, Orlando Central Chiro, Fort Myers Chiro, CFL Diagnostic, CFL Medical Supplies, and CFL MD were in compliance with Florida law, and therefore were eligible to collect PIP Benefits in the first instance. In fact, Touch of Health, Central Florida Chiro, Orlando Central Chiro, Fort Myers Chiro, CFL Diagnostic, CFL Medical Supplies, and CFL MD were never eligible for collect PIP Benefits in the first instance because: (a) Touch of Health, Central Florida Chiro, Orlando Central Chiro, Fort Myers Chiro, CFL Diagnostic, and CFL MD operated in violation of the Clinic Act; (b) Touch of Health, Orlando Central, Fort Myers Chiro, CFL Medical Supplies, CFL Diagnostic, and CFL MD operated in violation of the Patient Brokering Act and the Chiropractor Advertising Laws; (c) Touch of Health operated in violation of the Anti-Kickback Statute; (d) Orlando Central Chiro and Fort Myers Chiro operated in violation of the Self-Referral Act; and (e) Touch of Health, Central Florida Chiro, Orlando Central Chiro, Fort Myers Chiro, and CFL Medical Supplies operated in violation of the HME Licensing Laws.

(ii)    The bills and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement. In fact, the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement, because they were medically unnecessary and provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the Defendants, rather

than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

(iii)   The bills and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary and, in many cases, misrepresented to GEICO that the Fraudulent Services actually were performed. In fact, the Fraudulent Services frequently were not performed at all and, to the extent that they were performed, they were not medically necessary and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them.

(iv)   The bills and treatment reports submitted by and on behalf of the Defendants frequently misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided.

## IV.   The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

888.   The Defendants were legally and ethically obligated to act honestly and with integrity in connection with their performance of the Fraudulent Services and their submission of charges to GEICO.

889.   To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants have systemically concealed their fraud and have gone to great lengths to accomplish this concealment.

890.   For instance, the Defendants knowingly misrepresented and concealed facts concerning their unlawful operations and violations of Florida law in order to conceal them from GEICO and other insurers.

891.   Furthermore, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to a fraudulent pre-determined protocol designed to maximize the charges that could be

submitted, not to benefit the Insureds who supposedly were subjected to them.

892.    Moreover, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services frequently never were performed in the first instance.

893.    In addition, the Defendants conducted their fraudulent scheme through multiple entities in order to conceal the volume of fraudulent billing submitted through any one entity, and thereby perpetuate their scheme.

894.    The Defendants have hired law firms to pursue collection of the fraudulent charges for the Fraudulent Services from GEICO and other insurers. These law firms routinely file expensive and time-consuming litigation against GEICO and other insurers if the charges are not promptly paid in full.

895.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and acts of concealment described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $2,700,000.00.

896.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### FIRST CAUSE OF ACTION
**Against Touch of Health, Central Florida Chiro, Orlando Central Chiro,
Fort Myers Chiro, CFL Diagnostic, CFL Medical Supplies, and CFL MD
(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

897.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-896, above.

898.    There is an actual case in controversy between GEICO and Touch of Health, Central Florida Chiro, Orlando Central Chiro, Fort Myers Chiro, CFL Diagnostic, CFL Medical Supplies, and CFL MD regarding more than $75,000.00 in pending fraudulent claims for the Fraudulent Services that have been submitted to GEICO.

899.    Touch of Health, Central Florida Chiro, Orlando Central Chiro, Fort Myers Chiro, CFL Diagnostic, CFL Medical Supplies, and CFL MD have no right to receive payment for any pending bills submitted to GEICO because of the fraudulent and unlawful activity described herein.

900.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Touch of Health, Central Florida Chiro, Orlando Central Chiro, Fort Myers Chiro, CFL Diagnostic, CFL Medical Supplies, and CFL MD have no right to receive payment for any pending bills submitted to GEICO.

### SECOND CAUSE OF ACTION
**Against Korchagin
(Violation of RICO, 18 U.S.C. § 1962(c))**

901.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-86, 155-165, 176-202, 207-436, and 886-896, above.

902.    Touch of Health is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

903.     Korchagin knowingly has conducted and/or participated, directly or indirectly, in the conduct of Touch of Health's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Touch of Health was not eligible to receive under the No-Fault Law because: (i) Touch of Health unlawfully was operated in violation of the Clinic Act, the Patient Brokering Act, the Anti-Kickback Statute, the HME Licensing Laws, and the Chiropractor Advertising Laws; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

904.     A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

905.     Touch of Health's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail

fraud are the regular way in which Korchagin operated Touch of Health, inasmuch as Touch of Health was not engaged in a legitimate health care practice, and acts of mail fraud therefore were essential in order for Touch of Health to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Touch of Health to the present day.

906.    Touch of Health is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Touch of Health in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

907.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $350,000.00 pursuant to the fraudulent bills submitted through Touch of Health.

908.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## THIRD CAUSE OF ACTION
**Against Korchagin, TOH Management, Hanson, Penza, Roldos, Biondi, Kabushinskaya, Klochko, 855LEGAL4U, Aleksandrova, and Complete Injury**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

909.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-86, 155-165, 176-202, 207-436, and 886-896, above.

910.    Touch of Health is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

911.    Korchagin, TOH Management, Hanson, Penza, Roldos, Biondi, Kabushinskaya, Klochko, 855LEGAL4U, Aleksandrova, and Complete Injury are employed by or associated with the Touch of Health enterprise.

912.    Korchagin, TOH Management, Hanson, Penza, Roldos, Biondi, Kabushinskaya, Klochko, 855LEGAL4U, Aleksandrova, and Complete Injury knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Touch of Health's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Touch of Health was not eligible to receive under the No-Fault Law because: (i) Touch of Health unlawfully was operated in violation of the Clinic Act, the Patient Brokering Act, the Anti-Kickback Statute, the HME Licensing Laws, and the Chiropractor Advertising Laws; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the

charges submitted to GEICO.

913.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

914.    Korchagin, TOH Management, Hanson, Penza, Roldos, Biondi, Kabushinskaya, Klochko, 855LEGAL4U, Aleksandrova, and Complete Injury knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

915.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $350,000.00 pursuant to the fraudulent bills submitted through the Touch of Health enterprise.

916.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### FOURTH CAUSE OF ACTION
**Against Touch of Health, Korchagin, TOH Management, Hanson, Penza, Roldos, Biondi, Kabushinskaya, and Klochko
(Under Fla. Stat. 501.201 et. seq.)**

917.    GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-86, 155-165, 176-202, 207-436, and 886-896, above.

918.     Touch of Health, Korchagin, TOH Management, Hanson, Penza, Roldos, Biondi, Kabushinskaya, and Klochko are actively engaged in trade and commerce in the State of Florida.

919.     GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

920.     Touch of Health, Korchagin, TOH Management, Hanson, Penza, Roldos, Biondi, Kabushinskaya, and Klochko engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally-obtain PIP Benefits from GEICO.

921.     The bills and supporting documents submitted by Touch of Health, Korchagin, TOH Management, Hanson, Penza, Roldos, Biondi, Kabushinskaya, and Klochko to GEICO in connection with the Fraudulent Services were fraudulent in that they misrepresented: (i) Touch of Health's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

922.     Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous.   Additionally, the conduct of Touch of Health, Korchagin, TOH Management, Hanson, Penza, Roldos, Biondi, Kabushinskaya, and Klochko has been materially injurious to GEICO and its Insureds.

923.     The conduct of Touch of Health, Korchagin, TOH Management, Hanson, Penza, Roldos, Biondi, Kabushinskaya, and Klochko was the actual and proximate cause of the damages sustained by GEICO.

924.    Touch of Health, Korchagin, TOH Management, Hanson, Penza, Roldos, Biondi, Kabushinskaya, and Klochko's unfair and deceptive acts have caused GEICO to sustain damages of at least $350,000.00.

925.    By reason of Touch of Health, Korchagin, TOH Management, Hanson, Penza, Roldos, Biondi, Kabushinskaya, and Klochko's conduct, GEICO is also entitled to recover costs, and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

**FIFTH CAUSE OF ACTION**
**Against Korchagin**
**(Under Fla. Stat. 772.103(3))**

926.    GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-86, 155-165, 176-202, 207-436, and 886-896, above.

927.    Touch of Health is an ongoing "enterprise," as that term is defined in Fla. Stat. § 772.102(3), that engages in activities that constitute a pattern of criminal activity.

928.    Korchagin knowingly has conducted and/or participated, directly or indirectly, in the conduct of Touch of Health's affairs through a pattern of criminal activity consisting of repeated acts constituting insurance fraud in violation of Fla. Stat. § 817.234(1)(a), by submitting or causing to be submitted thousands of fraudulent bills to GEICO seeking payment under automobile insurance policies issued by GEICO to Florida Insureds, when the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) Touch of Health unlawfully was operated in violation of the Clinic Act, the Patient Brokering Act, the Anti-Kickback Statute, the HME Licensing Laws, and the Chiropractor Advertising Laws; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were not

medically necessary and were provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

929.    These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

930.    Touch of Health is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Touch of Health in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

931.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $350,000.00 pursuant to the fraudulent bills submitted through the Touch of Health enterprise.

932.    By reason of Korchagin's conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

**SIXTH CAUSE OF ACTION**
**Against Korchagin, TOH Management, Hanson, Penza, Roldos, Biondi, Kabushinskaya,**
**Klochko, 855LEGAL4U, Aleksandrova, and Complete Injury**
**(Under Fla. Stat. 772.103(4))**

933.    GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-86, 155-165, 176-202, 207-436, and 886-896, above.

934.    Touch of Health is an ongoing "enterprise," as that term is defined in Fla. Stat. § 772.102(3), that engages in activities that constitute a pattern of criminal activity.

935.    Korchagin, TOH Management, Hanson, Penza, Roldos, Biondi, Kabushinskaya, Klochko, 855LEGAL4U, Aleksandrova, and Complete Injury are employed by or associated with the Touch of Health enterprise.

936.    In furtherance of the fraudulent scheme, Korchagin, TOH Management, Hanson, Penza, Roldos, Biondi, Kabushinskaya, Klochko, 855LEGAL4U, Aleksandrova, and Complete Injury submitted or caused to be submitted thousands of fraudulent bills through Touch of Health to GEICO seeking payment under automobile insurance policies issued by GEICO to Florida Insureds.

937.    When the billing was submitted, Korchagin, TOH Management, Hanson, Penza, Roldos, Biondi, Kabushinskaya, Klochko, 855LEGAL4U, Aleksandrova, and Complete Injury knew that the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) Touch of Health unlawfully was operated in violation of the Clinic Act, the Patient Brokering Act, the Anti-Kickback Statute, the HME Licensing Laws, and the Chiropractor Advertising Laws; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were

provided at all – pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

938.    These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

939.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $350,000.00 pursuant to the fraudulent bills submitted through the Touch of Health enterprise.

940.    By reason of Korchagin, TOH Management, Hanson, Penza, Roldos, Biondi, Kabushinskaya, Klochko, 855LEGAL4U, Aleksandrova, and Complete Injury's conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

**SEVENTH CAUSE OF ACTION**
**Against Touch of Health, Korchagin, TOH Management, Hanson, Penza, Roldos,**
**Biondi, Kabushinskaya, and Klochko**
**(Common Law Fraud)**

941.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-86, 155-165, 176-202, 207-436, and 886-896, above.

942.    Touch of Health, Korchagin, TOH Management, Hanson, Penza, Roldos, Biondi, Kabushinskaya, and Klochko intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course

of their submission of thousands of fraudulent bills through Touch of Health for the Fraudulent Services.

943. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that that Touch of Health was in compliance with the Clinic Act, the Patient Brokering Act, the Anti-Kickback Statute, the HME Licensing Laws, and the Chiropractor Advertising Laws, and eligible to collect PIP Benefits in the first instance, when in fact Touch of Health never was in compliance with the Clinic Act, the Patient Brokering Act, the Anti-Kickback Statute, the HME Licensing Laws, and the Chiropractor Advertising Laws, and never was eligible to collect PIP Benefits; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed.

944. Touch of Health, Korchagin, TOH Management, Hanson, Penza, Roldos, Biondi, Kabushinskaya, and Klochko intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Touch of Health that were not reimbursable.

945. GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $350,000.00

pursuant to the fraudulent bills that were submitted or caused to be submitted by the Touch of Health Defendants through Touch of Health.

946.    Touch of Health, Korchagin, TOH Management, Hanson, Penza, Roldos, Biondi, Kabushinskaya, and Klochko's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

947.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## EIGHTH CAUSE OF ACTION
### Against Touch of Health, Korchagin, TOH Management, Hanson, Penza, Roldos, Biondi, Kabushinskaya, and Klochko
### (Unjust Enrichment)

948.    GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-86, 155-165, 176-202, 207-436, and 886-896, above.

949.    As set forth above, Touch of Health, Korchagin, TOH Management, Hanson, Penza, Roldos, Biondi, Kabushinskaya, and Klochko have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

950.    When GEICO paid the bills and charges submitted or caused to be submitted by Touch of Health, Korchagin, TOH Management, Hanson, Penza, Roldos, Biondi, Kabushinskaya, and Klochko through Touch of Health, it reasonably believed that it was legally obligated to make such payments based on Touch of Health, Korchagin, TOH Management, Hanson, Penza, Roldos, Biondi, Kabushinskaya, and Klochko's improper, unlawful, and/or unjust acts.

951.    Touch of Health, Korchagin, TOH Management, Hanson, Penza, Roldos, Biondi, Kabushinskaya, and Klochko have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Touch of Health, Korchagin, TOH Management, Hanson, Penza, Roldos, Biondi, Kabushinskaya, and Klochko voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

952.    Touch of Health, Korchagin, TOH Management, Hanson, Penza, Roldos, Biondi, Kabushinskaya, and Klochko's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

953.    By reason of the above, Touch of Health, Korchagin, TOH Management, Hanson, Penza, Roldos, Biondi, Kabushinskaya, and Klochko have been unjustly enriched in an amount to be determined at trial, but in no event less than $350,000.00.

## NINTH CAUSE OF ACTION
### Against Hanson
### (Violation of RICO, 18 U.S.C. § 1962(c))

954.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-86, 112-116, 176-181, 227-260, 437-603, and 886-896, above.

955.    Central Florida Chiro is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

956.    Hanson knowingly has conducted and/or participated, directly or indirectly, in the conduct of Central Florida Chiro's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over three years seeking payments that Central Florida Chiro was not eligible to receive under the No-Fault Law because: (i) Central Florida

Chiro unlawfully was operated in violation of the Clinic Act and the HME Licensing Laws; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

957.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

958.   Central Florida Chiro's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Hanson operated Central Florida Chiro, inasmuch as Central Florida Chiro was not engaged in a legitimate health care practice, and acts of mail fraud therefore were essential in order for Central Florida Chiro to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Central Florida Chiro to the present day.

959.    Central Florida Chiro is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Central Florida Chiro in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

960.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,480,000.00 pursuant to the fraudulent bills submitted through Central Florida Chiro.

961.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**TENTH CAUSE OF ACTION**
**Against Hanson, Vega, and Arocho**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

962.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-86, 112-116, 176-181, 227-260, 437-603, and 886-896, above.

963.    Central Florida Chiro is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

964.    Hanson, Vega, and Arocho are employed by or associated with the Central Florida Chiro enterprise.

965.    Hanson, Vega, and Arocho knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Central Florida Chiro's affairs through a pattern of racketeering activity consisting of repeated violations of the

federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over three years seeking payments that Central Florida Chiro was not eligible to receive under the No-Fault Law because: (i) Central Florida Chiro unlawfully was operated in violation of the Clinic Act and the HME Licensing Laws; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

966.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2". Each such mailing was made in furtherance of the mail fraud scheme.

967.    Hanson, Vega, and Arocho knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

968.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,480,000.00 pursuant to the fraudulent bills submitted through the Central Florida Chiro enterprise.

969.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### ELEVENTH CAUSE OF ACTION
**Against the Central Florida Chiro, Hanson, Vega, and Arocho
(Under Fla. Stat. 501.201 <u>et</u>. <u>seq.</u>)**

970.    GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-86, 112-116, 176-181, 227-260, 437-603, and 886-896, above.

971.    Central Florida Chiro, Hanson, Vega, and Arocho are actively engaged in trade and commerce in the State of Florida.

972.    GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

973.    Central Florida Chiro, Hanson, Vega, and Arocho engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally-obtain PIP Benefits from GEICO.

974.    The bills and supporting documents submitted by Central Florida Chiro, Hanson, Vega, and Arocho to GEICO in connection with the Fraudulent Services were fraudulent in that they misrepresented: (i) Central Florida Chiro's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

975.    Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous.  Additionally, the conduct of Central Florida Chiro, Hanson, Vega, and Arocho has been materially injurious to GEICO and its Insureds.

976.    The conduct of Central Florida Chiro, Hanson, Vega, and Arocho was the actual and proximate cause of the damages sustained by GEICO.

977.    Central Florida Chiro, Hanson, Vega, and Arocho's unfair and deceptive acts have caused GEICO to sustain damages of at least $1,480,000.00.

978.    By reason of Central Florida Chiro, Hanson, Vega, and Arocho's conduct, GEICO is also entitled to recover costs, and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

## TWELFTH CAUSE OF ACTION
### Against Hanson
### (Under Fla. Stat. 772.103(3))

979.    GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-86, 112-116, 176-181, 227-260, 437-603, and 886-896, above.

980.    Central Florida Chiro is an ongoing "enterprise," as that term is defined in Fla. Stat. § 772.102(3), that engages in activities that constitute a pattern of criminal activity.

981.    Hanson knowingly has conducted and/or participated, directly or indirectly, in the conduct of Central Florida Chiro's affairs through a pattern of criminal activity consisting of repeated acts constituting insurance fraud in violation of Fla. Stat. § 817.234(1)(a), by submitting or causing to be submitted thousands of fraudulent bills to GEICO seeking payment under automobile insurance policies issued by GEICO to Florida Insureds, when the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) Central Florida Chiro unlawfully was operated in violation of the Clinic Act and the HME Licensing Laws; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were

321

not medically necessary and were provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

982.     These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

983.     Central Florida Chiro is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Central Florida Chiro in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

984.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,480,000.00 pursuant to the fraudulent bills submitted through the Central Florida Chiro enterprise.

985.     By reason of Hanson's conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

## THIRTEENTH CAUSE OF ACTION
### Against Hanson, Vega, and Arocho
### (Under Fla. Stat. 772.103(4))

986.    GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-86, 112-116, 176-181, 227-260, 437-603, and 886-896, above.

987.    Central Florida Chiro is an ongoing "enterprise," as that term is defined in Fla. Stat. § 772.102(3), that engages in activities that constitute a pattern of criminal activity.

988.    Hanson, Vega, and Arocho are employed by or associated with the Central Florida Chiro enterprise.

989.    In furtherance of the fraudulent scheme, Hanson, Vega, and Arocho submitted or caused to be submitted thousands of fraudulent bills through Central Florida Chiro to GEICO seeking payment under automobile insurance policies issued by GEICO to Florida Insureds.

990.    When the billing was submitted, Hanson, Vega, and Arocho knew that the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) Central Florida Chiro unlawfully was operated in violation of the Clinic Act and the HME Licensing Laws; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented

323

and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

991.    These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

992.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,480,000.00 pursuant to the fraudulent bills submitted through the Central Florida Chiro enterprise.

993.    By reason of Hanson, Vega, and Arocho's conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

**FOURTEENTH CAUSE OF ACTION**
**Against Central Florida Chiro, Hanson, Vega, and Hanson**
**(Common Law Fraud)**

994.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-86, 112-116, 176-181, 227-260, 437-603, and 886-896, above.

995.    Central Florida Chiro, Hanson, Vega, and Arocho intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills through Central Florida Chiro for the Fraudulent Services.

996.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that that Central Florida Chiro was in compliance with the Clinic Act and the HME Licensing Laws, and eligible to collect PIP Benefits in the first instance, when in fact Central Florida Chiro never was in compliance with

the Clinic Act and the HME Licensing Laws, and never was eligible to collect PIP Benefits; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed.

997. Central Florida Chiro, Hanson, Vega, and Arocho intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Central Florida Chiro that were not reimbursable.

998. GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,480,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by Central Florida Chiro, Hanson, Vega, and Arocho through Central Florida Chiro.

999. Central Florida Chiro, Hanson, Vega, and Arocho's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

1000. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## FIFTEENTH CAUSE OF ACTION
### Against Central Florida Chiro, Hanson, Vega, and Arocho
### (Unjust Enrichment)

1001.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-86, 112-116, 176-181, 227-260, 437-603, and 886-896, above.

1002.   As set forth above, Central Florida Chiro, Hanson, Vega, and Arocho have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

1003.   When GEICO paid the bills and charges submitted or caused to be submitted by Central Florida Chiro, Hanson, Vega, and Arocho through Central Florida Chiro, it reasonably believed that it was legally obligated to make such payments based on Central Florida Chiro, Hanson, Vega, and Arocho's improper, unlawful, and/or unjust acts.

1004.   Central Florida Chiro, Hanson, Vega, and Arocho have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Central Florida Chiro, Hanson, Vega, and Arocho voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

1005.   Central Florida Chiro, Hanson, Vega, and Arocho's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

1006.   By reason of the above, Central Florida Chiro, Hanson, Vega, and Arocho have been unjustly enriched in an amount to be determined at trial, but in no event less than $1,480,000.00.

## SIXTEENTH CAUSE OF ACTION
### Against Korchagin and Hanson
### (Violation of RICO, 18 U.S.C. § 1962(c))

1007.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-99, 176-181, 189-193, 198-260, 604-752, and 886-896, above.

1008.   Orlando Central Chiro is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

1009.   Korchagin and Hanson knowingly have conducted and/or participated, directly or indirectly, in the conduct of Orlando Central Chiro's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Orlando Central Chiro was not eligible to receive under the No-Fault Law because: (i) Orlando Central Chiro unlawfully was operated in violation of the Clinic Act, Patient Brokering Act, Self-Referral Act, the HME Licensing Laws, and the Chiropractor Advertising Laws; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

1010.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3".

1011.   Orlando Central Chiro's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Korchagin and Hanson operated Orlando Central Chiro, inasmuch as Orlando Central Chiro was not engaged in a legitimate health care practice, and acts of mail fraud therefore were essential in order for Orlando Central Chiro to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Orlando Central Chiro to the present day.

1012.   Orlando Central Chiro is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Orlando Central Chiro in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

1013.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $570,000.00 pursuant to the fraudulent bills submitted through Orlando Central Chiro.

1014.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**SEVENTEENTH CAUSE OF ACTION**
**Against Korchagin, TOH Management, Hanson, Vega, Arocho, Mohammadi, and**
**Complete Injury**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

1015.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-99, 176-181, 189-193, 198-260, 604-752, and 886-896, above.

1016.   Orlando Central Chiro is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

1017.   Korchagin, TOH Management, Hanson, Vega, Arocho, Mohammadi, and Complete Injury are employed by or associated with the Orlando Central Chiro enterprise.

1018.   Korchagin, TOH Management, Hanson, Vega, Arocho, Mohammadi, and Complete Injury knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Orlando Central Chiro's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Orlando Central Chiro was not eligible to receive under the No-Fault Law because: (i) Orlando Central Chiro unlawfully was operated in violation of the Clinic Act, Patient Brokering Act, Self-Referral Act, the HME Licensing Laws, and the Chiropractor Advertising Laws; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent

Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

1019.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3". Each such mailing was made in furtherance of the mail fraud scheme.

1020.   Korchagin, TOH Management, Hanson, Vega, Arocho, Mohammadi, and Complete Injury knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

1021.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $570,000.00 pursuant to the fraudulent bills submitted through the Orlando Central Chiro enterprise.

1022.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### EIGHTEENTH CAUSE OF ACTION
**Against Orlando Central Chiro, Korchagin, TOH Management, Hanson, Vega, Mohammadi, and Arocho
(Under Fla. Stat. 501.201 <u>et</u>. <u>seq</u>.)**

1023.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-99, 176-181, 189-193, 198-260, 604-752, and 886-896, above.

1024.   Orlando Central Chiro, Korchagin, TOH Management, Hanson, Vega, Mohammadi, and Arocho are actively engaged in trade and commerce in the State of Florida.

1025.   GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

1026.   Orlando Central Chiro, Korchagin, TOH Management, Hanson, Vega, Mohammadi, and Arocho engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally-obtain PIP Benefits from GEICO.

1027.   The bills and supporting documents submitted by Orlando Central Chiro, Korchagin, TOH Management, Hanson, Vega, Mohammadi, and Arocho to GEICO in connection with the Fraudulent Services were fraudulent in that they misrepresented: (i) Orlando Central Chiro's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

1028.   Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous.   Additionally, the conduct of Orlando Central Chiro, Korchagin, TOH Management, Hanson, Vega, Mohammadi, and Arocho has been materially injurious to GEICO and its Insureds.

1029.   The conduct of Orlando Central Chiro, Korchagin, TOH Management, Hanson, Vega, Mohammadi, and Arocho was the actual and proximate cause of the damages sustained by GEICO.

1030.  Orlando Central Chiro, Korchagin, TOH Management, Hanson, Vega, Mohammadi, and Arocho's unfair and deceptive acts have caused GEICO to sustain damages of at least $570,000.00.

1031.  By reason of Orlando Central Chiro, Korchagin, TOH Management, Hanson, Vega, Mohammadi, and Arocho's conduct, GEICO is also entitled to recover costs, and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

### NINETEENTH CAUSE OF ACTION
**Against Korchagin and Hanson**
**(Under Fla. Stat. 772.103(3))**

1032.  GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-99, 176-181, 189-193, 198-260, 604-752, and 886-896, above.

1033.  Orlando Central Chiro is an ongoing "enterprise," as that term is defined in Fla. Stat. § 772.102(3), that engages in activities that constitute a pattern of criminal activity.

1034.  Korchagin and Hanson knowingly have conducted and/or participated, directly or indirectly, in the conduct of Orlando Central Chiro's affairs through a pattern of criminal activity consisting of repeated acts constituting insurance fraud in violation of Fla. Stat. § 817.234(1)(a), by submitting or causing to be submitted thousands of fraudulent bills to GEICO seeking payment under automobile insurance policies issued by GEICO to Florida Insureds, when the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) Orlando Central Chiro unlawfully was operated in violation of the Clinic Act, Patient Brokering Act, Self-Referral Act, the HME Licensing Laws, and the Chiropractor Advertising Laws; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent

Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

1035.   These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

1036.   Orlando Central Chiro is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Orlando Central Chiro in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

1037.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $570,000.00 pursuant to the fraudulent bills submitted through the Orlando Central Chiro enterprise.

1038.   By reason of Korchagin and Hanson's conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

## TWENTIETH CAUSE OF ACTION
### Against Korchagin, TOH Management, Hanson, Vega, Arocho, Mohammadi, and Complete Injury (Under Fla. Stat. 772.103(4))

1039.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-99, 176-181, 189-193, 198-260, 604-752, and 886-896, above.

1040.   Orlando Central Chiro is an ongoing "enterprise," as that term is defined in Fla. Stat. § 772.102(3), that engages in activities that constitute a pattern of criminal activity.

1041.   Korchagin, TOH Management, Hanson, Vega, Arocho, Mohammadi, and Complete Injury are employed by or associated with the Orlando Central Chiro enterprise.

1042.   In furtherance of the fraudulent scheme, Korchagin, TOH Management, Hanson, Vega, Arocho, Mohammadi, and Complete Injury submitted or caused to be submitted thousands of fraudulent bills through Orlando Central Chiro to GEICO seeking payment under automobile insurance policies issued by GEICO to Florida Insureds.

1043.   When the billing was submitted, Korchagin, TOH Management, Hanson, Vega, Arocho, Mohammadi, and Complete Injury knew that the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) Orlando Central Chiro unlawfully was operated in violation of the Clinic Act, Patient Brokering Act, Self-Referral Act, the HME Licensing Laws, and the Chiropractor Advertising Laws; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases,

the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

1044.   These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

1045.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $570,000.00 pursuant to the fraudulent bills submitted through the Orlando Central Chiro enterprise.

1046.   By reason of Korchagin, TOH Management, Hanson, Vega, Arocho, Mohammadi, and Complete Injury conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

## <u>TWENTY-FIRST CAUSE OF ACTION</u>
### Against Orlando Central Chiro, Korchagin, TOH Management, Hanson, Vega, Mohammadi, and Arocho
### (Common Law Fraud)

1047.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-99, 176-181, 189-193, 198-260, 604-752, and 886-896, above.

1048.   Orlando Central Chiro, Korchagin, TOH Management, Hanson, Vega, Mohammadi, and Arocho intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills through Orlando Central Chiro for the Fraudulent Services.

1049. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that that Orlando Central Chiro was in compliance with the Clinic Act, the Patient Brokering Act, the Self-Referral Act, the HME Licensing Laws, and the Chiropractor Advertising Laws, and eligible to collect PIP Benefits in the first instance, when in fact Orlando Central Chiro never was in compliance with the Clinic Act, the Patient Brokering Act, the Self-Referral Act, and the Chiropractor Advertising Laws, and never was eligible to collect PIP Benefits; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed.

1050. Orlando Central Chiro, Korchagin, TOH Management, Hanson, Vega, Mohammadi, and Arocho intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Orlando Central Chiro that were not reimbursable.

1051. GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $570,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by Orlando

Central Chiro, Korchagin, TOH Management, Hanson, Vega, Mohammadi, and Arocho through Orlando Central Chiro.

1052.  Orlando Central Chiro, Korchagin, TOH Management, Hanson, Vega, Mohammadi, and Arocho's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

1053.  Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## TWENTY-SECOND CAUSE OF ACTION
### Against Orlando Central Chiro, Korchagin, TOH Management, Hanson, Vega, Mohammadi, and Arocho
### (Unjust Enrichment)

1054.  GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-99, 176-181, 189-193, 198-260, 604-752, and 886-896, above.

1055.  As set forth above, Orlando Central Chiro, Korchagin, TOH Management, Hanson, Vega, Mohammadi, and Arocho have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

1056.  When GEICO paid the bills and charges submitted or caused to be submitted by Orlando Central Chiro, Korchagin, TOH Management, Hanson, Vega, Mohammadi, and Arocho through Orlando Central Chiro, it reasonably believed that it was legally obligated to make such payments based on Orlando Central Chiro, Korchagin, TOH Management, Hanson, Vega, Mohammadi, and Arocho's improper, unlawful, and/or unjust acts.

1057.  Orlando Central Chiro, Korchagin, TOH Management, Hanson, Vega, Mohammadi, and Arocho have been enriched at GEICO's expense by GEICO's payments

337

which constituted a benefit that Orlando Central Chiro, Korchagin, TOH Management, Hanson, Vega, Mohammadi, and Arocho voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

1058.  Orlando Central Chiro, Korchagin, TOH Management, Hanson, Vega, Mohammadi, and Arocho's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

1059.  By reason of the above, Orlando Central Chiro, Korchagin, TOH Management, Hanson, Vega, Mohammadi, and Arocho have been unjustly enriched in an amount to be determined at trial, but in no event less than $570,000.00.

### TWENTY-THIRD CAUSE OF ACTION
**Against Korchagin and Hanson**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

1060.  GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-86, 100-111, 176-181, 189-193, 198-206, 215-260, 753-818, and 886-896, above.

1061.  Fort Myers Chiro is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

1062.  Korchagin and Hanson knowingly have conducted and/or participated, directly or indirectly, in the conduct of Fort Myers Chiro's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for nearly one year seeking payments that Fort Myers Chiro was not eligible to receive under the No-Fault Law because: (i) Fort Myers Chiro unlawfully was operated in violation of the Clinic Act, Patient Brokering Act, Self-

Referral Act, the HME Licensing Laws, and Chiropractor Advertising Laws; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

1063.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4".

1064.   Fort Myers Chiro's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Korchagin and Hanson operated Fort Myers Chiro, inasmuch as Fort Myers Chiro was not engaged in a legitimate health care practice, and acts of mail fraud therefore were essential in order for Fort Myers Chiro to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Fort Myers Chiro to the present day.

1065. Fort Myers Chiro is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Fort Myers Chiro in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

1066. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $87,000.00 pursuant to the fraudulent bills submitted through Fort Myers Chiro.

1067. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**TWENTY-FOURTH CAUSE OF ACTION**
**Against Korchagin, TOH Management, Hanson, Pearce, and Complete Injury**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

1068. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-86, 100-111, 176-181, 189-193, 198-206, 215-260, 753-818, and 886-896, above.

1069. Fort Myers Chiro is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

1070. Korchagin, TOH Management, Hanson, Pearce, and Complete Injury are employed by or associated with the Fort Myers Chiro enterprise.

1071. Korchagin, TOH Management, Hanson, Pearce, and Complete Injury knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the

conduct of Fort Myers Chiro's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for nearly one year seeking payments that Fort Myers Chiro was not eligible to receive under the No-Fault Law because: (i) Fort Myers Chiro unlawfully was operated in violation of the Clinic Act, Patient Brokering Act, Self-Referral Act, the HME Licensing Laws, and Chiropractor Advertising Laws; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the Fort Myers Chiro Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

1072.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4". Each such mailing was made in furtherance of the mail fraud scheme.

1073.   Korchagin, TOH Management, Hanson, Pearce, and Complete Injury knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud

GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

1074.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $87,000.00 pursuant to the fraudulent bills submitted through the Fort Myers Chiro enterprise.

1075.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### TWENTY-FIFTH CAUSE OF ACTION
**Against Fort Myers Chiro, Korchagin, TOH Management, Hanson, and Pearce**
**(Under Fla. Stat. 501.201 et. seq.)**

1076.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-86, 100-111, 176-181, 189-193, 198-206, 215-260, 753-818, and 886-896, above.

1077.   Fort Myers Chiro, Korchagin, TOH Management, Hanson, and Pearce are actively engaged in trade and commerce in the State of Florida.

1078.   GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

1079.   Fort Myers Chiro, Korchagin, TOH Management, Hanson, and Pearce engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally-obtain PIP Benefits from GEICO.

1080.   The bills and supporting documents submitted by Fort Myers Chiro, Korchagin, TOH Management, Hanson, and Pearce to GEICO in connection with the Fraudulent Services were fraudulent in that they misrepresented: (i) Fort Myers Chiro's

eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

1081.   Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous.   Additionally, the conduct of Fort Myers Chiro, Korchagin, TOH Management, Hanson, and Pearce has been materially injurious to GEICO and its Insureds.

1082.   The conduct of Fort Myers Chiro, Korchagin, TOH Management, Hanson, and Pearce was the actual and proximate cause of the damages sustained by GEICO.

1083.   The Fort Myers Chiro, Korchagin, TOH Management, Hanson, and Pearce's unfair and deceptive acts have caused GEICO to sustain damages of at least $87,000.00.

1084.   By reason of Fort Myers Chiro, Korchagin, TOH Management, Hanson, and Pearce's conduct, GEICO is also entitled to recover costs, and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

## TWENTY-SIXTH CAUSE OF ACTION
### Against Korchagin and Hanson
### (Under Fla. Stat. 772.103(3))

1085.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-86, 100-111, 176-181, 189-193, 198-206, 215-260, 753-818, and 886-896, above.

1086.   Fort Myers Chiro is an ongoing "enterprise," as that term is defined in Fla. Stat. § 772.102(3), that engages in activities that constitute a pattern of criminal activity.

1087.   Korchagin and Hanson knowingly have conducted and/or participated, directly or indirectly, in the conduct of Fort Myers Chiro's affairs through a pattern of criminal activity consisting of repeated acts constituting insurance fraud in violation of Fla. Stat. § 817.234(1)(a), by submitting submit or causing to be submitted thousands of fraudulent bills to GEICO seeking payment under automobile insurance policies issued by GEICO to Florida Insureds, when the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) Fort Myers Chiro unlawfully was operated in violation of the Clinic Act, Patient Brokering Act, Self-Referral Act, the HME Licensing Laws, and Chiropractor Advertising Laws; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

1088.   These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

1089.   Fort Myers Chiro is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Fort Myers Chiro in pursuit of

inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

1090. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $87,000.00 pursuant to the fraudulent bills submitted through the Fort Myers Chiro enterprise.

1091. By reason of Korchagin and Hanson's conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

**TWENTY-SEVENTH CAUSE OF ACTION**
**Against Korchagin, TOH Management, Hanson, and Pearce**
**(Under Fla. Stat. 772.103(4))**

1092. GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-86, 100-111, 176-181, 189-193, 198-206, 215-260, 753-818, and 886-896, above.

1093. Fort Myers Chiro is an ongoing "enterprise," as that term is defined in Fla. Stat. § 772.102(3), that engages in activities that constitute a pattern of criminal activity.

1094. Korchagin, TOH Management, Hanson, Pearce, and Complete Injury are employed by or associated with the Fort Myers Chiro enterprise.

1095. In furtherance of the fraudulent scheme, Korchagin, TOH Management, Hanson, Pearce, and Complete Injury submitted or caused to be submitted thousands of fraudulent bills through Fort Myers Chiro to GEICO seeking payment under automobile insurance policies issued by GEICO to Florida Insureds.

1096. When the billing was submitted, Korchagin, TOH Management, Hanson,

Pearce, and Complete Injury knew that the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) Fort Myers Chiro unlawfully was operated in violation of the Clinic Act, Patient Brokering Act, Self-Referral Act, the HME Licensing Laws, and Chiropractor Advertising Laws; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

1097.   These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

1098.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $87,000.00 pursuant to the fraudulent bills submitted through the Fort Myers Chiro enterprise.

1099.   By reason of Korchagin, TOH Management, Hanson, Pearce, and Complete Injury's conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

**TWENTY-EIGHTH CAUSE OF ACTION**
**Against Fort Myers Chiro, Korchagin, TOH Management, Hanson, and Pearce**
**(Common Law Fraud)**

1100.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-86, 100-111, 176-181, 189-193, 198-206, 215-260, 753-818, and 886-896, above.

1101.   Fort Myers Chiro, Korchagin, TOH Management, Hanson, and Pearce intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills through Fort Myers Chiro for the Fraudulent Services.

1102.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that that Fort Myers Chiro was in compliance with the Clinic Act, Patient Brokering Act, Self-Referral Act, and the Chiropractor Advertising Laws, and eligible to collect PIP Benefits in the first instance, when in fact Fort Myers Chiro never was in compliance with the Clinic Act, Patient Brokering Act, Self-Referral Act, the HME Licensing Laws, and the Chiropractor Advertising Laws, and never was eligible to collect PIP Benefits; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed.

1103.   Fort Myers Chiro, Korchagin, TOH Management, Hanson, and Pearce intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Fort Myers Chiro that were not reimbursable.

1104.   GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $87,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by the Fort Myers Chiro Defendants through Fort Myers Chiro.

1105.   Fort Myers Chiro, Korchagin, TOH Management, Hanson, and Pearce's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

1106.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## TWENTY-NINTH CAUSE OF ACTION
### Against Fort Myers Chiro, Korchagin, TOH Management, Hanson, and Pearce
### (Unjust Enrichment)

1107.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-86, 100-111, 176-181, 189-193, 198-206, 215-260, 753-818, and 886-896, above.

1108.   As set forth above, the Fort Myers Chiro Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

1109.   When GEICO paid the bills and charges submitted or caused to be submitted by Fort Myers Chiro, Korchagin, TOH Management, Hanson, and Pearce through Fort Myers Chiro, it reasonably believed that it was legally obligated to make such payments based on the Fort Myers Chiro Defendants' improper, unlawful, and/or unjust acts.

1110.   Fort Myers Chiro, Korchagin, TOH Management, Hanson, and Pearce have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Fort Myers Chiro, Korchagin, TOH Management, Hanson, and Pearce voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

1111.   Fort Myers Chiro, Korchagin, TOH Management, Hanson, and Pearce's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

1112.   By reason of the above, Fort Myers Chiro, Korchagin, TOH Management, Hanson, and Pearce have been unjustly enriched in an amount to be determined at trial, but in no event less than $87,000.00.

### THIRTIETH CAUSE OF ACTION
### Against Korchagin and Kovalenko
### (Violation of RICO, 18 U.S.C. § 1962(c))

1113.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-86, 117-142, 189-197, 215-226, and 886-896, above.

1114.   CFL Diagnostic is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

1115.   Korchagin and Kovalenko knowingly have conducted and/or participated, directly or indirectly, in the conduct of CFL Diagnostic's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18

U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over one year seeking payments that CFL Diagnostic was not eligible to receive under the No-Fault Law because: (i) CFL Diagnostic unlawfully was operated in violation of the Clinic Act, Patient Brokering Act, and Chiropractor Advertising Laws; (ii) the underlying Fraudulent Services were not lawfully provided; and (iii) the underlying Fraudulent Services were provided pursuant to  an illegal referral scheme.

1116.  A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "5".

1117.  CFL Diagnostic's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Korchagin and Kovalenko operated CFL Diagnostic, inasmuch as CFL Diagnostic was not engaged in a legitimate health care practice, and acts of mail fraud therefore were essential in order for CFL Diagnostic to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through CFL Diagnostic to the present day.

1118.  CFL Diagnostic is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by CFL Diagnostic in pursuit of

inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

1119.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $150,000.00 pursuant to the fraudulent bills submitted through CFL Diagnostic.

1120.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## THIRTY-FIRST CAUSE OF ACTION
### Against Korchagin, Touch of Health, TOH Management, Kovalenko, Amponsah, Hanson, Penza, Roldos, Pearce, Orlando Central Chiro, Fort Myers Chiro, and Complete Injury
### (Violation of RICO, 18 U.S.C. § 1962(d))

1121.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-86, 117-142, 189-197, 215-226, and 886-896, above.

1122.   CFL Diagnostic is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

1123.   Korchagin, Touch of Health, TOH Management, Kovalenko, Amponsah, Hanson, Penza, Roldos, Pearce, Orlando Central Chiro, Fort Myers Chiro, and Complete Injury are employed by or associated with the CFL Diagnostic enterprise.

1124.   Korchagin, Touch of Health, TOH Management, Kovalenko, Amponsah, Hanson, Penza, Roldos, Pearce, Orlando Central Chiro, Fort Myers Chiro, and Complete Injury knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of CFL Diagnostic's affairs through a pattern of racketeering activity

consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over one year seeking payments that CFL Diagnostic was not eligible to receive under the No-Fault Law because: (i) CFL Diagnostic unlawfully was operated in violation of the Clinic Act, Patient Brokering Act, and Chiropractor Advertising Laws; (ii) the underlying Fraudulent Services were not lawfully provided; and (iii) the underlying Fraudulent Services were provided pursuant to an illegal referral scheme.

1125.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "5". Each such mailing was made in furtherance of the mail fraud scheme.

1126.   Korchagin, Touch of Health, TOH Management, Kovalenko, Amponsah, Hanson, Penza, Roldos, Pearce, Orlando Central Chiro, Fort Myers Chiro, and Complete Injury knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

1127.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $150,000.00 pursuant to the fraudulent bills submitted through the CFL Diagnostic enterprise.

1128.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**THIRTY-SECOND CAUSE OF ACTION**
**Against CFL Diagnostic, Korchagin, TOH Management, Kovalenko, and Amponsah**
**(Under Fla. Stat. 501.201 et. seq.)**

1129.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-86, 117-142, 189-197, 215-226, and 886-896, above.

1130.   CFL Diagnostic, Korchagin, TOH Management, Kovalenko, and Amponsah are actively engaged in trade and commerce in the State of Florida.

1131.   GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

1132.   CFL Diagnostic, Korchagin, TOH Management, Kovalenko, and Amponsah engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally-obtain PIP Benefits from GEICO.

1133.   The bills and supporting documents submitted by CFL Diagnostic, Korchagin, TOH Management, Kovalenko, and Amponsah to GEICO in connection with the Fraudulent Services were fraudulent in that they misrepresented: (i) CFL Diagnostic's eligibility to collect PIP Benefits in the first instance; and (ii) that the Fraudulent Services were lawfully provided.

1134.   Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous.  Additionally, the conduct of CFL Diagnostic, Korchagin, TOH Management, Kovalenko, and Amponsah has been materially injurious to GEICO and its Insureds.

1135.   The conduct of CFL Diagnostic, Korchagin, TOH Management, Kovalenko, and Amponsah was the actual and proximate cause of the damages sustained by GEICO.

1136.   CFL Diagnostic, Korchagin, TOH Management, Kovalenko, and Amponsah's unfair and deceptive acts have caused GEICO to sustain damages of at least $150,000.00.

1137.   By reason of CFL Diagnostic, Korchagin, TOH Management, Kovalenko, and Amponsah's conduct, GEICO is also entitled to recover costs, and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

### THIRTY-THIRD CAUSE OF ACTION
**Against Korchagin and Kovalenko**
**(Under Fla. Stat. 772.103(3))**

1138.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-86, 117-142, 189-197, 215-226, and 886-896, above.

1139.   CFL Diagnostic is an ongoing "enterprise," as that term is defined in Fla. Stat. § 772.102(3), that engages in activities that constitute a pattern of criminal activity.

1140.   Korchagin and Kovalenko knowingly have conducted and/or participated, directly or indirectly, in the conduct of CFL Diagnostic's affairs through a pattern of criminal activity consisting of repeated acts constituting insurance fraud in violation of Fla. Stat. § 817.234(1)(a), submit or cause to be submitted hundreds of fraudulent bills to GEICO seeking payment under automobile insurance policies issued by GEICO to Florida Insureds, when the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) CFL Diagnostic unlawfully was operated in violation of the Clinic Act, Patient Brokering Act, and Chiropractor Advertising Laws; (ii) the underlying Fraudulent Services were not lawfully provided; and (iii) the underlying Fraudulent Services were provided pursuant to  an illegal referral scheme.

1141.   These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

1142.   CFL Diagnostic is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by CFL Diagnostic in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

1143.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $150,000.00 pursuant to the fraudulent bills submitted through the CFL Diagnostic enterprise.

1144.   By reason of Korchagin and Kovalenko's conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

**THIRTY-FOURTH CAUSE OF ACTION**
**Against Korchagin, TOH Management, Kovalenko, Amponsah, Hanson, and Complete Injury**
**(Under Fla. Stat. 772.103(4))**

1145.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-86, 117-142, 189-197, 215-226, and 886-896, above.

1146.   CFL Diagnostic is an ongoing "enterprise," as that term is defined in Fla. Stat. § 772.102(3), that engages in activities that constitute a pattern of criminal activity.

1147.   Korchagin, Touch of Health, TOH Management, Kovalenko, Amponsah, Hanson, Penza, Roldos, Pearce, Orlando Central Chiro, Fort Myers Chiro, and Complete Injury are employed by or associated with the CFL Diagnostic enterprise.

1148.   In furtherance of the fraudulent scheme, Korchagin, Touch of Health, TOH Management, Kovalenko, Amponsah, Hanson, Penza, Roldos, Pearce, Orlando Central Chiro, Fort Myers Chiro, and Complete Injury submitted or caused to be submitted hundreds of fraudulent bills through CFL Diagnostic to GEICO seeking payment under automobile insurance policies issued by GEICO to Florida Insureds.

1149.   When the billing was submitted, Korchagin, Touch of Health, TOH Management, Kovalenko, Amponsah, Hanson, Penza, Roldos, Pearce, Orlando Central Chiro, Fort Myers Chiro, and Complete Injury knew that the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) CFL Diagnostic unlawfully was operated in violation of the Clinic Act, Patient Brokering Act, and Chiropractor Advertising Laws; (ii) the underlying Fraudulent Services were not lawfully provided; and (iii) the underlying Fraudulent Services were provided pursuant to  an illegal referral scheme.

1150.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $150,000.00 pursuant to the fraudulent bills submitted through the CFL Diagnostic enterprise.

1151.   By reason of Korchagin, Touch of Health, TOH Management, Kovalenko, Amponsah, Hanson, Penza, Roldos, Pearce, Orlando Central Chiro, Fort Myers Chiro, and Complete Injury's conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

**THIRTY-FIFTH CAUSE OF ACTION**
**Against CFL Diagnostic, Korchagin, TOH Management, Kovalenko, and Amponsah**
**(Common Law Fraud)**

1152.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-86, 117-142, 189-197, 215-226, and 886-896, above.

1153.   CFL Diagnostic, Korchagin, TOH Management, Kovalenko, and Amponsah intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills through CFL Diagnostic for the Fraudulent Services.

1154.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that that CFL Diagnostic was in compliance with the Clinic Act, the Self-Referral Act, the Patient Brokering Act, and the Chiropractor Advertising Laws, and eligible to collect PIP Benefits in the first instance, when in fact CFL Diagnostic never was in compliance with the Clinic Act, the Self-Referral Act, the Patient Brokering Act, and the Chiropractor Advertising Laws, and never was eligible to collect PIP Benefits; and (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement.

1155.   CFL Diagnostic, Korchagin, TOH Management, Kovalenko, and Amponsah intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through CFL Diagnostic that were not reimbursable.

1156.   GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $150,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by the Defendants through CFL Diagnostic.

1157.   CFL Diagnostic, Korchagin, TOH Management, Kovalenko, and Amponsah's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

1158.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### THIRTY-SIXTH CAUSE OF ACTION
**Against CFL Diagnostic, Korchagin, TOH Management, Kovalenko, and Amponsah**
**(Unjust Enrichment)**

1159.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-86, 117-142, 189-197, 215-226, and 886-896, above.

1160.   As set forth above, CFL Diagnostic, Korchagin, TOH Management, Kovalenko, and Amponsah have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

1161.   When GEICO paid the bills and charges submitted or caused to be submitted by CFL Diagnostic, Korchagin, TOH Management, Kovalenko, and Amponsah through CFL Diagnostic, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

1162.   The Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that CFL Diagnostic, Korchagin, TOH Management, Kovalenko, and Amponsah voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

1163.   CFL Diagnostic, Korchagin, TOH Management, Kovalenko, and Amponsah's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

1164.   By reason of the above, CFL Diagnostic, Korchagin, TOH Management, Kovalenko, and Amponsah have been unjustly enriched in an amount to be determined at trial, but in no event less than $150,000.00.

## THIRTY-SEVENTH CAUSE OF ACTION
### Against Korchagin and Kovalenko
### (Violation of RICO, 18 U.S.C. § 1962(c))

1165.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-82, 166-175, 189-197, 215-235, 304, 333, 819-840, and 886-896, above.

1166.   CFL Medical Supplies is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

1167.   Korchagin and Kovalenko knowingly have conducted and/or participated, directly or indirectly, in the conduct of CFL Medical Supplies' affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that CFL Medical Supplies was not eligible to receive under the No-Fault Law because: (i) CFL Medical Supplies unlawfully was operated in violation of the HME Licensing

Laws, the Patient Brokering Act, the Anti-Kickback Statute, and Chiropractor Advertising Laws; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

1168.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "6".

1169.   CFL Medical Supplies' business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Korchagin and Kovalenko operated CFL Medical Supplies, inasmuch as CFL Medical Supplies was not engaged in a legitimate health care practice, and acts of mail fraud therefore were essential in order for CFL Medical Supplies to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through CFL Medical Supplies to the present day.

1170.  CFL Medical Supplies is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by CFL Medical Supplies in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

1171.  GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $120,000.00 pursuant to the fraudulent bills submitted through CFL Medical Supplies.

1172.  By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## THIRTY-EIGHTH CAUSE OF ACTION
**Against Korchagin, Touch of Health, TOH Management, Kovalenko, Hanson, Penza, Roldos, Pearce, Orlando Central Chiro, Fort Myers Chiro, and Complete Injury (Violation of RICO, 18 U.S.C. § 1962(d))**

1173.  GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-82, 166-175, 189-197, 215-235, 304, 333, 819-840, and 886-896, above.

1174.  CFL Medical Supplies is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

1175.  Korchagin, Touch of Health, TOH Management, Kovalenko, Hanson, Penza, Roldos, Pearce, Orlando Central Chiro, Fort Myers Chiro, and Complete Injury are employed by or associated with the CFL Medical Supplies enterprise.

1176.  Korchagin, Touch of Health, TOH Management, Kovalenko, Hanson, Penza, Roldos, Pearce, Orlando Central Chiro, Fort Myers Chiro, and Complete Injury knowingly have

agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of CFL Medical Supplies' affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that CFL Medical Supplies was not eligible to receive under the No-Fault Law because: (i) CFL Medical Supplies unlawfully was operated in violation of the HME Licensing Laws, the Patient Brokering Act, the Anti-Kickback Statute, and Chiropractor Advertising Laws; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

1177.  A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "6". Each such mailing was made in furtherance of the mail fraud scheme.

1178.  Korchagin, Touch of Health, TOH Management, Kovalenko, Hanson, Penza, Roldos, Pearce, Orlando Central Chiro, Fort Myers Chiro, and Complete Injury knew of, agreed

to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

1179.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $120,000.00 pursuant to the fraudulent bills submitted through the CFL Medical Supplies enterprise.

1180.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## THIRTY-NINTH CAUSE OF ACTION
### Against CFL Medical Supplies, Korchagin, TOH Management, and Kovalenko
### (Under Fla. Stat. 501.201 et. seq.)

1181.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-82, 166-175, 189-197, 215-235, 304, 333, 819-840, and 886-896, above.

1182.   CFL Medical Supplies, Korchagin, TOH Management, and Kovalenko are actively engaged in trade and commerce in the State of Florida.

1183.   GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

1184.   CFL Medical Supplies, Korchagin, TOH Management, and Kovalenko engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally-obtain PIP Benefits from GEICO.

1185.   The bills and supporting documents submitted by CFL Medical Supplies, Korchagin, TOH Management, and Kovalenko to GEICO in connection with the Fraudulent

Services were fraudulent in that they misrepresented: (i) Springs Crossing's eligibility to collect PIP Benefits in the first instance; and (ii) that the Fraudulent Services were lawfully provided.

1186.   Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous.   Additionally, the conduct of CFL Medical Supplies, Korchagin, TOH Management, and Kovalenko has been materially injurious to GEICO and its Insureds.

1187.   The conduct of CFL Medical Supplies, Korchagin, TOH Management, and Kovalenko was the actual and proximate cause of the damages sustained by GEICO.

1188.   CFL Medical Supplies, Korchagin, TOH Management, and Kovalenko's unfair and deceptive acts have caused GEICO to sustain damages of at least $120,000.00.

1189.   By reason of CFL Medical Supplies, Korchagin, TOH Management, and Kovalenko's conduct, GEICO is also entitled to recover costs, and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

## FORTIETH CAUSE OF ACTION
### Against Korchagin and Kovalenko
### (Under Fla. Stat. 772.103(3))

1190.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-82, 166-175, 189-197, 215-235, 304, 333, 819-840, and 886-896, above.

1191.   CFL Medical Supplies is an ongoing "enterprise," as that term is defined in Fla. Stat. § 772.102(3), that engages in activities that constitute a pattern of criminal activity.

1192.   Korchagin and Kovalenko knowingly have conducted and/or participated, directly or indirectly, in the conduct of CFL Medical Supplies' affairs through a pattern of

criminal activity consisting of repeated acts constituting insurance fraud in violation of Fla. Stat. § 817.234(1)(a), by submitting or causing to be submitted hundreds of fraudulent bills to GEICO seeking payment under automobile insurance policies issued by GEICO to Florida Insureds, when the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) CFL Medical Supplies unlawfully was operated in violation of the HME Licensing Laws, the Patient Brokering Act, the Anti-Kickback Statute, and Chiropractor Advertising Laws; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

1193.   These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

1194.   CFL Medical Supplies is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by CFL Medical Supplies in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

1195.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $120,000.00 pursuant to the fraudulent bills submitted through the CFL Medical Supplies enterprise.

1196.   By reason of Korchagin and Kovalenko's conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

**FORTY-FIRST CAUSE OF ACTION**
**Against Korchagin, Touch of Health, TOH Management, Kovalenko, Hanson, Penza,**
**Roldos, Pearce, Orlando Central Chiro, Fort Myers Chiro, and Complete Injury**
**(Under Fla. Stat. 772.103(4))**

1197.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-82, 166-175, 189-197, 215-235, 304, 333, 819-840, and 886-896, above.

1198.   CFL Medical Supplies is an ongoing "enterprise," as that term is defined in Fla. Stat. § 772.102(3), that engages in activities that constitute a pattern of criminal activity.

1199.   Korchagin, Touch of Health, TOH Management, Kovalenko, Hanson, Penza, Roldos, Pearce, Orlando Central Chiro, Fort Myers Chiro, and Complete Injury are employed by or associated with the CFL Medical Supplies enterprise.

1200.   In furtherance of the fraudulent scheme, Korchagin, Touch of Health, TOH Management, Kovalenko, Hanson, Penza, Roldos, Pearce, Orlando Central Chiro, Fort Myers Chiro, and Complete Injury submitted or caused to be submitted hundreds of fraudulent bills through CFL Medical Supplies to GEICO seeking payment under automobile insurance policies issued by GEICO to Florida Insureds.

1201. When the billing was submitted, Korchagin, Touch of Health, TOH Management, Kovalenko, Hanson, Penza, Roldos, Pearce, Orlando Central Chiro, Fort Myers

Chiro, and Complete Injury knew that the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) CFL Medical Supplies unlawfully was operated in violation of the HME Licensing Laws, the Patient Brokering Act, the Anti-Kickback Statute, and Chiropractor Advertising Laws; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

1202.   These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

1203.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $120,000.00 pursuant to the fraudulent bills submitted through the CFL Medical Supplies enterprise.

1204.   By reason of Korchagin, Touch of Health, TOH Management, Kovalenko, Hanson, Penza, Roldos, Pearce, Orlando Central Chiro, Fort Myers Chiro, and Complete Injury's conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

**FORTY-SECOND CAUSE OF ACTION**
**Against CFL Medical Supplies, Korchagin, TOH Management, and Kovalenko**
**(Common Law Fraud)**

1205.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-82, 166-175, 189-197, 215-235, 304, 333, 819-840, and 886-896, above.

1206.   CFL Medical Supplies, Korchagin, TOH Management, and Kovalenko intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills through CFL Medical Supplies for the Fraudulent Services.

1207.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that that CFL Medical Supplies was in compliance with the HME Licensing Laws, the Patient Brokering Act, the Anti-Kickback Statute, and Chiropractor Advertising Laws, and eligible to collect PIP Benefits in the first instance, when in fact CFL Medical Supplies never was in compliance with the HME Licensing Laws, the Patient Brokering Act, the Anti-Kickback Statute, and Chiropractor Advertising Laws, and never was eligible to collect PIP Benefits; and (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement.

1208.   CFL Medical Supplies, Korchagin, TOH Management, and Kovalenko intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through CFL Medical Supplies that were not reimbursable.

1209.   GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $120,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by the CFL Medical Supplies Defendants through CFL Medical Supplies.

1210.   CFL Medical Supplies, Korchagin, TOH Management, and Kovalenko's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

1211.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### FORTY-THIRD CAUSE OF ACTION
**Against CFL Medical Supplies, Korchagin, TOH Management, and Kovalenko**
**(Unjust Enrichment)**

1212.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-82, 166-175, 189-197, 215-235, 304, 333, 819-840, and 886-896, above.

1213.   As set forth above, CFL Medical Supplies, Korchagin, TOH Management, and Kovalenko have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

1214.   When GEICO paid the bills and charges submitted or caused to be submitted by CFL Medical Supplies, Korchagin, TOH Management, and Kovalenko through CFL Medical Supplies, it reasonably believed that it was legally obligated to make such payments

based on CFL Medical Supplies, Korchagin, TOH Management, and Kovalenko's improper, unlawful, and/or unjust acts.

1215.   CFL Medical Supplies, Korchagin, TOH Management, and Kovalenko have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that CFL Medical Supplies, Korchagin, TOH Management, and Kovalenko voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

1216.   CFL Medical Supplies, Korchagin, TOH Management, and Kovalenko's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

1217.   By reason of the above, CFL Medical Supplies, Korchagin, TOH Management, and Kovalenko have been unjustly enriched in an amount to be determined at trial, but in no event less than $120,000.00.

## FORTY-FOURTH CAUSE OF ACTION
### Against Korchagin and Amponsah
### (Violation of RICO, 18 U.S.C. § 1962(c))

1218.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-86, 143-154, 189-197, 227-260, 841-885, and 886-896, above.

1219.   CFL MD is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

1220.   Korchagin and Amponsah knowingly have conducted and/or participated, directly or indirectly, in the conduct of CFL MD's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted dozens of fraudulent charges on a continuous basis for over six months seeking payments that CFL MD

was not eligible to receive under the No-Fault Law because: (i) CFL MD unlawfully was operated in violation of the Clinic Act and the Patient Brokering Act; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

1221.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "7".

1222.   CFL MD's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Korchagin and Amponsah operated CFL MD, inasmuch as CFL MD was not engaged in a legitimate health care practice, and acts of mail fraud therefore were essential in order for CFL MD to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through CFL MD to the present day.

1223.   CFL MD is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by CFL MD in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

1224.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $13,000.00 pursuant to the fraudulent bills submitted through CFL MD.

### FORTY-FIFTH CAUSE OF ACTION
**Against Korchagin, TOH Management, Amponsah, and Ball**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

1225.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-86, 143-154, 189-197, 227-260, 841-885, and 886-896, above.

1226.   CFL MD is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

1227.   Korchagin, TOH Management, Amponsah, and Ball are employed by or associated with the CFL MD enterprise.

1228.   Korchagin, TOH Management, Amponsah, and Ball knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of CFL MD's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted dozens of fraudulent charges on a continuous basis for over six months seeking payments that CFL MD was not eligible to receive under the No-

Fault Law because: (i) CFL MD unlawfully was operated in violation of the Clinic Act and the Patient Brokering Act; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

1229.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "7". Each such mailing was made in furtherance of the mail fraud scheme.

1230.   Korchagin, TOH Management, Amponsah, and Ball knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

1231.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $13,000.00 pursuant to the fraudulent bills submitted through the CFL MD enterprise.

1232.  By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## FORTY-SIXTH CAUSE OF ACTION
### Against CFL MD, Korchagin, TOH Management, Amponsah, and Ball
### (Under Fla. Stat. 501.201 et. seq.)

1233.  GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-86, 143-154, 189-197, 227-260, 841-885, and 886-896, above.

1234.  CFL MD, Korchagin, TOH Management, Amponsah, and Ball are actively engaged in trade and commerce in the State of Florida.

1235.  GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

1236.  CFL MD, Korchagin, TOH Management, Amponsah, and Ball engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally-obtain PIP Benefits from GEICO.

1237.  The bills and supporting documents submitted by CFL MD, Korchagin, TOH Management, Amponsah, and Ball to GEICO in connection with the Fraudulent Services were fraudulent in that they misrepresented: (i) CFL MD's eligibility to collect PIP Benefits in the first instance; and (ii) that the Fraudulent Services were lawfully provided.

1238.  Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous.   Additionally, the conduct of CFL MD, Korchagin, TOH Management, Amponsah, and Ball has been materially injurious to GEICO and its Insureds.

1239.  The conduct of CFL MD, Korchagin, TOH Management, Amponsah, and Ball was the actual and proximate cause of the damages sustained by GEICO.

1240.   CFL MD, Korchagin, TOH Management, Amponsah, and Ball's unfair and deceptive acts have caused GEICO to sustain damages of at least $13,000.00.

1241.   By reason of CFL MD, Korchagin, TOH Management, Amponsah, and Ball's conduct, GEICO is also entitled to recover costs, and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

### FORTY-SEVENTH CAUSE OF ACTION
#### Against Korchagin and Amponsah
#### (Under Fla. Stat. 772.103(3))

1242.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-86, 143-154, 189-197, 227-260, 841-885, and 886-896, above.

1243.   CFL MD is an ongoing "enterprise," as that term is defined in Fla. Stat. § 772.102(3), that engages in activities that constitute a pattern of criminal activity.

1244.   Korchagin and Amponsah knowingly have conducted and/or participated, directly or indirectly, in the conduct of CFL MD' affairs through a pattern of criminal activity consisting of repeated acts constituting insurance fraud in violation of Fla. Stat. § 817.234(1)(a), by submitting or causing to be submitted dozens of fraudulent bills to GEICO seeking payment under automobile insurance policies issued by GEICO to Florida Insureds, when the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) CFL MD unlawfully was operated in violation of the Clinic Act and the Patient Brokering Act; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the

Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

1245.   These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

1246.   CFL MD is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by CFL MD in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

1247.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $13,000.00 pursuant to the fraudulent bills submitted through the CFL MD enterprise.

1248.   By reason of Korchagin and Amponsah's conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

**FORTY-EIGHTH CAUSE OF ACTION**
**Against Korchagin, TOH Management, Amponsah, and Ball**
**(Under Fla. Stat. 772.103(4))**

1249.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-86, 143-154, 189-197, 227-260, 841-885, and 886-896, above.

1250.   CFL MD is an ongoing "enterprise," as that term is defined in Fla. Stat. § 772.102(3), that engages in activities that constitute a pattern of criminal activity.

1251.   Korchagin, TOH Management, Amponsah, and Ball are employed by or associated with the CFL MD enterprise.

1252.   In furtherance of the fraudulent scheme, Korchagin, TOH Management, Amponsah, and Ball submitted or caused to be submitted dozens of fraudulent bills through CFL MD to GEICO seeking payment under automobile insurance policies issued by GEICO to Florida Insureds.

1253.   When the billing was submitted, Korchagin, TOH Management, Amponsah, and Ball knew that the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) CFL MD unlawfully was operated in violation of the Clinic Act and the Patient Brokering Act; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

1254.   These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

1255.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $13,000.00 pursuant to the fraudulent bills submitted through the CFL MD enterprise.

1256.   By reason of Korchagin, TOH Management, Amponsah, and Ball's conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

<u>**FORTY-NINTH CAUSE OF ACTION**</u>
**Against CFL MD, Korchagin, TOH Management, Amponsah, and Ball**
**(Common Law Fraud)**

1257.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-86, 143-154, 189-197, 227-260, 841-885, and 886-896, above.

1258.   CFL MD, Korchagin, TOH Management, Amponsah, and Ball intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of dozens of fraudulent bills through CFL MD for the Fraudulent Services.

1259.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that that CFL MD was in compliance with the Clinic Act and the Patient Brokering Act, and eligible to collect PIP Benefits in the first instance, when in fact CFL MD never was in compliance with the Clinic Act and the Patient Brokering Act, and never was eligible to collect PIP Benefits; and (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement.

378

1260.   CFL MD, Korchagin, TOH Management, Amponsah, and Ball intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through CFL MD that were not reimbursable.

1261.   GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $13,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by the CFL MD Defendants through CFL MD.

1262.   CFL MD, Korchagin, TOH Management, Amponsah, and Ball's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

1263.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**FIFTIETH CAUSE OF ACTION**
**Against CFL MD, Korchagin, TOH Management, Amponsah, and Ball**
**(Unjust Enrichment)**

1264.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-86, 143-154, 189-197, 227-260, 841-885, and 886-896, above.

1265.   As set forth above, CFL MD, Korchagin, TOH Management, Amponsah, and Ball have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

1266.   When GEICO paid the bills and charges submitted or caused to be submitted by CFL MD, Korchagin, TOH Management, Amponsah, and Ball through CFL MD, it reasonably believed that it was legally obligated to make such payments based on CFL MD, Korchagin, TOH Management, Amponsah, and Ball's improper, unlawful, and/or unjust acts.

1267.   CFL MD, Korchagin, TOH Management, Amponsah, and Ball have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that CFL MD, Korchagin, TOH Management, Amponsah, and Ball voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

1268.   CFL MD, Korchagin, TOH Management, Amponsah, and Ball's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

1269.   By reason of the above, CFL MD, Korchagin, TOH Management, Amponsah, and Ball have been unjustly enriched in an amount to be determined at trial, but in no event less than $13,000.00.

### FIFTY-FIRST CAUSE OF ACTION
#### Against Korchagin, Hanson, Kovalenko, and Amponsah
#### (Violation of RICO, 18 U.S.C. § 1962(c)),

1270.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-866, above.

1271.   Touch of Health, CFL Diagnostic, CFL Medical Supplies, CFL MD, Orlando Central Chiro, and Fort Myers Chiro together constitute an association-in-fact "enterprise" (the "TOH Fraud Enterprise") as that term is defined in 18 U.S.C. § 1961(4), that engages in, and the activities of which affect, interstate commerce. The members of the TOH Fraud Enterprise are and have been associated through time, joined in purposed and organized in a

manner amenable to hierarchal and consensual decision making, with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose. Specifically, Touch of Health, CFL Diagnostic, CFL Medical Supplies, CFL MD, Orlando Central Chiro, and Fort Myers Chiro ostensibly are independent businesses – with different names and tax identification numbers – that were created as vehicles to achieve a common purpose – namely, to facilitate the submission of fraudulent charges to GEICO. The TOH Fraud Enterprise has been operated under seven separate names and tax identification numbers in order to reduce the number of bills submitted under any individual name, in an attempt to avoid attracting the attention and scrutiny of GEICO and other insurers to the volume of billing and the pattern of fraudulent charges originating from any one business.  Accordingly, the carrying out of this scheme would be beyond the capacity of each member of the TOH Fraud Enterprise acting singly or without the aid of each other.

1272.  The TOH Fraud Enterprise is distinct from and has an existence beyond the pattern of racketeering that is described herein, namely by recruiting, employing overseeing and coordinating many professionals and non-professionals who have been responsible for facilitating and performing a wide variety of administrative and professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to GEICO and other insurers), by creating and maintaining patient files and other records, by recruiting and supervising personnel, by negotiating and executing various contracts, by maintaining the bookkeeping and accounting functions necessary to manage the receipt and distribution of the insurance proceeds, and by retaining collection lawyers whose services also were used to generate payments from insurance companies to support all of the aforesaid functions.

1273.   Korchagin, Hanson, Kovalenko, and Amponsah each has been employed by and/or associated with the TOH Fraud Enterprise.

1274.   Korchagin, Hanson, Kovalenko, and Amponsah knowingly have conducted and/or participated, directly or indirectly, in the conduct of the TOH Fraud Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over three years seeking payments that Touch of Health, CFL Diagnostic, CFL Medical Supplies, CFL MD, Orlando Central Chiro, and Fort Myers Chiro were not eligible to receive under the No-Fault Law because: (i) they were unlawfully operated in violation of the Clinic Act, the Patient Brokering Act, the Anti-Kickback Statute, the HME Licensing Laws, and Chiropractor Advertising Laws; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the charts annexed hereto as Exhibits "1" – "7".

1275.   The TOH Fraud Enterprise's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Korchagin, Hanson, Kovalenko, and Amponsah operated the TOH Fraud Enterprise, insofar as the enterprise is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for the enterprise to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Touch of Health, CFL Diagnostic, CFL Medical Supplies, CFL MD, Orlando Central Chiro, and Fort Myers Chiro to the present day.

1276.   The TOH Fraud Enterprise is engaged in in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by the TOH Fraud Enterprise in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent PIP billing.

1277.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,290,000.00 pursuant to the fraudulent bills submitted through the PC Defendants.

1278.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**FIFTY-SECOND CAUSE OF ACTION**
**Against Korchagin, Amponsah, Kovalenko, Hanson, TOH Management, Penza,**
**Roldos, Biondi, Vega, Mohammadi, Kabushinskaya, Arocho, Pearce,**
**Klochko, 855LEGAL4U, Aleksandrova, and Complete Injury**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

1279.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-896, above.

1280.   Korchagin, Amponsah, Kovalenko, Hanson, TOH Management, Penza, Roldos, Biondi, Vega, Mohammadi, Kabushinskaya, Arocho, Pearce, Klochko, 855LEGAL4U, Aleksandrova, and Complete Injury are employed by and/or associated with the TOH Fraud Enterprise.

1281.   Korchagin, Amponsah, Kovalenko, Hanson, TOH Management, Penza, Roldos, Biondi, Vega, Mohammadi, Kabushinskaya, Arocho, Pearce, Klochko, 855LEGAL4U, Aleksandrova, and Complete Injury knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the TOH Fraud Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over three years seeking payments that Touch of Health, CFL Diagnostic, CFL Medical Supplies, CFL MD, Orlando Central Chiro, and Fort Myers Chiro were not eligible to receive under the No-Fault Law because: (i) they were unlawfully operated in violation of the Clinic Act, the Patient Brokering Act, the Anti-Kickback Statute, the HME Licensing Laws, and Chiropractor Advertising Laws; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were not medically necessary and were

provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the charts annexed hereto as Exhibits "1" – "7".

1282.  Korchagin, Amponsah, Kovalenko, Hanson, TOH Management, Penza, Roldos, Biondi, Vega, Mohammadi, Kabushinskaya, Arocho, Pearce, Klochko, 855LEGAL4U, Aleksandrova, and Complete Injury knew of, agreed to, and acted in furtherance of the common overall objective of the TOH Fraud Enterprise (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

1283.  GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,290,000.00 pursuant to the fraudulent bills submitted through Touch of Health, CFL Diagnostic, CFL Medical Supplies, CFL MD, Orlando Central Chiro, and Fort Myers Chiro.

1284.  By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## JURY DEMAND

1285.   Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. demand that a Judgment be entered in their favor:

A.      On the First Cause of Action against Touch of Health, Central Florida Chiro, Orlando Central Chiro, Fort Myers Chiro, CFL Diagnostic, CFL Medical Supplies, and CFL MD, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Touch of Health, Central Florida Chiro, Orlando Central Chiro, Fort Myers Chiro, CFL Diagnostic, CFL Medical Supplies, and CFL MD have no right to receive payment for any pending bills submitted to GEICO;

B.      On the Second Cause of Action against Korchagin, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $350,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.      On the Third Cause of Action against Korchagin, TOH Management, Hanson, Penza, Roldos, Biondi, Kabushinskaya, Klochko, 855LEGAL4U, Aleksandrova, and Complete Injury, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $350,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.      On the Fourth Cause of Action against Touch of Health, Korchagin, TOH Management, Hanson, Penza, Roldos, Biondi, Kabushinskaya, and Klochko, compensatory damages in an amount to be determined at trial but in excess of $350,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

E.      On the Fifth Cause of Action against Korchagin, compensatory damages in an amount to be determined at trial but in excess of $350,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

F.      On the Sixth Cause of Action against Korchagin, TOH Management, Hanson, Penza, Roldos, Biondi, Kabushinskaya, Klochko, 855LEGAL4U, Aleksandrova, and Complete Injury, compensatory damages in an amount to be determined at trial but in excess of $350,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

G.      On the Seventh Cause of Action against Touch of Health, Korchagin, TOH Management, Hanson, Penza, Roldos, Biondi, Kabushinskaya, and Klochko, compensatory damages in an amount to be determined at trial but in excess of $350,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

H.      On the Eighth Cause of Action against Touch of Health, Korchagin, TOH Management, Hanson, Penza, Roldos, Biondi, Kabushinskaya, and Klochko, more than $350,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

I.      On the Ninth Cause of Action against Hanson, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,480,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

J.      On the Tenth Cause of Action against Hanson, Vega, and Arocho, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,480,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

K.      On the Eleventh Cause of Action against Central Florida Chiro, Hanson, Vega, and Arocho, compensatory damages in an amount to be determined at trial but in excess of $1,480,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

L.      On the Twelfth Cause of Action against Hanson, compensatory damages in an amount to be determined at trial but in excess of $1,480,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

M.      On the Thirteenth Cause of Action against Hanson, Vega, and Arocho, compensatory damages in an amount to be determined at trial but in excess of $1,480,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

N.      On the Fourteenth Cause of Action against Central Florida Chiro, Hanson, Vega, and Arocho, compensatory damages in an amount to be determined at trial but in excess

of $1,480,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

O.    On the Fifteenth Cause of Action against Central Florida Chiro, Hanson, Vega, and Arocho, more than $1,480,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

P.    On the Sixteenth Cause of Action against Korchagin and Hanson, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $570,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

Q.    On the Seventeenth Cause of Action against Korchagin, TOH Management, Hanson, Vega, Arocho, Mohammadi, and Complete Injury, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $570,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

R.    On the Eighteenth Cause of Action against Orlando Central Chiro, Korchagin, TOH Management, Hanson, Vega, Mohammadi, and Arocho, compensatory damages in an amount to be determined at trial but in excess of $570,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

S.    On the Nineteenth Cause of Action against Korchagin and Hanson, compensatory damages in an amount to be determined at trial but in excess of $570,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

T.      On the Twentieth Cause of Action against Korchagin, TOH Management, Hanson, Vega, Arocho, Mohammadi, and Complete Injury, compensatory damages in an amount to be determined at trial but in excess of $570,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

U.      On the Twenty-First Cause of Action against Orlando Central Chiro, Korchagin, TOH Management, Hanson, Vega, Mohammadi, and Arocho, compensatory damages in an amount to be determined at trial but in excess of $570,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

V.      On the Twenty-Second Cause of Action against Orlando Central Chiro, Korchagin, TOH Management, Hanson, Vega, Mohammadi, and Arocho, more than $570,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

W.      On the Twenty-Third Cause of Action against Korchagin and Hanson, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $87,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

X.      On the Twenty-Fourth Cause of Action against Korchagin, TOH Management, Hanson, Pearce, and Complete Injury, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $87,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

Y.      On the Twenty-Fifth Cause of Action against Fort Myers Chiro, Korchagin, TOH Management, Hanson, and Pearce, compensatory damages in an amount to be determined at trial but in excess of $87,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

Z.      On the Twenty-Sixth Cause of Action against Korchagin and Hanson, compensatory damages in an amount to be determined at trial but in excess of $87,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

AA.     On the Twenty-Seventh Cause of Action against Korchagin, TOH Management, Hanson, Pearce, and Complete Injury, compensatory damages in an amount to be determined at trial but in excess of $87,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

BB.     On the Twenty-Eighth Cause of Action against Fort Myers Chiro, Korchagin, TOH Management, Hanson, and Pearce, compensatory damages in an amount to be determined at trial but in excess of $87,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

CC.     On the Twenty-Ninth Cause of Action against Fort Myers Chiro, Korchagin, TOH Management, Hanson, and Pearce, more than $87,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

DD.     On the Thirtieth Cause of Action against Korchagin and Kovalenko, compensatory damages in favor of GEICO in an amount to be determined at trial but in

excess of $150,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

EE.     On the Thirty-First Cause of Action against Korchagin, Touch of Health, TOH Management, Kovalenko, Amponsah, Hanson, Penza, Roldos, Pearce, Orlando Central Chiro, Fort Myers Chiro, and Complete Injury, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $150,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

FF.     On the Thirty-Second Cause of Action against CFL Diagnostic, Korchagin, TOH Management, Kovalenko, and Amponsah, compensatory damages in an amount to be determined at trial but in excess of $150,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

GG.     On the Thirty-Third Cause of Action against Korchagin and Kovalenko, compensatory damages in an amount to be determined at trial but in excess of $150,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

HH.     On the Thirty-Fourth Cause of Action against Korchagin, Touch of Health, TOH Management, Kovalenko, Amponsah, Hanson, Penza, Roldos, Pearce, Orlando Central Chiro, Fort Myers Chiro, and Complete Injury, compensatory damages in an amount to be determined at trial but in excess of $150,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

II.     On the Thirty-Fifth Cause of Action against CFL Diagnostic, Korchagin, TOH Management, Kovalenko, and Amponsah, compensatory damages in an amount to be

determined at trial but in excess of $150,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

JJ.     On the Thirty-Sixth Cause of Action against CFL Diagnostic, Korchagin, TOH Management, Kovalenko, and Amponsah, more than $150,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

KK.     On the Thirty-Seventh Cause of Action against Korchagin and Kovalenko, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $120,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

LL.     On the Thirty-Eighth Cause of Action against Korchagin, TOH Management, Kovalenko, Hanson, Penza, Roldos, Pearce, Orlando Central Chiro, Fort Myers Chiro, and Complete Injury, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $120,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

MM.     On the Thirty-Ninth Cause of Action against CFL Medical Supplies, Korchagin, TOH Management, and Kovalenko, compensatory damages in an amount to be determined at trial but in excess of $120,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

NN.     On the Fortieth Cause of Action against Korchagin and Kovalenko, compensatory damages in an amount to be determined at trial but in excess of $120,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

OO.    On the Forty-First Cause of Action against Korchagin, TOH Management, Kovalenko, Hanson, Penza, Roldos, Pearce, Orlando Central Chiro, Fort Myers Chiro, and Complete Injury, compensatory damages in an amount to be determined at trial but in excess of $120,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

PP.    On the Forty-Second Cause of Action against CFL Medical Supplies, Korchagin, TOH Management, and Kovalenko, compensatory damages in an amount to be determined at trial but in excess of $120,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

QQ.    On the Forty-Third Cause of Action against CFL Medical Supplies, Korchagin, TOH Management, and Kovalenko, more than $120,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

RR.    On the Forty-Fourth Cause of Action against Korchagin and Amponsah, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $13,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

SS.    On the Forty-Fifth Cause of Action against Korchagin, TOH Management, Amponsah, and Ball, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $13,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

TT.    On the Forty-Sixth Cause of Action against CFL MD, Korchagin, TOH Management, Amponsah, and Ball, compensatory damages in an amount to be determined at

trial but in excess of $13,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

UU.   On the Forty-Seventh Cause of Action against Korchagin and Amponsah, compensatory damages in an amount to be determined at trial but in excess of $13,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104

VV.   On the Forty-Eighth Cause of Action against Korchagin, TOH Management, Amponsah, and Ball, compensatory damages in an amount to be determined at trial but in excess of $13,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

WW.   On the Forty-Ninth Cause of Action against CFL MD, Korchagin, TOH Management, Amponsah, and Ball, compensatory damages in an amount to be determined at trial but in excess of $13,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

XX.   On the Fiftieth Cause of Action against CFL MD, Korchagin, TOH Management, Amponsah, and Ball, more than $13,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

YY.   On the Fifty-First Cause of Action against Korchagin, Kovalenko, Hanson, and Amponsah, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,290,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest; and

ZZ.    On the Fifty-Second Cause of Action against Korchagin, Amponsah, Kovalenko, Hanson, TOH Management, Penza, Roldos, Biondi, Vega, Mohammadi, Kabushinskaya, Arocho, Pearce, Klochko, 855LEGAL4U, Aleksandrova, and Complete Injury compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,290,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest.

Dated: February 27, 2020

*/s/ John P. Marino*
John P. Marino (FBN 814539)
Lindsey R. Trowell (FBN 678783)
Kristen L. Wenger (FBN 92136)
SMITH, GAMBRELL & RUSSELL, LLP
50 North Laura Street, Suite 2600
Jacksonville, Florida 32202
Phone:  (904) 598-6100
Facsimile:  (904) 598-6204
ltrowell@sgrlaw.com
jmarino@sgrlaw.com
kwenger@sgrlaw.com

Steven T. Henesy (*pro hac vice* pending)
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11550
Phone:  (516) 357-3000
Facsimile:  (516) 357-3333
Steven.henesy@rivkin.com

*Counsel for Plaintiffs*
